**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiff*
*The Arbitrage Fund*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE ARBITRAGE FUND, individually and on behalf of all others similarly situated, | CASE NO: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| THE TORONTO-DOMINION BANK, BHARAT B. MASRANI, KELVIN VI LUAN TRAN, and LEO SALOM, | **DEMAND FOR A JURY TRIAL** |
| Defendants. | |

Plaintiff The Arbitrage Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by The Toronto-Dominion Bank ("TD Bank" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on TD Bank's website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## **<u>NATURE OF THE ACTION</u>**

1.     This is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired securities of First Horizon Corporation ("First Horizon") between February 28, 2022 and May 3, 2023, inclusive (the "Class Period"), against TD Bank and certain of its officers (collectively "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act").  This action concerns statements made by, or on behalf of, TD Bank to the investing public regarding TD Bank's ability to timely

close a business combination with First Horizon – a combination that was ultimately abandoned.

2.    TD Bank is a Canadian financial institution with U.S. headquarters in this District that has been expanding its presence within the United States retail banking industry since 2005. TD Bank has recently grown via acquisition, having successfully completed at least ten acquisitions between 2016 and 2021. TD Bank's shares are traded on the New York Stock Exchange (the "NYSE"), and TD Bank makes necessary public filings with the SEC.

3.    First Horizon is a Memphis, Tennessee-based bank holding company whose shares are publicly traded on the NYSE. First Horizon operates over 427 banking centers in twelve states, mostly within the Southeastern United States. As of December 31, 2021, First Horizon had $89 billion in total assets.

4.    On February 28, 2022, TD Bank announced via a press release that it had entered into an agreement to purchase First Horizon for $13.4 billion in cash, easily TD Bank's largest potential acquisition to date. The acquisition would make TD Bank the sixth-largest U.S. bank in terms of assets, and significantly expand the Company's footprint within the Southeastern United States.

5.    The acquisition called for TD Bank to pay $25 per share for First Horizon, which represented a 37% premium to First Horizon's share price from the prior trading day. The press release also explained two additional provisions relating

to the timing of the transaction.  First, if the transaction did not close within nine months, *i.e.*, before November 27, 2022, TD Bank would provide additional compensation to First Horizon shareholders, namely: "First Horizon shareholders will receive, at closing, an additional US$0.65 per share on an annualized basis for the period from November 27, 2022 through the day immediately prior to the closing."  Second, if the transaction did not close within a year, *i.e.*, by February 27, 2023, "[t]he transaction will terminate, unless otherwise extended."  The transaction could be extended by either party until May 27, 2023, but any future extensions required mutual consent.

6.     The news of the potential acquisition caused First Horizon shares to surge to a Class Period high closing price of $24.64 on February 15, 2023.

7.     In the February 28, 2022 press release announcing the First Horizon acquisition, TD Bank explained it entered into the deal because First Horizon and TD Bank shared an "aligned culture and ***risk management framework***."[1]  In a slide show made public that day and provided directly to First Horizon shareholders via a proxy filing on Schedule 14A, TD Bank told investors: "***Like TD***, ***First Horizon has a strong team with a growth mindset and a disciplined risk culture***."

8.     The "disciplined risk culture" at TD Bank that Defendants touted as a catalyst for the deal included a dedicated Global Anti-Money Laundering

---

[1] All emphasis herein is added unless otherwise noted.

("GAML") Department, along with a global chief anti-money laundering officer, all directly overseen by TD Bank's Audit Committee.  Indeed, the Code of Conduct and Ethics available on TD Bank's website throughout the Class Period, and filed with the SEC on February 7, 2022 and February 14, 2023, claimed that "***TD is committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so***."

9.     Given TD Bank's "disciplined risk culture," Defendants repeatedly claimed they expected the transaction to close, with all necessary regulatory approvals, in the first quarter of 2023.  On a conference call held to discuss the transaction on February 28, 2022, analysts expressed skepticism that U.S. regulators would approve the deal in such a fast time frame.  In response, Defendant Bharat Masrani, TD Bank's Chief Executive Officer ("CEO"), confirmed that "***[w]e at TD pride ourselves in having excellent regulatory relationships***," and confirmed TD Bank's "expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023.  So our expectation is that ***this will get approved and get closed around the 9-month mark***."

10.    Later, during an August 2, 2022 conference call, an analyst directly questioned whether TD Bank knew of any "regulatory or other issues that may delay the deal."  In response, CEO Masrani unequivocally stated: "***No. I have no reason to believe that*** . . . . ***It is following its normal process within the US regulatory***

4

*requirements*."  Masrani confirmed: "*[we] feel comfortable that [it] is proceeding at the pace we expected and we are hoping that we can close it within the timeline we have stipulated*."  Similarly, in response to an analyst question during an August 25, 2022 earnings call about potential delays in the First Horizon acquisition, Masrani emphatically stated: "*Our deal continues to progress in the normal course. There is nothing out there to suggest that is different this time around*."

11.    Next, during a September 14, 2022 analyst conference call, Defendant Leo Salom, the head of TD Bank's U.S. banking operations, quashed concerns about regulatory delay of the First Horizon transaction by explaining: "I'm sure there's going to be a lot of questions about how confident are we? We're extremely *confident . . . if you look at the strength of the [regulatory] application, we're quite excited about getting this done in short order*."

12.    On December 1, 2022, TD Bank announced that the First Horizon transaction would not close during the first quarter of 2023, but assured investors that there was no cause for concern.  Indeed, in response to an analyst question of whether the delay was because U.S. regulators were "taking a closer look at anything," CEO Masrani retorted: "*No I'm not aware of anything of the sort you're mentioning*."

