James E. Cecchi
Kevin Cooper
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

Salvatore J. Graziano (*pro hac vice*
forthcoming)
Michael Blatchley
Aasiya Glover(*pro hac vice*
forthcoming)
Chloe Jasper (*pro hac vice*
forthcoming)
**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
michaelb@blbglaw.com
aasiya.glover@blbglaw.com
chloe.jasper@blbglaw.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the Class*

Steven B. Singer (*pro hac vice*
forthcoming)
David J. Schwartz (*pro hac vice*
forthcoming)
Kyla Grant (*pro hac vice* forthcoming)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com
kgrant@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice*
forthcoming)
Lester R. Hooker (*pro hac vice*
forthcoming)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (866) 290-1291
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE TORONTO-DOMINION BANK / FIRST HORIZON CORPORATION SECURITIES LITIGATION | **CASE NO: 23-cv-02763-RBK-AMD**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT .................................................................3

II.    JURISDICTION & VENUE .........................................................13

III.   THE PARTIES ......................................................................13

     A.     Lead Plaintiffs ........................................................13

     B.     Defendants..............................................................15

         1.     TD Bank ............................................................15

         2.     First Horizon ........................................................17

IV.   BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD .........19

     A.     TD and First Horizon Announce The Merger, Representing The Largest And Most Significant Transaction In The History Of Both Banks ..........................................................19

     B.     Regulators View Adequate AML Controls As Absolutely Critical When Considering Whether To Approve A Bank Merger ................................................................22

     C.     Leading Up To The Class Period, TD Was An Outlier Among Its Peers For Having A History Of Significant High-Profile AML Compliance Failures................................................28

     D.     The Rothstein And Stanford Ponzi Schemes Were Not Isolated Instances Of TD Bank's Compliance Failures, But Rather Part Of A Pattern And Practice Of Egregious AML Deficiencies .............35

     E.     After TD and First Horizon Announce The Blockbuster Merger, They Repeatedly Reassure Investors That They Have Effective AML Controls And Will  Easily Secure Regulatory Approval .........43

     F.     When Journalists and Lawmakers Begin To Raise Questions About TD's Regulatory Compliance, TD Vehemently Denies That It Has Any Regulatory Problems, And Continued To Tout Its "Extreme Confidence" In Obtaining Regulatory Approval..........47

i

G.    Defendants Disclose Slight Deal Delays They Claim Are Benign—When In Reality Regulators Had Already Begun To Raise Concerns About Significant AML Deficiencies That Seriously Jeopardized Approval..........................................................56

V.    INVESTORS SUFFER LOSSES AS THE TRUTH IS DISCLOSED.........62

A.    Even After Defendants Were Privately Informed By Regulators That The Merger Was Dead, They Continue To Falsely Claim To Investors That The Deal Is On Track And Will Close ..................62

B.    Defendants Terminate the Deal After *Capitol Forum* Reveals That Regulators Would Not Sign Off, And Belatedly Reveal That They Are Under Investigation By The DOJ For Deficient AML Controls—With Penalties Expected To Be Imposed................70

C.    After The Class Period, First Horizon Admits That Its Diligence on TD Was Rushed and "Chaotic" And That, Unbeknownst to Investors, Its Top Executives Expected Regulatory Delays ................................................................................77

D.    Numerous Detailed Accounts From Former High-Ranking TD Employees Confirm That, In Reality, TD Bank's AML Compliance Program Was Antiquated, Ineffective, and Routinely Failed To Identify Suspicious Transactions ......................80

    1.    TD Bank Had An Antiquated AML Program that Failed To Identify and Report Suspicious Transactions.....................80

    2.    TD Bank Failed to Train Employees About AML Compliance and Follow Appropriate KYC Protocols.............86

    3.    TD Bank's Regulators Identified Serious AML Deficiencies Despite TD Bank's Efforts to Conceal AML Problems...................................................................................88

E.    Defendants Were Highly Motivated to Conceal the Truth and Profited Through Their Suspicious Insider Trades ...........................92

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................................96

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ...........................................................................................108

A.  Defendants Tout TD's Regulatory Compliance and Confidence About Regulatory Approval in Announcing the Merger ..................109

B.  TD Claims It Is in Full Compliance With Its BSA Obligations and Details Compliance Framework in the Proxy ...........................114

C.  TD Issues "Vehement" Denials In Response to Reports Over Its Compliance Deficiencies.....................................................125

D.  Defendants Continue to Reassure Investors Concerning TD's Comfort with the Timeline and Regulatory Approval .....................133

E.  Defendants Disclose a Delay to Deal Timeline But Continue to Reassure Investors About Regulatory Approval...............................136

F.  Defendants Disclose Deal Delays But Insist They Are Benign—And Continue To Claim The Deal Is Going Forward Despite Regulators Having Already Rejected The Merger .............142

VIII.  LOSS CAUSATION ....................................................................150

IX.  PRESUMPTION OF RELIANCE ..............................................153

X.  THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS.............154

XI.  CLASS ACTION ALLEGATIONS..............................................156

XII.  COUNTS .....................................................................................159

COUNT I.............................................................................................159

FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS .........................................159

COUNT II ...........................................................................................160

FOR VIOLATION OF SECTION 14(A) AGAINST ALL DEFENDANTS .......160

COUNT III ..........................................................................................164

FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE EXECUTIVE DEFENDANTS ........................................164

XIII.  PRAYER FOR RELIEF ............................................................................168

JURY DEMAND ..........................................................................................169

Lead Plaintiffs the Westchester Funds, the Pentwater Funds, the Sand Grove Funds, and the Alpine Funds (collectively, "Lead Plaintiffs"), by their undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 14(a) of the Exchange Act and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 against Toronto-Dominion Bank ("TD Bank," "TD," or the "Bank") and certain of its officers and First Horizon Corporation ("First Horizon" or "FHN") and certain of its officers (collectively, "Defendants"). Lead Plaintiffs bring these claims on behalf of a class of investors who purchased or otherwise acquired FHN securities from February 28, 2022 through May 3, 2023, inclusive ("Class Period") and were damaged thereby.

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon the investigation of Lead Plaintiffs and their counsel, including review and analysis of (1) documents filed publicly by TD Bank and First Horizon with the SEC; (2) TD Bank and First Horizon press releases, presentations and other public statements; (3) transcripts of TD Bank and First Horizon investor conference calls; (4) research reports by financial analysts

and news reports concerning TD Bank and First Horizon; (5) other publicly available sources as described below; (6) consultations with relevant experts and consultants; (7) correspondence, testimony, and other materials released or obtained by the U.S. House of Representatives, the U.S. Senate, the Cullen Commission of Inquiry into Money Laundering in British Columbia, and other governmental bodies; (8) documents obtained through Freedom of Information requests and similar public access requests issued to the U.S. Office of the Comptroller of the Currency ("OCC"), the U.S. Treasury, the Federal Board of Reserves, and other governmental bodies; (9) testimony and pleadings in criminal and other legal proceedings involving TD Bank employees, including *United States v. Seck*, No. 8:20-cr-00317-TDC (D. Md.) and *United States v. Hernandez*, No. 1:22-cr-20529-KMM (S.D. Fla.), among others; (10) communications with former employees of TD Bank and First Horizon and other sources.

Lead Plaintiffs' investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

1.      This case arises out of a series of misrepresentations about what would have been the single most important transaction in the respective histories of TD Bank and First Horizon, and the egregious failures in TD's anti-money laundering ("AML") program that led regulators to reject the merger.  Indeed, TD's AML failures were so significant and material that, shortly after the merger was terminated, TD was forced to disclose that its AML practices were the subject of a criminal investigation launched by the U.S. Department of Justice ("DOJ")—and that TD fully "<u>anticipate[d] monetary and/or non-monetary penalties to be imposed</u>."

2.      On February 28, 2022, the first day of the Class Period, TD announced a proposed $13.4 billion, all-cash acquisition of FHN—one of the largest bank deals in the U.S. since the financial crisis.  The transaction would catapult TD into becoming the sixth largest bank in the country, allowing it to compete against the likes of JPMorgan and Citibank.  In announcing the proposed acquisition, TD's CEO, Defendant Bharat Masrani, lauded the deal as "strategically compelling" specifically because it would greatly expand TD's U.S. presence.  In particular, the acquisition would provide TD with a "powerful base" in the "fast-growing U.S. Southeast" market, which Masrani emphasized was a "long area of focus" for TD. The deal was equally critical for First Horizon, as the $25 per share consideration provided a 37% premium to FHN shareholders and triggered "golden parachute"

payouts to FHN's top executives totaling over $95 million. The market praised the transaction as highly beneficial to both banks, and in turn, FHN's stock price surged by nearly 30% upon the deal's announcement, from $18.25 to $23.48 per share.

3.     By far the most critical issue facing TD and First Horizon upon their announcement of the merger was obtaining regulatory approval for the transaction, with regulators' chief concern being whether TD had adequate AML controls that complied with U.S. regulatory requirements. Indeed, analysts noted that with respect to another recent bank merger that was much smaller in value and geographic magnitude—M&T's $3.7 billion acquisition of Hudson City, which was announced in 2012—regulators had delayed approval for three full years after finding significant AML deficiencies at M&T. Thereafter, the Federal Reserve made crystal clear that it would never again grant other banks the same leeway and would instead deny approval unless all AML compliance issues were fully remedied.

4.     This concern was even more pronounced with respect to TD. Indeed, prior to and during the Class Period, numerous U.S. and Canadian regulators, senior government officials and federal judges excoriated TD for egregious AML deficiencies that facilitated some of the largest frauds in history. For example, in 2013, TD entered into regulatory settlements concerning its role in the $1.2 billion Rothstein Ponzi scheme, pursuant to which TD admitted that it had "willfully violated" the Bank Secrecy Act due to what the OCC described as a "a pattern of

4

misconduct" that was "significant and egregious."   Similarly, in facilitating the notorious $7 billion Stanford Ponzi scheme—the second largest Ponzi scheme in history next to Bernie Madoff's—TD paid a $1.2 billion settlement after U.S. Senators lambasted the bank for providing "knowing assistance . . . without so much as questioning a single transaction in the face of Stanford's suspicious activity." TD's AML deficiencies also enabled another high-profile scheme in which a TD employee opened hundreds of fraudulent TD accounts to deposit stolen religious donation checks.   Notably, at a June 2023 hearing, the Honorable Theodore D. Chuang of the United States District Court for the District of Maryland stated that "it was apparent from the evidence that the leadership of TD Bank had sufficient information to uncover this fraud and the tools to put a stop to it, but it let it continue."

5.     Against this backdrop, the adequacy of TD's AML controls was of paramount importance to investors.   To assuage investor concerns, throughout the Class Period, TD repeatedly and emphatically assured its own investors and those of First Horizon that TD maintained "comprehensive" AML controls that were "designed to ensure compliance" with all applicable regulations, that it in fact "complied" with its AML obligations, and that it went even further than required by following "industry-best practices that are designed to detect and help prevent fraud."   Indeed, TD even represented that it had utilized the merger due diligence

process to further "review and assess key risks related to AML"; that it was proud of its "excellent regulatory relationships" and "familiar[ity]" with "regulatory requirements"; and that the banks were "<u>very comfortable</u>" and "<u>extremely confident</u>" that they would obtain regulatory approval.

6.      Remarkably, even when members of Congress and prominent media outlets openly challenged these assertions, TD vehemently denied that any regulatory issues existed.  For example, *Capitol Forum* issued a series of reports during the Class Period that sharply criticized TD's regulatory compliance and questioned whether AML issues would jeopardize regulatory approval of the deal. Thereafter, Senator Elizabeth Warren sent a letter to the OCC urging it to "closely examine any ongoing wrongdoing and block any merger until TD Bank is held responsible."  In response, TD issued a complete denial in which it stated that any allegations of TD's regulatory deficiencies were totally "<u>unfounded</u>."  TD even went so far as to threaten *Capitol Forum* with defamation claims, asserting that the reports amounted to "<u>an accumulation of false claims</u>" and "<u>extensive inaccuracies and misrepresentations</u>" that were made in "<u>reckless disregard of the truth</u>."

7.      However, as Defendants would ultimately be forced to admit, their Class Period representations were false.  Unbeknownst to investors—and while TD was publicly touting its AML compliance and its "extreme confidence" in gaining regulatory approval during the Class Period—TD executives, including Defendant

6

Masrani, knew that the exact opposite was true: that TD's AML deficiencies were so severe and pervasive that regulators could not and would not approve the FHN acquisition.  Indeed, by no later than October 2022, the OCC had completed a confidential supervisory examination of TD that revealed <u>serious AML deficiencies</u>, which was quickly followed by senior OCC officials meeting with TD's top executives on no less than <u>four</u> separate occasions the next month.  In fact, TD's AML problems were so significant that, in February 2023, TD was directly informed that the DOJ was now investigating TD's AML program for violations of federal law.

8.      Then, on February 22, 2023, the OCC's Head of Large Bank Supervision and Senior Examiner scheduled a highly unusual confidential meeting with Defendant Masrani and TD's outside counsel for March 9, 2023—a clear sign that the merger was dead.  As *Capitol Forum* reported at the end of the Class Period, such meetings are scheduled "only when matters are very serious."  Industry leaders later concluded that the meeting was likely a desperate plea by Masrani for regulators to abandon their investigation—a plea that was summarily rejected.

9.      On March 1, 2023, the truth about TD's severe regulatory deficiencies began to emerge.  On that day, First Horizon stunned the market by disclosing that TD could not obtain the necessary regulatory approvals by the scheduled merger closing date of May 27, 2023—and further that TD could not "provide a new

projected closing date at this time."  In response to these revelations, the price of First Horizon shares dropped 10.6%, from $24.77 per share to $22.14 per share.

10.     However, even though TD and First Horizon knew full well by this time that regulators were unwilling to approve the deal due to TD's AML deficiencies, Defendants did not breathe a word of these prominent regulatory problems to investors.  To the contrary, they continued to falsely assert for the next two months that TD was "fully committed to the transaction"; that regulatory approval was only a question of "when," not "if"; that the banks' "planning for integration continues"; and that "we are very happy with the transaction and continue to work hard to get it…over the finish line."  Indeed, when *Capitol Forum* issued a report on March 29, 2023 stating that it had learned that the DOJ was investigating TD Bank, TD issued a statement flatly denying the existence of any such investigation.  Even as late as April 20, 2023—only two weeks before the truth would be revealed—Defendant Masrani claimed at TD's Annual Meeting that it was currently and actively involved in "extension arrangements or negotiations" with FHN of the merger deadline.

11.     On May 4, 2023, the full truth emerged.  On that day, before the markets opened, TD and FHN stunned investors by issuing a joint press release stating that they had agreed to terminate the merger given "uncertainty as to when and if these regulatory approvals can be obtained."  Tellingly, TD did not provide any color regarding this "uncertainty."  Instead, on an investor call held later that day, it was

First Horizon's CEO, Defendant Jordan, who made clear to analysts that the reason behind the merger's failure was TD's severe regulatory issues, as TD was "unable" to obtain the necessary regulatory approvals and "could not provide assurance of regulatory approval in 2023 or 2024."  Indeed, these issues were so prominent and known by FHN that Jordan clarified—in direct contradiction to Defendants' representations only two months prior that the parties were actively negotiating an extension of the deal—that "[a]t no time did we discuss any changes in prices or any other changes to the structure of the deal."  Rather, First Horizon disclosed that TD had agreed to pay a $200 million break-up fee to First Horizon (on top of a $25 million merger-expense reimbursement) <u>even though no such out-of-pocket fee was contemplated in the merger agreement</u>—an extraordinarily unusual payment that TD clearly made to avoid a lawsuit from First Horizon in which TD's liability for its AML violations would come to light.  In response to this stunning news, First Horizon's stock price plummeted by 33%, from $15.05 per share on May 3, 2023, to $10.06 per share on May 4, 2023.

12.    Analysts expressed shock at the clear severity of TD's regulatory issues, with a National Bank of Canada report commenting that "on the FHN call, <u>it was clear that regulatory approvals were not coming</u>, to the point that FHN stated that a renegotiated deal price was not even attempted."  Similarly, an RBC report commented that TD's regulatory issues were clearly "<u>more serious than what we had</u>

assumed" based on Defendants' prior representations, while *Forbes* opined that the "delay in regulatory approval that TD cited as the reason for canceling the deal suggests that there is something wrong here."  BMO analysts explicitly criticized management's misrepresentations concerning TD's compliance issues, incredulously asking: "what was the issue that was significant enough to delay regulatory approvals indefinitely, yet not material enough to disclose?"

13.     Less than a week later, on May 8, 2023, investigative reports published by *The Wall Street Journal* and *Bloomberg* confirmed that both the OCC and the Federal Reserve had refused to approve the deal due to TD's severe AML deficiencies.  Indeed, these reports stated that regulators were greatly concerned by TD's routine and abject failure in recent years to alert U.S. authorities to suspicious fraudulent transactions as required by the Bank Secrecy Act, which internal sources cited as "the biggest obstacle" to regulatory approval of the FHN acquisition.

14.     Then, on August 24, 2023, TD itself finally—and belatedly— confirmed the severity of its AML deficiencies, revealing that it had received "formal and informal inquiries from regulatory authorities and law enforcement concerning its [AML] program"—including "an investigation by the United States Department of Justice."  Significantly, TD admitted that these investigations were so serious and advanced that—rather than defending its conduct or hedging about

10

possible outcomes—TD starkly admitted that it fully "anticipate[d] monetary and/or non-monetary penalties to be imposed."

15.     In addition to these damning facts, Plaintiffs' own independent investigation—including interviews with numerous former high-ranking TD and First Horizon employees—further confirms that Defendants knew, or recklessly disregarded, that their Class Period representations concerning TD's AML policies were materially false and misleading.  For example, former TD employees who had first-hand knowledge of the bank's AML practices confirmed that, in stark contrast to the sophisticated and automated systems of its peer banks, TD's AML infrastructure and policies were archaic and "ridiculous," relying upon manual systems and hardcopy files to track important metrics.  These employees noted that TD's systems were "antiquated," "pretty bad" and at least 10 to 20 years behind industry standards, such that "basic monitoring" systems were not in place and "a lot of things got missed."  Indeed, former TD employees uniformly reported that TD's suspicious transaction reporting programs had severe "capacity" issues that regularly and improperly released "holds" on frozen accounts with suspicious activity that should never have been released.  These compliance "holes" were so prevalent and well-known at TD that former AML employees confirmed that compliance managers "basically just lied" to regulators during supervisory exams.

16.     Finally, while Defendants' fraud had a devastating impact on First Horizon investors, the Executive Defendants were personally incentivized to enable the fraud for as long as possible.  Indeed, at TD's Annual Meeting held on April 23, 2023—just weeks before investors would learn that the merger was dead—TD's executives successfully convinced TD's shareholders to approve millions of dollars in additional compensation for the TD Executive Defendants for supposedly successfully shepherding the FHN merger.  Similarly, First Horizon insiders—who were kept apprised of TD's discussions with its regulators in real time pursuant to the parties' merger agreement and had first-hand insight into TD's AML compliance failures—sold millions of dollars of their FHN shares during the Class Period for lower prices than they would have received had the merger been consummated.  As one leading insider trading scholar pointed out, these sales were particularly suspicious and abnormal because there was no logical reason "for any insider during this 12-month window to sell any shares in the open market, especially below the merger price of $25," instead of holding them until the deal closes—unless, of course, they knew something that public investors did not.

17.     While Defendants profited from their deception, Lead Plaintiffs and the other members of the Class suffered substantial damages.  Lead Plaintiffs bring this action to recover the damages caused by the securities law violations alleged herein.

## II.     JURISDICTION & VENUE

18.     The claims asserted in this complaint arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5; and Rule 14a-9 promulgated under Section 14(a) by the SEC, 17 C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  TD Bank maintains its U.S. headquarters in this jurisdiction, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    THE PARTIES

### A.     Lead Plaintiffs

21.     Lead Plaintiff the "Westchester Funds" consist of six related private investment funds: JNL/Westchester Capitol Event Driven Fund; The Merger Fund; The Merger Fund VL; Virtus Westchester Event-Driven Fund (a series of Virtus

13

Event Opportunities Trust); Westchester Capitol Master Trust; and the Westchester Merger Arbitrage Strategy Sleeve of the JNL Multi-Manager Alternative Fund. As reflected in their PSLRA certification (ECF No. 17-4), the Westchester Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

22.    Lead Plaintiff the "Pentwater Funds" consist of eight related private investment funds: Pentwater Merger Arbitrage Master Fund Ltd.; PWCM Master Fund Ltd.; Pentwater Equity Opportunities Master Fund Ltd.; Oceana Master Fund Ltd.; Pentwater Unconstrained Master Fund Ltd.; Crown Managed Accounts SPC acting for and on behalf of Crown/PW Segregated Portfolio; Investment Opportunities SPC for the account of Investment Opportunities 3 Segregated Portfolio; and LMA SPC for and on behalf of the MAP 98 Segregated Portfolio. As reflected in their PSLRA certification (ECF No. 17-4), the Pentwater Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

23.    Lead Plaintiff the "Sand Grove Funds" consist of five related private investment funds: Sand Grove Opportunities Master Fund Ltd; Sand Grove Tactical Fund LP; QSMA Torus SP, a segregated portfolio of QSMA SPC; New Holland Tactical Alpha Fund LP; and 405 MSTV I LP. As reflected in their PSLRA certification (ECF No. 17-4), the Sand Grove Funds purchased a significant amount

of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

24.     Lead Plaintiff the "Alpine Funds" consist of nine related private investment funds: Alpine Associates, A Limited Partnership; Alpine Dedicated, L.P.; Alpine Heritage II, L.P.; Alpine Heritage Japan Trust; Alpine Heritage Offshore Fund Ltd.; Alpine Heritage, L.P.; Alpine Institutional, L.P.; Alpine Merger Growth, L.P.; and Alpine Partners, L.P.  As reflected in their PSLRA certification (ECF No. 17-4), the Alpine Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

## B.     Defendants

### 1.     TD Bank

25.     Defendant TD Bank, together with its subsidiaries, provides various personal and commercial banking products and services in Canada, the United States, and internationally. TD Bank is incorporated under the laws of Canada and operates through three segments: (i) Canadian Personal and Commercial Banking, (ii) U.S. Retail, and (iii) Wholesale Banking. TD Bank has its U.S. headquarters in

Cherry Hill, New Jersey, and TD Bank's U.S. Retail subsidiary, TD Bank, N.A., also is headquartered at Cherry Hill, New Jersey.

26.     Defendant Masrani has served as the Company's Group President and CEO throughout the Class Period. Masrani previously served as the CEO of TD's U.S. Retail Bank, and before that was Chief Risk Officer of TD Bank Group.  As The Globe and Mail reported in September 2014, by the time Masrani took over from TD's prior CEO Ed Clark that year, Masrani had "touched nearly every aspect of TD's far-flung operation" and was intimately familiar with the Bank's U.S. retail operations—including TD Bank's compliance practices.

27.     Defendant Leo Salom ("Salom") has served as TD Bank's Group Head, U.S. Retail, TD Bank Group and President and CEO of TD Bank America's Most Convenient Bank® since early 2022.  Prior to that time, Salom served as Citibank's Head of Retail Banking for Europe and Latin America, and as Barclays's CEO of Western European Retail and Commercial Banking group. In each of these roles, Salom was required to and did know about his institutions' regulatory risk and compliance obligations and practices, including for retail banking.

28.     Defendant Kelvin Vi Luan Tran ("Tran") has served as TD Bank's Group Head and Chief Financial Officer ("CFO") since September 1, 2021.  Prior to this position, Tran held various positions at TD for 20 years, previously serving as Head, Enterprise Finance; CFO of TD Bank, America's Most Convenient Bank®;

16

Chief Accountant; SVP for Treasury and Balance Sheet Management; CFO for TD Securities; and Chief Auditor—roles that gave him direct access into TD Bank's AML compliance functions.

29.    Defendants Masrani, Salom, and Tran are sometimes referred to collectively herein as the "TD Executive Defendants."

30.    The TD Executive Defendants possessed the power and authority to control the contents of TD Bank's SEC filings, press releases, and other market communications. The TD Executive Defendants were provided with copies of TD Bank's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with TD Bank, and their access to material information available to them but not to the public, the TD Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

### 2.    First Horizon

31.    Defendant First Horizon is a Memphis, Tennessee-based bank holding company whose shares are publicly traded on the NYSE under the ticker symbol "FHN."  First Horizon operates over 427 banking centers in twelve states, with most

of its geographic presence concentrated in the Southeastern United States.  As of June 2023, First Horizon held $85 billion in assets.