13.    TD's statements were false and misleading, and TD Bank failed to disclose material information to the market that it had deficient internal controls that

5

posed a significant risk to the closing of the First Horizon transaction.  Specifically, TD Bank suffered from grossly ineffective internal controls regarding anti-money-laundering practices and failed to appropriately report unusual transactions or suspicious activity to U.S. regulators.  Indeed, according to a report published by *The Wall Street Journal*, in "recent years," TD Bank only "flagged 28 customer transactions" as suspicious.  As a result, the Office of the Comptroller of the Currency (the "OCC") and the U.S. Federal Reserve refused to approve the transaction within the necessary time frames.

14.    The market began to learn the truth on March 1, 2023, when First Horizon noted in its annual filing on Form 10-K that TD Bank was unable to timely close the transaction because it could not obtain the necessary regulatory approvals.  Indeed, the filing made clear that TD Bank had previously extended the outside closing date to May 27, 2023, but had recently informed First Horizon that TD Bank was unable to close the transaction even by that late date.  The Form 10-K also noted that "***TD cannot provide a new projected closing date at this time***."  In response to these revelations, the price of First Horizon shares dropped 10.6%, from a close of $24.77 per share on February 28, 2023, to a close of $22.14 per share on March 1, 2023.

15.    Then, before the markets opened on May 4, 2023, First Horizon and TD Bank announced they had agreed to terminate the transaction.  A press release

announcing the termination explained that "TD informed First Horizon that TD does not have a timetable for regulatory approvals to be obtained . . . [and] [b]ecause there is **uncertainty as to when and if these regulatory approvals can be obtained**." Indeed, during a First Horizon investor call that day, First Horizon CEO Bryan Jordan explained to investors that TD Bank "**could not provide assurance of regulatory approval in 2023 or 2024**." Jordan also made clear that the regulatory hold up was "**unrelated to First Horizon [as] there are no restrictions on our ability to operate the bank as we have for the last 159 years**." As a result of these disclosures, the price of First Horizon shares dropped 33%, from a closing price of $15.05 per share on May 3, 2023, to $10.06 per share on May 4, 2023.

16.     Analysts were shocked and immediately questioned TD Bank's regulatory compliance. Indeed, an analyst with RBC Capital markets commented, "We may never know the precise reasons for the regulatory resistance, but it **must [be] more serious than we had assumed**, and we therefore believe TD's future ability to close U.S. deals may be in doubt and **TD's credibility as an acquirer has been dealt a blow**." Importantly, the analyst posited that the regulatory issues were TD Bank specific as the analyst would "assume other [Canadian] banks in our universe can/will continue to look at U.S. acquisitions." Soon thereafter, *The Wall Street Journal*, *Reuters*, and *Bloomberg News* reported that TD Bank's inability to obtain regulatory approval for the transaction was due to U.S. regulators'

"reluctance" to give TD Bank "a clean bill of health on its anti-money-laundering practices."

17.     As a result of Defendants' wrongful acts, misleading statements, and omissions, and the precipitous decline in the market value of First Horizon's securities Plaintiff and other Class members, as defined below, have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as TD Bank's U.S. headquarters are located within this District and a significant portion of the damages from Defendants' actions took place within this District.  Further, because First Horizon's shares trade on the NYSE, there are presumably hundreds, if not thousands, of investors in First Horizon securities located within the United States, some of whom undoubtedly reside in this Judicial District.

21.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

22.    Plaintiff The Arbitrage Fund is an investment fund formed on September 17, 2000, and organized under Delaware law.  The Arbitrage Fund is advised by Water Island Capital, LLC, a New York domiciled SEC registered entity. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased First Horizon securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or omissions of material facts alleged herein.

23.    Defendant TD Bank together with its subsidiaries, provides various personal and commercial banking products and services in Canada, the United States, and internationally.  TD Bank is incorporated under the laws of Canada and operates through four segments: (i) Canadian Personal and Commercial Banking, (ii) U.S. Retail, (iii) Wealth Management and Insurance, and (iv) Wholesale Banking.  TD Bank has its U.S. headquarters in Cherry Hill, New Jersey, and TD Bank's U.S. Retail subsidiary, TD Bank, N.A., also is headquartered at Cherry Hill,

New Jersey.  The Company's shares trade on the NYSE under the ticker symbol "TD."

24.     Defendant Bharat B. Masrani ("Masrani") has served as the Company's Group President and CEO throughout the Class Period.

25.     Defendant Kelvin Vi Luan Tran ("Tran") has served as the Company's Group Head and Chief Financial Officer ("CFO") since September 1, 2021.

26.     Defendant Leo Salom ("Salom") has served as the Company's Group Head, U.S. Retail, TD Bank Group and President and CEO of TD Bank America's Most Convenient Bank® since early 2022.

27.     Defendants Masrani, Tran, and Salom (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of, *inter alia*, TD Bank's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive

10

representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

28.    TD Bank and the Individual Defendants are collectively referred to herein as "Defendants."

29.    Non-party First Horizon is a bank holding company incorporated in Tennessee with its principal place of business in Memphis, Tennessee. First Horizon common stock trades on the NYSE under the symbol "FHN."