32.    Defendant D. Bryan Jordan ("Jordan") served as First Horizon's Chairman of the Board, President, and CEO at all relevant times during the Class Period.  Analysts dubbed him the "ambassador" of the TD acquisition in light of his close personal friendship with TD CEO Defendant Masrani, his deep knowledge of TD and its operations, and his work in introducing TD to First Horizon customers and employees.

33.    Defendant Hope Dmuchowski ("Dmuchowski"), a long-time banking executive with over 20 years of experience in the banking industry, served as First Horizon's Senior Executive Vice President and Chief Financial Officer ("CFO") at all relevant times during the Class Period.

34.    Defendants Jordan and Dmuchowski are sometimes referred to herein collectively as the "First Horizon Executive Defendants."

35.    The First Horizon Executive Defendants possessed the power and authority to control the contents of First Horizon's SEC filings, press releases, and other market communications. The First Horizon Executive Defendants were provided with copies of First Horizon's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of

their positions with First Horizon, and their access to material information available to them but not to the public, the First Horizon Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive statements being made were then materially false and misleading.

36.     The TD Executive Defendants and First Horizon Executive Defendants are sometimes collectively referred to as the "Executive Defendants."  TD Bank, First Horizon, and the Executive Defendants are collectively referred to herein as "Defendants."

## IV.     BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD

### A.     TD and First Horizon Announce The Merger, Representing The Largest And Most Significant Transaction In The History Of Both Banks

37.     On February 28, 2022, the first day of the Class Period, TD and First Horizon jointly announced that they had signed a definitive agreement for TD to acquire First Horizon for $13.4 billion in cash—a deal which was by far the largest and most significant transaction in the history of both banks.  Indeed, for TD, the deal represented what the bank described as a "tremendous opportunity" to catapult TD into becoming the sixth-largest bank in the U.S., allowing it to compete with the likes of J.P. Morgan and Citibank.  Moreover, as Defendant Masrani stated during the investor call held that same day, the merger was critical to TD's planned

expansion in some of the most important geographic regions in the U.S.  As Masrani made clear, the FHN acquisition was "strategically compelling" because it gave TD a strong "presence in some of the fastest-growing markets across the U.S."— including critical areas in the Southeastern U.S. where TD had yet to establish a foothold—and it would give the bank "a powerful base" in the U.S. and "lay[] the foundation for a fully national commercial banking franchise."  In sum, the deal was "precisely the kind of transaction that [TD] [had] been looking for."

38.     First Horizon—a Memphis-based regional bank with limited growth potential before receiving TD's unsolicited offer—likewise stood to significantly benefit from the merger.  The $13.4 billion all-cash deal offered First Horizon shareholders a price of $25 per share, representing a substantial 37% premium to First Horizon's stock price of $18.25 per share just prior to when the transaction was announced.  Moreover, under the terms of the deal, if closing took longer than nine months, First Horizon investors would receive an additional $0.65 per share.  As a result, on the news of the acquisition, First Horizon's stock price surged by nearly 30%, from a price of $18.25 per share to $23.48 per share.

39.     Significantly, First Horizon's top executives also stood to personally and substantially profit from the deal.  Specifically, upon the closure of the merger, First Horizon's senior-most executives—including Defendants Jordan and Dmuchowski—would receive highly lucrative "golden parachute" payments that

20

collectively totaled over $95 million. Moreover, Defendant Jordan—who alone stood to receive approximately $41.5 million in "golden parachute" payments upon the merger closing—would be appointed as the Vice Chair of TD Group, become a member of TD's Executive Team, and would be named to the Boards of TD's U.S. banking entities.

40.     Analysts widely lauded the transaction as a highly positive development for both companies, celebrating the significant 37% premium First Horizon investors would receive from the deal and that TD had finally achieved "its long anticipated U.S. bank acquisition" that would allow it to expand its operations in the rapidly-growing Southeastern U.S. and become the sixth largest bank in the country. For example, a February 28, 2022 Desjardins report commented that the "deal makes sense from a strategic, financial and geographic perspective" and would make TD "the sixth largest bank in the US." CIBC similarly commented that "TD management has been clear with respect to its strategic priorities—get bigger U.S. banking"—and acquiring First Horizon would "accelerate[] growth initiatives in commercial lending and provide[] new geographies for TD to capture share."

41.     However, the market also expressed concern about whether the banks would face challenges with respect to obtaining regulatory approval of the deal, which under the merger agreement was scheduled to close within a year, by February 27, 2023. For example, a February 28, 2022 BofA report noted that "the new

regulatory regime" in recent years was less friendly toward M&A activity, and a March 1, 2022 Cormark report likewise noted that regulatory delays were "a key risk right now in the U.S." with respect to larger bank mergers.  Given this potential regulatory scrutiny, at the outset of the Class Period, the most critical issue for investors by far was whether the banks could obtain regulatory approval of the deal.

### B. Regulators View Adequate AML Controls As Absolutely Critical When Considering Whether To Approve A Bank Merger

42.   In the United States, federal bank mergers like the TD-First Horizon transaction require regulatory approvals from both the Federal Reserve and the OCC.  Specifically, the Federal Reserve, as regulator of all bank holding companies, must approve the merger under the Bank Holding Company Act ("BCHA"), while the OCC, as the primary regulator of the surviving insured depository institution, must approve the merger under the Bank Merger Act ("BMA").  In turn, one of the most crucial factors these regulators focus on when determining whether to approve a bank merger is the effectiveness of the acquiring bank's anti-money laundering ("AML") controls.  Thus, during the Class Period, the most significant consideration for Defendants and investors in terms of TD's ability to obtain regulatory approval of the First Horizon acquisition was whether TD had adequate AML controls.

43.   As a nationally chartered bank, TD has long been subject to well-established standards for maintaining an effective AML compliance program and complying with its obligations to identify and report suspicious activity under the

Bank Secrecy Act ("BSA), which was signed into law in 1970. The Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of Treasury whose "mission" is "to safeguard the financial system from illicit use" and "combat money laundering and its related crimes," is the agency charged with enforcing the BSA. A primary goal of AML controls under the BSA is for financial institutions like TD to prevent the opening and use of suspicious bank accounts that organized and unorganized criminal sectors rely on to store and funnel funds for illegal activity—ranging from drug and human trafficking to financing for terrorism and political corruption—and to regularly monitor and report any suspicious activity to FinCEN.

44.     Specifically, under the BSA, financial institutions are required to regularly submit "suspicious activity reports," or SARs, to FinCEN within 30 days of initial detection of red flags that indicate suspicious or criminal activity. According to FinCEN, SARs are "instrumental" in enabling law enforcement to combat major money laundering or terrorist financing operations, with the timely filing of these reports being absolutely critical to the success of those investigations. The BSA also requires financial institutions like TD to implement a comprehensive internal AML program with at least five components or "pillars" to ensure its effectiveness, including: (1) designation of a compliance officer responsible for knowing and understanding BSA/AML policies; (2) development of internal AML

policies, procedures and controls; (3) ongoing, relevant BSA/AML training of employees; (4) independent testing for BSA/AML compliance; and (5) customer due diligence.

45.    Significantly, as part of this AML program, TD is also required to implement a Customer Identification Program designed to verify the true identity of customers and beneficial owners of accounts, and to conduct ongoing monitoring of accounts in order to identify and report any suspicious transactions—collectively known as the KYC or "Know Your Customer" procedures.  KYC procedures were established by the 2001 U.S. Patriot Act in the wake of the 9/11 terrorist attacks, and are designed to, in short, ensure that a customer is who they say they are by requiring proof of identity with a photograph and separate proof of address (with more in-depth documentation required for higher-risk customers, products or services). These procedures are widely regarded as a critical first line of defense against illegal money laundering or terrorist financing.  By verifying a customer's identity and intentions upon opening a new account, and then monitoring any unusual transaction patterns—such as frequent wire transfers, international transactions, or interactions with off-shore financial centers—financial institutions can pinpoint suspicious activity and prevent the opening or use of fake accounts for money laundering.  KYC procedures also require banks to regularly update customer information and request

more documentation verifying the customer's identity and purpose for the account if needed, particularly if ongoing monitoring identifies suspicious transactions.

46.     Significantly, these AML requirements were not only well understood by the senior leadership of TD—including Defendants Masrani, Salom and Tran—but these same executives were personally responsible for ensuring that the bank's BSA/AML compliance program satisfied statutory standards and met regulators' expectations.  Specifically, federal regulations make clear that responsibility for maintaining and monitoring an adequate AML compliance program rests squarely on the bank's senior leadership, who are "ultimately responsible for ensuring that the bank maintains a system of internal controls to assure ongoing compliance with BSA regulatory requirements."  Indeed, the BSA/AML Examination Manual used by the OCC requires that any deficiencies in a bank's AML controls be reported directly to the bank's senior management and its Board of Directors.

47.     The OCC also regularly reviews the adequacy of a bank's AML program during annual supervisory reviews—one of which occurred during the Class Period in the fall of 2022—and the results of those reviews are also reported directly to senior management.  The FDIC's Application Procedures Manual explicitly states that in order for a bank merger to be approved, the bank's most recent supervisory examination must indicate that a satisfactory BSA/AML program has been implemented—and that any "[s]ignificant unresolved BSA/AML

deficiencies, or an outstanding or proposed formal or informal enforcement action that includes provisions related to BSA/AML, will generally preclude" merger approval.

48.     Indeed, due to how crucial adequate AML controls are to a bank's regulatory compliance, the Federal Reserve and the OCC have made clear that they will refuse to approve a merger if significant AML deficiencies are found.  As former Federal Reserve board member Daniel Tarullo stated in a March 2021 article, "when an acquiring bank has significant shortcomings in its compliance with anti-money laundering [AML] or consumer protection laws, there is a good argument that its 'managerial resources' should not be diverted to the integration of its target bank until it has remediated those shortcomings."

49.     M&T's acquisition of Hudson City—one of the most recent larger bank mergers preceding TD's acquisition of First Horizon—is instructive and represented a stark warning to future banks seeking to merge that deficient AML controls could—and would—doom a merger.  Specifically, although M&T's proposed $3.7 billion acquisition of Hudson City was announced in 2012, regulators refused to approve this much smaller, and far less systemically important, merger for several years, until 2015, after they found "significant weaknesses" in M&T's AML and consumer compliance programs.  These AML deficiencies included (1) "a lack of robust and comprehensive systems for collecting, processing, and updating

information needed to make money-laundering risk determinations for every customer and account," and (2) "weaknesses in M&T's processes and policies for identifying and reporting suspected structuring activities and other suspicious activities."

50.     While regulators ultimately approved M&T's acquisition, they did so only after M&T spent three full years—and millions of dollars—remedying the AML issues. Moreover, at the same time, the Federal Reserve made crystal clear that it would never again give another bank the same leeway and approve a merger if it found AML deficiencies. Instead, in its September 20, 2015 order ultimately approving the M&T merger, the Federal Reserve emphatically stated that all AML issues must be fully resolved prior to a merger application being submitted—or else the application would have to be withdrawn:

> The Board expects that a banking organization will resolve all material weaknesses identified by examiners before applying to engage in expansionary activity. As noted, M&T's issues largely arose during processing of this application, and the Board took the highly unusual step of permitting the case to pend while M&T addressed its weaknesses. The Board does not expect to take such action in future cases. Rather, in the future, if issues arise during processing of an application, the Board expects that a banking organization will withdraw its application pending resolution of any supervisory concerns.

51.     To banking professionals across the industry—including the Executive Defendants and their counsel—the Federal Reserve's strongly worded warning was a watershed moment, as the policy change was widely reported in the press,

including in The Wall Street Journal and elsewhere.[1]  For example, bank merger experts from Wachtell Lipton advised in an October 2015 report that the "Federal Reserve now expects to review detailed due diligence reports, including identified weaknesses and plans for remediation, as well as integration plans that delineate post-merger compliance and risk management systems and programs," with an "intense focus on consumer compliance, CRA and BSA/AML and the CFPB's views are increasingly important."  According to other bank M&A practitioners, "[a]ll of this makes it vitally important for prospective acquirers to carefully diligence their own potential issues and present detailed presentations to the regulators well in advance of signing a merger agreement."

### C. Leading Up To The Class Period, TD Was An Outlier Among Its Peers For Having A History Of Significant High-Profile AML Compliance Failures

52.    While having sufficient AML controls is critical for any bank, these concerns were especially important for TD.  Indeed, not only was TD now pursuing the largest acquisition in its history—one that promised to transform it into a true banking giant—but it also had a well-documented history of AML deficiencies.  In the years leading up to and during the Class Period, numerous regulators, senior government officials, and federal courts in the U.S. and Canada regularly criticized

---

[1] *See, e.g.*, Rachel Louise Ensign, 1,129 Days Later…Bank Deal Approved, *The Wall Street Journal* (Sept. 30, 2015).

TD Bank for egregious AML failures.  These failures included TD's "knowing" and "willful" involvement in several of the largest Ponzi schemes in recent history, scathing regulatory reports singling out the bank for its "surprising" and "troubling" AML deficiencies, and federal judges overseeing criminal trials calling out TD for being "asleep at the switch" with regard to AML controls.  Significantly, these same regulators and courts found that TD's AML failures were so pervasive that the most senior officers of the bank were indisputably fully aware of them.

53.     First, in the fall of 2009, the media began reporting on allegations that TD Bank assisted Scott Rothstein ("Rothstein") in perpetrating what at that time was considered potentially the largest Ponzi scheme in history—a $1.2 billion fraud pursuant to which Rothstein, a former lawyer, sold thousands of investors fake shares in whistleblower and sexual harassment lawsuits while promising them large rewards when the cases were settled.  On January 27, 2010, Rothstein pleaded guilty to a racketeering conspiracy in the United States District Court for the Southern District of Florida and was sentenced to 50 years in prison.

54.     As would ultimately be revealed, Rothstein was only able to perpetrate his fraud because TD turned a blind eye to what were obvious and pervasive improprieties.  Indeed, on September 23, 2013, the SEC charged TD and one of its executives—Frank Spinosa, a regional vice president—with violating the federal securities laws for their direct participation in the scheme.  Specifically, the SEC

alleged that TD and Spinosa had falsified documents and made false statements to investors about accounts Rothstein held at the bank to perpetuate the scheme. Among other things, Spinosa executed phony "lock letters" on TD Bank letterhead purporting to irrevocably restrict Rothstein's trust accounts in order to prevent money from being transferred other than to the investor's bank account designated in the "lock letter." In reality, these letters were completely fictitious. TD did nothing to restrict Rothstein from moving money out of the trust accounts, and the "lock letters" were not even a device TD Bank ever used.

55. Spinosa also falsely assured investors that certain Rothstein accounts held balances totaling millions of dollars, when in reality, these accounts held less than $100. Indeed, in one instance, Spinosa responded to an investor group's question that a particular Rothstein account held $20 million from a lawsuit settlement—when in fact there was nothing in the account. Even when one of the investors obtained a TD Bank deposit slip stating that there was in fact $0 in the account, Spinosa backed up Rothstein's false assertion that the funds were in the account but did not yet appear "available" on the deposit slip because they were still in TD Bank's "federal wire queue."

56. Significantly, the OCC determined that TD Bank's AML program utterly failed to appropriately monitor the accounts through which Rothstein and TD employees had perpetuated the scheme. While Rothstein was a major TD client in

2008 and 2009, TD generated around 100 fraud alerts for Rothstein's bank accounts, involving thousands of suspicious transactions. However, TD failed to timely file a single suspicious activity report ("SAR") with regulators as required under the BSA, a striking failure of training and oversight. The OCC thus concluded that TD Bank had engaged in "a pattern of misconduct" that was "significant and egregious," with thousands of transactions totaling $900 million in aggregate suspicious activity flowing through Rothstein's TD accounts. Similarly, FinCEN concluded that TD Bank "willfully" violated the BSA's reporting requirements by failing to timely detect and adequately report suspicious activities, which the bureau attributed to "a lack of adequate training for both the anti-money laundering and business staff."

57.    Consequently, in September 2013, TD Bank was forced to settle with the OCC, FinCen and the SEC, whereby it admitted that it "willfully violated" the BSA's SAR reporting requirements and agreed to pay $52.5 million in penalties for its role in Rothstein's scheme. In announcing the settlement, Andrew J. Ceresney, Co-Director of the SEC's Division of Enforcement, stated: "TD Bank through a regional vice president produced false documents on bank letterhead and told outright lies to investors, failing in its gatekeeper role" to prevent money laundering and fraud. And as to TD Bank's woefully deficient AML controls, FinCEN's Director stated: "[I]t is not acceptable to have a poorly resourced and trained staff overseeing such a critical function," noting that "in the face of repeated alerts on Mr.

Rothstein's accounts by [TD Bank's] anti-money laundering surveillance software over an 18-month period, [TD Bank] did not do enough to prevent the pain and financial suffering of innocent investors."

58.   <u>Second</u>, and remarkably, the fraud perpetrated by Scott Rothstein was not the only multi-billion-dollar Ponzi scheme in which TD Bank was implicated. Indeed, also in 2009, at around the same time the Rothstein scheme was unraveling, investors in R. Allen Stanford's financial company, who believed they were investing in high yield certificates of deposit ("CDs"), learned that in actuality it was a massive Ponzi scheme.  Specifically, Stanford created and owned Antigua-based Stanford International Bank, Ltd. ("SIB"), through which he sold CDs promising extraordinary returns to ordinary middle-class investors.  The scheme ran from 1999 until it collapsed 2009 amid investigations by the SEC and federal prosecutors, during which time Stanford amassed over $7 billion from tens of thousands of investors through the sale of the fraudulent CDs—rendering it the second largest Ponzi scheme in history next to that of Bernie Madoff.  In March 2012, a jury found Stanford guilty of numerous counts of money laundering, wire fraud, mail fraud, obstruction of an SEC investigation, and conspiracy.  Stanford was sentenced in June 2012 to 110 years in prison and ordered to forfeit $5.9 billion, with the sentencing judge stating that Stanford had orchestrated "one of the most egregious frauds ever presented to a trial jury in federal court."

59.     Significantly, as was the case with Rothstein, Stanford could not have perpetuated his fraud without the assistance of TD Bank.  Stanford used TD Bank to facilitate his massive long-running fraud, with the bank collecting almost $7 billion in fake CDs over the course of ten years without ever once questioning highly suspicious red flags that constituted classic hallmarks of a Ponzi scheme.  As detailed in a letter to TD Bank from U.S. Senators John N. Kennedy and Bill Cassidy demanding restitution for investors from the bank due to its direct participation in the scheme, "TD Bank ignored numerous inescapable signs of fraudulent activity" and "turned a blind eye to obviously fraudulent activity by Stanford."  Among other things, the Senators stated that TD blatantly ignored "large round sums leaving Stanford's TD Bank accounts"; "actual investment returns that could not support the unreasonably high CD returns SIB was offering"; "SIB's location in Antigua, one of the highest risk jurisdictions in the world known for money laundering"; and "Stanford's declared bankruptcy and designation as a Politically Exposed Person."

60.     Moreover, and tellingly, "[i]n its pursuit of the fees it could earn by aiding the Stanford empire," TD Bank ignored explicit warnings it received from federal authorities and other banks about doing business with Stanford and SIB—including the SEC, Pershing, L.L.C., Chase Manhattan Bank, and Bank of America. The Senators concluded that "[b]y providing banking services to Allen Stanford without so much as questioning a single transaction in the face of Stanford's

suspicious activity, TD Bank helped Stanford defraud thousands of unsuspecting victims." Notably, the Senators emphasized that TD had "yet to be called to account for the years of knowing assistance it provided to Stanford and his Ponzi scheme"— all while continuing to expand its operations in the U.S.

61. Senior government officials were not the only ones to explicitly recognize TD's role in the fraud. Following Stanford's guilty plea and conviction, Stanford customers sued TD Bank, alleging that it had played a critical role in facilitating the scheme. Specifically, these customers claimed that TD Bank collected the phony certificates of deposits while continuously ignoring significant red flags that strongly indicated they were part of a Ponzi scheme. On January 20, 2022—just weeks before TD announced its proposed acquisition of First Horizon— Judge David C. Godbey of the United States District Court in the Northern District of Texas, the court where the Stanford lawsuit was pending, denied TD Bank's motion for summary judgment. In that decision, the Court wrote that the evidence showed that TD "had clear insight into the destination of funds wired out of [Stanford's] account, which clearly indicated that [Stanford's Bank] directed the bulk of incoming funds to paying earlier investors, an obvious hallmark of a Ponzi scheme." The court further determined that "TD Bank transacted with Stanford in full awareness that improper behavior was ongoing within the Stanford entities."

62.    On February 27, 2023—at the same time TD was assuring investors about the adequacy of its AML controls, and that there were no issues whatsoever impacting regulatory approval of the First Horizon merger—TD settled the Stanford lawsuit for a staggering $1.2 billion.  Market participants noted that the massive payout occurred precisely because of the significant role TD played in the fraud. Indeed, *Fortune* reported that, according to the Court-appointed receiver, "TD is shouldering the largest share because it played an outsized role in Stanford's wire transactions," as it effectively served as the lynchpin of the fraud.  The investors' lead attorney likewise commented that the "[e]vidence at trial would've shown that TD took in almost $7 billion in CD purchase money from investors, far more than any other bank," with transfers that "bore numerous red-flag indications of money laundering"—including "large, round-dollar, high-velocity, in and out layering transactions, with no apparent connection to any investing that Stanford claimed he was doing."

### D.    The Rothstein And Stanford Ponzi Schemes Were Not Isolated Instances Of TD Bank's Compliance Failures, But Rather Part Of A Pattern And Practice Of Egregious AML Deficiencies

63.    Significantly, the Rothstein and Stanford Ponzi schemes were not isolated instances.  To the contrary, during the Class Period, TD Bank continued to be criticized by federal courts, regulators and senior U.S. government officials for having deficient AML controls.  Indeed, TD Bank was involved in numerous

additional egregious AML failures, all of which shared a strikingly similar fact pattern: a plethora of red flags indicating obvious fraudulent activity that was readily apparent to senior management, and severely deficient AML controls that allowed the fraudulent conduct to occur.

64.     For example, TD Bank was alleged to have facilitated a $3 billion Ponzi scheme involving the internet phone service company Telexfree. Specifically, TD assisted TelexFree's illegal activities by opening up a number of Telexfree accounts, breaking up large checks in order to launder money to other banks, and writing reference letters on TD letterhead for TelexFree-related entities involved in the Ponzi scheme.

65.     On August 31, 2022, the United States District Court for the District of Massachusetts denied TD's motion to dismiss and later held that, even after becoming aware of numerous red flags, "TD Bank continued to allow TelexFree to open new accounts, and subsequently facilitated large fund transfers between accounts to assist TelexFree in obscuring the source and movement of its funds"— including one instance in which "TD Bank facilitated the transfer of three million dollars between three accounts within the span of seven minutes." The court thus concluded that "[t]his is not a case where, despite certain suspicious activity, a bank failed to detect an underlying fraud"—but rather, "TD Bank's reactions to red flags"

supported a finding "that TD Bank 'actually knew' that TelexFree was a fraud."  TD ultimately settled the TelexFree lawsuit for $95 million in October 2023.

66.     In addition to consistently violating U.S. regulations regarding AML policies, TD also ran afoul of Canadian banking AML regulations.  Specifically, the Cullen Commission—a formal money laundering inquiry established by the Canadian province of British Columbia that was convened to investigate hundreds of millions of dollars that had been laundered through British Columbian casinos between 2018 and 2021—singled out TD Bank as the worst money laundering offender by far among the six largest Canadian banks.  Tellingly, despite being directly informed by the Commission of this fact, TD was the only large bank that failed to participate in "Project Athena," a private-public partnership between Canada's largest banks and the Canadian authorities designed to implement simple, basic measures—such as writing customer names on bank drafts—in order to prevent rampant money laundering in British Columbia casinos.