## SUBSTANTIVE ALLEGATIONS

### Background

30.    In the years leading up to the Class Period, TD Bank had expanded its presence in the U.S. retail banking market. In less than 20 years operating within the U.S. retail banking market, TD Bank grew to become the tenth-largest U.S. bank, with locations along the Eastern Seaboard. For years, TD Bank discussed its plans to expand within the United States, and specifically in the Southeast region, which Defendant Masrani referred to as a "very attractive market."

31.    The Class Period begins on February 28, 2022, when TD Bank issued a press release, which it also filed with the SEC on Form 6-K, announcing that TD Bank had entered into an agreement to purchase First Horizon for $13.4 billion in cash. In announcing the transaction, Defendants claimed that "*[l]ike TD, First*

*Horizon has a strong team with a growth mindset and a disciplined risk culture*" and that the two companies were "***Culturally Aligned with Consistent Risk Frameworks***."

32.     TD Bank's "Risk Framework," which purportedly provided a basis for the transaction, was set forth in the Management's Discussion and Analysis for 2021 ("2021 MD&A") filed with the SEC on Form 40-F on December 2, 2021, and which was incorporated into TD Bank's Class Period filings on Form 6-K made on March 3, 2022, May 26, 2022, August 25, 2022.  According to 2021 MD&A, TD Bank's Audit Committee oversaw the "***the activities of the Bank's Global Anti-Money Laundering (GAML) group***."   The 2021 MD&A also claimed that "The GAML Department is responsible for regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and anti-bribery/anti-corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies ***so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated***."

33.     In addition, TD Bank had a Code of Conduct and Ethics ("Code of Conduct"), which was available on its website throughout the Class Period and was filed with the SEC on February 7, 2022 on Form 6-K.  The Code of Conduct unequivocally stated "***TD is committed to taking all reasonable and appropriate***

*steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so* . . . . We must not knowingly initiate or be party to money laundering and *must promptly report suspected money laundering situations in accordance with the TD Bank Group Enterprise Anti-Money Laundering and Anti-Terrorist Financing Policy and the escalation procedures established for our business or region*."

34.    Throughout the Class Period, Defendants continued to tout TD Bank's risk culture as both a reason for the transaction and a basis for TD Bank obtaining timely regulatory approvals for the deal.

**Defendants' Materially False and Misleading Statements
Issued During the Class Period**

35.    On February 28, 2022, TD Bank issued a press release, which it also filed with the SEC on Form 6-K, announcing the First Horizon transaction. According to the press release, "[t]hrough this financially compelling transaction, TD accelerates its long-term growth strategy in the United States by acquiring a premier regional bank with *an aligned culture and risk-management framework*."

36.    The press release also stated that the "*transaction is expected to close in the first quarter of TD's 2023 fiscal year, and is subject to customary closing conditions, including approvals from First Horizon's shareholders and U.S. and Canadian regulatory authorities*."

37.     TD Bank also issued a presentation regarding the First Horizon acquisition dated February 28, 2022.  The presentation was provided directly to First Horizon shareholders because TD Bank filed it with the SEC as a proxy statement on Schedule 14A as Soliciting Material under § 240.14a-12.  According to the presentation, "***[l]ike TD, First Horizon has a strong team with a growth mindset and a disciplined risk culture***."  Further, the presentation claimed the two companies were "***Culturally Aligned with Consistent Risk Frameworks***."

38.     Also on February 28, 2022, TD Bank held a conference call in connection with the announcement of the First Horizon acquisition.  A transcript of the conference call was provided directly to First Horizon shareholders because TD Bank filed it with the SEC as a proxy statement on Schedule 14A as Soliciting Material under § 240.14a-12.  On the call, an analyst noted that "there's a lot of sensitivity around regulatory approval process for M&A in the U.S," and asked about TD Bank's "comfort level on getting deal closing done" within nine months. Defendant Masrani responded:

> ***We at TD pride ourselves in having excellent regulatory relationships. We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking. So we will follow the customary regulatory requirements that you would expect us to do***. The structure here – there have been instances where some deals have been slightly delayed . . . ***But our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023. So our expectation is that this will get approved and get closed around the 9-month mark.***

39.     On the same call, another analyst asked about TD Bank's plan to timely close the transaction "given the size of the transaction and the sort of the situation of the Fed in the U.S., the probability of the delay is relatively high."  Masrani again recommitted to a timely closing and dismissed the suggestion that there was any basis that this deal was "unique" in terms of a potential delay:

> *[O]ur expectation is that we close by the first quarter, fiscal quarter of '23, which is before January 31. And then all these deals have extension rates of – in case the approvals are delayed or for whatever reason, we're not able to close during that time. It gets extended*. And then finally, there's a final extension as well, and that's just customary. *I don't think there's anything unique in this deal that you should be reading. Every deal we've done has had these provisions*.

40.     Later that week, on March 3, 2022, TD Bank issued a Report to Shareholders regarding its Q1 2022 results, which it publicly filed with the SEC on Form 6-K.   The Report to Shareholders incorporated the 2021 MD&A risk framework as alleged in Paragraph 32 above.  In addition, the Shareholder Report noted that the bank "takes risks required to build its business, but only if those risks . . . *do not risk harming the TD brand*."

41.     Also on March 3, 2022, TD Bank issued an investor presentation regarding its earnings for the first fiscal quarter of 2022 ended January 31, 2022.[2] The presentation discussed the recently announced First Horizon transaction and repeated the claim that "*[l]ike TD, First Horizon has a strong team with a growth*

---

[2] TD Bank's fiscal year runs from November 1 to October 31.