67.     Specifically, the Cullen Commission's final report, issued in June 2022, concluded that even though "TD was the largest source of bank drafts flagged as suspicious" by Canadian authorities dating back to 2018—and even though TD's top AML executives "were aware of this fact and that TD risked being out of step with its peers if it did not take action to reduce the anonymity of its drafts"—TD did not take any action at all to address the issue until over a year later, and even then only

after the Commission's counsel wrote the bank a letter pressuring it to do so.  The

Cullen Commission described this conduct as "troubling," and as rendering TD an

outlier among Canadian banks in terms of having woefully deficient AML controls:

> <u>I am troubled by TD's delay in implementing a change to its bank drafts
> (which did not involve tactical information sharing) to address a money
> laundering vulnerability flagged by law enforcement.</u>  It appears that,
> as early as December 2018, the vice president of Everyday Banking
> was advised of the Project Athena typology, the actions that other banks
> had taken to change their bank drafts, the potential for TD to be the sole
> bank among its peers not to do so, and the fact that failing to do so could
> make TD vulnerable for money laundering.  Yet, no change was made
> to its bank drafts until September 2020.  Further, this action appears to
> have been prompted by inquiries by Commission counsel, raising the
> question of whether it would have occurred otherwise.

68.     Indeed, the Cullen Commission's report explicitly criticized TD for its

long delay in implementing simple anti-money laundering measures, which it found

especially "surprising given that senior management in TD's anti-money laundering

unit were aware by at least May 2019 that their bank was the single largest source

of suspicious bank drafts being tendered at BC casinos, representing a sum of $26

million from March 2018 to January 2019 alone."

69.     Significantly, these senior executives included Michael Bowman, the

Global Chief AML Officer for TD Bank—whose role was to "oversee the bank's

AML compliance program ensuring that we are compliant with all of the applicable

laws," and to report to TD's senior management and Board of Directors regarding

any issues or deficiencies with that program—in addition to Caitlin Riddolls, Vice

President and Head of AML for Canadian Banking, and Anna Gabriele, a Senior AML Manager in charge of the Financial Intelligence Unit at TD Bank.

70.     Furthermore, the report stated that despite TD's top AML executives being fully aware that Canadian authorities had identified TD Bank as the single largest source of suspicious bank drafts, TD was unwilling to allocate any resources to remedy the issue, refusing the Commission's request for even a five-person investigation team—with Bowman claiming that TD "did not have a single person it could spare to analyze the data being provided by Project Athena." Indeed, in an interview for the Commission, Bowman had further admitted that, under TD AML controls as they existed at the time, "any client could have purchased a bank draft in the pacific region that would have not [] included information about their purchaser's name in the account." The report concluded that it was "concerning that one of Canada's largest financial institutions was so delayed in addressing a vulnerability to bank drafts that had been identified by law enforcement," stating that there were "costs to these decisions" with "millions of dollars of potentially suspicious funds entering BC casinos through TD bank drafts in the meantime."

71.     TD Bank's AML deficiencies were so severe they were also the subject of numerous criminal prosecutions of TD employees who flagrantly used the bank to carry out fraudulent schemes in the years leading up to the Class Period. One case involved what a federal prosecutor described as "one of the largest COVID-19 relief

cases in the country," in which a TD regional vice president used his position at the bank to obtain $15 million in fraudulent loans through the government's Paycheck Protection Program (or "PPP") COVID-19 relief loan program. That TD banker, Daniel Hernandez, served as a Vice President and Regional Manager at TD Bank who oversaw 80 employees at 27 branches, and was referred to internally at TD as the "second highest point of escalation [and] contact in South Florida." As Hernandez would ultimately admit in his criminal plea, from April 2020 through July 2021, he and several co-conspirators—including a former TD employee who was terminated from the bank in 2021 for submitting falsified documentation in order to obtain PPP loans—obtained kickback-like "commissions" from TD Bank customers by directing them to submit falsified paperwork for more than 90 PPP loans worth $30 million.

72. The PPP loans submitted by Hernandez and his co-conspirators were obviously fraudulent and should have been identified by basic AML checks. For example, the loans Hernandez procured included fictitious names that did not match IRS records, and were funneled to another TD employee, Oscar Alvarez, who processed three to four times more PPP loan applications than anyone else at the bank. Tellingly, when other TD employees raised concerns to their supervisors about the unusually high number of loans Alvarez processed—including Mr. Miceli and Mr. Pino, the Florida Regional Market President and South Florida Market

President, respectively—they were either ignored, silenced or retaliated against.  For example, Sean Tracy, a whistleblower who worked as a Regional Vice President in Miami from 2020 through 2022, was terminated after being told by Mr. Pino that, instead of raising concerns about Alvarez's high approval rates, Alvarez should be commended and looked upon as an example for other team members.  And even after TD Bank ultimately suspended Alvarez in May 2021, when that Tracy again reported to Miceli and Pino that it was very unusual that Alvarez processed significantly more PPP loan applications than any other bank employee—and told them that he had in fact personally witnessed Hernandez pushing numerous PPP applications to Alvarez—Miceli responded, "we are not to talk of this again . . . we didn't have this conversation."

73.     Thus, rather than help law enforcement identify and report the fraudulent transactions Hernandez had conducted through the bank, TD Bank senior managers did the opposite: they instructed TD employees "not to talk" about suspicions of fraud and not to report them to authorities, but to bury them.  As a result, it was not until over a year later when prosecutors had already zeroed in that Hernandez was finally terminated by TD Bank—indeed, this occurred only a few days before Hernandez was formally charged with conspiracy to commit wire fraud.

74.     In another fraudulent scheme that resulted in a criminal prosecution, Diape Seck, a TD Bank employee, opened hundreds of bank accounts between

41

January 2019 and January 2020 in order to facilitate the fraudulent depositing of checks stolen from the mail that were intended as donations to religious institutions. As described by witnesses at Mr. Seck's trial, *United States v. Seck*, No. 8:20-cr-00317-TDC (D. Md.), despite these accounts raising significant red flags, no Unusual Transaction Reports were submitted in connection with any of the hundreds of accounts Seck opened—even though Seck himself repeatedly raised concerns about the legitimacy of the accounts he was opening to his supervisor, Lawrence Thompson. Moreover, even though Thompson testified at trial that he in turn escalated Seck's concerns to his regional operations manager and regional market manager during quarterly audits, TD Bank still failed to act.

75. Significantly, after the jury found Mr. Seck guilty of conspiracy to commit bank fraud, the federal judge overseeing the trial—the Honorable Theodore D. Chuang—determined that Seck was entitled to a mitigation under the sentencing guidelines specifically because of TD Bank's complicity in failing to uncover and stop the fraud. As Judge Chuang recognized at Mr. Seck's sentencing hearing in June 2023, TD Bank's senior leadership had all of the information necessary to identify and put a stop to the fraud—but consciously chose not to do so in order to inflate the bank's bottom line. Indeed, Judge Chuang found that "the TD Bank people either were asleep at the switch or they were happy that they were getting these accounts." As Judge Chuang stated:

There is something very troubling about tagging Mr. Seck with the full brunt of a Draconian sentence for his conduct in treating TD Bank as the victim of a fraud perpetrated by him when <u>it was apparent from the evidence that the leadership of TD Bank had sufficient information to uncover this fraud and the tools to put a stop to it, but it let it continue.</u>

One need look no further than the fact that while the bank branch manager basically allowed this to continue, Mr. Thompson, a different employee at a different bank, upon looking at some records, pretty quickly figured out what was going on. With the most likely explanation being that the branch leadership likely, like Mr. Seck, <u>preferred to have the statistics associated with opening all these accounts credited to them and the dollar amounts associated with that rather than trying to uncover the fraud.</u>

**E.      After TD and First Horizon Announce The Blockbuster Merger, They Repeatedly Reassure Investors That They Have Effective AML Controls And Will  Easily Secure Regulatory Approval**

76.     As set forth above, on February 28, 2022, the first day of the Class Period, TD Bank and First Horizon jointly announced the $13.4 billion all-cash deal in which TD would acquire First Horizon at a price of $25 per share, a substantial 37% premium over what First Horizon stock was trading at prior to the announcement of the deal.

77.     Considering the critical importance of this deal to both banks—and TD's history of regulatory abuses—it was critically important for TD to convince investors that its prior AML issues had been fully remedied and that its current AML controls were robust and sufficient to satisfy regulators' requirements. Accordingly, throughout the Class Period—in Defendants' SEC filings and during nearly every earnings and investor call—Defendants went out of their way to repeatedly tout TD's

ability to satisfy its regulators' requirements, its "excellent regulatory relationships," TD's "comprehensive" AML controls that purportedly ensured that money laundering risks were "appropriately identified and mitigated," and Defendants' "extreme confidence" in obtaining regulatory approval.

78.     For example, throughout the Class Period, TD posted an "AML Statement" on its website touting its AML program, which the bank claimed allowed it to detect and deter money laundering, and the actions it supposedly took to address those concerns.  Specifically, the AML Statement claimed that TD's commitment to combatting money laundering was "formalized" through the Bank's "enterprise-wide Anti-Money Laundering/Anti-Terrorist Financing (AML/ATF)" program that was "designed to detect and report suspected money laundering and terrorist financing and activity."  The AML Statement further claimed that the bank ensured "[o]ngoing monitoring to detect and report suspicious transactions or activities" and conducted "[i]ndependent testing of AML, ATF and sanctions control effectiveness."

79.     TD further touted its AML controls throughout its Class Period SEC filings.  For example, in its March 7, 2022 Form 6-K signed by Defendant Masrani, TD highlighted its "risk culture," which "starts with the 'tone at the top' set by the board, CEO" and members of TD's senior executive team.  TD also emphasized its Code of Conduct, which was "reviewed and attested to by every board member and

eligible employee on an annual basis."  Significantly, that Code of Conduct explicitly affirmed that TD was "committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so."  TD's SEC filings also promoted the purported actions taken by TD's Audit Committee to ensure compliance with AML regulations, stating that the Audit Committee regularly "received updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions," and directly oversaw "the execution and ongoing effectiveness of [the AML program]."

80.    Then, in the parties' March 21, 2022 Bank Merger Act Application publicly filed with the OCC, TD Bank again affirmed that its "AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."  TD further stated, in no uncertain terms, that "[b]oth TD and FHN have comprehensive anti-money laundering and sanctions programs" that were "designed to ensure compliance with the [BSA]"—and that TD had in fact "review[ed] and assess[ed] key risks related to AML" during the due diligence process for the merger.

81.    In addition to these statements touting TD's "comprehensive" AML controls, TD consistently lauded the First Horizon transaction as a "strategically

compelling" and "financially very attractive" transaction that would add "critical" scale to TD's U.S. presence.  TD also repeatedly reaffirmed to investors, including in direct response to numerous analyst questions, that TD was intimately familiar with U.S. regulatory requirements and would easily secure approval of the deal safely within the timelines prescribed by the merger agreement.

82.    For example, on the February 28, 2022 conference call announcing the deal, Defendants Masrani and Jordan celebrated the transaction as a "strategically compelling" and "exciting opportunity" for TD because it would "increase[] our scale and density in core markets" and was "financially very attractive."  When an analyst questioned TD's ability to get regulatory approval of the merger, highlighting the recent "sensitivity around regulatory approval process for M&A in the U.S." and asking for "color just in terms of [TD's] comfort level" on closing the deal within the nine-month mark, Masrani quickly dismissed any such concerns:

> <u>We at TD have prided ourselves in having excellent regulatory relationships.  We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking .</u> . . The structure here, there have been instance where some deals have been slightly delayed.  So [the $0.65 price increase] does compensate the First Horizon shareholders should there be a delay of that nature.  But our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023.  So our expectation is that this will get approved and get [] closed around the 9-month mark.

83.    First Horizon's April 22, 2022 Proxy Statement (which was also reviewed and approved by TD)—in which First Horizon's board urged shareholders

to approve the merger—provided investors further comfort regarding TD's ability to easily secure regulatory approval.  Specifically, that filing  represented that:  (1) leading up to the merger, First Horizon's CEO Defendant Jordan personally met with Defendant Masrani no less than four times to discuss "the ability of TD to obtain, and the anticipated timing with respect to, the regulatory approvals required for TD to acquire First Horizon"; (2) First Horizon's board had identified TD's "legal and regulatory compliance" as a "Reason[] For The Merger" based on "information obtained through due diligence"; (3) that "each of First Horizon and TD does not know of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be received to permit the consummation of the merger on a timely basis"; and (4) that TD in fact "complied" with the BSA.

### F.  When Journalists and Lawmakers Begin To Raise Questions About TD's Regulatory Compliance, TD Vehemently Denies That It Has Any Regulatory Problems, And Continued To Tout Its "Extreme Confidence" In Obtaining Regulatory Approval

84.     Notwithstanding Defendants' positive representations about their robust AML controls and prospects for obtaining regulatory approval, beginning in the spring of 2022, certain journalists and lawmakers began raising pointed questions about TD's past regulatory issues and the potential impact of those issues on obtaining regulatory approval.  Significantly, in each and every instance, TD Bank emphatically and repeatedly denied the existence of any potential regulatory issues at all—while continuing to consistently assert that TD was "really, really excited"

about the "strategically compelling" First Horizon deal.  However, as Defendants would be forced to reveal at the end of the Class Period, all of these statements were false.  In reality, TD was plagued by severe and longstanding AML deficiencies that, at minimum, would take years to resolve—ultimately precluding regulatory approval of the First Horizon deal.

85.    For example, on May 4, 2022, *Capitol Forum* reported that TD had for years engaged in sales misconduct by opening fake bank accounts and enrolling customers in TD services without customers' permission—constituting clear violations of TD Bank's own AML Statement that the Bank ensured AML and KYC compliance through accurate "customer and transaction record-keeping" and "ongoing monitoring to detect and report suspicious transactions or activities"— which the OCC had discovered "during an industrywide probe into fake customer accounts spurred by [the] Wells Fargo scandal that came to light in September 2016."  According to *Capitol Forum*, these issues had resulted in the OCC issuing TD a private reprimand in 2017.  Significantly, the report directly questioned whether TD's misconduct would result in increased regulatory scrutiny of the First Horizon deal, particularly since current and former TD Bank employees told *Capitol Forum* that TD employees were still "strong-arm[ing]" customers into accounts and services they did not authorize or need—and that TD was "so lax about opening new

accounts," including by requiring only one form of identification instead of two in direct violation of KYC requirements, "that abuse [was] inevitable."

86.     In response to this report, TD immediately issued a statement attacking *Capitol Forum* and vehemently and completely denying any allegations of regulatory misconduct.  Specifically, TD stated that it "strongly disagree[d] with the characterization of information presented as facts regarding TD Bank's fraud procedures"—and that it also "strongly disagree[d]" with any implication "that our fraud controls are somehow related to sales practices or otherwise inadequate."  TD further vehemently asserted that its business was "built on a foundation of ethics, integrity, and trust," and that it faithfully "follow[ed] industry-best practices that are designed to detect and help prevent fraud":

> Our business is built on a foundation of ethics, integrity, and trust . . . We strongly disagree with any implications of systemic sales practices issues, or that our fraud controls are somehow related to sales practices or otherwise inadequate . . . [W]e strongly disagree with the characterization of information presented as facts regarding TD Bank's fraud procedures.  At TD Bank, protecting the security of our customer's accounts and personal information is a top priority.  We follow industry-best practices that are designed to detect and help prevent fraud.

87.     Then, on TD's May 26, 2022 earnings call held in the immediate wake of the *Capitol Forum* report—during which Defendant Salom again touted the "very compelling" First Horizon deal about which TD was "quite excited"—analysts again focused on TD's prospects for obtaining regulatory approval of the transaction.

49

Specifically, a Bank of America analyst noted that "the U.S. regulatory process has become a little more prolonged over the last year," and that "[o]ne of the concerns" the analyst had was that TD was "uniquely the G-SIB"—or Global Systemically Important Bank.  In light of the importance of TD to the global banking system, the analyst asked Masrani what his "conviction level" was "in terms of getting the deal through the regulatory sort of finish line."  Significantly, in response, Masrani emphatically and unequivocally asserted that TD was "very comfortable" because it had purportedly entered the transaction on the basis that "it meets all the requirements of all the regulators":

> [W]e feel very comfortable.  Our process continues.  And we did this transaction on the basis that [] it meets all requirements of all the regulators.  So we continue to be comfortable and are working hard to get it to closing.

88.    Nevertheless, despite TD Bank's angry denials, journalists and lawmakers continued to raise questions about TD's regulatory compliance.

89.    For example, as set forth above at ¶67, on June 3, 2022, the Cullen Commission issued its Final Report, which openly criticized TD for being the only large Canadian bank to fail to implement simple AML measures to prevent rampant money laundering.  The Commission specifically noted that TD failed to take these rudimentary measures despite "the actions the other banks had taken to change their bank drafts, the potential for TD to be the sole bank among its peers not to do so, and the fact that failing to do so could make TD vulnerable to money laundering."

Indeed, the Commission concluded that it was "troubled by TD's delay in implementing a change to its bank drafts" to "address money laundering vulnerability flagged by law enforcement," and that this delay was especially "surprising given that senior management in TD's anti-money laundering unit were aware" that TD "was the single largest source of suspicious bank drafts being tendered at BC casinos."

90.   Less than two weeks later, on June 15, 2022, Senator Elizabeth Warren and three other lawmakers sent an open letter to the OCC referencing the "disturbing May 4, 2022 *Capitol Forum* report about unchecked fraud and abuse at TD Bank." In the letter, Senator Warren cited the OCC's 2017 confidential finding that TD Bank was "one of a handful of retail financial institutions that had systemic problems in its account opening, verification and sales processes"—thus again constituting clear violations of KYC procedures requiring TD to verify customers' identities and purpose in opening new bank accounts—that "stretched across retail branches from Maine to Florida."  The letter sharply criticized the OCC's 2017 decision to issue only "a private reprimand" to TD "that would not materially impact TD Bank's business practices," which had "allowed TD Bank's rampant fraud and abuse to go unpunished, even after the agency's troubling findings in its own investigation of the bank."  The letter then specifically called upon Acting Comptroller Michael Hsu and the OCC to "closely examine" any "ongoing wrongdoing" and block the First

Horizon merger until TD had been held accountable for its regulatory abuses: "As TD Bank seeks approval from your agency to increase their market share and become the sixth-largest bank in the U.S., the OCC should closely examine any ongoing wrongdoing and block any merger until TD Bank is held responsible for its abusive practices."

91.     In response to Senator Warren's letter, TD again issued an unequivocal denial of any regulatory abuses regarding its fraud detection procedures.  TD stated that the *Capitol Forum* report was completely "unfounded"; that TD "vehemently object[ed] to any allegations of systemic sales practice issues, or any other claims alleged in the article"; that it "strongly" disagreed with the article's "characterization of information presented as facts regarding TD Bank's fraud procedures"; and asserted again that it "follow[ed] industry-best practices that are designed to detect and help prevent fraud."

92.     Then, on July 8, 2022, *Capitol Forum* issued another report detailing its discovery of another years-long investigation, this time by the Consumer Financial Protection Bureau ("CFPB") into improper sales practices involving TD Auto Finance.  The report again questioned TD's regulatory compliance and whether regulatory approval of the First Horizon deal was in jeopardy, stating that "[l]ast month, Senator Elizabeth Warren and three other lawmakers wrote that in light of *The Capitol Forum* reporting, the OCC should prevent TD Bank, which has

proposed buying First Horizon for $13.4 billion, from 'consolidating any new mergers until this pattern of behavior is addressed.'"  The report commented that news of the TD Auto Finance investigation "could spur additional concerns among lawmakers—and potentially regulators—about the First Horizon acquisition, which would make TD Bank the sixth largest retail financial institution in the U.S."

93.   TD's response to this report—which this time was issued by the General Counsel of TD Bank US, Ellen Glaessner—was again swift, and even more vehement than before.  Indeed, in its response, TD not only strongly denied the existence of any regulatory issues that could jeopardize the First Horizon deal, but went so far as to accuse the *Capitol Forum* reporter of defamation, asserting that the published reports contained "extensive inaccuracies and misrepresentations":

> <u>Your story is an accumulation of false claims, half-truths, rumor, innuendo, and completely unrelated information that misinforms your readers</u>.  You're leaping to <u>unfounded conclusions</u> that present an inaccurate view of TD and the hard work of thousands of dedicated employees.
>
> ….
>
> On repeated occasions, <u>we have outlined for you the extensive inaccuracies and misrepresentations in your reporting and inquiries</u>, which are once again evident in this story . . . You state 'the top regulator for national banks, found serious consumer abuses at TD Bank' . . . You make this claim yet have not disclosed any information to support this broad and unmitigated attack on our integrity.
>
> …

> If you persist in publishing, you will be doing so with the specific
> knowledge that your insinuations about TD are false, and in reckless
> disregard of the truth of the information that we have provided.

94.     Less than a month after *Capitol Forum*'s July report, on August 2, 2022,
TD held an investor call to announce its proposed acquisition of investment bank
Cowen Inc.  During the call, an analyst again directly asked Masrani about TD's
prospects for obtaining regulatory approval of the First Horizon deal—and
specifically, if Masrani had "[a]ny reason" to believe that the deal may not close, or
knowledge of any "regulatory or other issues that may delay the deal."  Significantly,
Masrani responded with a flat and emphatic "No":

> No, I have no reason to believe that . . . Just following its normal process
> within the U.S. regulatory requirements.  And we obviously cannot talk
> about our conversations with regulators.  We feel comfortable that [it]
> is proceeding at the pace we expected . . .

95.     Similarly, during an analyst call on September 14, 2022—soon after
TD had attended the August 18, 2022 public hearing on the First Horizon merger
with the OCC and the Federal Reserve—Defendant Salom emphasized that TD
remained "very excited" about the First Horizon deal, and was in fact "more excited
now than back in February when we announced the deal."  When an analyst again
directly asked Salom about "the elephant in the room"—specifically, for an "update
in terms of the timeline" for regulatory approval—Salom responded by
unequivocally asserting that TD was "extremely confident" in its ability to obtain

regulatory approval "in short order" due to the "strength" of its regulatory applications:

> [W]e're positioned to be able to close as we would expect.  At this point, we do expect to close the transaction at the end of the first quarter, fiscal first quarter.  And we're tracking well against that . . . And on August 18th we had the public hearing, the OCC, the Fed hosted that as part of the—normal part of the application process.  But to your point around—<u>I'm sure there's going to be a lot of questions about how confident are we?  We're extremely confident . . . So, if you look at the strength of the application, we're quite excited about getting this done in short order.</u>

96.    TD Bank's repeated positive statements about its ability to obtain regulatory approval of the First Horizon deal—and its vehement denials of any regulatory issues—had their intended effect.  For example, a June 2022 Bank of America report specifically cited TD's denials of the *Capitol Forum* reports as "unfounded" in downplaying the "anecdotal nature of the allegations," and pointed to TD's citation of the OCC's prior review of sales practices at U.S. banks as adding extra comfort that it was "unlikely" that there was any "widespread systemic issue at TD."  Similarly, a September 2022 Barclays report parroted Defendant Salom's statements that TD was "more excited about First Horizon (FHN) now than it was back in February when the deal was first announced"—and that TD was "extremely confident in approval of the deal."

97.    Indeed, First Horizon's stock price surged by 17%, from a price of $21.14 per share on June 15, 2022, the day after Senator Warren sent her letter to

the OCC, to a price of $24.85 per share on November 30, 2022—a price nearly equal to the $25 per share deal price, a strong indication that investors understood, based on Defendants' unqualified representations, that regulatory approval of the merger was a virtual certainty.

### G. Defendants Disclose Slight Deal Delays They Claim Are Benign— When In Reality Regulators Had Already Begun To Raise Concerns About Significant AML Deficiencies That Seriously Jeopardized Approval

98.    In or around October 24, 2022, the OCC completed its annual supervisory examination of TD Bank and its AML controls, and provided its feedback directly to TD's senior leadership, including Defendants Masrani, Salom and Tran.  Significantly, the feedback the OCC provided was far from positive.  As Defendants would be forced to admit at the end of the Class Period, TD was plagued by significant longstanding AML deficiencies that seriously jeopardized—and would ultimately preclude—TD's ability to obtain regulatory approval of the First Horizon deal.  Indeed, documents Plaintiffs obtained through a FOIA request to the OCC show that the results of this examination were promptly followed by urgent private meetings between TD's General Counsel, outside counsel Simpson Thacher and certain of TD's most senior executives—including Defendant Salom—and senior Federal Reserve and OCC officials and those agencies' counsel on no less than four separate occasions the following month.