*mindset and a disciplined risk culture*."   In addition, TD Bank noted its "Proven Business Model," which "*[d]eliver[ed] consistent earnings growth, underpinned by a strong risk culture*" and its "*[d]iversification and scale, underpinned by a strong risk culture*."

42.    On March 7, 2022, TD Bank issued its 2022 investor proxy statement, which it filed with the SEC on Form 6-K.  In the proxy statement, TD Bank touted its risk culture and Code of Conduct:

**Risk Culture**

Risk culture is one of the attributes that is integral to the bank's overall organizational culture. It forms part of and is guided by the TD Culture Framework. The central oversight for culture at the bank is led by human resources in partnership with risk management and compliance. The risk committee engages with the CRO [Chief Risk Officer] to drive a proactive risk culture.

*The bank's risk culture starts with the "tone at the top" set by the board, CEO, and members of the [Senior Executive Team], and is supported by the bank's vision, purpose, and shared commitments, impacting a range of processes including objective setting and performance management*. These governing objectives describe the behaviours that the bank seeks to foster where the only risks taken are those that can be understood and managed.

*Ethical behaviour is a key component of the bank's risk culture. The bank's Code, which is reviewed and attested to by every board member and eligible employee on an annual basis, guides employees to make decisions that meet the highest standards of integrity, professionalism, and ethical behaviour*. To reinforce the importance of ethical behaviour, all incentive awards are subject to continued compliance with the Code.

43.     The proxy statement also promoted the actions taken by TD Bank's audit committee to ensure compliance with anti-money-laundering regulations. Indeed, the proxy statement proclaimed that, as part of its responsibilities, "***the audit committee meets on its own as well as separately with . . . [the] chief anti-money laundering officer . . . at each of its regularly scheduled quarterly meetings***." Furthermore, the audit committee had, in fact, "***[r]eceived updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions***."   In particular, the proxy statement avowed that, in connection with "Anti-Money Laundering/Terrorist Financing," the audit committee had taken the following actions over the prior year:

- ***Oversaw the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anticorruption program (AML program), including the related risk assessment***.

- ***Reviewed and approved the bank's AML department annual plan, including the bank's AML strategic priorities***.

- ***Received regular updates on the effectiveness of key controls, status of key initiatives, operational performance, top and emerging risks and regulatory developments***.

- ***Received regular updates from the bank's chief anti-money laundering officer and key executives from the project team on the status of key technology related projects to enhance operational effectiveness and efficiency***.

44.    On March 9, 2022, Defendant Kelvin Tran, TD Bank's CFO, participated in the RBC 2022 Global Financial Institutions Conference.  A transcript of the conference was provided directly to First Horizon shareholders on March 21, 2022, when TD Bank filed it with the SEC as a proxy statement on Schedule 14A as Soliciting Material under § 240.14a-12.  During the call, an analyst asked Defendant Tran whether there were "cultural differences" between TD Bank and First Horizon. Defendant Tran replied that "[i]f you look at their bank, they're locally rooted with a strong balance sheet and also *with the discipline risk culture*. *And that's what we're all about*."

45.    TD Bank provided further assurances regarding its anti-money laundering practices in the Bank Merger Act Application ("BMA Application") it filed with the OCC on March 21, 2022.  The BMA Application was submitted in connection with the First Horizon merger and was publicly available to shareholders on the OCC website.  TD Bank represented in the BMA Application that "[t]he [TD Bank] AML Program aligns with enterprise AML policies so that *the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated*."  It further noted that TD Bank appointed a Bank Secrecy Act Officer who "has unfettered access, and *reports regularly*, *to the appropriate Board committees and senior management on the overall effectiveness of the AML Program*."

46.     On April 14, 2022, Defendant Masrani issued remarks to TD Bank shareholders, which TD Bank made public to the investing market via its website. In his remarks, Masrani gave no indication that regulators would have any difficulty in approving the First Horizon acquisition, and instead stated that "*[w]ork is underway to obtain the required approvals, and we expect the transaction in the first quarter of fiscal 2023.  I look forward to introducing you to First Horizon's leaders this time next year*."

47.     On May 26, 2022, TD Bank issued a Report to Shareholders regarding its results for the second fiscal quarter of 2022, which it publicly filed with the SEC on Form 6-K.  The Report to Shareholders incorporated the 2021 MD&A risk framework as alleged in Paragraph 32 above.  In addition, the Shareholder Report repeated the claim that the Company "takes risks required to build its business, but only if those risks . . . *do not risk harming the TD brand*."

48.     In a May 26, 2022 investor presentation made publicly available via TD Bank's website, TD Bank reassured the market that it "*[d]eliver[ed] consistent earnings growth, underpinned by a strong risk culture*," and achieved "*[d]iversification and scale, underpinned by a strong risk culture.*"  The investor presentation also provided an update regarding the First Horizon acquisition.  It noted that TD Bank "*[f]iled all required regulatory applications in March with*

**Fed, OCC and OSFI, among others**," and that it "**[c]ontinue[d] to target close in Q1 FY2023, subject to receipt of regulatory and shareholder approvals**."

49.     TD Bank held an earnings call on May 26, 2022 to discuss its performance for Q2 2022.  During the call, Masrani again touted TD Bank's risk management culture.   In his prepared remarks, Masrani claimed, "**[w]ith our disciplined risk management approach and sustainable business model, TD is well positioned to face the challenges – and seize the opportunities – that lie ahead**."