99.     Specifically, on November 3, 2022, less than two weeks after the OCC had completed its examination, TD's outside counsel, Simpson Thacher; the General Counsel of TD M&A, Khasif Zaman; the General Counsel of TD Bank Canada, Jane Langford; and the General Counsel of TD Bank U.S., Ellen Glaessner—the same General Counsel who had issued repeated and vehement denials on behalf of TD Bank in response to the "unfounded" *Capitol Forum* reports—secretly met with senior officials from the OCC and the Federal Reserve "to discuss the merger application decision timing with TD management and its outside counsel." Specifically, the senior officials from the OCC included Stephen Lybarger, the Deputy Comptroller for Licensing; Ted Dowd, OCC Deputy Chief Counsel; Bryan Heath, the OCC National Bank Examiner-in-Charge of Large Bank Supervision; and Jason Almonte, the OCC Director for Large Bank Licensing, among others.  Senior officials from the Federal Reserve included Vaishali Sack, Deputy Associate Director of the Federal Reserve; Alison Thro, Assistant General Counsel; Reena Sahni, Associate General Counsel; and Jon Stolloff, Senior Special Counsel, among others.  Only one day later, on November 4, 2022, Glaessner, the General Counsel of TD Bank US, held a confidential one-on-one meeting with Lybarger, the Deputy Comptroller for Licensing at the OCC, as a "Follow up to Nov. 3 Meeting."   A few days after that, on November 10, 2022, Glaessner and TD's outside counsel Simpson Thacher attended yet another private follow-up meeting with Lybarger and Almonte,

the Director for Large Bank Licensing at the OCC.  Then, less than two weeks later on November 21, 2022, Defendant Salom, CEO of TD Bank US, confidentially met one-on-one with Greg Goleman—the Senior Deputy Comptroller at the OCC for Large Bank Supervision.

100.   The serious implications of these four separate successive meetings in November 2022 were clear.  These meetings involved, among others, TD's General Counsel, its most senior executives, and senior Federal Reserve and OCC officials and those agencies' counsel.  They took place in the immediate wake of the OCC's completion of its supervisory examination of TD Bank, and during those agencies' review of the proposed FHN merger.  As confirmed by Defendants' admissions at the end of the Class Period, these regulators had clearly identified serious issues with TD Bank's AML controls and had informed TD Bank's senior management that these issues were significant, would take years to remedy, and would likely preclude approval of the merger—and certainly would not permit approval on the timeline that the parties had announced to investors.  Indeed, in the immediate wake of these meetings, Defendants began to announce a series of deal delays that they falsely assured investors were benign and had nothing to do with any major regulatory issues, when in fact the exact opposite was true.

101.   For example, on December 1, 2022, during TD Bank's fourth quarter earnings call, Defendant Masrani provided an "update" on the First Horizon

transaction and disclosed that the expected timeline for closing would be only slightly delayed—from the first quarter of 2023 to the first half of fiscal 2023 (i.e., from November 2022 to January 2023).  Significantly, in making this announcement, Masrani was quick to reassure investors that "we are confident we'll get the closing within the timeline that we have put out," and continued to assert that TD was "excited about the benefits that this acquisition will deliver for all of our stakeholders."  Even when an analyst directly asked Masrani during the call if U.S. regulators were "taking a closer look at anything" and if that was the reason for the delay, Masrani responded with an unequivocal "No," stating that that he was "not aware of anything of the sort you're mentioning."

102.  Following TD's December 1, 2022 disclosure of what the market concluded was only a "subtle shift in timing expectations," Defendants continued to repeatedly assuage investors' concerns about TD's prospects for obtaining regulatory approval of the deal.  For example, during the January 9, 2023 RBC Markets Canadian Bank CEO Conference call, when an analyst asked for an "update" on regulatory approval, Masrani had only positive things to say. Specifically, Masrani stated that "[t]here was a public meeting organized by the regulators that went pretty well"—without mentioning any of the behind-the-scenes meetings with regulators that had decidedly not gone well—that there was "a lot of support among the community groups" for TD's merger application, and that TD

was negotiating a community benefit agreement that was also "going pretty well."
When Masrani finally addressed the regulatory delay, he presented it as completely
benign, pointing to other large bank mergers that had extended their timelines for
approval, and telling investors that "[o]ne deal that was approved took … 14 or 15
months," while "[a]nother deal that was announced ... two or three months before
ours, [has] not yet been approved."  Masrani then reaffirmed that TD's "expectation"
was that the deal would close in the first fiscal half of 2023 pursuant to the updated
timeline TD had provided.

103.   However, TD's private interactions with regulators continued to tell a
completely different story.  Specifically—pursuant to documents obtained from the
Federal Reserve through FOIA requests—less than two weeks later, on January 17,
2023, the Federal Reserve Board put TD's outside counsel Simpson Thacher on
formal written notice that the agency could not decide on TD's merger application
"until board staff receives additional information from another agency that is
necessary for the board to make a decision on the proposal."  This correspondence
signaled that the transaction was in serious jeopardy—indeed, by this time, the
merger had already been pending for almost a year, yet the Federal Reserve
considered TD's merger application to be "not complete" because it lacked the
information needed to approve it.

104.   Rather than disclose that TD was facing significant regulatory roadblocks, Defendants instead announced another seemingly innocent deal delay. Specifically, on February 9, 2023, TD Bank and First Horizon issued a joint press release announcing an extension of the merger deadline by three months from February 27 to May 27, 2023.  Once again, TD and First Horizon downplayed the significance of this purportedly short delay by assuring investors that it was routine and "in accordance with the terms of the merger agreement"—which permitted one such mutually agreed upon three-month extension—and by asserting that both parties remained "fully committed to the merger and continue[d] to make significant progress in planning for the closing."

105.   Remarkably, however, and unbeknownst to investors, by this time regulators had already informed TD that the merger could not be approved.  Indeed, just two weeks later, on February 22, 2023, Bryan Heath, the OCC examiner in charge of TD Bank, and Tim McDonald, head of Large Bank Supervision at the OCC, scheduled a private Zoom meeting for March 9, 2023 with Defendant Masrani and TD's outside counsel, Simpson Thacher.  According to former bank regulators and industry insiders, this high-level, secret meeting—which was undisclosed to investors until the end of the Class Period—was extraordinarily unusual, and essentially meant that the merger was dead in the water.  As *Capitol Forum* would later reveal, according to former regulators and industry sources, this meeting did

61

not "bode well for the merger" because "Bank CEOs attend such meetings with outside counsel only when matters are very serious."  Indeed, *Capitol Forum* specifically noted that the involvement of both Masrani and TD's outside counsel strongly indicated that the meeting was a last-ditch attempt by TD to avoid a DOJ referral and criminal prosecution—meaning that it already had been apparent to Defendants for some time that the OCC could not and would not approve the merger.

## V.    INVESTORS SUFFER LOSSES AS THE TRUTH IS DISCLOSED

### A.    Even After Defendants Were Privately Informed By Regulators That The Merger Was Dead, They Continue To Falsely Claim To Investors That The Deal Is On Track And Will Close

106.   The truth about the First Horizon merger—and the fact that regulators had rejected it because of TD Bank's severe and longstanding AML compliance problems—was disclosed in a series of corrective disclosures.

107.   First, before the market opened on March 1, 2023, First Horizon stunned investors by announcing in its Form 10-K that "TD does not expect that the necessary regulatory approvals will be received in time to complete the [p]ending TD Merger by May 27, 2023."  First Horizon further disclosed that, rather than extending the deal deadline for another three months, "TD [could] not provide a new projected closing date at this time."  Upon this disclosure, First Horizon stock fell over 10%, from a close of $24.77 per share on February 28 to $22.14 per share on March 1, 2023.

108.   Analysts immediately reacted with concern, expressing surprise that First Horizon had announced a delay due to regulatory approval only weeks after the parties had already extended the closing date by three months.  For example, a March 1, 2023 Barclays report stated that "the timing of a disclosure that the deal may not get regulatory approval is surprising," as it was only "weeks after an extension of the agreement between TD and FHN."  Similarly, National Bank of Canada opined that the "regulatory approval uncertainty" was now "legitimate," "especially considering the TD/FHN transaction has already faced some political backlash."

109.   As a result, analysts were intently focused on TD Bank's statements about the status of the transaction on its forthcoming March 2 earnings call—with analysts from Evercore, RBC, Janney, Wells Fargo, and Barclays all specifically noting their interest in comments from TD management about the deal and TD's "desire and willingness to complete the deal" on that call.

110.   Then, during TD Bank's March 2, 2023, earnings call, Defendant Masrani provided the exact assurance the market was looking for, strongly reiterating TD Bank's commitment to the transaction and dismissing any suggestion that regulators would be unwilling to approve it.  For example, Defendant Masrani told investors that TD was "fully committed to the transaction" and that it was "really excited about what this transaction does for [TD Bank's] U.S. franchise."  Masrani

63

further confirmed that TD had "opened discussions with First Horizon about a potential additional extension" of the closing date.

111.   Despite these assurances, Masrani faced a barrage of analyst questions concerning the status of regulatory approval for the deal.  For example, later on the call, an analyst directly asked Masrani "about the nature of the delay" given that it had "come[] so soon after the contract was extended to the end of May"—and specifically whether it was "procedural" or "something more substantive."   In response, Masrani claimed that while he purportedly could not provide any more detail about the reason for the delay, there was no cause for concern about obtaining regulatory approval of the transaction.  Indeed, to the contrary, Masrani made clear that TD was "really excited about this transaction," was "continu[ing] to work very, very hard" on getting it done, and TD's "planning for integration [had] continue[d]" as the bank had recently "set up an integration management office."

112.   First Horizon offered similar reassurances.  Specifically, on March 3, 2023, CFO Defendant Dmuchowski had a discussion with analysts at Evercore ISI. In that discussion, Dmuchowski similarly told investors that "TD & FHN remain in active discussions re: merger integration plans & related matters," and "support[ed] [the] view that [a] new deal timeline is on the way"—leading the analysts to "remain confident that the likelihood of the deal closing exceeds that of the deal breaking."

113.    Analysts were greatly comforted by TD and First Horizon's statements. For example, a March 2, 2023 Barclays report noted that the "clarity [from TD] on the FHN transaction should alleviate some confusion."  A March 2, 2023 Evercore ISI report similarly noted that "[d]espite the regulatory delay, TD not only reiterated its commitment to the deal and discussions with FHN to discuss the outside date, but also reiterated the merits of the acquisition (citing scale & U.S. capabilities)." Evercore further took great comfort in the fact that, "[n]otably, [management] also highlighted continued conversion planning & integration plans across all businesses"—causing it to "continue to believe the likelihood of the deal closing is greater than a termination[,] particularly given today's seemingly firm reiteration by TD."   RBC likewise commented that "[w]e believe TD is committed to the FHN acquisition and we put a high enough probability on a successful closing that we maintain our Outperform rating."

114.    Significantly, however, at the same time Defendants were claiming that they were in the midst of merger integration planning and actively negotiating a new closing date, on February 22, 2023, Masrani had already scheduled the "highly unusual" meeting with senior OCC officials and TD's outside counsel for March 9, 2023.   As set forth above, this eleventh-hour meeting and its involvement of Masrani, TD's outside counsel, and the OCC's most senior officials overseeing the merger was completely out of the ordinary and meant that Defendants knew that the

merger could not be approved.  This was confirmed by documents produced pursuant to FOIA requests to the Federal Reserve, which revealed that only four days later on March 13, 2023, Philadelphia Federal Reserve supervisor Eddy Hsaio emailed TD Bank's outside counsel and instructed TD to "prepare and submit a request for suspension of the processing" of TD's merger application.  In other words, the Federal Reserve had explicitly instructed TD to formally withdraw its merger application because it could not be approved.

115.   Indeed, since at least 2014, the Federal Reserve has informed banks that "when substantive issues are not resolved during the application review process," the Federal Reserve's "general practice has been to inform the filer before final Board action that staff would recommend denial of the proposal to the Board in order to provide the filer the option to withdraw the application or notice."  Moreover, as set forth above, the Federal Reserve had explicitly warned banks in 2015, after taking "the highly unusual step of permitting" the delayed M&T merger to pend for three years while M&T remedied its severe AML issues, that it would never again approve a merger of a bank with significant AML issues and would instead ask the bank to "withdraw its application pending resolution of any supervisory concerns"—exactly what the Federal Reserve had asked TD to do.

116.   On March 17, 2023, TD's outside counsel complied with the Federal Reserve's request and provided the agency with its suspension letter—definitively

and formally ending any possibility of regulatory approval.  Remarkably, despite this stark reality, Defendants still did not disclose to investors that they could not obtain regulatory approval of the deal or that TD was plagued by serious regulatory issues.  To the contrary, they continued to represent that integration planning for the merger was continuing and that they were actively in the process of negotiating an extension of the deal deadline.

117.   For example, during a meeting Masrani attended with Bank of America analysts on April 12, 2023, Masrani made additional public statements about TD's strong commitment to completing the First Horizon deal—without disclosing that the merger application had already been formally withdrawn due to regulators' refusal to approve it.  As Bank of America reported that day, Masrani had represented that TD "remains committed to completing the FHN deal where TD/FHN are currently negotiating an extension to the current deal deadline"—and had again "emphasized the synergies expected from the acquisition, namely fortifying the U.S. commercial banking (mainly middle market) capabilities, while adding over one million new customers."  Significantly, Masrani's positive statements about the deal had a direct and immediate impact on First Horizon's share price, which surged as much as 4.6% just after he made them.

118.   Similarly, during TD's annual general shareholder meeting on April 20, 2023—only two weeks before Defendants would be forced to reveal the truth that

regulators had rejected the merger—Masrani continued to provide assurances to investors that the transaction was proceeding, and that closing remained a matter of "when," not "if."  For example, during the call, Masrani was besieged by shareholder questions about the transaction and what was "causing the delay."  Despite knowing that TD had already formally withdrawn its merger application over a month earlier because the deal could not be approved, Masrani continued to strongly give investors the impression that the deal would still close—just on a longer timeline—by repeatedly telling investors in response to their numerous questions that TD had "initiated negotiations to extend our agreement with FHN."

| Question: | Hello. … Just a few questions. Question number one, <u>are you currently in discussions with FHN to extend the merger agreement</u> that you were referred to earlier in your presentation? |
|---|---|
| Masrani: | <u>We've initiated the extension arrangements or negotiations with FHN. Yes.</u> |
| Question: | And if you compare where you were back in late February when you announced this to now, <u>do you have the ability to provide FHN with more information now than you did a few months ago as to what is causing the delay?</u> |
| Masrani: | We said in March and I said it today that our belief is that we will not be able to get approvals by the merger expiry date of May 27. And therefore, <u>we've initiated negotiations to extend our agreement with FHN</u>. That's all I can provide you today, and I have no further update. |

119.  Significantly, during this annual meeting, Masrani was highly motived to continue touting the benefits of the deal, while concealing the highly material fact that TD had no bank merger application pending because regulators had rejected the

transaction.  Indeed, at the annual meeting, TD shareholders held a say-on-pay vote for the TD Executive Defendants' compensation, which included a recommendation to increase Masrani's target compensation from his 2022 target of $13 million to $15 million—a one-year increase of $2 million, and a nearly 150% increase from his $10.5 million total compensation just two years earlier.  Tellingly, the purported basis for this increase included, among other things, the First Horizon deal.  At the meeting, without knowing that the First Horizon deal had already failed, TD shareholders voted overwhelmingly to approve the TD Executive Defendants' pay packages.

120.  Analysts were again strongly reassured by Defendants' representations and had no idea that regulators had already fully and formally rejected the merger. For example, Wells Fargo analysts reported on March 24 that the "Pending Deal with TD Still on Track," concluding that "we still expect the deal to ultimately close at the negotiated price of $25 per share."  That assessment remained the same in the weeks that followed, with Wells Fargo concluding as late as April 18, 2023 that "mgt at FHN is still focused on deal closure, and is working toward that goal" and that "TD has commented recently they also remain excited about and focused on closure."  And Cormark analysts rejected the idea that an OCC investigation was the cause of the delay, stating that "we don't have any evidence to suggest this is the

case," inferring instead that greater regulatory scrutiny to larger U.S. bank mergers overall had caused delays like the one reported by TD to be more "commonplace."

**B.**   **Defendants Terminate the Deal After *Capitol Forum* Reveals That Regulators Would Not Sign Off, And Belatedly Reveal That They Are Under Investigation By The DOJ For Deficient AML Controls—With Penalties Expected To Be Imposed**

121.   Less than two weeks after Masrani told investors that TD was working to close the deal, the truth emerged.  Tellingly, it was not TD or First Horizon who initially disclosed the truth, but *Capitol Forum*, who Defendants had repeatedly excoriated during the Class Period for purportedly publishing false and defamatory information about them.

122.   Specifically, on May 3, 2023, *Capitol Forum* published an article revealing for the first time that Defendant Masrani and TD's outside counsel had secretly met with senior OCC officials nearly two months earlier on March 9, 2023—in what could only be understood as an eleventh-hour meeting that former regulators and industry sources confirmed was highly unusual and "d[id] not bode well for the merger."  Moreover, *Capitol Forum* noted that the secret OCC meeting had suspiciously come "just seven days after Masrani publicly declined to 'speculate' on when the deal might close," and had confidently presented that TD was "fully committed to the transaction."   This report—which confirmed investors' worst fears that TD's repeated delays in seeking regulatory approval were due to significant regulatory issues Defendants had concealed for months—immediately

triggered a 7% decline in First Horizon shares, which news sources tied to the "*Capitol Forum* report being circulated among traders."

123.   Spurred by the *Capitol Forum* report, Defendants were finally forced to come clean.  The very next day, on May 4, 2023, before the market opened, First Horizon and TD Bank stunned investors by issuing a joint press release disclosing that they had mutually agreed to terminate the merger because TD Bank could not obtain regulatory approval of the deal.  According to the press release, the termination of the deal came after "TD informed First Horizon that TD does not have a timetable for regulatory approvals to be obtained," as there was "uncertainty as to when and if those regulatory approvals can be obtained."

124.   Significantly, TD and First Horizon also announced that TD would voluntarily pay First Horizon a massive $200 million break-up fee—despite the fact that no out-of-pocket termination fee by TD was contemplated in the merger agreement—on top of the $25 million in merger-related expenses TD was already required to pay under the merger agreement.  TD clearly made this unusual payment to avoid liability for breaching its representations and warranties in the merger agreement, including representations stating that TD had "complied with" BSA/AML regulations.  In addition, while Defendants had represented for months that they had been negotiating an "extension" of the deal, in reality, First Horizon and TD had instead been negotiating this lawsuit-preventing termination fee.

125.  In response to this shocking announcement, First Horizon's stock price plummeted 33%, from a closing price of $15.05 per share on May 3, 2023 to $10.06 per share on May 4, 2023.

126.  Tellingly, even after announcing the termination of the deal, TD remained completely silent as to any specifics about the regulatory issues that had prevented approval of the deal.  Instead, confronted with First Horizon's cratering stock price, it was First Horizon CEO Defendant Jordan who made clear during the company's first quarter earnings call held that morning that the termination of the deal was due to TD's regulatory problems, and had nothing to do with First Horizon. As Jordan told investors, "the fact that regulatory approvals weren't able to be obtained by May 27 did not relate in any way to First Horizon."  Rather, Jordan explained that TD "could not provide an updated timeline for an extension," and in fact "could not provide assurance of regulatory approval in 2023 or 2024"—meaning that TD's regulatory issues were so longstanding and severe that they would take years to resolve.

127.  Moreover, Defendant Jordan clarified that—despite First Horizon and TD having both previously represented that they had been actively engaged in merger deadline extension negotiations since February and that price renegotiations had also been entertained—TD's regulatory issues were so severe and had doomed

72

the merger to such a definitive degree that, in reality, "[a]t no time did we discuss any changes in price or any other changes to the structure of the deal."

128.   Analysts expressed utter shock at the parties' joint announcement, and immediately questioned the extent of TD Bank's regulatory compliance problems, and questioned management's credibility.  For example, an RBC Capitol analyst noted that "[r]egulatory resistance to this extent clearly was more serious than we thought," and that "TD's future ability to close U.S. deals may be in doubt and TD's credibility as an acquirer has been dealt a blow."  A Barclays analyst similarly commented that "TD ha[d] effectively put itself in the penalty box for some time" with future acquisitions, as the failure of the merger because of serious regulatory issues would prohibit TD from acquiring a U.S. retail bank for 3-5 years at least. National Bank of Canada noted that "on the FHN call it was clear that regulatory approvals were not coming, to the point that FHN stated a renegotiated deal price was not even attempted."  One Morningstar analyst similarly described the termination as "baffling" because before the termination, and based on Defendants' representations, TD had successfully convinced the market—including by keeping pervasive regulatory problems a secret—that it was "one of the highest rated banks" globally and believed its "risk management and the way they operate is very strong." BMO analysts explicitly criticized management's failure to disclose TD's compliance issues, incredulously asking: "[w]hat was the issue that was significant

enough to delay regulatory approvals indefinitely, yet not material enough to disclose?"  And a May 4, 2023 *Forbes* report opined that "[t]he delay in regulatory approval that TD cited as the reason for canceling the deal suggests that there is something wrong here."

129.   Although TD Bank refused to provide any further detail on its compliance issues, the investors' concerns were soon confirmed.  On May 8, 2023, *The Wall Street Journal* reported, based on internal sources, that TD Bank's deficient AML compliance program and improper "handling of suspicious transactions" was behind regulators' refusal to approve the deal.  The article noted that "regulators' concerns stemmed from the way TD handled unusual transactions in recent years, and the speed at which some of them were brought to the attention of U.S. authorities."  *The Wall Street Journal* specifically cited an instance relayed from regulators to the Bank in which TD Bank had reported only 28 SARs for suspicious customer transactions in the 30 days in which banks are required to report them to FinCEN—an extraordinarily low number for a bank the size of TD.  *Bloomberg* likewise reported on May 8, 2023 that the merger "was held up as US regulators scrutinized [TD Bank's] handling of suspicious customer transactions," and "[t]he reluctance by [the OCC] and the Federal Reserve to sign off on those practices ended up being the biggest obstacle."

130.   Analysts' reactions to these disclosures confirm the materiality of Defendants' statements and that investors had been misled by TD Bank's prior false statements about its regulatory compliance.  For example, Bank of America analysts described how these disclosures were a "significant negative for TD's leadership team," a "potential black eye for management," and contrary to Defendants' assertions of their strong risk management during the Class Period.

131.   Then, on August 23, 2023—after having remained silent on the nature of the regulatory issues that had doomed the merger for over three months—TD Bank confirmed *The Wall Street Journal* and *Bloomberg* reports by disclosing that it had been responding to a wave of regulatory inquiries into its AML practices, including a formal DOJ investigation.  Specifically, TD revealed that regulators were investigating its AML compliance program "both generally and in connection with specific clients, counterparties or incidents in the U.S.," and that at least some of these inquiries were related to an investigation by the DOJ.  Moreover—and significantly—despite disclosing these investigations for the very first time in August, TD confirmed that they were so serious, and so far advanced in their progress, that it fully "anticipat[ed] monetary and/or non-monetary penalties to be imposed."

132.   TD Bank further disclosed that—contrary to its Class Period representations that TD followed "industry-best practices"—TD was instead

aggressively "pursuing efforts to enhance its [BSA/AML] compliance program." Defendant Masrani reiterated that point to analysts during the bank's third-quarter earnings call on August 23, when analysts sought clarity as to the extent of TD Bank's AML problems.  Specifically, Masrani stated that TD Bank was "pursuing efforts to enhance" its risk management controls and "working hard to enhance our programs," and noted that additional expenses would be required to fix them and bring them up to regulators' standards but refused to quantify what those expenses would be.  Instead, Defendant Salom noted generally that expenses were up 9.8% from the prior quarter and up 24% year-over-year in part because of investments in "governance and control," and that TD Bank was "investing in a number of different areas to strengthen the foundation of our U.S. franchise."

133.   Similarly, when questioned about the size of potential fines from the DOJ during a September 6 investor conference, Defendant Masrani again refused to provide any detail, telling investors that "historically [we] don't talk about provisioning in the manner that you are asking us" and "this is probably not a good time to start."  However, as Morningstar concluded in an August 28, 2023 report, Masrani's statements had made "clear that issues with the bank's anti-money laundering/Bank Secrecy Act compliance likely played a role in regulators withholding approval of the acquisition."