50.     On the call, analysts were again focused on the timing of the First Horizon acquisition in light of the regulatory review.   In response to a question seeking TD Bank's "conviction level in terms of getting the deal through the regulatory sort of finish line," Masrani emphatically stated, "**we feel very comfortable, our process continues, and we did this transaction on the basis that it meets all the requirements of all the regulators. So, we continue to be comfortable and working hard to get it to closing**."   Similarly, in response to a question relating to regulatory approval of the transaction, Masrani professed to the market that "**I feel comfortable that not only will we close the transaction the way we have intended, but we'll have capital levels that will meet all regulatory requirements**."

51.    On August 2, 2022, TD Bank held a call to discuss its current acquisitions.  During the call, Masrani explicitly rejected the notion that there were any regulatory delays regarding the First Horizon acquisition:

**Ebrahim Poonawala**
BofA Securities – Analyst

And just one follow up, Bharat, on First Horizon. It's been about six months since the deal. ***Any reason you have to believe why the deal may not close as per the original timeline***, ***the regulatory or other issues that may delay the deal at this point***?

**Bharat B. Masrani**
Group President, CEO & Director

***No. I have no reason to believe that Ebrahim. It is following its normal process within the US regulatory requirements***. And we obviously cannot talk about our conversations with our regulators ***[we] feel comfortable that is proceeding at the pace we expected and we are hoping that we can close it within the timeline we have stipulated***.

52.    On August 25, 2022, TD Bank issued a Report to Shareholders regarding its results for the third fiscal quarter of 2022, which it publicly filed with the SEC on Form 6-K.  The Report to Shareholders incorporated the 2021 MD&A risk framework as alleged in Paragraph 32 above.  In addition, the Shareholder Report noted that the Company "takes risks required to build its business, but only if those risks . . . ***do not risk harming the TD brand***."  The shareholder report provided an update on the First Horizon acquisition.  It noted, "[l]ast week's public meeting before the joint [OCC] and the Federal Reserve Board was another important milestone in TD's ongoing work with community groups and regulators

to advance the approval process for the First Horizon transaction. ***TD continues to expect the transaction to close in the first quarter of fiscal 2023*** and looks forward to welcoming First Horizon customers and associates to the Bank."

53.     In an August 25, 2022 investor presentation made publicly available via TD Bank's website, TD Bank repeated its claim that it "***[d]eliver[ed] consistent earnings growth, underpinned by a strong risk culture***," and achieved "***[d]iversification and scale, underpinned by a strong risk culture***." The investor presentation also provided an update regarding the First Horizon acquisition. It noted that there was a "Fed and OCC joint public meeting on August 18th," that TD Bank would "***[c]ontinue to work with regulators through the normal course application process***," and that the "***[t]ransaction close [was] expected in Q1 FY2023, subject to receipt of regulatory approvals***."

54.     TD Bank held an earnings call on August 25, 2022 to discuss its performance for Q3 2022 at which Masrani touted TD Bank's strong risk framework. He noted that TD Bank's strong quarterly results "reflect the benefits of our diversified business mix and North American scale***, while maintaining our risk discipline***." With regard to the First Horizon acquisition, Masrani confirmed that he "***continue[d] to expect the transaction to close in the first quarter of our fiscal 2023***," and again denied that there was any concern for regulatory delay. For example, in response to an analyst question whether "there [is] any risk like in terms

of a deal delay," Masrani replied, "*[o]ur deal continues to progress in the normal course. There is nothing out there to suggest that is different this time around*."

55.     On September 14, 2022, Leo Salom, the head of TD Bank's American banking operations joined the Barclays Global Financial Services Conference and confirmed, "*[w]e do expect to close the [First Horizon] transaction at the end of the fiscal first quarter.  And we're tracking well against that*."  Indeed, Salom directly addressed the regulatory approval process and denied that there were any problems from TD Bank's end:

> [O]n August 18th we had the public hearing, the OCC, the Fed hosted. That is the normal part of the application process. But to your point, ***I'm sure there's going to be a lot of questions about how confident are we? We're extremely confident. We believe this transaction does not represent any financial stability or competitive consolidation risk.*** We've already announced that we will protect all the front-line staff, we will be retaining all the retail and commercial bankers. Likewise, we won't be closing any stores. ***So, if you look at the strength of the application, we're quite excited about getting this done in short order.***

56.     On December 1, 2022, TD Bank filed its Management's Discussion and Analysis for 2022 ("2022 MD&A") with the SEC on Form 40-F.  The 2022 MD&A claimed that "[t]he Audit Committee oversees financial reporting, the adequacy and effectiveness of internal controls . . . including the Regulatory Compliance Management Program, and the Anti-Money Laundering/Terrorist Financing/ Economic Sanctions/Anti-Bribery and Anti-Corruption Program."  TD Bank further noted that "*GAML is responsible for the oversight of TD's regulatory compliance*

**with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated**."

57.     In a December 1, 2022 investor presentation made publicly available via TD Bank's website, TD Bank repeated its claim that it "**[d]eliver[ed] consistent earnings growth, underpinned by a strong risk culture**," and achieved "**[d]iversification and scale, underpinned by a strong risk culture**."  The investor presentation also provided an update regarding the First Horizon transaction.  It noted again that there was a "**Fed and OCC joint public meeting on August 18th**," and that TD Bank would "**[c]ontinue to work towards obtaining required regulatory approvals**."  However, the investor report now explained that TD Bank was "**[c]urrently planning to close in the first half of F2023 subject to customary closing conditions, including approvals from U.S. and Canadian regulators**."