**C.   After The Class Period, First Horizon Admits That Its Diligence on TD Was Rushed and "Chaotic" And That, Unbeknownst to Investors, Its Top Executives Expected Regulatory Delays**

134.   After the deal collapsed, the First Horizon Executive Defendants admitted that their due diligence on TD was rushed and "chaotic"—despite being aware of significant regulatory red flags indicating that TD had serious compliance issues.

135.   For example, on June 14, 2023, during an investor call following the termination of the merger, Defendant Dmuchowski explained that First Horizon had received TD's unsolicited offer only seven days after it had completed a "merger-of-equals" with IberiaBank.   As a result, First Horizon's due diligence on TD Bank was in truth "chaotic" and cursory, and crammed into a 30-day period, even though "[t]ypically" the bank would "have a much longer due diligence."   Specifically, in describing First Horizon's due diligence on the investor call, Defendant Dmuchowski explained:

> So it was a little bit chaotic. We went into a 30-day due diligence. Typically, you have a much longer due diligence. Banks, when they enter into mergers, will enter right after a quarter end, give themselves some time. TD being on a Canadian calendar, they kind of worked right between that. So we had a 10-Q coming out, so we only had – or we had an earnings release coming out. So we only had 30 days to do all the due diligence with TD.

136.   Indeed, a former employee (herein referred to as "FE"), FE1, who worked in First Horizon's compliance program from 2018 through August 2022, and

most recently as a Senior Compliance Officer, likewise confirmed that First Horizon did not allocate sufficient time and resources to conduct adequate due diligence on TD.  FE1 stated that the merger with TD was announced very soon after First Horizon had finalized the merger with IberiaBank, and that First Horizon employees were given an unheard-of short amount of time in which to do proper due diligence.

137.  First Horizon employees were accordingly dumfounded that First Horizon thought the deal would quickly obtain regulatory approval.  While First Horizon had a very robust compliance program, TD did not have nearly the breadth of compliance testing First Horizon had, despite being a much larger bank.  For example, from what FE1 heard from fellow First Horizon employees, TD was not even looking at or touching some of the regulations First Horizon monitored.  As FE1 stated, TD bank had a very "light" compliance schedule—"too light of a schedule to properly mitigate risk"—and it was clear that TD was not doing enough compliance testing and did not have enough resources devoted to this work.  FE1 reported that, according to FE1's supervisor, TD's counterparts acknowledged how deficient TD's compliance program was in merger integration discussions centered on how the merged company would have to rely on First Horizon's compliance program instead.  According to FE1, by the early summer of 2022, it was evident to compliance personnel that there was no choice but to go with First Horizon's

program, as "we wouldn't be able to have the coverage we needed if we were to go with TD's program."

138.   Further, following the collapse of the deal, journalists and insider trading experts questioned the First Horizon Defendants insider stock sales during the Class Period—suggesting that these sales reflected that the stock market did not provide a "level playing field for both corporate insiders and outsiders."   Indeed, only one of Defendants' Class Period sales—Defendant Jordan's sales of 93,157 shares on February 24, 2023—was made pursuant to a Rule 10b5-1 insider trading plan.[2]

139.   However, the circumstances of even these sales were highly suspicious in nature, as Jordan had entered into the Rule 10b5-1 trading plan during the Class Period as regulators were zeroing in on TD's AML deficiencies in September 2022, and the sales were made less than one week before First Horizon would reveal that TD could not close by the merger deadline due to its inability to timely obtain regulatory approval.   Moreover, when asked to respond to suspicions that First Horizon insiders knew inside information about the risks to the deal while selling shares, a First Horizon spokesperson said that Defendant Jordan had entered into the Rule 10b5-1 plan specifically as a "safety measure" so that he could sell the shares

---

[2] In certain cases, implementing a Rule 10b5-1 trading plan can provide an affirmative defense to claims of insider trading where, unlike the case here, the plan is entered into when the insider lacks material nonpublic information.

in case there was a "delay" to deal closing—all but conceding that Defendant Jordan knew about the significant risks of regulatory delay, and entered into the Rule 10b5-1 plan so that he could profit off of that knowledge.

**D. Numerous Detailed Accounts From Former High-Ranking TD Employees Confirm That, In Reality, TD Bank's AML Compliance Program Was Antiquated, Ineffective, and Routinely Failed To Identify Suspicious Transactions**

140. Detailed accounts from numerous former high-ranking employees further establish that TD Bank had deficient AML systems and refused to make needed improvements, leading to widespread deficiencies in the TD's AML compliance program, including with respect to Know Your Customer ("KYC") and customer due diligence procedures.

**1. TD Bank Had An Antiquated AML Program that Failed To Identify and Report Suspicious Transactions**

141. Multiple former employees—who worked in geographically dispersed offices across North America and were responsible for different functions in TD's BSA/AML program—confirmed that TD Bank's systems were antiquated and decades out of date in comparison to its competitors in the banking industry. Indeed, even until just very recently, TD Bank relied on manual systems and hardcopy files to track important KYC information.

142. For example, FE2, a Vice President and Fraud Strategy Performance Manager at TD from 2021 to 2023, described significant capacity issues in which

TD Bank's systems were unable to manage all transactions flagged as suspicious, which occurred throughout FE2's tenure at TD.  FE2 described how TD's systems would identify suspicious transactions by setting up rules that would be triggered, for example, by identifying all cash transactions involving $10,000 or more, and another rule that would identify if someone tried to structure a $10,000 transaction by breaking it up over a few days (i.e., $3,000 one day, $4,000, the following day, and another $3,000 the next day).  BSA regulations require banks to file reports of cash transactions exceeding $10,000, or a series of related cash transactions that exceed $10,000.

143.   According to FE2, under TD's systems, all transactions were run through these rules at midnight every day and, if a suspicious transaction was identified, TD would receive an immediate alert and a "job" on that transaction would start running.  The following morning, a member of the AML/Fraud team would review the alerts and conduct an investigation. FE2 said, however, that these alerts were frequently "closed" during the night because of a "capacity" problem where TD's systems were unable to manage all of the flagged transactions. FE2 stated that if the system was running after midnight and there were capacity issues, those alerts would disappear—resulting in the system releasing holds on accounts that should not have been released.

144.   According to FE2, "There were no alerts in the system the following morning because the system would break down. It was a struggle every morning to try to fix it. This was a consistent problem."  As a result, scores of "open" transactions that should have been investigated were dropped from TD's system and not investigated for suspicious activity and reported to regulators as required by TD's policies and its obligations under the BSA.  According to FE2, "These accounts were flagged and should have been on hold but were released because of their system."  FE2 explained that these problems were prevalent throughout FE2's tenure at TD, and never resolved, leading TD's AML team to manage the problem with manual tools—which created severe delays with open cases because data had to be entered manually. For example, while alert systems at other banks would populate the transaction and customer information with a click of a button, this was not the case at TD—where all fields had to be entered manually, leading to delays and suspicious transactions getting missed.

145.   Equally problematic, many of the strategies TD was using to identify suspicious transactions did not work properly—as criminals identified ways to avoid detection through TD's checks.  As FE2 reported, TD's systems did not work in identifying suspicious transactions because TD "did not have clean data or correlation of data" and did "not have the right attributes for the rules"—because

"[i]f you pick the wrong attribute or data point, you are going to get false positive alerts because there was no correlation between that attribute and fraud."

146.   Similarly, FE3, who worked as an AML manager at TD Securities from 2015 to 2022, characterized TD Bank's systems as "archaic," and ten to 20 years behind competitor banks where FE3 had worked prior to TD Bank.  FE3 noted that, for years, TD had a KYC onboarding process in which documents were collected manually in hardcopy and stored in manila file folders and cabinets, and that this process was followed for a significant business line at TD through at least 2018.  As a result, conducting periodic review and updating customer information as required by FinCEN's customer due diligence rule ("CDD") rule required slow manual review of hard copy files.  To confirm whether each customer had updated documentation, the AML team had to reach out to relationship managers to discover if new information had been obtained.  The process was predictably vulnerable to errors, with FE3 describing many documents being misfiled and whole files being lost altogether.

147.   Likewise, FE4, who worked as an Assistant Vice President – Corporate Security Investigations on the Global Security Team at TD Bank from March 2022 through October 2023, confirmed that TD Bank's management and procedures facilitated and even codified systems that deterred filing SARs or reporting any kind of fraudulent activity.  At TD Bank, FE4 stated, the focus was "quantity, not

quality"—resulting in encouraging closing cases as quickly as possible, rather than thoroughly investigating them and reporting fraud.

148.   For example, FE4 explained that, while she was in the Global Security Investigations ("GSI") department at TD Bank, employees were frequently told to designate fraud cases as "Considered Not Filed" ("CNF").  This meant that—even where employees knew fraud to have occurred—TD Bank employees were told to find a reason not to file a SAR.  FE4 also explained the reason that journalists had publicly reported that TD Bank underreported suspicious transactions after the end of the Class Period was that TD Bank's processes for reporting suspicious activity hid the actual extent of fraud at the Bank.

149.   FE4 described at least three ways in which TD deliberately underreported suspicious activity.  First, if TD Bank identified fraud perpetrated by a non-Bank member, employees were told to mark the fraud as an "unidentified/unknown subject" even if the identity of the perpetrator actually was known.  FE4 explained that this practice was unique to TD Bank.  Typically, the "unidentified/unknown subject" designation would be used for credit card fraud— not known individuals who were members of another bank.  As a result of this mis-categorization, TD Bank would not have to report a fraud until it hit a $25,000 threshold.  If TD Bank categorized the fraud as conducted by a known suspect, the reporting threshold would have been far lower at $5000, and more fraud would have

been reported.  As one outcome of this practice, FE4 saw an unusually high rate of elder fraud occurring but not reported at TD Bank—far more than when FE4 was employed at Wells Fargo—because TD Bank would find ways not to report fraud perpetrated by known relatives of elderly TD Bank customers simply because the fraudster was not also a TD Bank customer.

150.   Second, TD Bank would group suspicious activities together to make it appear as though the total number of frauds at the Bank was less.  For example, if TD Bank identified a fraud ring that involved 10 suspects and 100 customers were defrauded, TD Bank employees would report, process, and document a single event of fraud.

151.   Third, FE4 confirmed that TD Bank did not always properly complete required state-level filings—including in particular with respect to cases of elder fraud—that TD Bank did identify internally.  Because TD Bank was severely under-resourced and understaffed in the Global Security Team, no one at TD Bank conducted quality control to ensure that required state filings of elder fraud had been completed.  And because the group was understaffed, FE4 stated that many SARs were filed incorrectly, including by recording incorrect amounts of money involved in the transactions, because employees needed to get them done as quickly as possible and did not receive the necessary training to complete them.

### 2. TD Bank Failed to Train Employees About AML Compliance and Follow Appropriate KYC Protocols

152. TD Bank's failure to invest in AML also extended to the inadequate training it provided to bank personnel. FE2 explained that at the other major banks where FE2 used to work, the banks would provide thorough training classes on AML that included real-world simulations where employees could practice their responses and receive feedback on identifying and handling suspicious transactions. TD Bank offered no simulations or similar tools—in fact, as confirmed by multiple former employees, TD Bank's AML training in many cases amounted to a single PowerPoint presentation. Moreover, FE3 explained that the presentation was just an overview of the relevant rules, containing no actual training on what it meant to implement those rules. As described by former TD employees, this training was nowhere close to what one would expect or be required from a major bank like TD.

153. The lack of adequate resources and training was reflected in the Bank's improper collection and handling of KYC information. For example, FE3 explained that his team was responsible for onboarding new clients and obtaining the necessary information to comply with regulatory requirements. However, when customers resisted providing the requested information, members of the Bank's Compliance function would frequently intervene to grant "exemptions," circumventing the AML team and essentially waiving the regulatory requirements for those customers. Compliance members would grant exemptions based on verbal conversations with

customers but without input from the AML team and often without documented assurance that the customer satisfied the Bank's onboarding requirements.  TD's AML team was instructed to onboard these customers anyway, over their objections that doing so was a violation of the Bank's regulatory obligations.  FE3 stated that these exemptions were granted "more often than not" and "more times than he would have like" when an onboarding customer pushed back on providing the requisite documentation.

154.   Other former TD Bank employees similarly reported that the Bank frequently provided exemptions to KYC rules for the Bank's senior management and "valuable" clients—and that this attitude was consistent with senior management's dismissiveness of the Bank's regulatory obligations.  For example, FE5, a senior manager during the Class Period and until recently, recounted one instance where another executive at TD Bank, who was requesting the opening of an account for a family member without proper identification, forced the opening despite the Bank's procedures and complained the procedures were inappropriate. FE6, who worked as a Compliance Manager at TD from 2016 to 2022, described a similar situation where a senior level manager's son applied for a TD credit card and his approval was pushed through without following AML protocols and without the requisite in-person verification.  According to FE6, these instances reflected the broader attitude at TD that senior executives and high-net worth customers "had

different rules" and were often onboarded without having to satisfy AML protocols—and violated BSA guidance concerning internal controls, segregation of duties, and management approval.

### 3. TD Bank's Regulators Identified Serious AML Deficiencies Despite TD Bank's Efforts to Conceal AML Problems

155.   Former employees also confirmed that TD Bank personnel took steps to hide TD's AML compliance deficiencies from the OCC and the Federal Reserve during annual supervisory examinations.  For example, FE3 repeatedly raised to his managers that TD's onboarding software did not reflect instances where compliance managers had granted KYC exceptions, making it impossible to accurately convey to regulators when and why certain customers had been onboarded without the proper documentation and verification.

156.   When regulators at the Federal Reserve or the OCC did request documentation for a customer who had been granted one of these exemptions, FE3 was instructed by individuals in Compliance who interacted with the regulators not to tell the regulators that they were missing the requested documentation and to leave it to the regulators to find the problems.  When the regulators ultimately did raise these issues, FE3 stated that the Compliance department assured them they were working to address them.  In reality, FE3 said, TD was not doing the work needed to fix TD's AML deficiencies.  FE3 could not understand how such supervisory exams could have gone successfully because TD Bank had such huge "holes" in its

AML compliance.  To FE3, TD's AML compliance procedures were so obvious and significant that he was surprised when the Bank's examination supervisors did not issue severe regulatory findings.  To the extent TD avoided adverse findings, FE3 reaction was to question his counterparts in Compliance, asking "What?  How?  Oh, so you basically just lied."

157.   In fact, TD had numerous AML compliance issues during the Class Period.  FE5, a manager at TD Bank during the Class Period and until recently, recounted that, in February or March 2022, TD's Global Anti-Money Laundering ("GAML") identified three AML issues in advance of an examination by Canada's Financial Transactions and Reports Analysis Center ("FINTRAC").  The first issue related to deficiencies with an inventory of TD's policies and procedures, which caused problems because when there were new AML updates, it was "cumbersome and painful" to implement new policy and procedure updates.  The second issue related to transactions that should have been disallowed under country-imposed sanctions rules following Russia's invasion of the Ukraine.  According to FE5, TD had trades that went through that should not have been allowed because TD's "Sanctions Playbook" did not properly handle these Russian-related sanctions.

158.   The third issue related to TD's deficient handling of medium and low risk clients which, according to FE5, were not being appropriately monitored and tracked.  According to FE5, "we were not keeping good audit files when we got

updates from our medium and low-risk clients," such as the client's employment status, address, and other information.  FE5 said that although TD's GAML team had identified this deficiency in February or March 2022, TD did not have a remediation plan on how to address this issue even a year later—after the merger had been terminated.

159.   Similarly, FE7, who served as the head of TD Securities U.S. Governance and Controls from October 2022 through March 2023 and was a member of the "Integration Management Team" on the First Horizon acquisition, confirmed that the OCC conducted an examination of TD during the Class Period and reported its findings to senior management in October 2022.  According to FE7, the OCC had flagged problems with TD Bank's AML programs like "basic monitoring" systems that were not in place, and which were documented in the formal written communications with TD concerning the OCC's supervisory findings.

160.   Moreover, far from these deficiencies representing isolated examples of misconduct by "rogue" employees, CFPB complaint data demonstrates that in the past three years, TD Bank had more fraudulent account opening complaints reported to the CFPB than any other bank except Wells Fargo—representing systemic and direct violations of TD's AML Statement obligations and KYC requirements.  This high rate of fraudulent account openings is particularly significant in light of the fact

that TD is meaningfully smaller than other banks with high levels of complaints. Indeed, on a per branch basis, TD Bank's fraudulent account rate was multiples higher than other institutions—with TD's rate of fraudulent account complaints per U.S. branch around three times that of Wells Fargo from July 5, 2019 to July 5, 2022:



161.   The consumer complaints filed with the CFPB detail how TD Bank opened these fraudulent accounts—which should have been prevented with adequate internal controls and KYC procedures requiring verification of customer identity before new accounts can be opened—with customers reporting, for example:

- "I have had numerous fraudulent accounts open at TD Bank. I've called them multiple times and they say 'they are looking into it.' I continue to get new accounts sent to me that someone is opening fraudulently. I have documents of everything I have for TD Bank. I am annoyed that this continues to happen at the same bank." (April 2022 CFPB Complaint)

- "The bank seems to have a high number of fraudulent activities. After leaving the bank, I went to the [ ] Police Department and filed a report.

The officer also told me that they had increased reports from individuals reporting the same situation with TD Bank." (March 2022 CFPB Complaint)

- "I received unsolicited debit card and checkbooks from TD Bank." (February 2022 CFPB Complaint)

- "I received an unsolicited new account from TD Bank. I tried to call them to correct the issue, only to be held for more than 2 hours to discuss an issue with the fraud line…" (February 2022 CFPB Complaint)

- "Neither of these two accounts were opened by me or my wife. A new debit card associated with account # [ ] was also mailed to my home address. I was out of town for a few months, when I returned home… I saw THREE different statements from TD BANK with Account #[s ], which we have no association with."  (April 2022 CFPB Complaint)

162.  These high rates of fraudulent accounts and TD's responses to customer complaints during the Class Period similarly put senior management on notice of the scope of TD Bank's compliance issues, and the outsized instances of fraud and AML abuses at the Bank compared to TD's peers.

### E.  Defendants Were Highly Motivated to Conceal the Truth and Profited Through Their Suspicious Insider Trades

163.  The First Horizon and TD Bank Executive Defendants were highly incentivized to conceal the truth from investors—as they were able to profit through highly suspicious sales of their personally held shares at artificially inflated prices and through pay packages premised on an acquisition they knew had failed.

164.  During the Class Period, numerous First Horizon senior executives engaged in sales of their personally held shares on the open market while the merger

was pending—highly suspicious trades that did not make any economic sense unless those individuals knew that the deal would not occur, or at minimum was in serious jeopardy of not being completed. As a University of Michigan Ross School of Business professor and insider trading expert noted, these insider sales were for prices below the $25 per share price that was guaranteed upon closing of the merger, and occurred at a time when "there was no need for any insider during this 12-month window to sell any shares in the open market, especially below the merger price of $25."

165.   Not only did First Horizon insiders sell shares on the open market while the merger was pending, but they did so under circumstances that strongly support an inference of scienter.  For example, Defendant Jordan sold approximately $2.3 million worth of First Horizon common stock on February 24, 2023, just two days after the OCC scheduled a call with Defendant Masrani and TD's outside counsel— a highly unusual meeting that industry insiders described as indicating the OCC's concerns were "very serious."  Of course, under the deal's terms, TD Bank was required to report this meeting to Defendant Jordan, invite him to attend (if permitted by the OCC), and relay the "substantive matters" that it was to address.

166.   Further, although this sale was conducted pursuant to a Rule 10b5-1 trading plan, that plan was adopted in September 2022—while the merger was pending and after First Horizon executives had seen first-hand just how deficient

TD's compliance and AML systems were.  While First Horizon defended Defendant Jordan's highly suspicious trades after the Class Period—claiming this 10b5-1 plan was set up as a "safety measure" in case the merger with TD Bank was delayed—First Horizon's explanation all but concedes that Defendant Jordan had knowledge of a risk of delay that investors did not.  Indeed, Defendant Jordan's adoption of a Rule 10b5-1 trading plan as a "safety measure" while regulators were scrutinizing the merger and TD Bank's AML compliance betrays Defendants' contemporaneous statements that they were "extremely confident" about the merger timeline.

167.    Similarly, Defendant Byrd sold twice as many shares during the Class Period as compared to the 15 months prior, for total proceeds of $12.66 million—representing one-fourth of his total holdings—none of which were pursuant to a Rule 10b5-1 trading plan.

168.    Likewise, First Horizon's Chief Risk Officer Terry Lawson Akins sold approximately $1 million of his First Horizon stock during the Class Period—or nearly one-fourth of his entire shareholdings—and had not reported any sales prior to this time.  His sales occurred on two dates—on April 27, 2022 and February 2, 2023, just days before TD Bank and First Horizon disclosed an extension of the deal closing timeline—and none were made pursuant to a Rule 10b5-1 trading plan.

169.    Notably, neither Jordan, Byrd or Akins sold any shares after the deal fell apart, when First Horizon shares collapsed and began trading at prices unaffected

by the TD Bank merger premium.  Moreover, their shares were sold at an average price of $23.35—a level approximately 10% below the merger price but, following the disclosures at the end of the Class Period, a value that is almost double what they are worth today.

170.   The TD Bank Executive Defendants—and Masrani and Salom in particular—were also motivated to conceal the truth that regulators had rejected TD Bank's application, as publicly disclosing that fact risked jeopardizing their rich compensation packages that were in part premised on their work in overseeing the acquisition.

171.   Specifically, as detailed in the proxy circular for TD Bank's April 20, 2023 annual meeting, Defendant Masrani and Salom were awarded pay packages that significantly exceeded those these executives received in prior years.  Moreover, those pay packages were supposedly based, in part, on those executives' work on the First Horizon transaction.  According to the proxy, the First Horizon transaction was one of a few "strategic" "highlights" entitling Masrani and Salom to their compensation packages and was a transaction that, "once closed, [it] will add scale, new capabilities, talented colleagues, and over one million customers and clients to the bank."

172.   Indeed, these Defendants' work on the First Horizon transaction was cited to justify an 117% upward adjustment for their bonus compensation plan under

TD Bank's Executive Compensation Plan.  These and the other key terms of the TD Bank Executive Defendants' compensation were subject to a "say-on-pay" vote by TD shareholders as outlined in the proxy circular sent to investors via a press release published on March 14, 2023—after the Federal Reserve told TD to suspend and withdraw its merger application.  But rather than disclose the truth that regulators had rejected the deal, at the April 20 annual meeting, Defendant Masrani misleadingly represented that TD was in "extension negotiations with First Horizon" about when the deal would close.

173.   As a result, shareholders overwhelmingly approved the compensation packages detailed in the proxy.  In doing so, Defendant Masrani received the largest pay bump of the most senior executives at Canada's five largest banks—enabling him to take home nearly $15 million in compensation, a 150% increase from two years prior, and during a year where most bank CEOs' pay declined.  For his part, Defendant Salom was paid $8 million—almost double his compensation as compared to the prior year.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

174.   As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning TD's proposed acquisition of First Horizon were materially false and

misleading when made. In addition to the allegations set forth above, these particularized facts include the following.

175. <u>First</u>, TD's proposed acquisition of First Horizon was the largest and most critical transaction in the history of both companies, and throughout the Class Period, the most senior officers of TD and First Horizon repeatedly spoke at length about the transaction and responded to repeated analyst questions about the prospects and progress of the deal. Indeed, Defendant Masrani characterized the deal as a "tremendous opportunity" for TD that was "strategically compelling" precisely because it would provide "leadership positions" in "some of the fastest-growing markets across the U.S.," catapulting TD into becoming the sixth largest bank in the nation that would compete against the likes of JPMorgan and Citibank. For that reason, Masrani stated that the deal was a "rare" find that would "lay[] the foundation for a fully national commercial banking franchise" and was "precisely the kind of transaction that [TD had] been looking for." Accordingly, it is implausible that the senior executives of TD and FHN were unaware of the details of such an important and transformative transaction, the regulatory requirements surrounding approval, and the discussions with regulators regarding the merger.