58.     TD Bank also held an earnings call on December 1, 2022, to discuss its performance for the fiscal fourth quarter of 2022.  During the call, Masrani downplayed any risk associated with the short delay in the First Horizon acquisition.  In his opening remarks, Masrani disclosed, "**[w]e are currently planning to close the [First Horizon] transaction in the first half of fiscal 2023**."  Picking up on the

revised timeline, an analyst questioned "What's prompting the delayed expectation of closing?"  Rather than disclose regulatory problems with TD Bank's AML controls, Masrani dismissed the question by stating, "*[w]e're already in December. And so we don't control the timing of all the regulatory approvals, but we are confident that we'll get closing within the time line that we've put out*."

59.    The analyst followed up by asking for additional detail about what caused the regulatory delay, but Masrani claimed he was "not aware" of the cause:

**Gabriel Dechaine – National Bank Financial – Analyst**

I mean are [the regulators] taking a closer look at anything? Are you anticipating having to make any adjustments to your product lineup or your fee schedule in advance of the close?

**Bharat Masrani – TD – Group President and CEO**

*No, I'm not aware of anything of the sort you're mentioning.*

60.    On January 9, 2023, Masrani joined the RBC Markets Canadian Bank CEO Conference where he provided an update regarding the First Horizon acquisition.  In response to an analyst question seeking an update on the First Horizon timeline, Masrani explained that the delay in the regulatory approvals was common in U.S. mergers and that the deal would close in a timely manner:

*[I]n the U.S., the latest deals seem to take longer than what they used to. One deal that was approved took 14 or 15 months. Another deal was announced approximately 2 to 3 months before our deal got announced and we are about 9 or 10 months into ours, end of February is when we announced First Horizon, but the deal that was announced 2 or 3 months before ours has not yet been approved.*

25

*Given all that, last quarter, I said that instead of our original expectation of closing within the first fiscal quarter of this year, it will be the first fiscal half, which seems to be appropriate given all the other stuff that's been going on. That's our expectation on when that gets done.*

61.    During the conference call, Masrani again touted TD Bank's "risk culture" as a reason to look forward to the First Horizon deal:  "*We've shown that we can manage the bank very effectively and very profitably in various scenarios, and our conservative risk culture and capital management bodes well given the uncertainty in this environment, so I feel very excited.*"

62.    On February 9, 2023, TD Bank and First Horizon issued a joint press release announcing that the companies had agreed to extend the acquisition's closing deadline to May 27, 2023.  The press release claimed, "*TD and First Horizon are fully committed to the merger and continue to make significant progress in planning for the closing.*"

63.    On February 14, 2023, TD Bank filed a Form 6-K with the SEC that included a revised Code of Conduct.  The Code of Conduct repeated the same misstatements set forth in ¶¶ 33 and 42.

64.    The statements referenced in ¶¶ 35-63 were materially false and/or misleading and failed to disclose material adverse facts about TD Bank's operations, the risks associated with the timing for the closing of the First Horizon acquisition, and TD Bank's ability to obtain the necessary regulatory approvals to make the

statements made, in light of the circumstances under which they were made, not false and misleading.

65.     Specifically, Defendants misrepresented and/or failed to disclose to the market that: (1) TD Bank had deficient controls over AML and suspicious transaction reporting; (2) that the lack of controls posed a significant risk to the closing of the First Horizon acquisition; and (3) that the deficient AML controls actually caused delay in obtaining the regulatory approvals for the First Horizon acquisition.  As a result, Defendants' positive statements about TD Bank's risk culture and its ability to timely close the First Horizon transaction were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Begins to Be Revealed**

66.     On March 1, 2023, before market hours, First Horizon filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022.  First Horizon's report revealed that, in stark contrast to Defendant Masrani's recent statements that the transaction will "get closing" in early 2023, TD Bank informed First Horizon that it "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023."

67.     On this news, the price of First Horizon shares fell 10.6% to close at $22.14 per share on March 1, 2023.

68.     Despite the March 1, 2023 revelation, Defendants continued to affirm the Company's commitment to the transaction and purportedly robust approach to risk management.  For example, on March 2, 2023, TD Bank issued a Report to Shareholders regarding its results for the fiscal first quarter of 2023, which the Company publicly filed with the SEC on Form 6-K.  The Report to Shareholders incorporated the 2022 MD&A risk framework as alleged in Paragraph 56 above.  In addition, the Shareholder Report again noted that the Company "***takes risks required to build its business, but only if those risks . . . do not risk harming the TD brand***." The shareholder report noted that TD Bank did not expect to obtain timely regulatory approval for the First Horizon transaction, but quoted Masrani as stating, "***TD is fully committed to the transaction***."

69.     Similarly, in a March 2, 2023 investor presentation made publicly available via TD Bank's website, TD Bank repeated its claim that it "***[d]eliver[ed] consistent earnings growth, underpinned by a strong risk culture***" and achieved "***[d]iversification and scale, underpinned by a strong risk culture***."  The investor presentation also provided an update regarding the First Horizon transaction.  It noted that TD Bank would "***[c]ontinue to engage with regulators on applications***."

70.     TD Bank also held an earnings call on March 2, 2023, to discuss its performance for Q1 2023, during which Masrani told investors: "As you know on February 9th, we mutually agreed with First Horizon to extend the close date to May

27th as provisioned in our contract. Since then, we have come to believe that the deal is not expected to receive regulatory approval in time to close the transaction by that date."    However, Masrani confirmed, "*we are fully committed to the transaction*."    During the call, an analyst asked whether the underlying problem causing the regulatory delay was something that "could have an impact on your organic business in the United States."  In response, Masrani dismissed the question as "*hypothetical in nature*," and noted that "[w]e continue to grow our bank, Leo [Salom] does a great job, six new stores were opened and I'm sure Leo would be happy to answer the loan growth we're having and the tremendous momentum we have in the U.S."