176. <u>Second</u>, the Executive Defendants understood full well that regulatory approval of the transaction would be of paramount importance for the deal's success, and that in particular, the effectiveness of TD's AML controls was the single most

critical aspect of the deal as the approval process unfolded.  Indeed, in the years immediately preceding the announcement of the transaction, regulators had materially delayed much smaller and less important bank mergers for years precisely because of AML deficiencies.  For example, M&T's $3.7 billion acquisition of Hudson City, announced in 2012, did not gain regulatory approval until 2015 precisely because regulators found "significant weaknesses" in M&T's AML policies.  Significantly, the Federal Reserve emphasized in a September 2015 order that it would not provide any such leeway in the future, and that moving forward, it "expect[ed] that a banking organization will resolve all material weaknesses identified by examiners before applying to engage in expansionary activity."  Given that TD's proposed merger with FHN was an even larger and more high-profile transaction—one of the largest deals of its kind since the financial crisis, and a transaction that would greatly expand TD's presence in the U.S.—the Executive Defendants knew full well that regulators would closely scrutinize the transaction.

177.  Third, the Executive Defendants were well aware of the massive deficiencies in TD's AML program given that, in the recent past and throughout the Class Period, TD was embroiled in some of the largest financial frauds in history, with multiple regulators, senior government officials and federal judges excoriating TD for its pervasive AML failures.  Indeed, with respect to the $1.2 billion Rothstein Ponzi scheme, the OCC found "a pattern of misconduct" at TD that was "significant

and egregious," and TD ultimately entered into a settlement with the OCC, the SEC and FinCen in which the bank admitted that it "willfully violated" BSA reporting requirements.  With respect to the $7 billion Stanford Ponzi scheme, TD paid a $1.2 billion settlement during the Class Period after U.S. Senators highlighted that "TD Bank ignored numerous inescapable signs of fraudulent activity" and "turned a blind eye to obviously fraudulent activity by Stanford."  In fact, just months before the start of the Class Period, a federal judge in Texas determined that "TD Bank transacted with Stanford in full awareness that improper behavior was ongoing within the Stanford entities."  Likewise, with respect to the $3 billion Telexfree Ponzi scheme, the United States District Court for the District of Massachusetts found in August 2022 that the facts supported a finding that "that TD Bank 'actually knew' that TelexFree was a fraud."

178.   Canadian authorities also singled out TD's abject failure in maintaining adequate AML controls.  In June 2022, the Cullen Commission issued a scathing report after a multi-year money-laundering investigation, which criticized TD for failing to implement basic AML controls after being "aware by at least May 2019 that their bank was the single largest source of suspicious bank drafts being tendered at [British Columbia, Canada] casinos."   TD's AML deficiencies also led to numerous criminal prosecutions of its own employees, including "one of the largest COVID-19 relief cases in the country"—involving TD employees submitting

fraudulent loan documentation for the PPP program—as well as another high-profile scheme in which a TD employee opened hundreds of TD bank accounts to help criminals steal religious donation checks. With respect to the latter case, Judge Chuang of the District of Maryland found that "it was apparent from the evidence that the leadership of TD Bank had sufficient information to uncover this fraud and the tools to put a stop to it, but it let it continue." These repeated and consistent excoriations from a multitude of regulators, judges and government officials put the Executive Defendants on direct notice that, contrary to their representations, TD was not in compliance with its AML obligations, providing compelling support for a strong inference of scienter.

179. Fourth, TD's increasingly vehement denials of any regulatory issues jeopardizing the First Horizon deal in direct response to questions being raised by journalists, lawmakers and investors supports scienter. Throughout the Class Period, *Capitol Forum* issued a series of reports raising questions about TD's regulatory compliance, including the rampant opening of fake accounts at TD that constituted direct violations of critical KYC procedures and internal controls. These reports ultimately prompted Senator Warren to write a letter to the OCC flagging "unchecked fraud and abuse at TD Bank," including the opening of new accounts without customers' knowledge or permission in violation of KYC requirements, and requesting that the OCC "closely examine" any regulatory violations and "block any

100

merger until TD bank is held responsible for its abusive practices." In response, TD issued increasingly strongly-worded vehement denials of any regulatory issues with its fraud detection procedures, going as far as to accuse the *Capitol Forum* reporter of defamation for printing "misrepresentations" and "inaccuracies." Moreover, despite these concerns being raised, TD continued to unequivocally represent to investors—including in response to direct investor questions about whether there were any regulatory issues causing delays in the deal timeline—that TD remained "extremely confident" in obtaining regulatory approval of the deal. Defendants' repeated and emphatic denials in response to concerns being raised about TD's widespread AML violations—the same violations that, unbeknownst to investors, were so severe they would preclude regulatory approval of the deal—is highly probative of their scienter.

180. <u>Fifth</u>, the Executive Defendants were aware by no later than October 2022 that the merger was highly unlikely to receive regulatory approval specifically because of TD's severe AML deficiencies. Indeed, in October 2022, the OCC conducted a confidential supervisory examination of TD, and in November 2022, senior TD executives privately met with OCC officials no less than four times— meetings during which TD's AML problems were undoubtedly discussed. Furthermore, on February 22, 2023, Defendant Masrani scheduled what journalists reported and industry insiders described as a "very serious" meeting with senior

OCC officials that was a "last-ditch effort" to stave off a DOJ referral with the OCC on March 9, 2023—confirming that the merger lacked any chance for approval. Four days later, TD was instructed by the Federal Reserve to submit a request to suspend the agency's consideration of the merger application, and TD did just that on March 17, 2023—formally terminating any chance for approval.

181. Moreover, there is no question that both TD and First Horizon executives were well aware of these communications and meetings with the very regulators that would determine whether the merger would be approved. Indeed, as set forth in the merger agreement, TD was obligated not only to "keep [First Horizon] apprised of the status of matters relating to completion" of the transaction, but also to consult with First Horizon "in advance of any meeting or conference with any regulatory agency or governmental entity" concerning the merger; to provide First Horizon with "the opportunity to attend and participate in such meetings and conference"; to provide First Horizon with "all information . . . as may be reasonably necessary or advisable in connection with the requisite regulatory approvals"; and to "promptly advise each other upon receiving any communication" from regulators "that causes such party to believe that there is a reasonable likelihood that [regulatory approval] will not be obtained, or that the receipt of any such approval will be materially delayed." Thus, despite knowing full well that regulatory approval of the deal was not forthcoming, the Executive Defendants proceeded to make a litany of

wholly positive statements concerning the regulatory prospects of the transaction as set forth above—including in direct response to analysts' specific questions about regulatory approval—while concealing from investors their contemporaneous knowledge that the deal was imperiled and, ultimately, had been withdrawn. Such facts provide an overwhelmingly strong inference of the Executive Defendants' scienter.

182. <u>Sixth</u>, the senior executives of TD received the results of regular independent testing of the bank's AML compliance program. Indeed, these reports showed that TD's compliance program was severely deficient and inadequate, and the bank's AML violations identified therein were reported directly to Defendant Masrani and TD's Audit Committee. Despite receiving this information, the Executive Defendants never disclosed these deficiencies to investors, and instead falsely claimed during the Class Period that the Bank was in compliance with its BSA obligations while continually touting the purportedly positive prospects for regulatory approval of the transaction.

183. <u>Seventh</u>, and as disclosed at the end of the Class Period, TD had been under investigation by several "regulatory authorities and law enforcement concerning its Bank Secrecy Act/anti-money laundering compliance program," including "an investigation by the United States Department of Justice." In fact, the DOJ began investigating TD by no later than February 2023, and by August 2023,

the regulatory investigations into TD's AML practices were so advanced and serious that—rather than defend its conduct—TD admitted that it "anticipate[d] monetary and/or non-monetary penalties to be imposed."  Such critical and potentially damaging investigations by multiple regulators and law enforcement agencies could not have possibly escaped the attention of senior management for TD and First Horizon—particularly after news reports had specifically identified the fact of a DOJ investigation and raised it directly with TD during the Class Period.  The fact that TD disclosed an active DOJ investigation just a few short months after vehemently denying the existence of such an investigation—and threatening the journalist who identified it with claims of defamation—supports a strong inference of scienter.

184.  Moreover, under BSA enforcement guidelines, an AML violation warranting investigation by the DOJ would only have been initiated where the AML problem had been already reported to the "board of directors or senior management in a report of examination or other supervisory communication as a violation of law or regulation that is not isolated or technical, or as a matter that must be corrected." In fact, as reported by FE7, during the Class Period, the OCC examined TD Bank's AML compliance, and reported its findings directly to senior management in October 2022, and the serious AML deficiencies it identified were presented to the Audit Committee and Defendant Masrani.

185.  Eighth, the Executive Defendants had a strong personal financial motivation to conceal the truth.  Indeed, by delaying disclosure of the truth concerning the TD/FHN merger, Defendants Masrani, Salom and Tran avoided jeopardizing their generous pay packages, which were premised on the First Horizon acquisition but subject to a shareholder "say-on-pay" vote on April 20—after TD Bank had formally withdrawn the merger application.  By delaying this disclosure, these Defendants were able to avoid scrutiny into their pay packages—and an embarrassing situation in which the compensation approved by the Board would have been based on a failed deal that exposed the very AML compliance deficiencies that will likely inhibit TD's growth for years to come.

186.  Likewise, the First Horizon Executive Defendants' sales of their personally held First Horizon shares during the Class Period were highly suspicious in both timing and amount, and are highly indicative of their scienter.  For example, Defendant Jordan sold over a quarter worth of his personally held shares during the Class Period—including in sales that occurred just days after the OCC scheduled a "very serious" meeting with Defendant Masrani on February 22.  Similarly, Defendant Byrd sold a quarter of his holdings—over twice as many shares as he had the prior 15 months prior—for proceeds of $12.66 million, while First Horizon's chief risk officer sold a quarter of his holdings for proceeds of $1 million.  Neither of these latter two executives' sales were conducted pursuant to a Rule 10b5-1

trading plan, and all of which were suspicious in light of the fact that they were made at prices below those they would have received had merger closed.  As one leading insider trading expert put it, no insider would logically "sell any shares in the open market, especially below the merger price of $25" unless they knew the truth—that the merger was at grave risk of being denied regulatory approval.

187.  <u>Ninth</u>, First Horizon CEO Defendant Jordan was a longtime personal friend of Defendant Masrani, and communicated with him frequently about the transaction as it was occurring.  As Defendant Jordan told the Memphis Business Journal, "Bharat and I have known each other for over 10 years and have been friends" for years before the deal was announced.   Consistent with their personal friendship, and as reflected in the proxy, Defendant Masrani and Defendant Jordan spoke frequently and in detail about the transaction before the deal was announced, including during in-person meetings on January 12 and January 20 in Nashville; on February 4 in Charlotte, in which the two discussed Defendant Jordan's role in the combined company; on February 7, in Dallas, where Masrani, Salom, Jordan and the First Horizon Board discussed the transaction; and on February 19, when Masrani and Jordan discussed the transaction by phone.  Defendants Masrani and Jordan also kept in close contact while the merger was pending, as required by the merger terms and as Masrani and Jordan admitted.

188.   Tenth, even though Defendant Dmuchowski admitted First Horizon's due diligence for the transaction was "chaotic" and abbreviated, First Horizon bargained for and obtained deal terms that protected its interests in the event regulators rejected the merger.  Specifically, under the merger agreement, the base merger consideration of $25 per share would increase by $0.625 per share on an annualized basis if the merger did not close within the nine-month closing date of November 27, 2022—a term that compensated First Horizon for delays in obtaining regulatory approvals within an already tight timeline.  Further, as part of the merger, First Horizon negotiated and obtained TD's agreement to invest $493.5 million in convertible First Horizon stock—a cash payment to First Horizon that First Horizon would be able to (and in fact did) retain if (and when) TD was unable to close.  While Defendant Masrani claimed these were "customary terms" and "nothing unusual" when questioned about them during the Class Period, they decidedly were not.  Rather, these terms were highly unique, not found in any comparable transaction, and support a strong inference that the First Horizon Executive Defendants possessed highly material nonpublic information about TD's regulatory risks that were not shared with the investing public.

189.   Eleventh, TD's payout of $200 million to First Horizon when the deal was terminated is further indicative of Defendants' scienter.  The merger agreement did not contemplate any such payout—and there was no reason for TD to make any

such payout, let alone one of this magnitude—but for the fact that TD knew that it needed to do so in order to avoid or resolve claims against it by First Horizon. Indeed, TD had made a series of representations and warranties in the parties' merger agreement claiming that it was fully in compliance with BSA/AML requirements when it clearly was not. Not only does the break-up fee bolster the inference that TD's senior management knew its statements about AML compliance were false, but also demonstrates Defendants' statements about seeking to "extend" the deal deadline were knowingly false. As Defendant Jordan admitted at the end of the Class Period, in truth, Defendants had never negotiated a revised deal structure or price—but as the break-up fee reflects, were instead focused on TD's culpability for its inability to obtain regulatory approval due to its severe AML deficiencies.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

190.   During the Class period, Defendants made materially false and misleading statements, and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning TD Bank's acquisition of First Horizon, including, among other misrepresentations, Defendants' statements concerning TD Bank's compliance with BSA/AML regulations and their ability to obtain regulatory approval of the merger.

191.   As discussed above and further below, Defendants' representations were false and misleading when made, and omitted material facts either required to be disclosed or necessary to make Defendants' statements not misleading.  These material misstatements and omissions had the effect of creating in the market an unrealistically positive assessment of TD Bank's prospects to successfully acquire First Horizon.  In truth, Defendants knew that TD Bank had a slew of serious regulatory issues, including serious BSA/AML violations and woefully inadequate BSA/AML controls, that made obtaining regulatory approval of the First Horizon deal much less likely than what Defendants had represented to investors.  Defendants therefore misleadingly concealed from the market, among other things:  (i) that TD was at high risk for regulatory action, which significantly threatened regulatory approval of the First Horizon acquisition; and (ii) that First Horizon was at great risk proceeding with the merger, as it would be forced to put its strategic plan on hold for an extended period of time with no assurance that the merger would ever close due to TD's serious and undisclosed regulatory violations.

## A.   Defendants Tout TD's Regulatory Compliance and Confidence About Regulatory Approval in Announcing the Merger

192.   On February 28, 2022, the first day of the Class Period, First Horizon and TD Bank issued a joint-press release, which the companies also filed with the SEC on Forms 8-K and 6-K, respectively, announcing TD Bank's proposed acquisition of First Horizon.  In the press release, Defendants lauded the transaction

as "financially compelling," a "tremendous opportunity" and a "terrific strategic fit for TD." Indeed, Defendants emphasized that the deal was compelling specifically because it would significantly expand TD's U.S. presence, highlighting that the deal would "accelerate[] [TD's] long-term growth strategy in the United States by acquiring a premier regional bank with an aligned culture and risk-management framework." The press release further represented that the deal was "expected to close in the first quarter of TD's 2023 fiscal year"—or by January 21, 2023.

193. Also on February 28, 2022, TD held a conference call to discuss the First Horizon acquisition, which was attended by First Horizon CEO Jordan. A transcript of the conference call was provided directly to First Horizon shareholders as part of the proxy statement for the merger, which TD filed on Schedule 14A as "Soliciting Material" under § 240.14a-12. Significantly, during the call, analysts bombarded Defendants with questions about the likelihood of receiving regulatory approval for the deal, and in response, Defendant Masrani made clear that there were no impediments whatsoever in obtaining regulatory approval of the merger. For example, after an analyst noted that "there's a lot of sensitivity around regulatory approval process for M&A in the U.S," and asked for TD Bank's "comfort level on getting deal closing done," Masrani responded by asserting that, due to TD Bank's "excellent regulatory relationships" and "familiar[ity] with what the regulatory

requirements are," the companies "expect[ted]" that the deal "will get approved and get closed around the 9-month mark"—with a risk of only a "slight delay" at most:

> We at TD pride ourselves in having excellent regulatory relationships. We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking. So we will follow the customary regulatory requirements that you would expect us to do. The structure here – there have been instances where some deals have been slightly delayed. So [the $0.65 per share increase] does compensate the First Horizon shareholders should there be a delay of that nature. But our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023. So our expectation is that this will get approved and get closed around the 9-month mark.

194. Similarly, on the same call, another analyst asked about TD's ability to timely close the transaction "given the size of the transaction and the sort of the situation of the Fed in the U.S.," noting that "the probability of the delay is relatively high." Masrani responded by again asserting his confidence in a timely closing, and dismissing any suggestion that there was any basis to infer that the acquisition was "unique" in terms of the risk of a potential regulatory delay:

> [O]ur expectation is that we close by the first quarter, fiscal quarter of '23, which is before January 31. And then all these deals have extension rates of – in case the approvals are delayed or for whatever reason, we're not able to close during that time. It gets extended. And then finally, there's a final extension as well, and that's just customary. I don't think there's anything unique in this deal that you should be reading. Every deal we've done has had these provisions.

195. The statements in ¶¶192–194 were materially false and misleading, and omitted material facts when made. Indeed, Defendants had no basis to make these

representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition. Specifically, and contrary to Defendants' representations, TD did not have "excellent regulatory relationships," nor was it in compliance with the "regulatory requirements" it knew would be necessary for the First Horizon acquisition. Rather, as Defendants admitted at the end of the Class Period, TD had serious BSA/AML deficiencies that were so severe and persistent they would take years to cure—such that TD was unable to obtain the necessary regulatory approvals within any reasonable timeframe, and therefore had no basis to assert that it had an "expectation" of obtaining approval "around the 9-month mark," or at all.  Indeed, TD itself later confirmed that it had been the subject of numerous government inquiries regarding significant deficiencies with its BSA/AML compliance during the pendency of the merger—including a DOJ investigation—and expected "monetary and/or non-monetary penalties to be imposed" as a result of its violations. Former TD employees further confirmed that TD Bank's BSA/AML controls were woefully deficient throughout the Class Period.  Former TD Bank employees FE2 and FE3 explained how TD Bank failed to report suspicious activity as required by law, "a lot of things [got] missed" even when red flags were triggered, and deliberately employed policies to systematically underreport suspicious activity—

and how, on top of this, TD had insufficient AML personnel who were poorly trained and did not know or care enough about implementing AML controls.

196.   TD Bank also maintained a Code of Conduct and Ethics ("Code of Conduct") on its website throughout the Class Period, which was accessible to investors on February 28, 2022, the first day of the Class Period, via a Form 6-K TD Bank filed with the SEC on February 7, 2022.   The Code of Conduct was also reproduced and re-filed throughout the Class Period, including through Form 6-K filings on March 7, 2022, February 14, 2023 and March 14, 2023.

197.   The Code of Conduct unequivocally stated that "TD is committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so . . . We must not knowingly initiate or be party to money laundering and must promptly report suspected money laundering situations in accordance with the TD Bank Group Enterprise Anti-Money Laundering and Anti-Terrorist Financing Policy and the escalation procedures established for our business or region."

198.   The statements in ¶¶196–197 were materially false and misleading, and omitted material facts when made.   Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition.

113

Specifically, rather than TD Bank and its senior most executives being "committed" to "taking all reasonable and appropriate steps to detect and deter" money laundering and "promptly report suspected money laundering," the exact opposite was true. As Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal and expected to incur monetary and/or non-monetary penalties due to its regulatory violations. Several former high-ranking TD Bank employees—such as FE2 and FE3—further confirmed that, throughout the Class Period, TD Bank failed to report suspicious activity as required by law, including because its "antiquated" and "pretty bad" AML systems routinely resulted in suspicious transactions being "released" that should have been investigated. As a result, "a lot of things [got] missed" even when red flags were triggered. Moreover, as FE4 explained, TD deliberately employed policies to systematically underreport suspicious activity, and its reporting process to regulators was designed to hide the actual extent of fraud identified by the Bank. These former employees further described how, during the Class Period, TD Bank had insufficient AML personnel and who were provided with only minimal AML training.

**B.      TD Claims It Is in Full Compliance With Its BSA Obligations and Details Compliance Framework in the Proxy**

199.   Throughout the Class Period, TD posted an "AML Statement" on its website touting its AML program, which the bank claimed allowed it to detect and deter money laundering, and the actions it supposedly took to address those concerns.   Specifically, the AML Statement claimed that TD's commitment to combatting money laundering was "<u>formalized</u>" through the Bank's "<u>enterprise-wide Anti-Money Laundering/Anti-Terrorist Financing (AML/ATF)</u>" program that was "<u>designed to detect and report suspected money laundering and terrorist financing and activity</u>."   The AML Statement further claimed that the bank ensured "<u>[o]ngoing monitoring to detect and report suspicious transactions or activities</u>" and conducted "<u>[i]ndependent testing of AML, ATF and sanctions control effectiveness</u>."

200.   The statements in ¶199 were materially false and misleading, and omitted material facts when made.   Far from formalizing an AML program "designed to detect and report suspected money laundering and terrorist financing and activity," TD's AML program suffered from pervasive flaws that repeatedly failed to "detect and report suspicious transactions or activities."   Indeed, as Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, and TD expected to incur monetary and/or non-monetary

penalties due to its regulatory violations.   Several former high-ranking TD Bank employees further confirmed that, throughout the Class Period, TD Bank had "antiquated" and "pretty bad" AML systems that failed to capture necessary customer information and routinely resulted in suspicious transactions being "released" instead of reported and investigated.  Moreover, instead of maintaining "sanctions control effectiveness," former employees confirmed that TD deliberately employed policies to systematically underreport suspicious activity, and to hide from regulators the actual extent of fraud identified by the Bank.  These former employees further described how TD Bank had insufficient AML personnel who were provided with only minimal AML training.

201.   On March 3, 2022, TD Bank issued a Report to Shareholders regarding its first fiscal quarter 2022 results, which it publicly filed with the SEC on Form 6-K, signed by Defendants Masrani and Tran.   The Report to Shareholders incorporated TD Bank's "Risk Framework" set forth in TD Bank's 2021 Annual Report (filed with the SEC on Form 40-F on December 2, 2021), which purportedly provided a basis for the First Horizon transaction.  The same "Risk Framework" was incorporated into TD Bank's Class Period filings on Form 6-K made on May 26, 2022 and August 25, 2022.

202.   According to the "Risk Framework," TD Bank's Audit Committee actively oversaw "the activities of the Bank's Global Anti-Money Laundering

(GAML) group," which was "responsible for the oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance" and ensured "that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."

203.    The statements in ¶¶199–202 were materially false and misleading, and omitted material facts when made.  Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition. Specifically, TD Bank did not have a "disciplined risk culture," as it had been out of compliance with critical BSA/AML regulations for years.  As a result, TD Bank was in truth systemically failing to "identi[fy] and mitigate[]" money laundering risk, and therefore had no basis to claim that the First Horizon deal would "close in the first quarter of fiscal 2023" or within any reasonable timeframe.  Indeed, as Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, and TD expected to incur monetary and/or non-monetary penalties due to its regulatory violations.   Several former high-ranking TD Bank

employees further confirmed that, throughout the Class Period, TD Bank had "antiquated" and "pretty bad" AML systems that failed to capture necessary customer information and routinely resulted in suspicious transactions being "released" instead of reported and investigated. Moreover, TD deliberately employed policies to systematically underreport suspicious activity, and to hide from regulators the actual extent of fraud identified by the Bank. These former employees further described how TD Bank had insufficient AML personnel who were provided with only minimal AML training.

204. On March 7, 2022, TD Bank filed its 2022 investor proxy, which it filed with the SEC on Form 6-K and which was signed by Defendant Masrani. In the proxy statement, TD promoted the actions taken by TD Bank's Audit Committee to ensure compliance with anti-money-laundering regulations. Specifically, the proxy statement proclaimed that, as part of its responsibilities, the Audit Committee "[r]eceived updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions," and oversaw "the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program)."

205.   The statements in ¶204 were materially false and misleading, and omitted material facts when made.  Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition. Specifically, TD's BSA/AML compliance program did not have "adequate resources with experience and knowledge" to ensure its "ongoing effectiveness."  To the contrary, and as Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal—and expected to incur monetary and/or non-monetary penalties due to its regulatory violations.  Indeed, several former high-ranking TD Bank employees confirmed that, throughout the Class Period, TD Bank maintained severely deficient AML systems that routinely resulted in suspicious transactions being "released" instead of being reported and investigated.  Moreover, as FE4 explained, TD deliberately employed policies to systematically underreport suspicious activity to hide from regulators the actual extent of fraud identified by the Bank.  These former employees further described how, far from having "adequate resources with experience and knowledge" to ensure AML compliance, during the

Class Period, TD Bank instead maintained woefully insufficient AML personnel who were provided with only minimal AML training.