71.    Then, on March 14, 2023, TD Bank issued its 2023 investor proxy statement, which it filed with the SEC on Form 6-K.  The 2023 investor proxy statement contained the same misstatements set forth in ¶¶ 42-43.

72.    On May 4, 2023, First Horizon and TD Bank issued a joint press release revealing that "TD Bank and First Horizon Mutually Agree to Terminate Merger Agreement."  The press release explained that "TD informed First Horizon that TD does not have a timetable for regulatory approvals to be obtained for reasons unrelated to First Horizon.  Because there is uncertainty as to when and if these regulatory approvals can be obtained, the parties mutually agreed to terminate the merger agreement."  During a First Horizon investor call held that day, First Horizon

further revealed that TD Bank "could not provide assurance of regulatory approval in 2023 *or 2024*."

73.    On this news, First Horizon's share price fell another $4.99 per share, or 33%, to close at $10.06 per share on May 4, 2023.

74.    Analysts questioned whether the lack of regulatory approval stemmed from a deeper problem within TD Bank.  For example, a Desjardins analyst wondered, "[w]hy was TD not able to see a line of sight to obtaining regulatory approvals? And does this prevent TD from pursuing future US bank acquisitions?" RBC Capital Markets commented that the regulatory problems at TD Bank "must [be] more serious than we had assumed, and we therefore believe TD's future ability to close U.S. deals may be in doubt and TD's credibility as an acquirer has been dealt a blow."  RBC Capital Markets further believed the problem was specific to TD Bank but "assume[d] other banks . . . will continue to look at U.S. acquisitions." Barclays commented that "[w]ith TD dissolving the merger agreement, we believe that it is likely in the penalty box for some time with potential partners in U.S. retail banking."

75.    Within days, *The Wall Street Journal*, *Reuters*, and *Bloomberg News* all reported that TD Bank's inability to obtain regulatory approval for the First Horizon acquisition was due to TD Bank's deficient anti-money-laundering practices.  In an article titled "Concern Over TD Anti-Money-Laundering Practices

Helped Scuttle First Horizon Deal" published on May 8, 2023, *The Wall Street Journal* reported that, based on its investigation, TD Bank's "handling of suspicious customer transactions was behind regulators' refusal to bless the Canadian lender's $13.4 billion bid to buy First Horizon."  Specifically, the "reluctance by the Office of the Comptroller of the Currency and the Federal Reserve to give TD a clean bill of health on its anti-money-laundering practices proved to be the biggest obstacle" to gaining regulatory approval.  "The regulators' concerns stemmed from the way TD handled unusual transactions in recent years, and the speed at which some of them were brought to the attention of U.S. authorities . . . . The bank flagged 28 customer transactions in the period."  According to the article, "TD had pledged to regulators that it would make its anti-money-laundering policies more comprehensive and timely, but it wasn't enough to win approval for the deal." *Bloomberg News* similarly reported that the transaction was "held up as U.S. regulators scrutinized the Toronto lender's handling of suspicious customer transactions."

76.     As a result of Defendants' wrongful acts and omissions, Plaintiff and the other Class members, as defined below, have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired First Horizon securities between February 28, 2022 and May 3, 2023, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of TD Bank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, First Horizon shares actively traded on the NYSE (an open and efficient market) under the symbol "FHN."  Millions of First Horizon shares were traded publicly during the Class Period on the NYSE.  As of April 28, 2023, First Horizon had more than 537 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by First Horizon or its transfer agent and may be notified of the pendency of this

action by mail, using a form of notice similar to that customarily used in securities class actions.

79.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

(b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)    whether Defendants' statements, press releases, reports, and other documents disseminated to the investing public were materially misleading or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants were controlling persons of TD Bank under Section 20(a) of the Exchange Act;

(e)     whether the market price of First Horizon securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

83.     At all relevant times, the market for First Horizon securities was an open, well-developed, and efficient market that promptly digested current information affecting First Horizon from all publicly available sources, including TD Bank, and reflected such information in the prices of First Horizon's securities. As a result of the materially false and/or misleading statements and/or omissions of material facts particularized in this Complaint, First Horizon's securities traded at

artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased First Horizon's securities relying upon the integrity of the market price of First Horizon's common stock and market information relating to First Horizon and have been damaged thereby.

84.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of First Horizon securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about TD Bank's business, operations, and ability to timely close the First Horizon acquisition and/or obtain the necessary regulatory approvals as alleged herein.  These material misstatements and/or omissions of material facts had the cause and effect of creating in the market an unrealistically positive assessment of First Horizon's value, thus causing First Horizon's common stock to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements and omissions of material facts during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class that purchased First

Horizon's securities at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

85.    As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of TD Bank during the Class Period were materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

86.    Defendants were acutely aware of the increased regulatory scrutiny concerning TD Bank's business practices, and the heightened risk it created for obtaining the required government approvals for the First Horizon acquisition.  For example, on June 14, 2022, Senator Elizabeth Warren sent a joint letter to the OCC requesting that it block the First Horizon acquisition pending further investigation of TD Bank's practice of enrolling "customers in new accounts and services like overdraft protection without their permission."  Defendants therefore knew, or were

reckless in not knowing, that their deficient anti-money laundering practices would result in delayed or denied regulatory approvals for the First Horizon merger.