206.   On March 21, 2022, TD filed the Bank Merger Act Application ("BMA Application") with the OCC in which the bank provided further assurances regarding its anti-money laundering practices.   The BMA Application was submitted in connection with the First Horizon merger and was publicly available to shareholders on the OCC website.   TD represented in the BMA Application that "[t]he [TD] AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."   Additionally, the BMA application represented:

> Both TD and FHN have comprehensive anti-money laundering and sanctions programs that are reasonably designed to ensure compliance with the Bank Secrecy Act of 1970 [] and all applicable regulations and regulatory guidance, as well as compliance with requirements administered by [OFAC].   In addition, each bank has qualified, dedicated personnel who are responsible for administering such programs.   During the due diligence process, the AML team members from TD used a risk based approach to review and assess key risks related to AML.   Both programs are currently designed to meet the five pillars requirements and will be further enhanced in the Proposed Transaction.

207.   The statements in ¶206 were materially false and misleading, and omitted material facts when made.   Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any

possibility for obtaining regulatory approval of the First Horizon acquisition.  Far from having "comprehensive anti-money laundering" programs that were "designed to ensure compliance" with BSA/AML regulations and "meet the five pillars requirements," the exact opposite was true.  As Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it could not satisfy BSA/AML regulations and therefore was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, and TD expected to incur monetary and/or non-monetary penalties as a result of its regulatory violations.  Moreover, several former high-ranking TD Bank employees confirmed that, throughout the Class Period, TD Bank failed to report suspicious activity as required by law because the Bank's severely deficient AML systems routinely resulted in suspicious transactions being "released" instead of reported and investigated.  Moreover, as FE4 explained, TD deliberately employed policies to systematically underreport suspicious activity to hide from regulators the actual extent of fraud identified by the Bank.  These former employees further described how, during the Class Period, TD had insufficient AML personnel who were provided with only minimal AML training.

208.   On April 12, 2022, First Horizon filed its Preliminary Proxy Statement on Schedule 14A with the SEC (the "Preliminary Proxy Statement"), which was signed by Defendant Jordan.  TD was also responsible for the content of the

Preliminary Proxy Statement, as Section 6.1 of the Merger Agreement provided that TD Bank was to be "provided with a reasonable period of time to review the Proxy Statement . . . prior to filing and shall reasonably consider any comments from Parent."   The Preliminary Proxy Statement represented that "<u>each of First Horizon and TD does not know of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be received to permit the consummation of the merger on a timely basis[.]</u>"  It further represented that "<u>First Horizon currently anticipates that the merger will be completed in the first quarter of TD's 2023 fiscal year (beginning on November 1, 2022)</u>."

209.   TD Bank and First Horizon included a copy of the Merger Agreement as Annex A to the Preliminary Proxy Statement.  The Merger Agreement contained multiple representations by TD Bank that it was in material compliance with its obligations under the Bank Secrecy Act, including by maintaining a compliant AML program.   Specifically, TD represented that, "Except as would not, either individually or in the aggregate, have a Material Adverse Effect on Parent, Parent, Holdco and each of their Subsidiaries have complied with and are not in default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to Parent, Holdco or any of their Subsidiaries, including" the Bank Secrecy Act and "<u>any other law, policy or guideline relating to bank secrecy, discriminatory lending, financing or leasing</u>

practices, consumer protection, money laundering preventing, foreign assets control," and "U.S. sanctions laws and regulations." Moreover, TD Bank represented that it and its affiliates "have established and maintain a system of internal controls designed to ensure compliance by Parent, Holdco and their Subsidiaries with applicable financial recordkeeping and reporting requirements of applicable money laundering prevention laws in jurisdictions where Parent, Holdco and their Subsidiaries conduct business."

210. The statements in ¶¶208–209 were materially false and misleading, and omitted material facts when made. Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition. Specifically, contrary to TD Bank's representations that it was in compliance with its AML obligations and not subject to any supervisory action relating to its AML compliance, in reality, the opposite was true. As TD Bank was later forced to admit after the Class Period, in truth, it had been the subject of numerous government inquiries regarding significant deficiencies with its BSA/AML compliance during the pendency of the merger—including a DOJ investigation—and expected "monetary and/or non-monetary penalties to be imposed" as a result of its violations.

211.   On April, 22, 2022, First Horizon filed its Definitive Proxy Statement on Schedule 14A with the SEC, which was signed by Defendant Jordan.  As set forth above, TD Bank was also responsible for the content of the Definitive Proxy Statement pursuant to Section 6.1 of the Merger Agreement.  In the Definitive Proxy Statement, First Horizon made the same statements as made in the Preliminary Proxy Statement as set forth in ¶¶208–209.

212.   The statements referenced in ¶211 were materially false and misleading, and omitted material facts when made.  Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition.  Specifically, in light of TD Bank's serious and ongoing BSA/AML deficiencies, First Horizon had no basis to claim to investors that TD Bank's "legal and regulatory compliance" was a reason for it recommending the deal, or First Horizon and/or TD were unaware of any regulatory risk that would delay or prevent Defendants' ability to obtain regulatory approval.

213.   First, as Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal

Reserve for the First Horizon deal and expected to incur monetary and/or non-monetary penalties as a result of its violations.

214.   Second, First Horizon was aware of numerous red flags indicating that TD Bank had a recent history of serious regulatory violations that should have prompted it to conduct thorough due diligence on the matter, including, among other things, TD Bank's facilitation of several Ponzi schemes, its systemic creation of unauthorized or fraudulent customer accounts, and its routine facilitation of money laundering—and Defendants' admissions at the end of the Class Period confirmed that these deficiencies were ongoing and would take years to cure, such that two top regulators refused to sign off on the deal.

215.   Third, despite these numerous and serious red flags, Defendant Dmuchowski admitted after the Class Period that First Horizon's due diligence on TD Bank was in truth cursory and "chaotic" and crammed into a 30-day period, even though "[t]ypically" the bank would "have a much longer due diligence." Thus, First Horizon had not actually properly considered TD Bank's "legal and regulatory compliance," and misleadingly failed to disclose during the Class Period that its due diligence was in truth haphazard and inadequate.

## C.   TD Issues "Vehement" Denials In Response To Reports Over Its Compliance Deficiencies

216.   On May 4, 2022, *Capitol Forum* published the first of a series of scathing articles that directly questioned the adequacy and legitimacy of TD's

compliance controls.  Specifically, the article reported that TD had engaged in massive improprieties by opening fraudulent and fictitious bank accounts and enrolling customers in TD services without their customers' knowledge or consent, and that the OCC had privately reprimanded TD in 2017 regarding these violations. Significantly, the article directly questioned whether TD's misconduct would jeopardize regulatory approval of the First Horizon acquisition, particularly since the article alleged, relying on accounts from anonymous TD employees, that TD was still "strong-arm[ing]" customers into services they did not need—and that the bank was "so lax about opening new accounts that abuse [was] inevitable."

217.   In response, TD Bank categorically denied that it was engaged in any fraudulent practices that would jeopardize the regulatory review of the First Horizon deal whatsoever, and claimed that it followed "industry-best practices" that were "designed to detect and help prevent fraud":

> Our business is built on a foundation of ethics, integrity and trust . . . . We strongly disagree with any implications . .  that our fraud controls are somehow related to sales practices or otherwise inadequate. . . . [W]e strongly disagree with the characterization of information presented as facts regarding TD Bank's fraud procedures. At TD Bank, protecting the security of our customer's accounts and personal information is a top priority.  We follow industry-best practices that are designed to detect and help prevent fraud.

218.   The statements in ¶¶216–217 were materially false and misleading, and omitted material facts when made.  Indeed, Defendants had no basis to make these representations because they knew full well that TD was beset by severe and

intractable issues with its AML compliance controls, which gravely jeopardized any possibility for obtaining regulatory approval of the First Horizon acquisition. Specifically, far from having adequate fraud controls or "follow[ing] industry-best practices that are designed to detect and help prevent fraud," the exact opposite was true. As Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, and TD expected to incur monetary and/or non-monetary penalties as a result of its regulatory violations. Several former high-ranking TD Bank employees—such as FE2 and FE3—further confirmed that, throughout the Class Period, TD Bank had "antiquated" and "pretty bad" manual AML systems that routinely failed to capture necessary customer identifying information such that "a lot of things [to get] missed" even when red flags were triggered. Moreover, as FE4 explained, TD deliberately employed policies to systematically underreport suspicious activity, and its reporting processes hid the actual extent of fraud at the Bank. These former employees further described how, during the Class Period, TD Bank had insufficient AML personnel who did not know or care enough about AML controls, and who were provided with only minimal AML training.

219.   On May 26, 2022, TD Bank issued a Report to Shareholders regarding its results for the second fiscal quarter of 2022, which it publicly filed with the SEC

on Form 6-K signed by Defendants Masrani and Tran.  TD also held an earnings call on the same day to discuss those results.  During the call, Defendant Masrani again lauded the deal as "very compelling" from a strategic perspective, touting the acquisition as being "very additive as we continue to build our commercial bank and as we continue to try to grow the middle-market space," and that the progress of the transaction was "quite encouraging."  And once again, the merger's prospects for obtaining regulatory approval was front and center during the call and the focus of analysts' questions.  Indeed, analysts specifically inquired about the timing of the First Horizon acquisition in light of "the U.S. regulatory process [that] has become a little more prolonged over the last year."  In response to an analyst question seeking TD Bank's "conviction level in terms of getting the deal through the regulatory sort of finish line," Masrani emphatically stated that TD Bank was "very comfortable":

> [W]e feel very comfortable.  Our process continues.  <u>And we did this transaction on the basis that [] it meets all the requirements of all the regulators</u>.  So we continue to be comfortable and are working hard to get it to closing.

220.  The statements in ¶219 were materially false and misleading, and omitted material facts when made.  Rather than the transaction "meet[ing] all the requirements of all the regulators," the exact opposite was true.  As Defendants admitted at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, TD and

expected to incur monetary and/or non-monetary penalties as a result of its regulatory violations.   Moreover, several former high-ranking TD Bank employees—such as FE2 and FE3—further confirmed that, throughout the Class Period, TD Bank failed to report suspicious activity as required by law, including because it had "antiquated" and "pretty bad" AML systems that failed to capture necessary customer information and routinely resulted in suspicious transactions being "released" that should have been investigated.   These former employees further described how, during the Class Period, TD Bank had insufficient AML personnel who did not know or care enough about AML controls, and who were provided with only minimal AML training.

221.   Notwithstanding TD's angry denials of *Capitol Forum*'s reports, in the following months, numerous regulators, senior government officials, and investigative journalists continued to raise issues regarding TD's regulatory compliance and SML deficiencies.   In response, TD continued to tout the merger and assure investors that there were no obstacles or impediments to obtaining regulatory approval of the deal.

222.   On June 3, 2022, the Cullen Commission issued its Final Report, singling out TD as the only one of Canada's largest banks to fail to implement simple AML measures to prevent rampant money laundering in BC casinos.   Specifically, the Commission concluded that it was "troubled" by TD's delay in "address[ing]

<u>money laundering vulnerability flagged by law enforcement</u>"—a fact the Commission found especially "surprising" given that "senior management in TD's anti-money laundering unit" were aware that "their bank was the single largest source of suspicious bank drafts being tendered at BC casinos."

223.   Then, less than two weeks later on June 15, 2022, several media outlets—including CNBC, The Commercial Appeal and the Financial Post—reported on Senator Warren's June 14, 2022 letter to the OCC, referencing the "disturbing May 4, 2022 *Capitol Forum* report about unchecked fraud and abuse at TD Bank."  In the letter, Senator Warren sharply criticized the OCC for issuing only "a private reprimand" to TD in 2017 in response to discovering the bank's "systemic" and "troubling" improper sales practices, which had "allowed TD Bank's rampant fraud and abuse to go unpunished."  The letter then called upon the OCC to block the First Horizon merger until TD had been held accountable for its regulatory abuses: "As TD seeks approval from your agency to increase their market share and become the sixth-largest bank in the U.S., the OCC should closely examine any ongoing wrongdoing and block any merger until TD bank is held responsible for its abusive practices."

224.   In response to Senator Warren's letter and media reports regarding that letter, TD Bank issued another strong statement unequivocally denying any regulatory abuses:

> The allegations in the *Capitol Forum* article are unfounded. Our business is built on a foundation of ethics, integrity and trust . . . We vehemently object to any allegations of systemic sales practice issues, or any other claims alleged in the article . . . Finally, we strongly disagree with the article's characterization of information presented as facts regarding TD Bank's fraud procedures. At TD Bank, protecting the security of our customers' accounts and personal information is a top priority. <u>We follow industry-best practices that are designed to detect and help prevent fraud</u>.

225. On July 8, 2022, *Capitol Forum* issued another report questioning TD Bank's regulatory compliance, stating that the CFPB had conducted a "years-long investigation into TD Auto Finance," and that "matters on the CFPB enforcement unit's docket typically involve violations of law that have been found by the CFPB." The report also again referenced how the OCC, "the top regulator for national banks, found serious consumer abuses at TD Bank"—and how this had resulted in Senator Elizabeth Warren writing a letter to the OCC asking it to block the First Horizon merger. The report commented that these investigations "could spur additional concerns" among regulators "about the First Horizon acquisition."

226. TD Bank swiftly issued another categorical denial of this "unfounded" report—which this time came directly from the General Counsel of TD Bank US, Ellen Glaessner—that went so far as to accuse the *Capitol Forum* of defamation due to the "inaccuracies and misrepresentations of your reporting":

> Your story is an accumulation of false claims, half-truths, rumor, innuendo, and completely unrelated information that misinforms your readers. <u>You're leaping to unfounded conclusions that present an</u>

> <u>inaccurate view of TD and the hard work of thousands of dedicated employees.</u>
>
> . . .
>
> <u>On repeated occasions, we have outlined for you the extensive inaccuracies and misrepresentations in your reporting</u> and inquiries, which are once again evident in this story . . . You state '. . . the top regulator for national banks [the OCC], found serious consumer abuses at TD Bank . . .' You make this claim yet have not disclosed any information to support this broad and unmitigated attack on our integrity. . . . <u>If you persist in publishing, you will be doing so with the specific knowledge that your insinuations about TD are false, and in reckless disregard of the truth and the information that we have provided.</u>

227.   The statements in ¶¶221–226 were materially false and misleading, and omitted material facts when made.  Far from having no issues with the OCC or "follow[ing] industry-best practices that are designed to detect and help prevent fraud," the exact opposite was true.  As Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, and TD expected to incur monetary and/or non-monetary penalties as a result of its regulatory violations.  Moreover, former high-ranking TD Bank employees—such as FE2 and FE3—further confirmed that, throughout the Class Period, TD Bank failed to report suspicious activity as required by law, including because it had "antiquated" and "pretty bad" AML systems that failed to capture necessary customer information and routinely resulted in suspicious transactions being "released" that should have been

message

investigated.  As a result, "a lot of things [got] missed" even when red flags were triggered.  Moreover, as FE4 explained, TD deliberately employed policies to systematically underreport suspicious activity, and its reporting process to regulators hid the actual extent of fraud identified by the Bank.  These former employees further described how, during the Class Period, TD Bank had insufficient AML personnel who did not know or care enough about AML controls, and who were provided with only minimal AML training.

### D.   Defendants Continue to Reassure Investors Concerning TD's Comfort with the Timeline and Regulatory Approval

228.  On August 2, 2022, TD Bank held a call to discuss its current acquisitions, including TD's proposed acquisition of Cowen Inc. that was disclosed that day.  During the call and in response to an analyst question, Defendant Masrani explicitly rejected the notion that there was any risk of regulatory delay regarding the First Horizon acquisition:

Question:   And just one follow up, Bharat, on First Horizon.  It's been about six months since the deal.  Any reason you have to believe why the deal may not close as per the original timeline, the regulatory or other issues that may delay the deal at this point?

Masrani:   No.  I have no reason to believe that, Ebrahim.  Just following its normal process within the U.S. regulatory requirements.  And we obviously cannot talk about our conversations with our regulators.  We feel comfortable that [it] is proceeding at the pace we expect, and we are hoping that we can close it within the timeline we have stipulated.

229.   On August 25, 2022, TD Bank held a conference call to discuss its third quarter earnings.  During the call, analysts were again focused on TD's ability to obtain regulatory approval of the deal, with an analyst asking if TD "still fe[lt] comfortable in terms of the timing of the close," and if "there [is] any risk like in terms of a deal delay."  Defendant Masrani responded by again denying the existence of any regulatory risk, insisting that the deal "continued to progress in the normal course" with "nothing out there to suggest that is different this time around":

Just on your point, there is a lot of speculation on what might be the requirements to get approvals.  Our deal continues to progress in the normal course.  There is nothing out there to suggest that, that is different this time around.

230.   The statements in ¶¶228–229 were materially false and misleading, and omitted material facts when made.  In reality, TD Bank had no basis to assert that regulatory approval of the First Horizon deal would "progress in the normal course," with "nothing out there" or "no reason" to suggest any risk of regulatory delay or non-approval.  As Defendants were forced to admit at the end of the Class Period, in reality, TD Bank had serious regulatory deficiencies that were so severe and persistent that it was unable to obtain the necessary regulatory approvals for the deal within any reasonable timeframe.  Moreover, reports issued after the Class Period by The Wall Street Journal and Bloomberg confirmed that these deficiencies related to significant BSA/AML violations that had been ongoing for years, causing the two leading bank regulators—the OCC and the Federal Reserve—to refuse to sign off

on the deal.  Indeed, TD Bank later confirmed that it had been the subject of numerous government inquiries regarding significant deficiencies with its BSA/AML compliance during the pendency of the merger—including a DOJ investigation—and expected "monetary and/or non-monetary penalties to be imposed" as a result of its violations.

231.   On September 14, 2022, Defendant Salom attended the Barclays Global Financial Services Conference.  During the conference, Salom again claimed that TD was still "very excited about the First Horizon transaction," and in fact "more excited now than back in February when we announced the deal."  The Barclays analyst asked Defendant Salom about "the elephant in the room," which was "obviously [] the acquisition of First Horizon"—and specifically, for an "update in terms of the timeline" for regulatory approval.  Salom responded by unequivocally stating that TD Bank was "extremely confident" in obtaining regulatory approval of the deal "in short order":

> [O]n August 18th we had the public hearing, the OCC, the Fed hosted. That is part of the normal part of the application process.  But to your point, I'm sure there's going to be a lot of questions about how confident are we?  We're extremely confident.  We believe this transaction does not represent any financial stability or competitive consolidation risk. We've already announced that we will protect all the front-line staff, we will be retaining all the retail and commercial bankers. Likewise, we won't be closing any stores.  So, if you look at the strength of the application, we're quite excited about getting this done in short order.

232.   The statements in ¶231 were materially false and misleading, and omitted material facts when made.  In reality, Defendants had no basis to assert that they were "extremely confident" in obtaining regulatory approval from the OCC or the Federal Reserve, or that they "expect[ed]" the transaction to close by the end of TD Bank's first fiscal quarter.  Rather, as Defendants were forced to admit at the end of the Class Period, TD Bank had serious regulatory deficiencies related to significant BSA/AML violations that had been ongoing for years, and which were anticipated to result in "monetary and/or non-monetary penalties to be imposed."

### E.   Defendants Disclose a Delay to Deal Timeline But Continue to Reassure Investors About Regulatory Approval

233.   In October 2022, the OCC completed its supervisory examination of TD Bank, and communicated to the bank's senior leadership, including Defendants Masrani, Salom and Tran, that it had identified serious and longstanding AML deficiencies.  This prompted four separate meetings in November 2022 between senior OCC and Federal Reserve officials, those agencies' senior counsel, and TD's outside counsel, in addition to the bank's most senior executives—including its General Counsel Ellen Glaessner and Defendant Salom—during which regulators made clear to TD that the AML deficiencies regulators had identified were so severe and pervasive that regulatory approval of the First Horizon deal was highly unlikely.

234.   Nevertheless, Defendants continued to assert that TD's maintained robust AML controls and that the deal was going forward as expected and would soon obtain regulatory approval.

235.   On December 1, 2022, TD Bank filed its Annual Report for the fiscal year ending October 31, 2022 ("2022 Annual Report") with the SEC on Form 40-F, signed by Defendants Masrani and Tran.   The 2022 Annual Report included information about TD Bank's AML controls, stating:  "GAML is responsible for the oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."

236.   The 2022 Annual Report also represented (including in the notes to the financial statements) that the "Bank is currently planning to close the [First Horizon] transaction in the first half of fiscal 2023" or April 2023—which signaled a delay to the prior planned closing date of the first fiscal quarter, in January 2023.

237.   The statements in ¶¶233–236 were materially false and misleading, and omitted material facts when made.   In reality, and as Defendants were forced to admit at the end of the Class Period, TD Bank's BSA/AML controls were so

137

woefully deficient that it was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal, and the subject of numerous regulatory and law enforcement inquiries into its AML compliance—including by the DOJ—and expected to incur monetary and/or non-monetary penalties due to its regulatory violations.  Moreover, several former high-ranking TD Bank employees—such as FE2 and FE3—further confirmed that, throughout the Class Period, TD Bank failed to report suspicious activity as required by law, including because it had "antiquated" and "pretty bad" AML systems that failed to capture necessary customer information and routinely resulted in suspicious transactions being "released" that should have been investigated.  As a result, "a lot of things [got] missed" even when red flags were triggered.  Moreover, as FE4 explained, TD deliberately employed policies to systematically underreport suspicious activity, and its reporting process to regulators hid the actual extent of fraud identified by the Bank.  These former employees further described how, during the Class Period, TD Bank had insufficient AML personnel who did not know or care enough about AML controls, and who were provided with only minimal AML training.

238.  TD Bank held an earnings call on December 1, 2022, during which Defendants assured investors that the delay in the closing timeline for the First Horizon deal was of no moment.  Specifically, when an analyst questioned what was

"prompting the delayed expectation of closing," rather than disclose any regulatory problems with TD Bank's AML controls, Masrani dismissed any reason for concern, stating:  "[W]e're already in December. And so we don't control the timing of all the regulatory approvals, but we are confident that we'll get the closing within the timeline that we have put out."

239.   When the analyst followed up by asking for additional detail about what had caused the regulatory delay—and specifically whether the regulators were "taking a closer look at anything"—Masrani responded with an unequivocal "No," stating that he was "not aware" of any regulatory issues that could be causing the delay:

Question:   I mean are [the regulators] taking a closer look at anything?  Are you anticipating having to make any adjustments to your product lineup or your fee schedule in advance of the close?

Masrani:   No, I'm not aware of anything of the sort you're mentioning.

240.   The statements in ¶¶238–239 were materially false and misleading, and omitted material facts when made.  The delay in the regulatory review process was not routine and inconsequential as Defendants represented, but was rather demonstrated regulators had significant concerns about the deal and were unlikely to approve it.   Indeed, as Defendants were forced to admit at the end of the Class Period, TD Bank had serious regulatory deficiencies related to significant BSA/AML violations that had been ongoing for years, causing the two leading bank

139

regulators—the OCC and the Federal Reserve—to refuse to sign off on First Horizon the deal.

241.   On January 6, 2023, the *Miami Herald* published a news report that a high-ranking TD Bank employee Daniel Hernandez, who had conducted a massive PPP loan fraud through TD Bank's customers and accounts, had pleaded guilty to a wire conspiracy charge in what prosecutors labeled one of the "largest COVID-relief cases in the country."  In response to the story, TD Bank issued a strong defense to its conduct with respect to Mr. Hernandez, and represented that it complied with the law and that its fraud and AML controls had worked.  Specifically, as reported in the *Miami Herald*, TD represented that "[t]o protect our customers and the bank, TD has strong processes in place to identify, investigate, and deter potential fraud."  TD Bank further stated that "[i]n this matter, we initiated an internal investigation, cooperated with law enforcement, and terminated Mr. Hernandez prior to his arrest."

242.   The statements in ¶241 were materially false and misleading, and omitted material facts when made.  Rather than have "strong processes in place" to "identify, investigate, and deter potential fraud," in reality, TD Bank's processes were so weak and deficient that it was unable to obtain the necessary regulatory approvals for the First Horizon transaction and, in fact, expects to incur monetary and/or non-monetary penalties because of its AML compliance failures.  Further, rather than act properly to initiate an "internal investigation" and "cooperate with

law enforcement," TD Bank deliberately ignored, silenced, or retaliated against TD Bank employees who sought to report Mr. Hernandez's suspicious conduct—including by telling the whistleblower Sean Tracy "not to talk" about his suspicions concerning Mr. Hernandez to anyone.  Finally, while TD Bank claimed to have terminated Hernandez "prior to his arrest," in reality, TD misleadingly omitted that TD's senior management told employees who reported suspicions about the Hernandez fraud to remain silent, and only a year later terminated Herandez just days before he was formally indicted.