87.    The Individual Defendants further knew, or were reckless in not knowing, the details of TD Bank's inadequate anti-money laundering practices given the regular reports they received from the Company's Bank Secrecy Act ("BSA") Officer "*on the overall effectiveness of the AML Program*."

88.    As set forth herein, the Individual Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts regarding TD Bank's anti-money laundering practices, their control over, receipt, and/or modification of TD Bank's allegedly materially misleading statements and omissions, and/or their positions with TD Bank, which made them privy to confidential information concerning TD Bank.

## **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

89.    As a result of their purchases of First Horizon securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

90.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that

the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of TD Bank who knew that the statement was false when made.

## LOSS CAUSATION

91.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

92.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions of material facts and engaged in a scheme to deceive the market.  This artificially inflated the prices of First Horizon's securities and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of First Horizon's securities fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

93.    The market for First Horizon securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, First Horizon securities traded at artificially inflated and/or maintained prices during the Class

Period.  Plaintiff and other members of the Class purchased or otherwise acquired First Horizon's securities relying upon the integrity of the market price of First Horizon securities and market information relating to First Horizon, including information disseminated by TD Bank and the Individual Defendants, and have been damaged thereby.

94.     At all times relevant, the market for First Horizon securities was an efficient market for the following reasons, among others:

(a)     First Horizon was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, First Horizon filed periodic public reports with the SEC and/or the NYSE;

(c)     First Horizon and TD Bank regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     First Horizon and TD Bank were followed by securities analysts employed by brokerage firms who wrote reports about First Horizon and TD Bank, and these reports were distributed to the sales force and certain customers of their

respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

95.    As a result of the foregoing, the market for First Horizon securities promptly digested current information regarding First Horizon and TD Bank from all publicly available sources and reflected such information in the price of First Horizon's securities.  Under these circumstances, all purchasers of First Horizon securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices, and a presumption of reliance applies.

96.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding TD Bank's business, operations, and ability to timely close the First Horizon acquisition and/or obtain the necessary regulatory approvals – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class

Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that: (i) deceived the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of First Horizon securities; and (iii) caused Plaintiff and other members of the Class to purchase First Horizon securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

99.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of First Horizon's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   All Defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

100.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about TD Bank's business, operations, and ability to timely close the First Horizon acquisition and/or obtain the necessary regulatory approvals, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about TD Bank and its business, operations, and ability to timely close the First Horizon acquisition and/or obtain the necessary regulatory approvals, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers and acquirers of First Horizon's securities during the Class Period.

101.   Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants

was a high-level executive and/or director at TD Bank during the Class Period and a member of TD Bank's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of TD Bank, was privy to and participated in the creation, development, and reporting of TD Bank's business, operations, and ability to timely close the First Horizon acquisition and/or obtain the necessary regulatory approvals; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of TD Bank's management team, including regular reports by TD Bank's BSA Officer on the effectiveness of the Company's anti-money laundering program, other internal reports concerning TD Bank's business operations, and additional data and information about TD Bank's regulatory compliance at all relevant times; and (iv) each of the Individual Defendants was aware of TD Bank's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

102.  Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of

concealing from the investing public TD Bank's operating condition, business practices, and ability to timely close the First Horizon acquisition and/or obtain the necessary regulatory approvals. As demonstrated by Defendants' misstatements, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

103. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of First Horizon securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased or otherwise acquired First Horizon securities during the Class Period at artificially inflated prices and were damaged thereby.

104. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known

of the truth regarding TD Bank's internal control problems and inability to timely obtain regulatory approvals for the First Horizon acquisition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their First Horizon securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

105. By virtue of the foregoing, TD Bank and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of First Horizon securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against All Individual Defendants

107. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

108. The Individual Defendants acted as controlling persons of TD Bank within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with TD Bank, participation in, and/or awareness of TD Bank's operations, and intimate knowledge of the false statements filed by TD Bank

with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of TD Bank, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of TD Bank's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

109.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of TD Bank and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

110.   As set forth above, TD Bank and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of First Horizon securities during the Class Period.

## **PRAYER FOR RELIEF**

111.   WHEREFORE, Plaintiff, individually and on behalf of the Class, prays

for relief and judgment as follows:

112.   Declaring this action to be a class action pursuant to Rule 23(a) and

(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

113.   Awarding Plaintiff and the other members of the Class damages in an

amount that may be proven at trial, together with interest thereon;

114.   Awarding Plaintiff and the members of the Class pre-judgment and

post-judgment interest, as well as their reasonable attorneys' and experts' witness

fees and other costs; and

115.   Awarding such other relief as this Court deems appropriate.

## **JURY DEMAND**

116.   Plaintiff demands a trial by jury.

Dated: May 22, 2023                              Respectfully submitted,

**CARELLA, BYRNE, CECCHI, BRODY
& AGNELLO, P.C.**

By: */s/ James E. Cecchi*
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiff The Arbitrage Fund*

**ENTWISTLE & CAPPUCCI, LLP**

Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci
Jonathan H. Beemer (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
Fax: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com

*Counsel for Plaintiff The Arbitrage Fund*

**SAXENA WHITE P.A.**

Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice* forthcoming)
Rachel A. Avan (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com
ravan@saxenawhite.com

*Counsel for Plaintiff The Arbitrage Fund*