243.   On January 9, 2023, Defendant Masrani attended the RBC Markets Canadian Bank CEO Conference.  In response to an analyst question seeking an update on the First Horizon timeline, Masrani asserted that the delay was common in U.S. mergers and that the deal would close in a timely manner:

> [In] the U.S., the latest deals seem to take longer than what they used to.  The one deal that was approved took, I don't know, 14 or 15 months or something like that. Another deal was announced approximately 2.5 to 3 months ago before our deal got announced, we are into about 9 or 10 months into ours – I think, end of February is when we announced First Horizon.  But the deal that was announced a couple of months, two or three months before ours, is not yet been approved.  So, given all that, we - last quarter, I said that instead of originally expectation of closing within the first fiscal quarter of this year, it will be the first fiscal half, which seems to be appropriate given all the other stuff that's been going on.  So, that's our expectation on when that gets done.

244.   On January 18, 2023, First Horizon issued an investor presentation, which it filed with the SEC on Form 8-K.   The presentation stated that "TD expects the deal to close in the first half of its 2023 fiscal year."

245.   The statements in ¶¶243–244 were materially false and misleading, and omitted material facts when made.   The delay in the regulatory review process was not routine and inconsequential as Defendants represented, but instead indicated that regulators had significant concerns about the deal and were unlikely to approve it. As Defendants were forced to admit at the end of the Class Period, TD Bank had serious regulatory deficiencies related to significant BSA/AML violations that had been ongoing for years and would take years to cure, causing the two leading bank regulators—the OCC and the Federal Reserve—to refuse to sign off on First Horizon the deal.

**F.    Defendants Disclose Deal Delays But Insist They Are Benign— And Continue To Claim The Deal Is Going Forward Despite Regulators Having Already Rejected The Merger**

246.   On February 9, 2023, TD Bank and First Horizon issued a joint press release announcing that the companies had agreed to extend the acquisition's closing deadline by three months, from February 27, 2023 to May 27, 2023, which they claimed was routine and "in accordance with the terms of the merger."   TD and First Horizon further represented that they remained "fully committed to the merger and continue to make significant progress in planning for the closing"—without

disclosing anything about the significant regulatory issues TD was facing that likely precluded regulatory approval of the deal.

247.   Then, on February 22, 2023 and unbeknownst to investors, senior OCC officials scheduled a private Zoom meeting with Defendant Masrani and TD's outside counsel, Simpson Thacher, for March 9, 2023.  As *Capitol Forum* would later report, this meeting was "highly unusual," and effectively meant that the merger was dead in the water because "Bank CEOs attend such meetings with outside counsel only when matters are very serious."

248.   Less than one week later, the truth began to emerge.  First, on March 1, 2023, before market hours, First Horizon filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022.  In the report, First Horizon revealed that TD Bank had informed First Horizon that it "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023."  On this news, the price of First Horizon shares fell 10.6%, to close at $22.14 per share on March 1, 2023.

249.   The next day on March 2, 2023, TD Bank held its earnings call for the first quarter of 2023.  During the call, Defendant Masrani continued to give investors the impression that no significant regulatory issues had surfaced, and that TD Bank was "fully committed to the transaction" and still fully expected to close the deal and receive regulatory approval:

[W]e are doing what is prudent and appropriate.  We've opened discussions with First Horizon about a potential additional extension.  I cannot speculate on when we will receive approval.  I can tell you that we are fully committed to the transaction.  We have a robust Community Benefits Plan in place with broad community support across our combined footprint and our teams have made progress on integration plans.  This is a great transaction that offers scale and new capabilities to our U.S franchise.

250.   Later on the call, an analyst asked Masrani whether investors "should [] be concerned that maybe there is a supervisory issue in the U.S.," to which Masrani responded:  "I can't comment on our confidential discussions with our regulators.  That is an area no bank ventures into.  But with respect to First Horizon, we continue to work with our regulators as part of our application process, and we continue to do that."  When the analyst pressed Masrani and brought up the example of the M&T/Hudson City merger that was delayed by regulators for three years due to AML concerns, Masrani responded:  "We are very happy with the transaction and continue to work hard to get it over the closing over the finish line."

251.   The statements in ¶¶246–250 were materially false and misleading, and omitted material facts when made, as Defendants gave investors the misleading impression that TD Bank was actively negotiating a further extension of the deal and that no tangible regulatory issue seriously jeopardizing regulatory approval of the deal had yet come to light.  However, the delay in the regulatory review process was not benign, but instead was because regulators had raised significant concerns about TD Bank's BSA/AML compliance.  Indeed, by this time, Defendants had met with

144

senior OCC and Federal Reserve officials on several occasions, and senior OCC officials had requested a meeting with Defendant Masrani and TD's outside counsel—causing TD Bank to be fully aware that regulators had serious concerns about TD Bank's regulatory compliance and were unlikely to approve the deal.

252.   On March 3, 2023, Evercore ISI published an analyst report which summarized a recent discussion it had held with First Horizon CFO Defendant Dmuchowski.  The report stated that the analysts' "[d]iscussion with FHN's CFO Hope Dmuchowski supports view that new deal timeline is on the way," as Dmuchowski had represented that "TD & FHN remain in active discussions re: merger integration plans & related matters." Dmuchowski also claimed that "FHN has not been informed as to the nature of the new regulatory issue at TD, nor which regulator has brought it up."  The Evercore ISI analysts reported that, based on their discussion with Dmuchowski, they "remain[ed] confident that the likelihood of the deal closing exceeds that of the deal breaking."

253.   The statements in ¶252 were materially false and misleading, and omitted material facts when made, as Defendants falsely gave investors the impression that First Horizon was actively negotiating a further extension of the deal and that no tangible regulatory issue seriously jeopardizing the deal had occurred. However, in truth, the delay in the regulatory review process was not benign, but instead indicated that regulators had significant concerns about the deal and were

unlikely to approve it. Indeed, on February 22, 2023, senior OCC officials had requested an additional meeting with Defendant Masrani and TD Bank's outside counsel, strongly indicating that regulators had refused to approve the merger. Contrary to Defendant Dmuchowski's statements, First Horizon was fully aware of TD Bank's interactions with regulators and of their significance, as the Merger Agreement required TD Bank to keep First Horizon promptly and fully advised of regulatory discussions pertaining to any delay in approval. Moreover, as Defendant Jordan admitted at the end of the Class Period, in truth TD's regulatory issues were so severe and had doomed the merger to such a definitive degree that, in reality, "[a]t no time did we discuss any changes in price or any other changes to the structure of the deal."

254. On March 7, 2023, Defendant Tran attended an investor conference with RBC Capitol Markets. In response to a question about what had "changed" about the First Horizon deal, and whether the closing date would "go much further into the future," Tran responded by asserting that TD Bank was still "very excited about the deal." When the analyst pressed Tran by asking if there was a "plan B" if "First Horizon doesn't actually close," Tran rejected the notion there was any "plan B" and responded by claiming TD Bank was still fully committed to the deal: "Well, we're very committed to the transaction, very focused on that. And we're doing— we're working really hard to get the deal closing as soon as we can."

255. Just two days later, on March 9, 2023, Masrani and TD's outside counsel met with senior OCC officials, in the "highly unusual" meeting that, according to former regulators and industry insiders, meant that the merger was doomed.

256. On March 29, 2023, *Capitol Forum* reported that "U.S. financial regulators' decisions on TD Bank's (TD) proposed $13.4 billion acquisition of First Horizon Bank (FHN) are being held up by issues raised in a DOJ investigation, a source familiar with the matter said." While the *Capitol Forum* did not know what the focus of this investigation was or how long it had been going on, the source claimed it was not "related to faulty account concerns" which had been the subject of an earlier May 4, 2022 article by the *Capitol Forum*. Significantly, the March 29, 2023 article contained a response from TD Bank (which it also provided publicly as an attachment) denying that any DOJ investigation existed:

> When asked if TD Bank is being probed by DOJ for possible fair lending abuses, TD Bank in a statement defended its lending practices, adding, "We are not aware of any such investigation." <u>When asked whether TD Bank was aware of any Justice investigation, the bank said: "Our statement stands as our response."</u>

257. The statements in ¶¶254–256 were materially false and misleading, and omitted material facts when made. By this time, senior OCC officials had already told TD's senior most executives that the merger was dead in the water—and moreover, the DOJ investigation of TD's AML deficiencies had already been

ongoing for months.  Indeed, on August 24, 2023, TD revealed that it had, in fact, been responding to a DOJ investigation "concerning its Bank Secrecy Act/anti-money laundering compliance program"—and that the investigation was so serious and so advanced in its progress that, rather than defend its conduct, TD Bank "anticipate[d] monetary and/or non-monetary penalties to be imposed" as a result of the DOJ probe.

258.  On April 12, 2023, Bank of America held an investor meeting with Defendant Masrani.  According to Bank of America analysts, in that discussion, Defendant Masrani "reiterated interest in pursuing the First Horizon-FHN acquisition, with mgmt. highlighting the strategic merits of the deal, including expansion into the demographically attractive US Southeast markets, and gaining middle market commercial lending capabilities (synergistic with the recently completed Cowen acquisition)."   According to Bank of America, Defendants represented:

> Committed to First Horizon-FHN: <u>Mgmt. remains committed to completing the FHN deal where TD/FHN are currently negotiating an extension to the current deal deadline</u>. Mgmt. emphasized the synergies expected from the acquisition, namely fortifying the U.S. commercial banking (mainly middle market) capabilities, while adding over one million new customers. Location also remains attractive to TD, as the US Southeast is desirable for business and continues to grow at a faster pace than the rest of the US. The recent completion of the Cowen acquisition brings middle market investment banking capabilities to TD, pairing well with markets served by FHN. Cowen's equity Capitol markets (ECM) operations also brings US offering to TD's Canadian clients who want access to the US Capitol markets.

259.   On April 20, 2023, at TD Bank's Annual Meeting—which was held less than two weeks before the truth would be revealed—Defendant Masrani was besieged by shareholder questions about when the merger would close, and what the cause of the regulatory delay was.   In response, Masrani provided repeated assurances to investors that TD Bank had "opened discussions with First Horizon about a possible extension," while refusing to provide any information about what was causing the regulatory delay:

| | |
|---|---|
| Question: | Just a few questions. Question number one, are you currently in discussions with FHN to extend the merger agreement that you were referred to earlier in your presentation? |
| Masrani: | We've initiated the extension arrangements or negotiations with FHN. Yes. |
| Question: | And if you compare where you were back in late February when you announced this to now, do you have the ability to provide FHN with more information now than you did a few months ago as to what is causing the delay? |
| Masrani: | We said in March and I said it today that our belief is that we will not be able to get approvals by the merger expiry date of May 27. And therefore, we've initiated negotiations to extend our agreement with FHN. That's all I can provide you today, and I have no further update. |

260.   The statements in ¶¶258–259 were materially false and misleading, and omitted material facts when made, as Defendants falsely gave investors the impression that TD Bank was continuing to negotiate the deal with First Horizon when, in truth, regulators had already rejected it.   Indeed, by this time, senior OCC officials had directly informed Defendant Masrani and TD's outside counsel that the

deal would not be approved because of TD Bank's serious BSA/AML compliance problems. In fact, the Federal Reserve requested that TD Bank suspend its application from consideration by March 13—and TD Bank did just that on March 17, 2023, meaning that there was zero prospect of regulatory approval. Moreover, these facts—which were produced to Plaintiffs pursuant to a routine FOIA request—were decidedly not subject to any supervisory privilege, and thus could easily have been conveyed to investors despite Masrani's assertions to the contrary.

261. Indeed, it was not until May 4, 2023 that First Horizon—and not TD—disclosed that the deal was off due to regulatory issues concerning TD that "did not relate in any way to First Horizon," and that were so longstanding and severe that they could not be resolved for years, precluding regulatory approval of the deal.

## VIII. LOSS CAUSATION

262. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of First Horizon shares and operated as a fraud or deceit on Class Period purchasers of First Horizon shares by failing to disclose and misrepresenting the adverse facts detailed herein, including that (1) TD Bank routinely failed to comply with regulations governing its business; (2) TD's failures to comply with such regulations jeopardized regulatory approval of the TD-First Horizon merger; and (3) regulators had disapproved of the TD-First Horizon merger during the Class Period.

263.   As a result of Defendants' misrepresentations and omissions, the price of First Horizon securities declined significantly as the prior artificial inflation came out of the price of First Horizon securities on March 1, May 3, and May 4, 2023. Defendants' misstatements and omissions were the proximate cause of those price declines and the losses suffered by Class members.   The disclosures that corrected the market price of First Horizon securities and reduced the artificial inflation caused by Defendants' materially false and misleading statements and omissions are summarized in the chart below, which identifies each corrective disclosure event, the price declines in First Horizon common stock resulting from the event as compared to the prior day's close, and the percentage decline, each of which was statistically significant at the 99% confidence level:

| Date | Event | Price Change |
|------|-------|--------------|
| March 1, 2023 | First Horizon's annual report reveals that TD had informed First Horizon that TD "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023." | ($2.63) |
| May 3, 2023 | *Capitol Forum* reveals that Defendant Masrani had a "very serious" meeting with senior OCC officials that did not "bode well" for merger approval. | ($1.14) |
| May 4, 2023 | TD Bank and First Horizon disclose that the deal had been terminated because TD | ($4.99) |

151

| | was unable to receive regulatory approval. | |
|---|---|---|

264.   As a result of their purchases of First Horizon shares during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.   Defendants' materially false and misleading statements caused First Horizon shares to trade at artificially inflated levels throughout the Class Period, reaching as high as $24.64 on February 15, 2023.

265.   By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of TD Bank's ability to acquire First Horizon and the value of First Horizon securities.   As true facts about the Company were revealed to the market, the price of First Horizon securities declined significantly. These declines removed the inflation from the price of First Horizon securities, causing real economic loss to investors who had purchased or acquired First Horizon securities during the Class Period.

266.   The declines in the price of First Horizon securities after the corrective disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in First Horizon shares negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed

market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

267.   The economic loss, i.e., damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of First Horizon shares and the subsequent significant decline in the value of First Horizon when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.   PRESUMPTION OF RELIANCE

268.   At all relevant times, the market for First Horizon securities was an efficient market for the following reasons, among others:

(a)   First Horizon met the requirements for listing and its shares were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   First Horizon filed periodic public reports with the SEC and the New York Stock Exchange;

(c)   First Horizon regularly publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   First Horizon was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

269.   As a result of the foregoing, the market for First Horizon securities promptly digested current information regarding First Horizon from all publicly available sources and reflected that information in the price of First Horizon securities.  Under these circumstances, all purchasers of First Horizon shares during the Class Period suffered similar injury through their purchase of First Horizon shares at artificially inflated prices, and the presumption of reliance applies.

270.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding First Horizon and the TD Bank Merger—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the TD Bank's compliance with regulations governing its business, as alleged above, that requirement is satisfied here.

## X.   THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

271.   The statements alleged herein to be materially false and misleading are not subject to the protections of the PSLRA's statutory Safe Harbor for forward-

looking statements because (a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, Defendants cannot meet the requirements for invoking the protection, i.e., identifying the statements as forward looking and demonstrating that the statements were accompanied by meaningful cautionary language.

272.   Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

273.   Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is identified as such and "accompanied by meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A)(i).   An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (i) identify the written document, or portion thereof, that contains such factors; and (ii) the referenced written documents must contain meaningful cautionary language. 15 U.S.C. § 78u-5(c)(2)(B).

274.   The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K. 15 U.S.C. § 78u-5(b)(2)(A).

275.   Statements of historical fact, current condition or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

276.   To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  A warning that identifies a potential risk, but implies that such a risk had not materialized, i.e., states that something might occur but does not state that something actually has already occurred, is not meaningful and does not fall within the protections of the Safe Harbor.

277.   Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis.  Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of First Horizon and TD Bank, who knew that those statements were false or misleading when made.

## XI.   CLASS ACTION ALLEGATIONS

278.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired First Horizon securities from February 28, 2022 through May 3, 2023, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants; members of the immediate families of the Executive Defendants; First Horizon's and TD Bank's subsidiaries and affiliates; any person who is or was an officer or director of First Horizon's and TD Bank's during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

279.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The First Horizon shares are actively traded on the NYSE and there are more than 566 million shares of First Horizon shares outstanding.  While the exact number of Class members is unknown at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by First Horizon, its transfer agent, or its depository bank and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

280.   Common questions of law and fact predominate and include:

(a)   whether Defendants violated the Exchange Act and SEC Rule 10b-5 and SEC Rule 14a-9;

(b)   whether Defendants omitted and/or misrepresented material facts;

(c)   whether Defendants knew or recklessly disregarded that their statements were false;

(d)   whether Defendants' statements and/or omissions artificially inflated the price of First Horizon shares; and

(e)   the extent and appropriate measure of damages.

281.   Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

282.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

283.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## XII.   COUNTS

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

284.   Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

285.   This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

286.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

287.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and a course of business

that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of First Horizon shares during the Class Period.

288.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for First Horizon shares.  Lead Plaintiffs and the Class would not have purchased First Horizon shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

289.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of First Horizon shares during the Class Period.

## COUNT II

### For Violation of Section 14(a) Against All Defendants

290.   Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

291.   The claims in this Count are brought under Section 14(a) of the Exchange Act (the "Proxy Claims").  The Proxy Claims are brought on behalf of investors who held First Horizon common stock on the Record Date of April 20, 2022 and were entitled to vote on the merger between TD and First Horizon.  The Proxy Claims are based solely on negligence.  They are not based on any knowing

or reckless conduct by or on behalf of Defendants, and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

292.   The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the merger, including the Proxy and the documents incorporated into the Proxy, contained misstatements and/or omissions of material facts.

293.   Defendants' proxy solicitations included all statements which in any way informed and affected the market's view of the deal and encouraged First Horizon shareholders to vote in favor of the merger. These statements included the statements (collectively referred to as the "Proxy Solicitations") set forth in ¶¶192 through 210 above.   All of the Proxy Solicitations were materially false and misleading because they failed to disclose the highly material facts concerning TD Bank's AML compliance deficiencies that imperiled regulatory approval of the transaction.

294.   Moreover, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made concerning TD Bank's AML compliance deficiencies and their impact on regulatory approval.   In violation of these duties, Defendants never disclosed any of the omitted facts before the shareholder vote.

295.   The false statements and omissions set forth above proximately caused foreseeable losses to Lead Plaintiffs and members of the Class, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures causing First Horizon stock to fall precipitously, as alleged herein.

296.   Defendants named in this Count did not update the solicitations, or the Proxy, when material information arose after dissemination of these documents, but before the shareholder vote on May 31, 2022.  The Defendants named in this count, jointly and severally, solicited and/or permitted the use of their names in solicitations contained in the Proxy.

297.   TD and First Horizon permitted the use of their names in the Proxy by allowing the Proxy to represent, among other things, that TD was in compliance with BSA and AML laws and regulations and that TD would be able to obtain regulatory approval for the merger.

298.   Defendant Masrani permitted the use of his name in the Proxy by allowing the Proxy to represent, among other things, Defendant Masrani's discussions with Defendant Jordan about "TD's confidence in its ability to obtain regulatory approvals for any potential transaction, including the timing of such approvals"; "the ability of TD to obtain, and the anticipated timing with respect to, the regulatory approvals required for TD to acquire First Horizon"; and "the payment

by First Horizon of a termination fee if the definitive transaction agreement," among other things.

299.    Defendant Salom signed the merger agreement attached as Annex A to the Proxy, which included numerous false statements of material fact concerning TD's compliance with BSA and AML laws and regulations, and permitted the use of his name elsewhere in the Proxy by allowing the Proxy to represent, among other things, Defendant Salom's discussions with Defendant Jordan and others about "the businesses and operations of First Horizon in connection with TD's due diligence."

300.    Defendant Jordan signed the cover letter for the Proxy and the merger agreement attached as Annex A to the Proxy and otherwise permitted the use of his name in the Proxy.

301.    By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants named in this Count sought to secure Lead Plaintiffs' and other Class members' approval of the merger and solicited proxies from Lead Plaintiffs and other members of the Class.

302.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, and/or omitting material facts required to be stated in order to make the statements contained therein not misleading. These Defendants were required to disclose the material facts discussed above because Defendants were required to ensure that the Proxy fully and fairly disclosed all

objective material facts to allow a reasonably prudent investor to make an informed investment decision.  These Defendants also acted negligently in failing to update the Proxy and its Supplements prior to the May 31, 2022 shareholder vote.

303.   The solicitations alleged herein were essential links in the accomplishment of the merger and, through these solicitations, First Horizon shareholders approved the merger.

304.   Lead Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

305.   This claim is brought within the applicable statute of limitations.

306.   By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

## COUNT III

### For Violation of Section 20(a) of the Exchange Act
### Against the Executive Defendants

307.   Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

308.   This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

309.   During the Class Period, the Executive Defendants acted as controlling persons of First Horizon and TD Bank within the meaning of Section 20(a) of the Exchange Act.

310.   **The TD Executive Defendants**.  During their tenures as officers and/or directors of TD, each of Defendants Masrani, Salom and Tran was a controlling person of TD within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of TD, these Defendants had the power and authority to cause TD to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of statements alleged as false and misleading, as well as the Proxy and the other solicitations described herein made by TD during the Class Period.   In addition to permitting their names to be used in the Proxy concerning false and misleading statements and omissions of material facts as to TD's ability to timely obtain regulatory approvals, Defendants Masrani, Salom and Tran were able to and did control, directly and indirectly, the content of the merger agreement and, in particular, TD's false and misleading representations as to its legal compliance, which were attached as Annex A to the Proxy.

311.   In their capacities as senior corporate officers and/or directors of TD, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above. Indeed, these Defendants had access to information regarding the circumstances surrounding the merger, including TD's regulatory approval process, TD's regulatory and legal compliance, and the terms of the merger. As a result of the foregoing, Masrani, Salom and Tran were control persons within the meaning of Section 20(a) of the Exchange Act.

312.   **The First Horizon Executive Defendants**.   During his tenure as President and CEO, and her tenure as CFO, of First Horizon, respectively, Defendants Jordan and Dmuchowski were controlling persons of First Horizon within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as CEO and CFO, respectively, of First Horizon, Jordan and Dmuchowski had the power and authority to cause First Horizon to engage in the wrongful conduct complained of herein.  Jordan and Dmuchowski were able to and did control, directly and indirectly, the contents of the Proxy and the other solicitations described herein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

313.   In their capacities as senior corporate officers of First Horizon, and as more fully described above, Jordan and Dmuchowski had access to information regarding the circumstances surrounding the merger and, consistent with the terms

of the merger, were provided with updates concerning TD's interactions with its regulators in real time.  By reason of their positions of control and authority as officers and/or directors of First Horizon, these Defendants had the power and authority to cause First Horizon to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of statements alleged as false and misleading, as well as the Proxy and the other solicitations described herein, made by First Horizon during the Class Period.

314.   As set forth above, TD violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of TD, and as a result of their own aforementioned conduct, Defendants Masrani, Salom, and Tran are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as TD is liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class.  Similarly, as set forth above, First Horizon violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of First Horizon and as a result of their own aforementioned conduct, Defendants Jordan and Dmuchowski are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as First Horizon is liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class.

315.   Further, as detailed above, TD violated Section 10(b) of the Exchange Act by their acts and omissions as alleged in this Complaint.  During the respective times Defendants Masrani, Salom, and Tran served as officers TD, they are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as TD is liable under Section 10(b).  Similarly, as detailed above, First Horizon violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  During the respective times Defendants Jordan and Dmuchowski served as officers of First Horizon, they are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as First Horizon is liable under Section 10(b).

316.   By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

317.   WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a)   Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b)   Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly

and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)   Awarding Lead Plaintiffs' reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(d)   Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

318.   Lead Plaintiffs demand a trial by jury.

Dated:  December 15, 2023                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

By: /s/ *James E. Cecchi*
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

169

Salvatore J. Graziano
Michael Blatchley
Aasiya Glover (*pro hac vice* forthcoming)
Chloe Jasper (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
michaelb@blbglaw.com
aasiya.glover@blbglaw.com
chloe.jasper@blbglaw.com

**SAXENA WHITE P.A.**

Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice*
forthcoming)
Kyla Grant (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com
kgrant@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice*
forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (866) 290-1291
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

170

*Counsel for Lead Plaintiffs and Lead
Counsel for the Class*