James E. Cecchi
Kevin Cooper
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

Salvatore J. Graziano (*pro hac vice*)
Michael Blatchley
Aasiya Glover (*pro hac vice*)
Chloe Jasper (*pro hac vice*)
**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
michaelb@blbglaw.com
aasiya.glover@blbglaw.com
chloe.jasper@blbglaw.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the Class*

Steven B. Singer (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Kyla Grant (*pro hac vice*)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com
kgrant@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice*
forthcoming)
Lester R. Hooker (*pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (866) 290-1291
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE TORONTO-DOMINION BANK / FIRST HORIZON CORPORATION SECURITIES LITIGATION | **CASE NO: 23-cv-02763-RBK-AMD**<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................3

    A.    Summary Of The Action ...............................................................3

    B.    Overview Of Lead Plaintiffs' Allegations ..............................5

II.   JURISDICTION & VENUE ..................................................................20

III.  THE PARTIES ...................................................................................21

    C.    Lead Plaintiffs .........................................................................21

    D.    Defendants................................................................................23

        1.    TD Bank...........................................................................23

        2.    First Horizon ..................................................................29

IV.   BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD ........31

    A.    TD and First Horizon Announce The Merger, Representing The Largest And Most Significant Transaction In The History Of Both Banks ...................................................................................31

    B.    Regulators View Adequate AML Controls As Absolutely Critical When Considering Whether To Approve A Bank Merger ............................................................................................34

    C.    Leading Up To The Class Period, TD Was An Outlier Among Its Peers For Having A History Of Significant High-Profile AML Compliance Failures................................................................47

    D.    After TD and First Horizon Announce The Blockbuster Merger, They Repeatedly Reassure Investors That They Have Effective AML Controls And Will Easily Secure Regulatory Approval ..........55

    E.    When Journalists and Lawmakers Begin To Raise Questions About TD's Regulatory Compliance, TD Vehemently Denies That It Has Any Regulatory Problems, And Continues To Tout Its "Extreme Confidence" In Obtaining Regulatory Approval..........60

F.    In Reality, TD Engaged in Criminal Violations of the AML Laws Throughout the Entire Class Period as a Result of the "Flat Cost Paradigm" Enforced by the TD Executive Defendants .....................69

G.    Defendants Disclose Slight Deal Delays They Claim Are Benign—When In Reality Regulators Had Already Told Defendants that TD's AML Deficiencies Seriously Jeopardized Approval ...........................................................................................78

V.    INVESTORS SUFFER LOSSES AS THE TRUTH IS DISCLOSED .........86

A.    As the Truth Is Revealed Through a Series of Disclosures, Defendants Falsely Claim That The Deal Will Close Until News Reporting Forces Defendants to Announce the Merger's Termination ........................................................................................86

B.    After the Class Period, Additional Details Emerge Corroborating the *Capitol Forum*'s Reporting that the Merger Was Terminated Due to Regulatory Scrutiny in TD's AML Program...........................98

VI.    TD ADMITS TO CRIMINAL VIOLATIONS OF THE AML LAWS......102

A.    TD Pleads Guilty to Violating the Bank Secrecy Act and Conspiracy to Commit Money Laundering and Pays $3 Billion in Fines and Penalties .........................................................................102

B.    TD Admitted that It Deliberately Underfunded Necessary AML Programs for Years Despite Repeated Warnings From Regulators and Internal Auditors .....................................................105

C.    TD Admitted It Knowingly Used Old And Outdated Automated Transaction Monitoring System That Facilitated Rampant Money Laundering ...........................................................................109

D.    TD Admitted It Completely Failed To Monitor Trillions of Dollars In Transactions, Including ACH, Zelle, and Checks............120

E.    TD Knowingly Failed to File Thousands Of Necessary Reports In Violation of The Bank Secrecy Act ...............................................124

F.    TD's AML Failures Led to Rampant Money Laundering and Active Criminal Prosecutions of TD Employees During the Class Period...............................................................................................128

G.    TD Misled Its Regulators for Years, and Sought to Conceal Its AML Violations in Order to Close the First Horizon Merger ..........139

H.    After The Class Period, First Horizon Admits That Its Diligence on TD Was Rushed and "Chaotic" And That, Unbeknownst to Investors, Its Top Executives Expected Regulatory Delays .............143

I.    Defendants Were Highly Motivated to Conceal the Truth and Profited Through Their Suspicious Insider Trades ..........................147

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER .....................................153

A.    Additional Allegations of Scienter as to All Defendants..................153

B.    Additional Allegations of Scienter as to the TD Defendants............158

C.    Additional Allegations of Scienter as to the First Horizon Defendants....................................................................................172

VIII.    ADDITIONAL ALLEGATIONS THAT DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE ABOUT FIRST HORIZON SECURITIES...............................................................................179

IX.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS...................................................................................182

A.    Defendants Tout TD's Regulatory Compliance and Confidence About Regulatory Approval in Announcing the Merger .................184

B.    While Defendants Conduct Due Diligence, TD Claims It Is in Full Compliance With Its BSA Obligations and Details Its Compliance Framework in the Proxy ..............................................193

C.    TD Issues "Vehement" Denials In Response to Reports Over Its Compliance Deficiencies..................................................................211

D.    Despite Increasing Scrutiny on TD's Compliance with its BSA Obligations, First Horizon Continues to Reassure Investors About TD's Comfort with the Timeline and Regulatory Approval............................................................................................218

E.    Defendants Continue to Reassure Investors Concerning TD's Comfort with the Timeline and Regulatory Approval.....................221

F.    Defendants Disclose a Delay to Deal Timeline But Continue to Reassure Investors About Regulatory Approval ..............................224

G.    Defendants Disclose Deal Delays But Insist They Are Benign—And Continue To Claim The Deal Is Going Forward Despite Regulators Having Already Rejected The Merger ..........................237

X.    LOSS CAUSATION ...............................................................................248

XI.    PRESUMPTION OF RELIANCE ...........................................................252

XII.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..............253

XIII.    CLASS ACTION ALLEGATIONS ..........................................................255

XIV.    COUNTS ..................................................................................................258

COUNT I ..................................................................................................258

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ...............................................258

A.    Defendants' Affirmative Misrepresentations in Violation of Section 10b-5(b) ...............................................................259

B.    Defendants' Acts in Furtherance of Defendants' Scheme to Defraud Investors in Violation of Section 10(b) Specifically Under Rules 10b-5(a) and (c) ..............................................259

COUNT II ................................................................................................267

For Violation of Section 14(a) Against All Defendants ..................267

COUNT III ...............................................................................................272

For Violation of Section 20(a) of the Exchange Act Against the Executive Defendants ..........................................................272

XV.    PRAYER FOR RELIEF ...........................................................................276

JURY DEMAND .................................................................................................276

Lead Plaintiffs the Westchester Funds, the Pentwater Funds, the Sand Grove Funds, and the Alpine Funds (collectively, "Lead Plaintiffs"), by their undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 14(a) of the Exchange Act and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 against Toronto-Dominion Bank ("TD Bank," "TD," or the "Bank") and certain of its officers and First Horizon Corporation ("First Horizon" or "FHN") and certain of its officers (collectively, "Defendants"). Lead Plaintiffs bring these claims on behalf of a class of investors consisting of (i) all persons or entities who purchased or otherwise acquired FHN securities from February 28, 2022 through May 3, 2023, inclusive ("Class Period") and were damaged thereby; and (ii) all persons or entities who were holders of FHN common stock as of the April 20, 2022 record date that were entitled to vote to approve the merger agreement as set forth in the April 22, 2022 Proxy Statement (defined below) (the "Class").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon the investigation of Lead Plaintiffs and their counsel, including review and analysis of (1) pleadings, evidence

and admissions offered in connection with TD's guilty pleas concerning its criminal violations of anti-money laundering ("AML") laws in *United States v. TD Bank, N.A.*, No. 2:24-cr-0667-ES (D.N.J.), and *United States v. TD Bank U.S. Holding Co.*, No. 2:24-0668-ES (D.N.J.); (2) regulators' findings concerning TD's violations of AML laws and the Bank Secrecy Act ("BSA"), including in connection with the October 8, 2024 Consent Order TD entered into with the U.S. Office of the Comptroller of the Currency ("OCC"), *In re Matter of TD Bank, N.A., TD Bank USA*, N.A., No. AA-ENF-2024-77, the October 8, 2024 Consent Order TD entered into with the Department of the Treasury's U.S. Financial Crimes Enforcement Network ("FinCEN"), *In the Matter of TD Bank, N.A.*, N.A., No. 2024-02, and the October 9, 2024 Order entered into with the U.S. Board of Governors of the Federal Reserve System, *In the Matter of Toronto-Dominion Bank*, Nos. 24-027-B-FB; (3) documents filed publicly by TD Bank and First Horizon with the SEC; (4) TD Bank and First Horizon press releases, presentations and other public statements; (5) transcripts of TD Bank and First Horizon investor conference calls; (6) research reports by financial analysts and news reports concerning TD Bank and First Horizon; (7) other publicly available sources as described below; (8) consultations with relevant experts and consultants; (9) correspondence, testimony, and other materials released or obtained by the U.S. House of Representatives, the U.S. Senate, the Cullen Commission of Inquiry into Money Laundering in British Columbia, and

other governmental bodies; (10) documents obtained through Freedom of Information requests and similar public access requests issued to the OCC, the U.S. Treasury, the Federal Reserve Board, and other governmental bodies; (11) testimony and pleadings in criminal and other legal proceedings involving TD Bank employees, including *United States v. Seck*, No. 8:20-cr-00317-TDC (D. Md.), *United States v. Hernandez*, No. 1:22-cr-20529-KMM (S.D. Fla.), *United States v. Nunez-Flores*, No. 23-mj-12229 (D.N.J.), and *United States v. Da Ying Sze*, No. 2:22-cr-00141-ES-1 (D.N.J.), among others; and (11) communications with former employees of TD Bank and First Horizon and other sources.

Lead Plaintiffs' investigation into the factual allegations contained in this complaint is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

### A.    Summary Of The Action

1. This case arises out of a series of misrepresentations Defendants made about TD Bank's merger with First Horizon—the most important transaction in either bank's histories—that concealed TD's ongoing criminal activity, and TD's "willful" and "knowing" violations of AML laws that led regulators to reject the

deal. Throughout the Class Period, Defendants assured investors that the First Horizon merger was a tremendous opportunity, that TD's AML controls were rigorous and "comprehensive," that TD in fact "complied" with its AML obligations, and that Defendants were "extremely confident" the deal would be approved in "short order." Defendants repeated these and similar statements defending the deal after journalists and lawmakers questioned TD's track record of significant AML failures and corporate scandals—even as Defendants secretly worked to scuttle a confidential DOJ investigation and regulatory scrutiny into TD's AML violations.

2.     Defendants' statements were false. As the DOJ eventually uncovered and as TD has now admitted in a historic criminal guilty plea, for nearly a decade and throughout the entire Class Period, TD "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML program," knowingly failed to monitor trillions of dollars in transactions, and enabled criminal organizations to launder hundreds of millions of dollars in illicit proceeds through the Bank.

3.     Indeed, TD's AML failures were so longstanding and pervasive that the Bank ultimately pleaded guilty to violating the Bank Secrecy Act ("BSA") and conspiracy to commit money laundering—the first U.S. bank in history to plead guilty to a money laundering conspiracy charge. In so doing, TD admitted that the Bank committed "willful" violations of AML regulations and that TD's "senior executive management" knew of "long-term[] and systemic deficiencies" in TD's

4

AML practices, which the DOJ characterized as "staggering and pervasive failures in oversight." As the DOJ explained, by "<u>making its services convenient for criminals, TD became one</u>." In connection with TD's criminal plea, the DOJ and regulators imposed extraordinary penalties against the Bank, including unprecedented fines totaling $3 billion—the largest ever imposed under the BSA; five years of probation; a three-year DOJ monitorship; and an asset cap that prohibits TD from growing its U.S. operations without explicit regulatory approval.

4.       By November 2022, the merger began to unravel after Defendants were told regulators would reject it precisely because of TD's AML failures. Rather than come clean, however, Defendants doubled down, denied the existence of any regulatory problems, and insisted that closing was a question of "when" not "if." It was only when news broke that the DOJ was investigating that Defendants were forced to disclose the deal had been terminated, triggering an immediate 30% decline in the price of First Horizon shares, and causing massive damages to investors.

## B.    Overview Of Lead Plaintiffs' Allegations

5.       On February 28, 2022, the first day of the Class Period, TD announced a proposed $13.4 billion, all-cash acquisition of FHN—one of the largest bank deals in the U.S. since the financial crisis. The transaction would catapult TD into becoming the sixth largest bank in the country, allowing it to compete against the likes of JPMorgan and Citibank. In announcing the proposed acquisition, TD's

5

CEO, Defendant Bharat Masrani, lauded the deal as "strategically compelling" specifically because it would greatly expand TD's U.S. presence.  In particular, the acquisition would provide TD with a "powerful base" in the "fast-growing U.S. Southeast" market, which Masrani emphasized was a "long area of focus" for TD. The deal was equally critical for First Horizon, as the $25 per share consideration provided a 37% premium to FHN shareholders and triggered "golden parachute" payouts to FHN's top executives totaling over $95 million. The market praised the transaction as highly beneficial to both banks, and in turn, FHN's stock price surged by nearly 30% upon the deal's announcement, from $18.25 to $23.48 per share.

6.     By far the most critical issue facing TD and First Horizon upon their announcement of the merger was obtaining regulatory approval for the transaction, with regulators' chief concern being whether TD had adequate AML controls that complied with U.S. regulatory requirements.  Indeed, analysts noted that with respect to another recent bank merger that was much smaller in value and geographic magnitude—M&T Bank's $3.7 billion acquisition of Hudson City Bancorp, which was announced in 2012—regulators had delayed approval for three full years after finding significant AML deficiencies at M&T. Thereafter, the Federal Reserve made crystal clear that it would never again grant other banks the same leeway and would instead deny approval unless all AML compliance issues were fully remedied.

7.     This concern was even more pronounced with respect to TD. Prior to and during the Class Period, numerous U.S. and Canadian regulators, senior government officials and federal judges excoriated TD for egregious AML deficiencies that facilitated some of the largest frauds in history.  For example, in 2013, TD entered into regulatory settlements concerning its role in the $1.2 billion Rothstein Ponzi scheme, pursuant to which TD admitted that it had "willfully violated" the Bank Secrecy Act for its "pattern of misconduct" that was "significant and egregious."  Similarly, in facilitating the notorious $7 billion Stanford Ponzi scheme—the second largest Ponzi scheme in history next to Bernie Madoff's—TD paid a $1.2 billion settlement after U.S. Senators lambasted the Bank for providing "knowing assistance . . . without so much as questioning a single transaction in the face of Stanford's suspicious activity."

8.     Against this backdrop, the adequacy of TD's AML controls was of paramount importance to investors. To assuage investor concerns, throughout the Class Period, TD repeatedly and emphatically assured First Horizon investors that TD maintained "comprehensive" AML controls that were "designed to ensure compliance" with all applicable regulations, that it in fact "complied" with its AML obligations, and that it went even further than required by following "industry-best practices that are designed to detect and help prevent fraud." TD even represented that it had utilized the merger due diligence process to further "review and assess

7

key risks related to AML"; that it was proud of its "excellent regulatory relationships" and "familiar[ity]" with "regulatory requirements"; and that as a result, TD and First Horizon were "very comfortable" and "extremely confident" that they would obtain regulatory approval of the merger. First Horizon similarly cited TD's "legal and regulatory compliance" as a "Reason[] For The Merger" in the Proxy Statement seeking shareholder approval of the merger agreement, and further asserted that "each of First Horizon and TD does not know of any reason . . . why the requisite regulatory approvals will not be received."

9.     When members of Congress and prominent media outlets openly challenged these assertions, TD vehemently denied any regulatory issues. For example, *Capitol Forum* issued a series of reports during the Class Period that sharply criticized TD's regulatory compliance and questioned whether AML issues would jeopardize regulatory approval of the deal. Thereafter, Senator Elizabeth Warren sent a letter to the OCC urging it to "closely examine any ongoing wrongdoing and block any merger until TD Bank is held responsible." In response, TD issued a complete denial in which it stated that any allegations of TD's regulatory deficiencies were totally "unfounded." TD even went so far as to threaten *Capitol Forum* with defamation claims, asserting that the reports amounted to "an accumulation of false claims" and "extensive inaccuracies and misrepresentations" that were made in "reckless disregard of the truth."

8

10.     However, as would ultimately be admitted in TD's historic criminal plea, Defendants' Class Period representations were false.   Unbeknownst to investors, while TD was publicly touting its AML compliance and its "extreme confidence" in gaining regulatory approval during the Class Period, TD and First Horizon executives, including Defendant Masrani, knew that TD's AML controls were broken, that regulators were closing in, and that the merger was in peril.  As TD has now admitted, rather than follow "industry-best practices that are designed to detect and help prevent fraud" and maintain a "comprehensive [AML] and sanctions program[]" that was "designed to ensure compliance with the [BSA]," in truth, TD "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML program" for a decade and "willfully" failed to monitor trillions of dollars in transactions—a staggering 92% of all transactions processed by the Bank.  In so doing, TD directly enabled criminal organizations to launder hundreds of millions of dollars in illicit proceeds on an unprecedented scale.

11.     TD's admissions confirm what the TD Executive Defendants knew during the Class Period.  By no later than October 2022, the OCC had completed a confidential supervisory examination of TD that revealed serious AML deficiencies, which was quickly followed by senior OCC officials meeting with TD's top executives on no less than four separate occasions the next month.  In fact, in November 2022, TD's senior executives were directly informed that multiple federal

9

agencies had found such significant failures in TD's AML practices that the DOJ had launched a formal investigation into the Bank's AML program for violations of federal law, eviscerating the prospects for regulatory approval of the deal.

12.    There was no question that First Horizon and its most senior executives were contemporaneously aware of these highly significant regulatory developments.  Not only was the merger with TD the most significant transaction in First Horizon's history and unquestionably the chief focus of First Horizon's business during the Class Period, but First Horizon was well aware that TD's AML practices were regulators' chief concern and could prevent the merger from receiving regulatory approval.    Furthermore, the parties' merger agreement explicitly required that TD "promptly advise [First Horizon] with respect to substantive matters that [were] addressed in any meeting or conference" with any regulatory authority concerning the merger. The fact that multiple federal law enforcement and regulatory agencies were bearing down on TD's pervasive AML violations obviously constituted a "substantive matter" that TD was required to "promptly" disclose to First Horizon.  Tellingly, there has been no allegation on the part of First Horizon that TD failed to inform or lied to First Horizon about these regulatory developments, or denied First Horizon from access to these communications, meetings and related materials.

13.     Despite these serious regulatory developments, Defendants did not disclose TD's pervasive AML abuses or the formal DOJ investigation to investors. To the contrary, only weeks later, in December 2022, when directly asked by analysts about whether regulators were "taking a closer look at anything" in considering approval of the merger, Masrani outright lied to the market, stating: "<u>I'm not aware of anything of the sort you're mentioning</u>."

14.     However, in reality and unbeknownst to investors, the investigations continued to intensify as regulators uncovered additional evidence of TD's AML violations—despite the Bank's ongoing, years-long admitted efforts to conceal them from regulators. On February 22, 2023, the OCC's Head of Large Bank Supervision and Senior Examiner scheduled a highly unusual confidential meeting with Defendant Masrani and TD's outside counsel for March 9, 2023—a clear sign that the merger was dead.  As *Capitol Forum* reported at the end of the Class Period, such meetings are scheduled "only when matters are very serious." Industry leaders later concluded that the meeting was likely a desperate plea by Masrani for regulators to abandon their investigations—a plea that was summarily rejected.

15.     On March 1, 2023, the truth about TD's severe regulatory deficiencies began to emerge. On that day, First Horizon stunned the market by disclosing that TD could not obtain the necessary regulatory approvals by the scheduled merger closing date of May 27, 2023—and further revealed that TD could not "provide a

new projected closing date at this time." In response to these revelations, the price of First Horizon shares dropped 10.6%, from $24.77 per share to $22.14 per share.

16.    Even though TD and First Horizon knew full well by this time that regulators would not approve the deal due to TD's systemic AML deficiencies and the ongoing DOJ investigation, <u>Defendants did not breathe a word of the DOJ criminal investigation and TD's pervasive and systematic criminal AML failures to investors</u>.  To the contrary, <u>for the next two months</u>, Defendants continued to falsely assert that TD and First Horizon were "fully committed to the transaction"; that regulatory approval was only a question of "when," not "if"; that the banks' "planning for integration continues"; and that "we are very happy with the transaction and continue to work hard to get it…over the finish line."  Indeed, when *Capitol Forum* issued a report on March 29, 2023 stating that it had learned that the DOJ was investigating TD Bank, TD issued a statement flatly denying the existence of any such investigation. Even as late as April 20, 2023—only two weeks before the truth would be revealed—Defendant Masrani claimed at TD's Annual Meeting that it was currently and actively involved in "extension arrangements or negotiations" with First Horizon of the merger deadline.

17.    On May 4, 2023, the truth emerged. On that day, before the markets opened, TD and FHN shocked investors by issuing a joint press release stating that they had agreed to terminate the merger given "uncertainty as to when and if these

regulatory approvals can be obtained." Tellingly, TD did not provide any color regarding this "uncertainty." Instead, on an investor call held later that day, it was First Horizon's CEO, Defendant Jordan, who made clear to analysts that the reason behind the merger's failure was TD's severe regulatory issues, as TD was "unable" to obtain the necessary regulatory approvals and "could not provide assurance of regulatory approval in 2023 or 2024." Indeed, these issues were so prominent, and so well known to FHN, that Jordan clarified—in direct contradiction to Defendants' representations only two months prior that the parties were actively negotiating an extension of the deal—that "[a]t no time did we discuss any changes in prices or any other changes to the structure of the deal." Rather, First Horizon disclosed that TD had agreed to pay a $200 million break-up fee to First Horizon (on top of a $25 million merger-expense reimbursement) <u>even though no such out-of-pocket fee was contemplated in the merger agreement</u>—an extraordinarily unusual payment that TD clearly made to avoid a lawsuit from First Horizon in which TD's liability for its AML violations would come to light. In response to this stunning news, First Horizon's stock price plummeted by 33%, from $15.05 per share on May 3, 2023, to $10.06 per share on May 4, 2023.

18.    Analysts expressed shock at the clear severity of TD's regulatory issues, with a National Bank of Canada report commenting that "on the FHN call, <u>it was clear that regulatory approvals were not coming</u>, to the point that FHN stated

that a renegotiated deal price was not even attempted." Similarly, an RBC report commented that TD's regulatory issues were clearly "more serious than what we had assumed" based on Defendants' prior representations, while *Forbes* opined that the "delay in regulatory approval that TD cited as the reason for canceling the deal suggests that there is something wrong here." BMO analysts explicitly criticized management's misrepresentations concerning TD's compliance issues, incredulously asking: "what was the issue that was significant enough to delay regulatory approvals indefinitely, yet not material enough to disclose?"

19.     Less than a week later, on May 8, 2023, investigative reports published by *The Wall Street Journal* and *Bloomberg* confirmed that both the OCC and the Federal Reserve had refused to approve the deal due to TD's severe AML deficiencies.  Indeed, these reports stated that regulators were greatly concerned by TD's routine and abject failure in recent years to alert U.S. authorities to suspicious fraudulent transactions as required by the BSA, which internal sources cited as "the biggest obstacle" to regulatory approval of the FHN acquisition.

20.     Then, on August 24, 2023, TD belatedly confirmed that it had received "formal and informal inquiries from regulatory authorities and law enforcement concerning its [AML] program"—including "an investigation by the United States Department of Justice."  Significantly, these investigations were so serious and advanced that—rather than defend its conduct or hedge about possible outcomes—

TD starkly admitted that it fully "anticipate[d] monetary and/or non-monetary penalties to be imposed."

21.    Following these admissions, further facts emerged that confirmed that federal regulators had informed TD's most senior executives in November 2022—more than six months before the end of the Class Period—that the merger was essentially dead because TD's AML practices had enabled criminal money laundering on a massive scale for years. On January 8, 2024, *Capitol Forum* issued a report revealing that, by no later than November 2022, TD's top executives "were aware that multiple federal law enforcement agencies had found such serious lapses in [AML] controls" that they were poised to reject the First Horizon merger—and that the DOJ had launched a formal investigation of TD's egregious AML deficiencies. *Capitol Forum* further revealed that additional and striking AML failures were ongoing during the Class Period. Specifically, as *Capitol Forum* reported, in October 2023, Oscar Marcelo Nunez-Flores, a TD Financial Services Representative "sales leader" based in New Jersey, had been "charged with helping launder millions of dollars in illegal drug sales" by enabling accomplices in Colombia to launder millions of dollars in cash by making over 20,000 ATM withdrawals in a matter of months—suggesting that TD Bank's AML deficiencies were far more significant than TD had begun to belatedly acknowledge.

22.    That precise fact was confirmed on October 10, 2024.  On that date, the DOJ and regulators from the OCC, FinCEN, and the Federal Reserve disclosed that TD Bank had pleaded guilty to criminal violations of the BSA and conspiracy to commit money laundering. TD's criminal guilty plea was historic, as TD became the largest bank in U.S. history to plead guilty to BSA program failures and the first U.S. bank in history to plead guilty to conspiracy to commit money laundering. Furthermore, in connection with the Bank's criminal plea, TD agreed to pay over $3 billion in fines and penalties—the largest ever imposed under the BSA and the first time that the DOJ assessed a daily fine against a bank (in TD's case, $500,000)—and admitted to "willful" AML violations for nearly a decade.

23.    Significantly, TD's regulators concluded that the TD Executive Defendants knew full well of these pervasive AML violations as they were driven by an explicit directive, enforced by TD's senior leadership—the TD Executive Defendants—to take a "pennywise, pound-foolish approach" to funding TD's AML program.  Specifically, TD admitted that "high-level executives" and "senior executive management"—including the TD Executive Defendants named herein—knew of "long-term, pervasive, systemic deficiencies" in TD's AML program, that the Bank failed to monitor over $18.3 trillion in transaction activity, and that its violations enabled criminal organizations to launder at least $670 million through TD accounts.  In announcing this historic plea, the U.S. Attorney General

highlighted that TD had "created an environment that allowed financial crime to flourish," and that by "making its services convenient for criminals, [TD] became one."

24.    TD's admissions and its regulators' findings establish that Defendants' statements during the Class Period were materially false and misleading.  For example, while Defendants told investors during the Class Period that TD had "strong processes in place to identify, investigate, and deter potential fraud," TD later admitted the opposite was true—the Bank had "failed to maintain an AML program that complied with the BSA," and "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML program."  Similarly, while during the Class Period Defendants had repeatedly reassured investors that the First Horizon merger faced no regulatory hurdles or scrutiny, TD later admitted that the exact opposite was true.  In reality, as TD's regulators were bearing down, TD concealed its criminal violations from them—with FinCEN finding that TD "was aware that its AML practices were facing intense scrutiny by regulators and law enforcement" but that TD knowingly failed to address them until (and sometimes even after) law enforcement agencies intervened.

25.    TD's admissions also establish that Defendants' statements were knowingly or recklessly false.  Indeed, TD has admitted that its "willful" AML deficiencies were "known" by "high-level executives," including the "senior

executive management" at TD—i.e., Defendants Masrani, Salom, Tran, Bowman and Levine.  Because TD's criminal AML deficiencies were "known to AML senior management," FinCEN found that the civil monetary penalty it imposed—the largest in FinCEN history—was warranted due to the "pervasiveness of wrongdoing" and "management's complicity in, condoning or enabling of, or knowledge of the conduct underlying the violations," as well as because TD failed "to timely disclose the ongoing nature of certain issues that persisted late into FinCEN's investigation of TD Bank."

26.    The facts admitted in TD's pleas, its regulators' findings, and the accounts of former First Horizon employees also establish that the First Horizon Defendants were, at bare minimum, deliberately reckless in making their misleading statements concerning the progress of the merger.  As TD has now admitted, TD's AML violations were so egregious, pervasive, and systemic that "suspicious activity" at the Bank "was obvious even to the casual observer."  But unlike a "casual observer," First Horizon had exacting, first-hand knowledge of TD's AML systems through its due diligence and integration planning, as well as the express terms of the merger agreement itself, which required TD to promptly inform First Horizon of any regulatory developments impacting the merger.  As a result of this information, First Horizon immediately concluded what TD later admitted:  that TD's AML and compliance systems were woefully inadequate.  In fact, as reported by well-placed

former First Horizon employees, just weeks into integration planning, TD and First Horizon compliance executives quickly determined that the combined bank would have to scrap TD's compliance program and rely on First Horizon's—even though TD Bank was five times its size—because they would not "have the coverage we needed if we were to go with TD's program."

27.    In addition to these damning facts, Plaintiffs' own independent investigation—including interviews with numerous former high-ranking TD and First Horizon employees—corroborated regulators' findings and TD's admissions. For example, former TD employees who had first-hand knowledge of the Bank's AML practices confirmed that TD's AML systems were archaic and "ridiculous" and 10 to 20 years behind industry standards; that "basic monitoring" systems were not in place and "a lot of things got missed"; and that TD's suspicious transaction reporting programs had severe "capacity" issues.

28.    Finally, while Defendants' fraud had a devastating impact on First Horizon investors, the Executive Defendants were personally incentivized to enable the fraud for as long as possible.  Indeed, at TD's Annual Meeting held on April 23, 2023—just weeks before investors would learn that the merger was dead—TD's executives successfully convinced TD's shareholders to approve millions of dollars in additional compensation for the TD Executive Defendants for supposedly successfully shepherding the FHN merger. Similarly, First Horizon insiders—who

were kept apprised of TD's discussions with its regulators in real time pursuant to the parties' merger agreement and had first-hand insight into TD's AML compliance failures—sold millions of dollars of their FHN shares during the Class Period for lower prices than they would have received had the merger been consummated.  As one leading insider trading scholar pointed out, these sales were particularly suspicious and abnormal because there was no logical reason "for any insider during this 12-month window to sell any shares in the open market, especially below the merger price of $25," instead of holding them until the deal closes—unless, of course, they knew something that public investors did not.

29.    While Defendants profited from their deception, Lead Plaintiffs and the other members of the Class suffered substantial damages. Lead Plaintiffs bring this action to recover the damages caused by the securities law violations alleged herein.

## II.    JURISDICTION & VENUE

30.    The claims asserted in this complaint arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5; and Rule 14a-9 promulgated under Section 14(a) by the SEC, 17 C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

31.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). TD Bank maintains its U.S. headquarters in this jurisdiction, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

32.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.   THE PARTIES

### C.    Lead Plaintiffs

33.    Lead Plaintiff the "Westchester Funds" consist of six related private investment funds: JNL/Westchester Capitol Event Driven Fund; The Merger Fund; The Merger Fund VL; Virtus Westchester Event-Driven Fund (a series of Virtus Event Opportunities Trust); Westchester Capitol Master Trust; and the Westchester Merger Arbitrage Strategy Sleeve of the JNL Multi-Manager Alternative Fund.  As reflected in their PSLRA certification (ECF No. 17-4), the Westchester Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

34.    Lead Plaintiff the "Pentwater Funds" consist of eight related private investment funds: Pentwater Merger Arbitrage Master Fund Ltd.; PWCM Master Fund Ltd.; Pentwater Equity Opportunities Master Fund Ltd.; Oceana Master Fund Ltd.; Pentwater Unconstrained Master Fund Ltd.; Crown Managed Accounts SPC acting for and on behalf of Crown/PW Segregated Portfolio; Investment Opportunities SPC for the account of Investment Opportunities 3 Segregated Portfolio; and LMA SPC for and on behalf of the MAP 98 Segregated Portfolio.  As reflected in their PSLRA certification (ECF No. 17-4), the Pentwater Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

35.    Lead Plaintiff the "Sand Grove Funds" consist of five related private investment funds: Sand Grove Opportunities Master Fund Ltd; Sand Grove Tactical Fund LP; QSMA Torus SP, a segregated portfolio of QSMA SPC; New Holland Tactical Alpha Fund LP; and 405 MSTV I LP.  As reflected in their PSLRA certification (ECF No. 17-4), the Sand Grove Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

36.    Lead Plaintiff the "Alpine Funds" consist of nine related private investment funds: Alpine Associates, A Limited Partnership; Alpine Dedicated, L.P.; Alpine Heritage II, L.P.; Alpine Heritage Japan Trust; Alpine Heritage

Offshore Fund Ltd.; Alpine Heritage, L.P.; Alpine Institutional, L.P.; Alpine Merger Growth, L.P.; and Alpine Partners, L.P.  As reflected in their PSLRA certification (ECF No. 17-4), the Alpine Funds purchased a significant amount of First Horizon shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

### D.    Defendants

#### 1.    TD Bank

37.    Defendant TD Bank, together with its subsidiaries, provides various personal and commercial banking products and services in Canada, the United States, and internationally. TD Bank is incorporated under the laws of Canada and operates through three segments: (i) Canadian Personal and Commercial Banking, (ii) U.S. Retail, and (iii) Wholesale Banking.  As TD admitted in the Criminal Pleas, TD Bank's Board—on which Defendant Masrani sits—is responsible for TD's global AML program and BSA compliance. Specifically, the Board "oversees and monitors the integrity and effectiveness of the Group's internal controls and adherence to applicable compliance standards." These responsibilities include "setting the tone at the top as it relates to integrity and culture" and "communicating and reinforcing the compliance culture."

38.    TD Bank has its U.S. headquarters in Cherry Hill, New Jersey, and TD Bank's U.S. Retail subsidiary, TD Bank, N.A. ("TDBNA"), also is headquartered at

Cherry Hill, New Jersey. TDBNA has over 1,100 branches, or what TDBNA calls "stores," along the eastern seaboard of the United States, including a large presence in New Jersey, New York, and Florida. Throughout the Class Period, TDBNA's retail banking activity involved providing banking products and services (e.g., checking and savings accounts, debit cards, and loans) to over 10 million individual and commercial customers in the United States.

39.    TD Bank US Holding Company ("TDBUSH") is the direct parent of TDBNA, has oversight of the Bank's AML compliance program, including through reporting to TDBUSH's Audit Committee, and is accountable for monitoring the effectiveness of the Bank's AML program pursuant to the BSA. TDBUSH in turn is the wholly owned subsidiary of TD Group US Holdings LLC ("TDGUS"), which is the intermediate holding company and ultimate parent holding company in the United States. TDGUS is responsible for oversight of the risk management framework for all U.S. operations, including AML programs. TDGUS is a wholly owned subsidiary of the Toronto-Dominion Bank d/b/a TD Bank Group. TD Bank Group is the ultimate parent bank of all TD operations. For ease of reference, TDBNA, TDBUSH, TDGUS, and TD Bank Group, and their affiliates and subsidiaries, are referred to herein as TD, TD Bank, or the Bank.

40.    On October 10, 2024, TDBNA pleaded guilty to a one-count Information charging TBDNA of conspiring to: (1) fail to maintain an adequate

AML program in violation of 31 U.S.C. §§5318(h) and 5233, (2) fail to file accurate Currency Transaction Reports ("CTRS"), in violation of 31 U.S.C. §§5313 and 5324, and (3) launder monetary instruments, in violation of 18 U.S.C. §1956(a)(2)(B)(i) and in violation of 18 U.S.C. §371 (herein, the "TDBNA Plea" docketed at ECF No. 61-3).  Also on October 10, 2024, TDBUSH pleaded guilty to a two-count Information charging TDBUSH with causing TDBNA to fail to maintain an adequate AML program in violation of 31 U.S.C. §§5318(h) and 5322 and 18 U.S.C. §2, and causing TDBNA to fail to file accurate CTRs in violation of 31 U.S.C. §§5313 and 5324.  (herein, the "TDBUSH Plea" docketed at ECF No. 61-4).  The TDBNA Plea and the TDBUSH Plea are together referred to herein as the Criminal Pleas.

41.    Significantly, the Criminal Pleas explicitly provide that TD Bank is not permitted to "make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant" as set forth in the Criminal Pleas, "or [contradicting] the facts described in the Information and Statement of Facts" incorporated in the Criminal Pleas, including the BSA and AML violations described herein.  And while TD Bank is permitted to raise defenses in other litigations that relate to the matters that are the subject of the Criminal Pleas, those defenses cannot "contradict, in whole or in part, a statement contained in the Information or Statement of Facts" incorporated in the Criminal Pleas.

42.     Defendant Masrani served as the TD's Group President and CEO throughout the Class Period.  In this role, Defendant Masrani also served on the board of TD Bank, which received reports on Global AML from the Global Head of AML Compliance. Masrani previously served as the CEO of TD's U.S. Retail Bank, and before that was Chief Risk Officer of TD Bank Group.  As *The Globe and Mail* reported in September 2014, by the time Masrani took over from TD's prior CEO Ed Clark that year, Masrani had "touched nearly every aspect of TD's far-flung operation" and was intimately familiar with the Bank's U.S. retail operations—including TD Bank's AML compliance practices. On September 19, 2024, just before TD publicly disclosed the Criminal Pleas, TD announced that Masrani intended to retire on April 10, 2025.

43.     Defendant Leo Salom ("Salom") has served as TD Bank's Group Head, U.S. Retail, TD Bank Group and President and CEO of TD Bank America's Most Convenient Bank® since early 2022.  In this role, Defendant Salom served on the boards of TDBNA and TDBUSH, which received reports on U.S. AML from the BSA Officer and Deputy Global Head of AML Compliance, Defendant Levine (defined below). Prior to that time, Salom served as Citibank's Head of Retail Banking for Europe and Latin America, and as Barclays's CEO of Western European Retail and Commercial Banking group.  In each of these roles, Salom was

required to and did know about his institutions' regulatory risk and compliance obligations and practices, including for retail banking.

44.     Defendant Kelvin Vi Luan Tran ("Tran") has served as TD Bank's Group Head and Chief Financial Officer ("CFO") since September 1, 2021. Prior to this position, Tran held various positions at TD for 20 years, previously serving as Head, Enterprise Finance; CFO of TD Bank, America's Most Convenient Bank®; Chief Accountant; SVP for Treasury and Balance Sheet Management; CFO for TD Securities; and Chief Auditor—roles that gave him direct access into TD Bank's AML compliance functions.  As described in TD's March 14, 2023 proxy, as CFO, Tran "guided the bank's investment prioritization and expense management," and, as discussed below, enforcement of the "flat cost paradigm" internally adopted at TD.

45.     Defendant Michael Bowman ("Bowman") served as Global Head of AML Compliance for TD Bank Group ("Global Head of AML Compliance") from 2019 until November 2023 and departed from TD Bank in March 2024. Prior to this position, Bowman shared these Chief AML Officer responsibilities as the Global Co-Head of AML Compliance since approximately 2017.  In these roles, Bowman was responsible for the AML program for the entire TD Bank Group, setting Global AML budget, priorities, and strategic planning.   He also had oversight responsibilities for TD Bank's AML compliance in the U.S., including overseeing

the BSA Officer of TD Bank, N.A., Defendant Levine.   As part of these responsibilities, Bowman personally briefed the boards of TD Bank and TD Bank, N.A. on AML compliance. Since he was first hired as Vice President, AML Operations by TD Bank in 2013, when he reported directly to the Chief AML Officer, Bowman has served only in high-level AML positions.  Defendant Bowman is referred to "Individual-1" in the Criminal Pleas.

46.    Defendant Mia Levine ("Levine") served as the BSA Officer for TD Bank, N.A. and Deputy Global Head of AML Compliance for TD Bank from May 2019 until TD Bank terminated her on May 16, 2023, following the termination of the merger.  Prior to this role, Levine served as the Deputy BSA Officer from January 2018, and, before that, the Head of the U.S. Financial Intelligence Unit ("FIU"), in which role Levine supervised the teams responsible for reporting suspicious activity. In her role as the BSA Officer, and in coordination with Bowman, Levine was responsible for the US AML program, including its budget, staffing, policies, risk management, and presentations to the boards of TD Bank Group U.S. ("TDGUS") and TD Bank U.S. Holding Company ("TDBUSH").  Defendant Levine is referred to as "Individual-2" in the Criminal Pleas.

47.    Defendants Masrani, Salom, Tran, Bowman, and Levine are sometimes referred to collectively herein as the "TD Executive Defendants."

48.     The TD Executive Defendants possessed the power and authority to control the contents of TD Bank's SEC filings, press releases, and other market communications. The TD Executive Defendants were provided with copies of TD Bank's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with TD Bank, and their access to material information available to them but not to the public, the TD Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

### 2.    First Horizon

49.     Defendant First Horizon is a Memphis, Tennessee-based bank holding company whose shares are publicly traded on the NYSE under the ticker symbol "FHN." First Horizon operates over 427 banking centers in twelve states, with most of its geographic presence concentrated in the Southeastern United States.  As of June 2023, First Horizon held $85 billion in assets.

50.     Defendant D. Bryan Jordan ("Jordan") served as First Horizon's Chairman of the Board, President, and CEO at all relevant times during the Class Period.  Analysts dubbed him the "ambassador" of the TD acquisition in light of his close personal friendship with TD CEO Defendant Masrani, his deep knowledge of

TD and its operations, and his work in introducing TD to First Horizon customers and employees.

51.     Defendant Hope Dmuchowski ("Dmuchowski"), a long-time banking executive with over 20 years of experience in the banking industry, served as First Horizon's Senior Executive Vice President and Chief Financial Officer ("CFO") at all relevant times during the Class Period.

52.     Defendants Jordan and Dmuchowski are sometimes referred to herein collectively as the "First Horizon Executive Defendants."

53.     The First Horizon Executive Defendants possessed the power and authority to control the contents of First Horizon's SEC filings, press releases, and other market communications. The First Horizon Executive Defendants were provided with copies of First Horizon's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with First Horizon, and their access to material information available to them but not to the public, the First Horizon Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive statements being made were then materially false and misleading.

54.    The TD Executive Defendants and First Horizon Executive Defendants are sometimes collectively referred to as the "Executive Defendants." TD Bank, First Horizon, and the Executive Defendants are collectively referred to herein as "Defendants."

## IV.    BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD

### A.    TD and First Horizon Announce The Merger, Representing The Largest And Most Significant Transaction In The History Of Both Banks

55.    On February 28, 2022, the first day of the Class Period, TD and First Horizon jointly announced that they had signed a definitive agreement for TD to acquire First Horizon for $13.4 billion in cash—a deal which was by far the largest and most significant transaction in the history of both banks.  Indeed, for TD, the deal represented what the Bank described as a "tremendous opportunity" to catapult TD into becoming the sixth-largest bank in the U.S., allowing it to compete with the likes of J.P. Morgan and Citibank. Moreover, as Defendant Masrani stated during the investor call held that same day, the merger was critical to TD's planned expansion in some of the most important geographic regions in the U.S.  As Masrani made clear, the FHN acquisition was "strategically compelling" because it gave TD a strong "presence in some of the fastest-growing markets across the U.S."— including critical areas in the Southeastern U.S. where TD had yet to establish a foothold—and it would give the bank "a powerful base" in the U.S. and "lay[] the

foundation for a fully national commercial banking franchise." In sum, the deal was "precisely the kind of transaction that [TD] [had] been looking for."

56.    First Horizon—a Memphis-based regional bank with limited growth potential before receiving TD's unsolicited offer—likewise stood to significantly benefit from the merger.  For example, Defendant Jordan proclaimed in the press release announcing the merger that, "by joining forces with TD, [First Horizon] will create extraordinary value for our key stakeholders," marking "a true growth story." The merger would also be highly lucrative for First Horizon shareholders. The $13.4 billion all-cash deal offered First Horizon shareholders a price of $25 per share, representing a substantial 37% premium to First Horizon's stock price of $18.25 per share just prior to when the transaction was announced. Moreover, under the terms of the deal, if closing took longer than nine months, First Horizon investors would receive an additional $0.65 per share.  As a result, on the news of the acquisition, First Horizon's stock price surged by nearly 30%, from a price of $18.25 per share to $23.48 per share.

57.    Significantly, First Horizon's top executives also stood to personally and substantially profit from the deal. Specifically, upon the closure of the merger, First Horizon's senior-most executives—including Defendants Jordan and Dmuchowski and other insiders who sold millions of dollars' worth of First Horizon stock during the Class Period—would receive highly lucrative "golden parachute"

payments that collectively totaled over $95 million. Moreover, Defendant Jordan—who alone stood to receive approximately $41.5 million in "golden parachute" payments upon the merger closing—would be appointed as the Vice Chair of TD Group, become a member of TD's Executive Team, and would be named to the Boards of TD's U.S. banking entities.

58.     Analysts widely lauded the merger as a highly positive development for both companies, celebrating the significant 37% premium First Horizon investors would receive from the deal and that TD had finally achieved "its long anticipated U.S. bank acquisition" that would allow it to expand its operations in the rapidly growing Southeastern U.S. and become the sixth largest bank in the country.  For example, a February 28, 2022 Desjardins report commented that the "deal makes sense from a strategic, financial and geographic perspective" and would make TD "the sixth largest bank in the US." CIBC similarly commented that "TD management has been clear with respect to its strategic priorities—get bigger U.S. banking"—and acquiring First Horizon would "accelerate[] growth initiatives in commercial lending and provide[] new geographies for TD to capture share.

59.     However, the market also expressed concern about whether the banks would face challenges with respect to obtaining regulatory approval of the deal, which under the merger agreement was scheduled to close within a year, by February 27, 2023.  For example, a February 28, 2022 BofA report noted that "the new

regulatory regime" in recent years was less friendly toward M&A activity, and a March 1, 2022 Cormark report likewise noted that regulatory delays were "a key risk right now in the U.S." with respect to larger bank mergers. Given this potential regulatory scrutiny, at the outset of the Class Period, the most critical issue for investors by far was whether the banks could obtain regulatory approval of the deal.

**B.    Regulators View Adequate AML Controls As Absolutely Critical When Considering Whether To Approve A Bank Merger**

60.    In the United States, federal bank mergers like the TD-First Horizon deal require regulatory approvals from both the Federal Reserve and the OCC. Specifically, the Federal Reserve, as regulator of all bank holding companies, must approve the merger under the Bank Holding Company Act ("BCHA"), while the OCC, as the primary regulator of the surviving insured depository institution, must approve the merger under the Bank Merger Act ("BMA"). In turn, one of the most crucial factors these regulators focus on when determining whether to approve a bank merger is the effectiveness of the acquiring bank's AML controls. Thus, during the Class Period, the most significant consideration for Defendants and investors in terms of TD's ability to obtain regulatory approval of the First Horizon acquisition was whether TD had adequate AML controls.

61.    As a nationally chartered bank, TD has long been subject to well-established standards for maintaining an effective AML compliance program and complying with its obligations to identify and report suspicious activity under the

34

Bank Secrecy Act ("BSA"), which was signed into law in 1970. FinCEN, a bureau of the Department of Treasury whose "mission" is "to safeguard the financial system from illicit use" and "combat money laundering and its related crimes," is the agency charged with enforcing the BSA.

62.    A primary goal of AML controls under the BSA is for financial institutions like TD to prevent the opening and use of suspicious bank accounts that organized and unorganized criminal sectors rely on to store and funnel funds for illegal activity—ranging from drug and human trafficking to financing for terrorism and political corruption—and to regularly monitor and report any suspicious activity to FinCEN. Importantly, financial institutions can be held criminally liable for knowing violations of the BSA.

63.    Under the BSA, financial institutions are required to regularly submit "currency transaction reports," or "CTRs." CTRs are required to be filed with FinCEN within 15 days of any transactions—including deposits, withdrawals, or exchanges of currency—that either exceed $10,000, or that aggregate to that amount or above in a single day. The filing must include detailed information about who conducted the transaction (the "conductor")—including that individual's name and address—which accounts were used, and identification of the person or entity on whose behalf the transaction was conducted (the "beneficiary"), including that individual's social security or taxpayer identification number. According to

FinCEN, accurate and timely CTRs are "critical" to "combating financial crimes, terrorist financing, and other illicit activity," as they "establish a paper trail for law enforcement to identify large currency transactions, create financial transactions, and identify conductors and beneficiaries."

64.    In addition, financial institutions must file "suspicious activity reports," or "SARs," for transactions that involve or aggregate to $5,000 whenever there is an identifiable customer or other suspect engaged in suspicious activity that may be indicative of money laundering, terror financing, or other financial crimes.  Further, a bank must file a SAR for suspicious transactions aggregating $25,000 or more whenever the bank cannot identify a possible suspect.  According to FinCEN, SARs should be filed if a bank "knows, suspects or has reason to suspect" that the transaction (i) involves funds derived from illegal activities, or is conducted to disguise funds derived from illegal activities; (ii) is designed to evade the reporting or recordkeeping requirements of the BSA or regulations implementing it; or (iii) has no business or apparent lawful purpose or is not the sort of activity in which the customer normally would be expected to engage.

65.    Thus, SARs help alert law enforcement to activity that may not be captured by CTRs, such as where a customer makes unusual or unexplained transactions, performs transactions exceeding expected amounts or expected activity, deposits or withdraws unexplained sources of funds, performs transactions

with high-risk jurisdictions, or when the Bank suspects there may be insider wrongdoing by its employee. SARs must be submitted to FinCEN within 30 days of the initial detection of red flags indicating the suspicious activity.  According to FinCEN, SARs form the "cornerstone of the BSA reporting system," and are "instrumental" in enabling law enforcement to combat major money laundering or terrorist financing operations.

66.    The BSA also requires financial institutions like TD to implement a comprehensive internal AML program with at least five components, or "five pillars," to ensure its effectiveness, including: (1) designation of a compliance officer responsible for managing BSA/AML compliance (the "BSA Officer"); (2) development of internal AML policies, procedures and controls to ensure ongoing BSA compliance; (3) ongoing, relevant BSA/AML training of employees; (4) independent testing for BSA/AML compliance; and (5) customer due diligence ("CDD").

67.    In order to comply with its CTR and SAR reporting obligations, TD Bank was required to install an automated transaction monitoring system. This system was supposed to automatically identify transactions with suspicious characteristics and alert the bank to them so that they could be reviewed by BSA analysts to determine whether they needed to be reported to regulators.  Indeed, TD's regulators have made clear that "[f]or financial institutions of [TD Bank's] size and

sophistication, an effective automated transaction monitoring system is necessary to properly identify, mitigate and report suspicious activity as required by law and to prevent the institution from being used to facilitate criminal activity." This automated transaction monitoring system relies on "scenarios," or rules setting forth certain characteristics (such as the frequency or nature of the transaction, if it is to or from a high-risk jurisdiction, if it differs from the customer's normal transactional activity, etc.), that are inputted by the Bank in order to determine if the transaction shows heightened indicia of money laundering, terrorist financing, or other illicit activity.  If a transaction or series of transactions meet the parameters of a specific scenario, the automated transaction monitoring system generates an alert, with Bank analysts then reviewing each alert to determine if it needs further investigation or requires a SAR or CTR to be filed with FinCEN.

68.    As part of this AML program, TD is also required to implement a Customer Identification Program designed to verify the true identity of customers and beneficial owners of accounts at account opening, and to conduct ongoing monitoring of accounts in order to identify and report any suspicious transactions—collectively known as the KYC or "Know Your Customer" procedures. KYC procedures were established by the 2001 U.S. Patriot Act in the wake of the 9/11 terrorist attacks, and are designed to, in short, ensure that a customer is who they say they are by requiring proof of identity with a photograph and separate proof of

physical address (with more in-depth documentation required for higher-risk customers, products or services).

69.     Similarly, banks are required to verify the identification of all individuals conducting transactions at the bank, especially when the individual is not the account holder, and must report such information on CTRs or SARs when appropriate. These procedures are widely regarded as a critical first line of defense against illegal money laundering or terrorist financing.  By verifying a customer's identity and intentions upon opening a new account, and then monitoring any unusual transaction patterns—such as frequent wire transfers, international transactions, or interactions with off-shore financial centers—financial institutions can pinpoint suspicious activity and prevent the opening or use of fake accounts for money laundering. KYC procedures also require banks to regularly update customer information and request more documentation verifying the customer's identity and purpose for the account if needed, particularly if ongoing monitoring identifies suspicious transactions.

70.     These AML requirements were not only well understood by the senior leadership of TD—including Defendants Masrani, Salom, Tran, Bowman, and Levine—but these same executives were personally responsible for ensuring that the bank's BSA/AML compliance program satisfied statutory standards and met regulators' expectations. Specifically, federal regulations make clear that

responsibility for maintaining and monitoring an adequate AML compliance program rests squarely on the bank's senior leadership, who are "ultimately responsible for ensuring that the bank maintains a system of internal controls to assure ongoing compliance with BSA regulatory requirements." Indeed, the Federal Financial Institutions Examination Council ("FFIEC") BSA/AML Examination Manual used by the OCC requires that any deficiencies in a bank's AML controls be reported directly to the bank's senior management and its Board of Directors. As TD admitted in the Criminal Pleas, Defendant TD Bank's Board—on which Defendant Masrani sits—is responsible for TD's global AML program and BSA compliance. Specifically, the Board "oversees and monitors the integrity and effectiveness of the Group's internal controls and adherence to applicable compliance standards," which includes "setting the tone at the top as it relates to integrity and culture" and "communicating and reinforcing the compliance culture."

71.    The OCC also regularly reviews the adequacy of a bank's AML program during annual supervisory reviews—one of which occurred during the Class Period in the fall of 2022—and the results of those reviews are also reported directly to the bank's senior management. The FDIC's Application Procedures Manual explicitly states that in order for a bank merger to be approved, the bank's most recent supervisory examination must indicate that a satisfactory BSA/AML program has been implemented—and that any "[s]ignificant unresolved BSA/AML

deficiencies, or an outstanding or proposed formal or informal enforcement action that includes provisions related to BSA/AML, will generally preclude" merger approval.

72.    Indeed, due to how crucial adequate AML controls are to a bank's regulatory compliance, the Federal Reserve and the OCC have made clear that they will refuse to approve a merger if significant AML deficiencies are found.  As former Federal Reserve board member Daniel Tarullo stated in a March 2021 article, "when an acquiring bank has significant shortcomings in its compliance with anti-money laundering [AML] or consumer protection laws, there is a good argument that its 'managerial resources' should not be diverted to the integration of its target bank until it has remediated those shortcomings."

73.    M&T's acquisition of Hudson City—one of the most recent larger bank mergers preceding TD's acquisition of First Horizon—is instructive and represented a stark warning to future banks seeking to merge that deficient AML controls could—and would—doom a merger. Specifically, although M&T's proposed $3.7 billion acquisition of Hudson City was announced in 2012, regulators refused to approve this much smaller, and far less systemically important, merger for several years, until 2015, after they found "significant weaknesses" in M&T's AML and consumer compliance programs. These AML deficiencies included (1) "a lack of robust and comprehensive systems for collecting, processing, and updating

41

information needed to make money-laundering risk determinations for every customer and account," and (2) "weaknesses in M&T's processes and policies for identifying and reporting suspected structuring activities and other suspicious activities."

74.     While regulators ultimately approved M&T's acquisition, they did so only after M&T spent three full years—and millions of dollars—remedying the AML issues. Moreover, at the same time, the Federal Reserve made crystal clear that it would never again give another bank the same leeway and approve a merger if it found AML deficiencies.   Instead, in its September 20, 2015 order ultimately approving the M&T merger, the Federal Reserve emphatically stated that all AML issues must be fully resolved prior to a merger application being submitted—or else the application would have to be withdrawn:

> The Board expects that a banking organization will resolve all material weaknesses identified by examiners before applying to engage in expansionary activity.   As noted, M&T's issues largely arose during processing of this application, and the Board took the highly unusual step of permitting the case to pend while M&T addressed its weaknesses. The Board does not expect to take such action in future cases. Rather, in the future, if issues arise during processing of an application, the Board expects that a banking organization will withdraw its application pending resolution of any supervisory concerns.

75.     To banking professionals across the industry—including the Executive Defendants and their counsel—the Federal Reserve's strongly worded warning was a watershed moment, as the policy change was widely reported in the press,

including in The *Wall Street Journal* and elsewhere.[1] For example, bank merger experts from Wachtell Lipton advised in an October 2015 report that the "Federal Reserve now expects to review detailed due diligence reports, including identified weaknesses and plans for remediation, as well as integration plans that delineate post-merger compliance and risk management systems and programs," with an "intense focus on consumer compliance, CRA [Community Reinvestment Act] and BSA/AML and the CFPB's views are increasingly important." According to other bank M&A practitioners, "[a]ll of this makes it vitally important for prospective acquirers to carefully diligence their own potential issues and present detailed presentations to the regulators well in advance of signing a merger agreement."

76.    First Horizon and its senior executives were keenly aware of this Federal Reserve guidance making clear that TD's AML compliance would be vital to gaining the necessary regulatory approval—and that First Horizon would need to pay particularly close attention to TD's AML compliance during due diligence and throughout the regulatory application process.  Indeed, just before being courted by TD, First Horizon had completed a merger of its own, combining with Louisiana-based IberiaBank in a transaction that closed in July 2020  The proxy statement for the IberiaBank transaction—issued by First Horizon on March 19, 2020 and signed

---

[1] *See, e.g.*, Rachel Louise Ensign, 1,129 Days Later…Bank Deal Approved, *The Wall Street Journal* (Sept. 30, 2015).

by Defendant Jordan—explicitly warned that when assessing whether to approve a merger, the Federal Reserve Board "considers the effectiveness of the applicant in combatting money laundering."  In connection with the IberiaBank transaction, First Horizon told its shareholders that all "material weaknesses" impacting First Horizon's AML program must be resolved "<u>before applying</u>" for "expansionary activity," and if material weaknesses occurred or developed while the application was pending, First Horizon would be expected to "withdraw its application" until the problems were fixed:

> The Federal Reserve Board has stated that if material weaknesses are identified by examiners before a banking organization applies to engage in expansionary activity, the Federal Reserve Board will expect the <u>banking organization to resolve all such weaknesses before applying for such expansionary activity.</u> The Federal Reserve Board has also stated that if issues arise during the processing of an application for expansionary activity, it will expect the applicant banking organization to <u>withdraw its application pending resolution of any supervisory concerns.</u>

77.    First Horizon repeated this warning in connection with the TD Bank merger as well.  Specifically, First Horizon's Annual Reports filed on Forms 10-K during the Class Period—on March 1, 2022, the day after the merger was announced, and on March 1, 2023, the day Defendants first disclosed a delay to the timing of regulatory approvals (both of which were signed by Defendants Jordan and Dmuchowski)—contained the exact same warning in connection with the TD-First Horizon merger.  First Horizon and its senior most executives therefore fully

appreciated the critical importance that TD's AML program would play in obtaining the necessary regulatory approvals to close the TD-First Horizon merger.

78.    In addition to regulators' refusal to approve the M&T transaction due to significant AML failures, Defendants were also acutely aware that in February 2018, U.S. Bancorp pleaded guilty to criminal violations of the AML laws "for willfully failing to have an adequate [AML] program and willfully failing" to file SARs. Specifically, in the DOJ press release announcing the settlement, the U.S. Attorney stated that U.S. Bancorp's AML program was "highly inadequate" because it "operated the program 'on the cheap' by restricting headcount and other compliance resources," "imposed hard caps on the number of transactions subject to AML review in order to create the appearance the program was operating properly," and deliberately "concealed its wrongful approach from the OCC." As a result, U.S. Bancorp "failed to detect and investigate large numbers of suspicious transactions," amounting to "criminal conduct" by the bank.

79.    With respect to SARs, the DOJ stated that U.S. Bancorp's internal "below threshold testing"—or its testing of suspicious transactions that fell below what would be captured by U.S. Bancorp's current scenarios—had revealed that SARs "should have been filed on more than 25 percent, and as much as 80 percent, of the tested transactions." However, rather than increase AML resources to lower

SAR thresholds and detect and report this suspicious activity, U.S. Bancorp instead decided to stop conducting this testing altogether.

80.    U.S. Bancorp's highly publicized guilty plea and settlement sent a stern warning to other banks that cost-cutting at the expense of BSA and AML compliance was prohibited and warranted criminal penalties.  U.S. Bancorp's plea and settlement was widely covered in the news media, including in *The Wall Street Journal*, and incorporated into AML guidance published by leading practitioners and AML experts.  For example, commenting on the settlement, Paul Weiss published an article warning that the U.S. Bancorp plea was a clear instruction to financial institutions that they must "appropriately invest" in their BSA/AML programs to avoid criminal liability:

> [T]his resolution reinforces the expectation that financial institutions will appropriately invest resources to ensure a robust BSA/AML compliance function. Not only are regulated entities expected to employ sufficient numbers of qualified personnel, they also are expected to routinely upgrade, test, and invest in transaction monitoring and other AML-related systems to ensure they are up-to-date and appropriately monitoring AML risk.

81.    TD Bank admitted in its guilty plea that the Bank and its senior leadership had specific and contemporaneous knowledge of the February 2018 U.S. Bancorp settlement and its implications with respect to regulatory compliance. Specifically, TD admitted that its "Senior US-AML executives were aware" of the U.S. Bancorp settlement when it occurred, and fully "understood that banks must

monitor their transactions for suspicious activity" as a result.  In fact, at the time of the U.S. Bancorp settlement, TD's BSA Officer, Defendant Levine, immediately raised and addressed the settlement with the Bank's AML Oversight Committee, commenting to the Board at the time that TD would need to "look at our own program and compare the conduct that has occurred" in order "to make sure nothing like this is happening" at TD.  Levine also specifically noted U.S. Bancorp's failure to file SARs as being a key component of its AML violations, noting that U.S. Bancorp had inappropriately "either ignored or discontinued" its certain "below the line threshold" SARs testing in order to reduce AML costs.

### C.   Leading Up To The Class Period, TD Was An Outlier Among Its Peers For Having A History Of Significant High-Profile AML Compliance Failures

82.    While having sufficient AML controls is critical for any bank, these concerns were especially important for TD.  Indeed, not only was TD now pursuing the largest acquisition in its history—one that promised to transform it into a true banking giant—but it also had a well-documented history of AML deficiencies.  In the years leading up to and during the Class Period, numerous regulators, senior government officials, and federal courts in the U.S. and Canada regularly criticized TD Bank for egregious AML failures. These failures included TD's "knowing" and "willful" involvement in several of the largest Ponzi schemes in recent history, scathing regulatory reports singling out the bank for its "surprising" and "troubling"

AML deficiencies, and federal judges overseeing criminal trials calling out TD for being "asleep at the switch" with regard to AML controls.

83.    First, in the fall of 2009 the media began reporting on allegations that TD Bank assisted Scott Rothstein ("Rothstein") in perpetrating what at that time was considered potentially the largest Ponzi scheme in history—a $1.2 billion fraud pursuant to which Rothstein, a former lawyer, sold thousands of investors fake shares in whistleblower and sexual harassment lawsuits while promising them large rewards when the cases were settled. On January 27, 2010, Rothstein pleaded guilty to a racketeering conspiracy in the United States District Court for the Southern District of Florida and was sentenced to 50 years in prison.

84.    As would ultimately be revealed, Rothstein was only able to perpetrate his fraud because TD turned a blind eye to what were obvious and pervasive improprieties.  Indeed, September 2013, TD Bank settled with the OCC, FinCEN and the SEC, whereby it admitted that it "willfully violated" the BSA's SAR reporting requirements and agreed to pay $52.5 million in penalties for its role in Rothstein's scheme.  The OCC determined that TD Bank's AML program utterly failed to appropriately monitor the accounts through which Rothstein and TD employees had perpetuated the scheme.  While Rothstein was a major TD client in 2008 and 2009, TD generated around 100 fraud alerts for Rothstein's bank accounts,

involving thousands of suspicious transactions. However, TD failed to timely file a single SAR with regulators as required under the BSA.

85.    The OCC thus concluded that TD Bank had engaged in "a pattern of misconduct" that was "significant and egregious," with thousands of transactions totaling $900 million in aggregate suspicious activity flowing through Rothstein's TD accounts. Similarly, FinCEN concluded that TD Bank "willfully" violated the BSA's reporting requirements by failing to timely detect and adequately report suspicious activities, which the bureau attributed to "a lack of adequate training for both the anti-money laundering and business staff." FinCEN's 2013 consent order specifically addressed TD Bank's failure to properly train its AML investigators and staff on how to spot fraud and file SARs, and explicitly noted that the Bank's "lack of adequate training … contributed to the failure to recognize [the] suspicious activity." The OCC's 2013 consent order likewise found the Bank failed to file necessary SARs, and that the conduct was "part of a pattern of misconduct" for TD Bank.

86.    Second, and remarkably, the fraud perpetrated by Scott Rothstein was not the only multi-billion-dollar Ponzi scheme in which TD Bank was implicated. In 2009, at around the same time the Rothstein scheme was unraveling, investors in R. Allen Stanford's financial company, who believed they were investing in high yield certificates of deposit ("CDs"), learned that in actuality it was a massive Ponzi

scheme. Specifically, Stanford created and owned Antigua-based Stanford International Bank, Ltd. ("SIB"), through which he sold CDs promising extraordinary returns to ordinary middle-class investors. The scheme ran from 1999 until it collapsed in 2009 amid investigations by the SEC and federal prosecutors, during which time Stanford amassed over $7 billion from tens of thousands of investors through the sale of the fraudulent CDs—rendering it the second largest Ponzi scheme in history next to that of Bernie Madoff.

87.    As was the case with Rothstein, Stanford could not have perpetuated his fraud without the assistance of TD Bank. Stanford used TD Bank to facilitate his massive long-running fraud, with the bank collecting almost $7 billion in fake CDs over the course of ten years without ever once questioning highly suspicious red flags that constituted classic hallmarks of a Ponzi scheme.  As detailed in a letter to TD Bank from U.S. Senators John N. Kennedy and Bill Cassidy demanding restitution for investors from the bank due to its direct participation in the scheme, "TD Bank ignored numerous inescapable signs of fraudulent activity" and "turned a blind eye to obviously fraudulent activity by Stanford." Among other things, the Senators stated that TD blatantly ignored "large round sums leaving Stanford's TD Bank accounts"; "actual investment returns that could not support the unreasonably high CD returns SIB was offering"; "SIB's location in Antigua, one of the highest

risk jurisdictions in the world known for money laundering"; and "Stanford's declared bankruptcy and designation as a Politically Exposed Person."

88.    Senior government officials were not the only ones to explicitly recognize TD's role in the fraud.  Following Stanford's guilty plea and conviction, Stanford customers sued TD Bank, alleging that it had played a critical role in facilitating the scheme. Specifically, these customers claimed that TD Bank collected the phony certificates of deposits while continuously ignoring significant red flags that strongly indicated they were part of a Ponzi scheme. On January 20, 2022—just weeks before TD announced its proposed acquisition of First Horizon—Judge David C. Godbey of the United States District Court in the Northern District of Texas, where the Stanford lawsuit was pending, denied TD Bank's motion for summary judgment.  In that decision, the Court wrote that the evidence showed that TD "had clear insight into the destination of funds wired out of [Stanford's] account, which clearly indicated that [Stanford's Bank] directed the bulk of incoming funds to paying earlier investors, an obvious hallmark of a Ponzi scheme." The court further determined that "TD Bank transacted with Stanford in full awareness that improper behavior was ongoing within the Stanford entities."  TD ultimately settled the Stanford lawsuit for $1.2 billion during the Class Period on February 27, 2023.

89.    Third, TD Bank was also alleged to have facilitated a $3 billion Ponzi scheme involving the internet phone service company TelexFree, considered one of

51

the largest Ponzi schemes ever in terms of number of people affected. TD assisted TelexFree's fraud by opening up a number of TelexFree accounts, breaking up large checks in order to launder money to other banks, and writing reference letters on TD letterhead for TelexFree-related entities involved in the Ponzi scheme. On August 31, 2022, the U.S. District Court for the District of Massachusetts denied TD's motion to dismiss and later held that, even after becoming aware of numerous red flags, "TD Bank continued to allow TelexFree to open new accounts, and subsequently facilitated large fund transfers between accounts to assist TelexFree in obscuring the source and movement of its funds." The court thus concluded that "TD Bank's reactions to red flags" supported a finding "that TD Bank 'actually knew' that TelexFree was a fraud." TD ultimately settled the TelexFree lawsuit for $95 million in October 2023.

90.     In addition to consistently violating U.S. regulations regarding AML policies, TD also ran afoul of Canadian banking AML regulations. Specifically, the Cullen Commission—a formal money laundering inquiry established by the Canadian province of British Columbia that was convened to investigate hundreds of millions of dollars laundered through British Columbian casinos between 2018 and 2021—singled out TD Bank as the worst money laundering offender by far among the six largest Canadian banks. Despite senior management, including Michael Bowman, TD's Global Chief AML Officer, being directly informed by the

Cullen Commission of this fact, TD was the only large bank that failed to participate in "Project Athena," a private-public partnership between Canada's largest banks and the Canadian authorities designed to implement simple, basic measures—such as writing customer names on bank drafts—in order to prevent rampant money laundering in British Columbia casinos.

91.    The Cullen Commission's final report, issued in June 2022, concluded that even though "TD was the largest source of bank drafts flagged as suspicious" by Canadian authorities dating back to 2018—and even though TD's top AML executives "were aware of this fact and that TD risked being out of step with its peers if it did not take action to reduce the anonymity of its drafts"—TD did not take any action at all to address the issue until over a year later, and even then only after the Cullen Commission's counsel wrote the bank a letter pressuring it to do so. The Cullen Commission described this conduct as "troubling," and as rendering TD an outlier among Canadian banks in terms of having woefully deficient AML controls:

> I am troubled by TD's delay in implementing a change to its bank drafts (which did not involve tactical information sharing) to address a money laundering vulnerability flagged by law enforcement. It appears that, as early as December 2018, the vice president of Everyday Banking was advised of the Project Athena typology, the actions that other banks had taken to change their bank drafts, the potential for TD to be the sole bank among its peers not to do so, and the fact that failing to do so could make TD vulnerable for money laundering. Yet, no change was made to its bank drafts until September 2020. Further, this action appears to have been prompted by inquiries by Commission counsel, raising the question of whether it would have occurred otherwise.

92.    Indeed, the Cullen Commission's report explicitly criticized TD for its long delay in implementing simple anti-money laundering measures, which it found especially "surprising given that senior management in TD's anti-money laundering unit were aware by at least May 2019 that their bank was the single largest source of suspicious bank drafts being tendered at BC casinos, representing a sum of $26 million from March 2018 to January 2019 alone."

93.    Furthermore, the report stated that despite TD's top AML executives being fully aware that Canadian authorities had identified TD Bank as the single largest source of suspicious bank drafts, TD was unwilling to allocate any resources to remedy the issue, refusing the Cullen Commission's request for even a five-person investigation team—with Defendant Bowman claiming that TD "did not have a single person it could spare to analyze the data being provided by Project Athena." In an interview for the Cullen Commission, Defendant Bowman further admitted that, under TD AML controls as they existed at the time, "any client could have purchased a bank draft in the pacific region that would have not [] included information about their purchaser's name in the account." The report concluded that it was "concerning that one of Canada's largest financial institutions was so delayed in addressing a vulnerability to bank drafts that had been identified by law enforcement," stating that there were "costs to these decisions" with "millions of

dollars of potentially suspicious funds entering BC casinos through TD bank drafts in the meantime."

### D. After TD and First Horizon Announce The Blockbuster Merger, They Repeatedly Reassure Investors That They Have Effective AML Controls And Will Easily Secure Regulatory Approval

92.     As set forth above, on February 28, 2022, the first day of the Class Period, TD Bank and First Horizon jointly announced the $13.4 billion all-cash deal in which TD would acquire First Horizon at a price of $25 per share, a substantial 37% premium over what First Horizon stock was trading at prior to the announcement of the deal.

93.     Considering the critical importance of this deal to both banks, the public history of TD's regulatory abuses, and TD's knowledge of its ongoing willful and criminal AML deficiencies, it was critically important for TD to convince investors that its AML controls had remediated past abuses, were legally compliant, and were sufficient to satisfy regulators' requirements.  Accordingly, throughout the Class Period—in Defendants' SEC filings and during nearly every earnings and investor call—Defendants went out of their way to repeatedly tout TD's ability to satisfy its regulators' requirements, its "excellent regulatory relationships," TD's "comprehensive" AML controls that purportedly ensured that money laundering risks were "appropriately identified and mitigated," and Defendants' "extreme confidence" in obtaining regulatory approval.

94.    For example, throughout the Class Period, TD posted an "AML Statement" on its website touting its AML program, which the bank claimed allowed it to detect and deter money laundering, and the actions it supposedly took to address those concerns. Specifically, the AML Statement claimed that TD's commitment to combatting money laundering was "formalized" through the Bank's "enterprise-wide Anti-Money Laundering/Anti-Terrorist Financing (AML/ATF)" program that was "designed to detect and report suspected money laundering and terrorist financing and activity." The AML Statement further claimed that the bank ensured "[o]ngoing monitoring to detect and report suspicious transactions or activities" and conducted "[i]ndependent testing of AML, ATF and sanctions control effectiveness."

95.    TD further touted its AML controls throughout its Class Period SEC filings.  For example, in its March 7, 2022 Form 6-K signed by Defendant Masrani, TD highlighted its "risk culture," which "starts with the 'tone at the top' set by the board, CEO" and members of TD's senior executive team. TD also emphasized its Code of Conduct, which was "reviewed and attested to by every board member and eligible employee on an annual basis." Significantly, that Code of Conduct explicitly affirmed that TD was "committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so." TD's SEC filings also promoted the purported actions taken

by TD's Audit Committee to ensure compliance with AML regulations, stating that the Audit Committee regularly "received updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions," and directly oversaw "the execution and ongoing effectiveness of [the AML program]."

96.     Then, in the parties' March 21, 2022 Bank Merger Act Application publicly filed with the OCC, TD Bank again affirmed that its "AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated." TD further stated, in no uncertain terms, that "[b]oth TD and FHN have comprehensive anti-money laundering and sanctions programs" that were "designed to ensure compliance with the [BSA]"—and that TD had in fact "review[ed] and assess[ed] key risks related to AML" during the due diligence process for the merger. General Counsel of TD Bank US, Ellen Glaessner was listed as the contact person for TD in the application.

97.     In addition to these statements touting TD's "comprehensive" AML controls, TD also repeatedly reaffirmed to investors, including in direct response to numerous analyst questions, that TD was intimately familiar with U.S. regulatory

requirements and would easily secure approval of the deal safely within the timelines prescribed by the merger agreement.

98.    For example, on the February 28, 2022 conference call announcing the deal, Defendants Masrani and Jordan celebrated the merger as a "strategically compelling" and "exciting opportunity" for TD because it would "increase[] our scale and density in core markets" and was "financially very attractive." For example, an analyst questioned TD's ability to get regulatory approval of the merger, highlighting the recent "sensitivity around regulatory approval process for M&A in the U.S.," the merger's unique payment terms in the event of delay or termination, and asking for "color just in terms of [TD's] comfort level" on closing the deal within the nine-month mark, Masrani quickly dismissed any such concerns:

> We at TD have prided ourselves in having excellent regulatory relationships. We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking . . . The structure here, there have been instance where some deals have been slightly delayed. So [the $0.65 price per share increase provided under the merger agreement] does compensate the First Horizon shareholders should there be a delay of that nature.  But our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023. So our expectation is that this will get approved and get [] closed around the 9-month mark.

99.    First Horizon's April 22, 2022 Proxy Statement (which was also reviewed and approved by TD)—in which First Horizon's board urged shareholders to approve the merger agreement—provided investors further comfort regarding TD's ability to easily secure regulatory approval. Specifically, that filing represented

that: (1) leading up to the merger, First Horizon's CEO Defendant Jordan personally met with Defendant Masrani no less than four times to discuss "the ability of TD to obtain, and the anticipated timing with respect to, the regulatory approvals required for TD to acquire First Horizon"; (2) First Horizon's board had identified TD's "legal and regulatory compliance" as a "Reason[] For The Merger" based on "information obtained through due diligence"; and (3) that "each of First Horizon and TD does not know of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be received to permit the consummation of the merger on a timely basis." Additionally, the merger agreement itself—which First Horizon provided directly to FHN shareholders as part of the Proxy Statement and which was signed by Defendants Jordan and Salom— specifically stated that TD Bank "complied" with the BSA.

100.   Analysts and investors credited these representations, and cited them in valuing First Horizon shares. For example, Bank of America analysts repeated these statements when reporting on a meeting they had with Defendants Masrani and Salom that "highlighted management's sound understanding of the execution risks," and provided a positive assessment of the deal by citing the fact that "management reiterated comfort in its ability to meet regulatory expectations," as well as the two banks' "cultural alignment" and "similar approach toward risk management." Similarly, Jeffries noted in a March 7, 2022 First Horizon report that the "[b]iggest

risk is lack of regulatory approval, which is definitely a higher hurdle to clear given a tougher regulatory regime, but we believe this risk to be low as well."

**E.  When Journalists and Lawmakers Begin To Raise Questions About TD's Regulatory Compliance, TD Vehemently Denies That It Has Any Regulatory Problems, And Continues To Tout Its "Extreme Confidence" In Obtaining Regulatory Approval**

101.  Notwithstanding Defendants' positive representations about their robust AML controls and prospects for obtaining regulatory approval, beginning in the spring of 2022, certain journalists and lawmakers began raising pointed questions about TD's past regulatory issues and the potential impact of those issues on obtaining regulatory approval.  In each and every instance, TD Bank emphatically and repeatedly denied the existence of any potential regulatory issues at all—while continuing to consistently assert that TD was "really, really excited" about the "strategically compelling" First Horizon deal.  However, as Defendants would be forced to reveal at the end of the Class Period, all of these statements were false.  In reality, TD perpetrated a decade-long willful criminal conspiracy to launder money and to cripple its AML program in order to cut costs and grow the bank—all of which culminated in a perfect storm of multiple criminal indictments, lawsuits, federal regulatory investigations, and a historic guilty plea with unprecedented civil and criminal penalties being imposed.

102.  On May 4, 2022, *Capitol Forum* reported that TD had for years engaged in sales misconduct by opening fake bank accounts and enrolling customers in TD

services without customers' permission. This misconduct constituted clear violations of TD Bank's own AML Statement that the Bank ensured AML and KYC compliance through accurate "customer and transaction record-keeping" and "ongoing monitoring to detect and report suspicious transactions or activities." The OCC had discovered TD's misconduct "during an industrywide probe into fake customer accounts spurred by [the] Wells Fargo scandal that came to light in September 2016." According to *Capitol Forum*, these issues had resulted in the OCC issuing TD a private reprimand in 2017. The report questioned whether TD's misconduct would result in increased regulatory scrutiny of the First Horizon deal just before the shareholder vote, particularly since current and former TD Bank employees told *Capitol Forum* that TD employees were still "strong-arm[ing]" customers into accounts and services they did not authorize or need—and that TD was "so lax about opening new accounts," including by requiring only one form of identification instead of two in direct violation of KYC requirements, "that abuse [was] inevitable."

103. In response to this report, TD immediately issued a statement attacking *Capitol Forum* and vehemently and completely denying any allegations of regulatory misconduct. Specifically, TD stated that it "strongly disagree[d] with the characterization of information presented as facts regarding TD Bank's fraud procedures"—and that it also "strongly disagree[d]" with any implication "that our

fraud controls are somehow related to sales practices or otherwise inadequate." TD further vehemently asserted that its business was "built on a foundation of ethics, integrity, and trust," and that it faithfully "follow[ed] industry-best practices that are designed to detect and help prevent fraud":

> Our business is built on a foundation of ethics, integrity, and trust . . . We strongly disagree with any implications of systemic sales practices issues, or that our fraud controls are somehow related to sales practices or otherwise inadequate . . . [W]e strongly disagree with the characterization of information presented as facts regarding TD Bank's fraud procedures. At TD Bank, protecting the security of our customer's accounts and personal information is a top priority. We follow industry-best practices that are designed to detect and help prevent fraud.

104.    Then, on TD's May 26, 2022 earnings call held in the immediate wake of the *Capitol Forum* report—during which Defendant Salom again touted the "very compelling" First Horizon deal about which TD was "quite excited"—analysts again focused on TD's prospects for obtaining regulatory approval of the merger. Specifically, a Bank of America analyst noted that "the U.S. regulatory process has become a little more prolonged over the last year," and that "[o]ne of the concerns" the analyst had was that TD was "uniquely the G-SIB"—or Global Systemically Important Bank. In light of the importance of TD to the global banking system, the analyst asked Masrani what his "conviction level" was "in terms of getting the deal through the regulatory sort of finish line." In response, Masrani emphatically and unequivocally asserted that TD was "very comfortable" because it had purportedly

entered the transaction on the basis that "it meets all the requirements of all the regulators":

> [W]e feel very comfortable. Our process continues.  And we did this transaction on the basis that [] it meets all requirements of all the regulators. So we continue to be comfortable and are working hard to get it to closing.

105.   Reassured by TD's statements about the prospects for regulatory approval, that the merger "meets all the requirements of all the regulators," and the quality of TD's supposedly "industry-best practices" for identifying and preventing fraud, First Horizon shareholders overwhelmingly voted to approve the merger agreement at the May 31, 2022 shareholder vote.

106.   Nevertheless, despite TD Bank's angry denials, journalists and lawmakers continued to raise questions about TD's regulatory compliance.

107.   For example, as set forth above at ¶91, on June 3, 2022, the Cullen Commission issued its Final Report, which openly criticized TD for being the only large Canadian bank to fail to implement simple AML measures to prevent rampant money laundering despite the fact that "senior management in TD's anti-money laundering unit were aware" that TD "was the single largest source of suspicious bank drafts being tendered at BC casinos."

108.   Less than two weeks later, on June 15, 2022, Senator Elizabeth Warren and three other lawmakers sent an open letter to the OCC referencing the "disturbing May 4, 2022 *Capitol Forum* report about unchecked fraud and abuse at TD Bank."

In the letter, Senator Warren cited the OCC's 2017 confidential finding that TD Bank was "one of a handful of retail financial institutions that had systemic problems in its account opening, verification and sales processes"—thus again constituting clear violations of KYC procedures requiring TD to verify customers' identities and purpose in opening new bank accounts—that "stretched across retail branches from Maine to Florida." The letter sharply criticized the OCC's 2017 decision to issue only "a private reprimand" to TD "that would not materially impact TD Bank's business practices," which had "allowed TD Bank's rampant fraud and abuse to go unpunished, even after the agency's troubling findings in its own investigation of the bank." The letter then specifically called upon Acting Comptroller Michael Hsu and the OCC to "closely examine" any "ongoing wrongdoing" and block the First Horizon merger until TD had been held accountable for its regulatory abuses: "As TD Bank seeks approval from your agency to increase their market share and become the sixth-largest bank in the U.S., the OCC should closely examine any ongoing wrongdoing and block any merger until TD Bank is held responsible for its abusive practices."

109.   In response to Senator Warren's letter, TD again issued an unequivocal denial of any regulatory abuses regarding its fraud detection procedures. TD stated that the *Capitol Forum* report was completely "unfounded"; that TD "vehemently object[ed] to any allegations of systemic sales practice issues, or any other claims

alleged in the article"; that it "strongly" disagreed with the article's "characterization of information presented as facts regarding TD Bank's fraud procedures"; and asserted again that it "follow[ed] industry-best practices that are designed to detect and help prevent fraud." Again, the detailed findings about the stunning failures in TD's fraud procedures, revealed in the Criminal Pleas, would directly contradict these TD's denials to Senator Warren.

110.    Then, on July 8, 2022, *Capitol Forum* issued another report detailing its discovery of another years-long investigation, this time by the Consumer Financial Protection Bureau ("CFPB") into improper sales practices involving TD Auto Finance. The report again questioned TD's regulatory compliance and whether regulatory approval of the First Horizon deal was in jeopardy, stating that "[l]ast month, Senator Elizabeth Warren and three other lawmakers wrote that in light of *The Capitol Forum* reporting, the OCC should prevent TD Bank, which has proposed buying First Horizon for $13.4 billion, from 'consolidating any new mergers until this pattern of behavior is addressed.'"  The report commented that news of the TD Auto Finance investigation "could spur additional concerns among lawmakers—and potentially regulators—about the First Horizon acquisition, which would make TD Bank the sixth largest retail financial institution in the U.S."

111.    TD's response to this report—which this time was issued by the General Counsel of TD Bank US, Ellen Glaessner, who served as a key advisor to

Defendant Salom and the TD US Management Committee—was again swift, and even more vehement than before.  In its response, TD not only strongly denied the existence of any regulatory issues that could jeopardize the First Horizon deal, but went so far as to accuse the *Capitol Forum* reporter of defamation, asserting that the published reports contained "extensive inaccuracies and misrepresentations":

> Your story is an accumulation of false claims, half-truths, rumor, innuendo, and completely unrelated information that misinforms your readers. You're leaping to unfounded conclusions that present an inaccurate view of TD and the hard work of thousands of dedicated employees.
>
> ….
>
> On repeated occasions, we have outlined for you the extensive inaccuracies and misrepresentations in your reporting and inquiries, which are once again evident in this story . . . You state 'the top regulator for national banks, found serious consumer abuses at TD Bank' . . . You make this claim yet have not disclosed any information to support this broad and unmitigated attack on our integrity.
>
> …
>
> If you persist in publishing, you will be doing so with the specific knowledge that your insinuations about TD are false, and in reckless disregard of the truth of the information that we have provided.

112.   Less than a month after *Capitol Forum*'s July report, on August 2, 2022, TD held an investor call to announce its proposed acquisition of investment bank Cowen Inc. During the call, an analyst again directly asked Masrani about TD's prospects for obtaining regulatory approval of the First Horizon deal—and specifically, if Masrani had "[a]ny reason" to believe that the deal may not close, or

knowledge of any "regulatory or other issues that may delay the deal." Masrani responded with a flat and emphatic "No":

> <u>No, I have no reason to believe that</u> . . . Just following its normal process within the U.S. regulatory requirements. And we obviously cannot talk about our conversations with regulators. We feel comfortable that [it] is proceeding at the pace we expected . . .

113. Similarly, during an analyst call on September 14, 2022—soon after TD had attended the August 18, 2022 public hearing on the First Horizon merger with the OCC and the Federal Reserve—Defendant Salom emphasized that TD remained "very excited" about the First Horizon deal and was in fact "more excited now than back in February when we announced the deal." When an analyst again directly asked Salom about "the elephant in the room"—specifically, for an "update in terms of the timeline" for regulatory approval—Salom responded by unequivocally asserting that TD was "<u>extremely confident</u>" in its ability to obtain regulatory approval "in short order" due to the "strength" of its regulatory applications:

> [W]e're positioned to be able to close as we would expect. At this point, we do expect to close the transaction at the end of the first quarter, fiscal first quarter. And we're tracking well against that . . . And on August 18th we had the public hearing, the OCC, the Fed hosted that as part of the—normal part of the application process. But to your point around—<u>I'm sure there's going to be a lot of questions about how confident are we? We're extremely confident</u> . . . <u>So, if you look at the strength of the application, we're quite excited about getting this done in short order.</u>

67

114.   TD Bank's repeated positive statements about its ability to obtain regulatory approval of the First Horizon deal—and its vehement denials of any regulatory issues—had their intended effect.  For example, a June 2022 Bank of America report specifically cited TD's denials of the *Capitol Forum* reports as "unfounded" in downplaying the "anecdotal nature of the allegations," and pointed to TD's citation of the OCC's prior review of sales practices at U.S. banks as adding extra comfort that it was "unlikely" that there was any "widespread systemic issue at TD." Similarly, a September 2022 Barclays report parroted Defendant Salom's statements that TD was "more excited about First Horizon (FHN) now than it was back in February when the deal was first announced"—and that TD was "extremely confident in approval of the deal."

115.   Indeed, First Horizon's stock price surged by 17%, from a price of $21.14 per share on June 15, 2022, the day after Senator Warren sent her letter to the OCC, to a price of $24.85 per share on November 30, 2022—a price nearly equal to the $25 per share deal price, a strong indication that investors understood, based on Defendants' unqualified representations, that regulatory approval of the merger was a virtual certainty.

**F.    In Reality, TD Engaged in Criminal Violations of the AML Laws Throughout the Entire Class Period as a Result of the "Flat Cost Paradigm" Enforced by the TD Executive Defendants**

116.   In sharp contrast to the positive impression Defendants conveyed to First Horizon investors about the merger and its prospects for approval—including TD's vehement defense of its conduct and its attacks on journalists who questioned the Bank's regulatory compliance—in reality, TD was engaged in criminal money laundering, a fact it hid from both investors and the regulators investigating the Bank's crimes during the Class Period.

117.   As a result of multiple government investigations into TD's AML violations—including by the DOJ, FinCEN, the Federal Reserve and the OCC—TD would soon become the largest bank in U.S. history to plead guilty to numerous violations of the BSA, and the first U.S. bank ever to plead guilty to conspiracy to commit money laundering.  As TD would admit, for nearly a decade and throughout the entire Class Period, TD "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML program," knowingly failed to monitor trillions of dollars in transactions, and enabled criminal organizations to launder hundreds of millions of dollars in illicit proceeds through the Bank.  As the U.S. Attorney for the District of New Jersey put it:

> TD Bank prioritized growth and convenience over following its legal obligations.  <u>As a result of staggering and pervasive failures in oversight</u>, <u>it willfully failed to monitor trillions of dollars of transactions</u>—including those involving ACH transactions, checks, high-risk countries, and peer-to-peer

transactions – <u>which allowed hundreds of millions of dollars from money laundering networks to flow through the bank</u>, including for international drug traffickers.

118.  TD's BSA and AML violations were so pervasive, severe and unprecedented that they resulted in a staggering $3 billion in penalties being levied against the Bank—including a $1.8 billion criminal penalty imposed by the DOJ and a $1.3 billion civil penalty imposed by FinCEN.  This was the largest penalty ever imposed under the BSA, and the first time the DOJ ever invoked the BSA's unique daily penalty provision that fines a financial institution up to $500,000 for each day it lacks a functional AML program.  As Attorney General Merrick B. Garland remarked, imposing this daily penalty was "based on TD Bank's failure to maintain an effective [AML] program every single day from the beginning of 2014 to the end of October 2023."

119.  Additionally, due to the seriousness and ongoing nature of TD's transgressions, the OCC also imposed an asset cap restricting TD's growth for the foreseeable future—a rare step typically reserved for only the most severe cases—which prevented TD from expanding further in the U.S., a crippling blow for the Bank's business.  In addition, TD would be subjected to independent monitoring for four years to ensure the Bank's compliance with regulators' demands that TD completely overhaul its AML program.

120. The unprecedented magnitude of the penalties and fines imposed on TD were due to the extraordinary lengths to which the Bank resorted to facilitate its criminal misconduct, including the following:

121. **The TD Executive Defendants Issued the "Flat Cost Paradigm" Directive That Resulted In Severe AML Failures**. TD's pervasive AML and BSA deficiencies were established and driven by the directive of TD's senior leadership—including the TD Executive Defendants—who enforced a "flat cost paradigm" that starved TD's AML programs of necessary funding even though TD's revenue, profits and risk continued to grow. According to FinCEN, TD's flat cost approach to budgeting "resulted in an underinvestment in its AML program by underline substantial sums"—such that TD "knowingly spent an order of magnitude less [on AML compliance] than its peers." As a result, between January 2014 and October 2023—i.e., through the duration of the Class Period—TD Bank "failed to maintain an AML program that complied with the BSA" thus "allowing illicit activity to flow through the Bank."

122. Indeed, as set forth in TD's Criminal Pleas, the TD Executive Defendants issued explicit directives to restrict funding for AML and BSA compliance despite the known consequences of TD's violations—including facilitating large-scale money laundering. TD's plea described that the $3 billion in penalties imposed on the Bank were warranted because of:

71

The pervasiveness of the offense, which involved the Defendant's prioritization of growth and the customer experience over compliance; implementation of a flat cost year-over-year spending paradigm, including in its AML program, despite changing and growing AML risks; and the involvement of employees at all levels of the Defendant…, <u>ranging from store-level employees who accepted payments to open or maintain accounts involved in money laundering to senior executive management, including AML leadership, who understood the Defendant's failure to adapt its AML program to address evolving risks and the impact of the flat-cost spending paradigm for the AML program, and repeatedly failed to update and remediate the AML program, despite the Bank's consistent growth and expansion of its business in the United States</u>.

123.    The TD Executive Defendants thus directly issued and enforced the mandate that TD's AML leadership keep its budget flat year-over-year, even though TD's revenue, profits and risk continued to grow. This "flat cost paradigm," or "zero expense growth paradigm," was implemented by TD's AML executives, starting with Defendants Bowman and Levine, who worked to reduce expenditures on AML compliance across the Bank even in the face of known AML gaps and deficiencies that required additional spending.  As a result, and as TD admitted, the Bank's AML program was left with "systemic deficiencies" that "exposed the Bank to potential legal and regulatory consequences."

124.    **TD Failed to Monitor 92% of All Transactions**.  As a result of TD Bank's senior leadership-imposed "flat cost paradigm," TD knowingly failed to monitor the overwhelming majority of all transactions conducted through the Bank for over a decade.  As TD has now admitted, "between January 1, 2018, and April 12, 2024, [the Bank's] automated AML monitoring failed to monitor 92% of

transaction volume and 74% of transaction value, which corresponded to <u>over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value</u>." In essence, TD allowed an amount of money more than <u>eight times</u> Canada's entire annual Gross Domestic Product to flow through the Bank unchecked.

125.    These unmonitored transactions included transfers using the Automated Clearing House, or "ACH," a system responsible for processing domestic transfers under $1 million between financial institutions; transactions using Zelle, the mobile peer-to-peer payment platform; and most check activity. Remarkably, these extraordinary and "fundamental" gaps in TD's AML program persisted for a decade despite the fact that "the OCC, FinCEN, TDBNA Internal Audit, and third-party consultants [] repeatedly identified TDBNA's transaction monitoring program as an area of concern."

126.    **<u>TD Reduced AML Monitoring to Save on Costs</u>**.    In addition to failing to monitor at all the overwhelming majority of transactions conducted at the Bank, TD also failed to update its monitoring program for the transactions it did monitor.    And for those transactions TD monitored, over this same decade-long period, <u>not once</u> did TD implement any new transaction monitoring scenarios or making any substantive changes to the parameters of existing transaction monitoring scenarios—despite the "rapid growth" of the Bank and corresponding AML risks, the introduction of new products and services, and "repeated warnings about the

outdated system."  Shockingly, the limited changes it did make to transaction monitoring "almost exclusively—and intentionally—<u>reduced</u> the universe of alerts being generated and thereby lowered the associated cost of their review" such that while TD "<u>did not add any</u> new transaction monitoring scenarios during the relevant period, it <u>removed</u> at least nine."

127.  **TD Knowingly Failed to File Thousands of Required Reports**.  In addition to lacking basic monitoring systems, TD also willfully and criminally failed to accurately and timely file thousands of necessary CTRs and SARs when its monitoring identified suspicious activity.  Indeed, TD pleaded guilty to the criminal offense of "knowing failure to file accurate" CTRs between January 2014 and October 2023, with "the purpose of evad[ing] the [transaction] reporting requirements."

128.  As admitted in TD's Criminal Pleas, these violations included the Bank's failure to file CTRs and SARs in connection with: $470 million in proceeds from fentanyl drug sales laundered by Chinese money-brokers, including Da Ying Sze, known as "David" by TD employees from January 2019 through March 2021; $39 million of drug funds funneled from TD stores in New Jersey and Florida to ATMs in Colombia, with the assistance of five TD employees from early 2022 to October 2023; and $123 million laundered by a high-risk purported wholesale diamond, gold and jewelry business that used shell companies to transmit illicit

proceeds through TD accounts from March 2021 to March 2023.  As described further below, in each of these examples, the signs of money laundering were blatant, open, and obvious, and as TD admitted, were enabled by TD's "willful" failure to "remediate persistent, pervasive, and known deficiencies in its AML program."

129.   In all, FinCEN identified that TD completely failed to file thousands of required SARs and untimely filed over 6,000 SARs covering over $500 million in transaction value. Of those it did file, TD willfully filed over "more than 1,000 inaccurate CTRs" that "misled law enforcement," and filed more than 4,000 CTRs, covering more than $150 million in cash transactions, weeks after the required deadline.

130.   **TD Concealed Its Misconduct from Regulators and the DOJ**. TD's "pervasive" criminal activity did not suddenly appear overnight or out of the blue. To the contrary, TD's willful and criminal failure to maintain an adequate AML program was a longstanding focus of TD's regulators for years, the subject of extensive findings from TD's outside consultants, and the target of DOJ prosecutors during the Class Period.

131.   At the exact same time Defendants were reassuring the market of TD's AML compliance and the likelihood of regulatory approval and a speedy close, TD was actively facing numerous law enforcement investigations into money laundering conspiracies carried out by Bank employees—as well as into TD itself.  For example,

after prosecutors arrested "David" in May 2021, he quickly began providing information about TD's glaring AML holes to law enforcement, including as documented in his November 2021 plea agreement. As set forth in the Criminal Pleas, while David "attempted to launder money through numerous financial institutions, [the Bank] had by far the most permissive policies and procedures," which was precisely why TD "was where David chose to launder most of his funds." David pleaded guilty to money laundering on February 22, 2022—i.e., one week before Defendants announced the First Horizon merger and the Class Period began.

132. Strikingly, the DOJ's prosecution of David was only one of numerous high-profile money laundering prosecutions involving TD employees during the Class Period. In those investigations, the Bank's senior management and general counsel's office—headed by TDBNA's then General Counsel Ellen Glaessner, a key advisor to Defendant Salom—were required to respond to formal and informal DOJ requests, produce documents, make witnesses available to provide information and testify, and update the DOJ on findings from the Bank's internal investigations.

133. But as the DOJ and FinCEN concluded, rather than fully and transparently cooperate with regulators' efforts, TD obstructed prosecutors' investigation into its criminal AML program in numerous ways. As the DOJ concluded, TD not only failed to disclose its wrongdoing, but in many instances the Bank actively concealed it. Among other things, while the DOJ's investigation was

pending, TD failed to disclose "a well-known and significant transaction monitoring gap"— and namely, the Bank's processing since 2008 of trillions of dollars of ACH and other types of transactions per year without any monitoring or reporting whatsoever.  Moreover, FinCEN detailed that, even when "these substantial gaps were identified by one of TD Bank's regulators," the Bank still did not come clean.  Rather, TD misleadingly told the regulator "that its risk assessment historically categorized ACH payments as low risk, which the Bank claimed justified the lack of monitoring for these transactions"—however, when pressed, the Bank admitted that "it could not identify any 'historic documentation . . . related to domestic ACH risk and its exclusion for monitoring from [the transaction monitoring system]."

134.   FinCEN further found that TD "fail[ed] to timely disclose the ongoing nature of certain issues that persisted late into FinCEN's investigation of TD Bank" and did take any measures to improve its AML resources even "after the Bank was aware it was under investigation."  This included TD's failure to implement required monitoring procedures for Zelle transactions until "February 2023 … well after the Bank was aware its AML practices were facing intense scrutiny by regulators and law enforcement."

**G.    Defendants Disclose Slight Deal Delays They Claim Are Benign—When In Reality Regulators Had Already Told Defendants that TD's AML Deficiencies Seriously Jeopardized Approval**

135.   In or around October 24, 2022, the OCC completed its annual supervisory examination of TD Bank and its AML controls, and provided its feedback directly to TD's senior leadership, including Defendants Masrani, Salom and Tran. The feedback the OCC provided was highly critical and alerted TD executives that bank regulators had identified serious lapses in the Bank's AML program.  In fact, immediately following this review, in a series of secret meetings with the highest-ranking officials at TD's primary regulators at the Federal Reserve and OCC, TD's regulators openly discussed the Bank's severe AML failings with TD's senior executives—which had become the subject of a formal DOJ probe—and put them on notice that the deal was virtually certain to be rejected.

136.   Documents Plaintiffs obtained through a FOIA request to the OCC show that the OCC's examination was promptly followed by urgent private meetings between TD's General Counsel, outside counsel Simpson Thacher and certain of TD's most senior executives—including Defendant Salom—and senior Federal Reserve and OCC officials and those agencies' counsel on no less than four separate occasions the following month. These documents show that on November 3, 2022, less than two weeks after the OCC had completed its examination and as the DOJ investigation was pending, TD's outside counsel, Simpson Thacher; the General

Counsel of TD M&A, Khasif Zaman; the General Counsel of TD Bank Canada, Jane Langford; and the General Counsel of TD Bank U.S., Ellen Glaessner—the same General Counsel who had issued repeated and vehement denials on behalf of TD Bank in response to the "unfounded" *Capitol Forum* reports—secretly met with senior officials from the OCC and the Federal Reserve "to discuss the merger application decision timing with TD management and its outside counsel." The senior officials from the OCC included Stephen Lybarger, the Deputy Comptroller for Licensing; Ted Dowd, OCC Deputy Chief Counsel; Bryan Heath, the OCC National Bank Examiner-in-Charge of Large Bank Supervision; and Jason Almonte, the OCC Director for Large Bank Licensing, among others. Senior officials from the Federal Reserve included Vaishali Sack, Deputy Associate Director of the Federal Reserve; Alison Thro, Assistant General Counsel; Reena Sahni, Associate General Counsel; and Jon Stolloff, Senior Special Counsel, among others.

137.    Only one day later, on November 4, 2022, Glaessner, the General Counsel of TD Bank US, held a confidential one-on-one meeting with Lybarger, the Deputy Comptroller for Licensing at the OCC, as a "Follow up to Nov. 3 Meeting." A few days after that, on November 10, 2022, Glaessner and TD's outside counsel Simpson Thacher attended yet another private follow-up meeting with Lybarger and Almonte, the Director for Large Bank Licensing at the OCC. Then, less than two weeks later on November 21, 2022, Defendant Salom, CEO of TD Bank US,

confidentially met one-on-one with Greg Goleman—the Senior Deputy Comptroller at the OCC for Large Bank Supervision.

138.   The highly serious nature of these meetings was made evident by the fact that these meetings involved, among others, TD's General Counsel, its most senior executives, and senior Federal Reserve and OCC officials and those agencies' counsel. They took place in the immediate wake of the OCC's completion of its supervisory examination of TD Bank, and during those agencies' review of the proposed FHN merger.  As confirmed by Defendants' admissions at the end of the Class Period and TD's admissions in the Criminal Pleas, these regulators had identified serious issues with TD Bank's AML controls and had informed TD Bank's senior management that these issues were significant, would take years to remedy, would likely preclude approval of the merger—and certainly would not permit approval on the timeline that the parties had announced to investors.

139.   Reports issued after the Class Period confirmed that the message conveyed to TD's top executives through these meetings in November 2022 was clear: the OCC and Federal Reserve regulators had identified such serious problems in TD's AML controls that they were the focus of an ongoing DOJ investigation and, as a result, the merger was almost certain to be rejected. Specifically, on January 8, 2024, *Capitol Forum* issued a report confirming that Defendants were fully aware of these investigations by no later than November 2022:

Executives at Toronto-Dominion Bank (TD) knew of a DOJ anti-money laundering investigation more than six months before the company publicly disclosed the probe, which ended up scuttling their proposed $13.4 billion buyout of First Horizon Bank (FHN) last year, sources familiar with the matter said.

TD Bank announced the First Horizon deal in late February 2022; by November of that year, the bank's executives were aware that multiple federal law enforcement agencies had found such serious lapses in anti-money laundering (AML) controls that U.S. regulators might reject the merger, said two sources familiar with the matter.

"The investigation is big," said a lawyer with knowledge of the probe. "TD Bank is looking to settle and make this go away."

140.    Indeed, *Capitol Forum* made clear that, by November 2022, "leading bank regulators were aware of problems at TD Bank and the DOJ probe," and "[o]fficials from both the Fed and OCC—two bank regulators that had a say on whether the First Horizon acquisition went through—discussed the alleged AML failings openly with TD Bank." In the wake of this report, multiple other news outlets—including *Bloomberg*, *The Globe and Mail* and *AML Intelligence*—similarly reported on the revelation that TD Bank executives had known the merger would not be approved more than six months before the merger was terminated.

141.    Moreover, the Criminal Pleas have further confirmed just how serious TD's AML violations discussed during these meetings were.  As set forth above, these regulators found, and TD admitted, that the Bank had been facilitating rampant money laundering for nearly a decade while utterly failing to have any adequate AML program in place—conduct that would ultimately result in TD becoming the

first ever U.S. Bank to plead guilty to conspiracy to commit money laundering with over $3 billion in penalties imposed.

142.    Despite these extraordinarily significant regulatory developments, Defendants did not breathe a word of these issues to investors. To the contrary, in the immediate wake of these meetings, Defendants began to announce a series of deal delays that they falsely asserted to investors were entirely benign—while flatly denying that the delays had anything to do with any regulatory issues.

143.    For example, during TD Bank's fourth quarter earnings call on December 1, 2022, Defendant Masrani provided an "update" on the First Horizon transaction and disclosed that the expected timeline for closing would be only slightly delayed—from the first quarter of 2023 to the first half of fiscal 2023 (i.e., from November 2022 to January 2023).  However, rather than reveal that this delay was due to serious regulatory issues, Masrani was instead quick to reassure investors that "we are confident we'll get the closing within the timeline that we have put out," and continued to assert that TD was "excited about the benefits that this acquisition will deliver for all of our stakeholders."

144.    Even when an analyst directly asked Masrani during the call if U.S. regulators were "taking a closer look at anything" and if that was the reason for the delay, Masrani responded with an unequivocal "No," flatly stating that that he was "not aware of anything of the sort you're mentioning." Defendant Masrani made this

statement despite the fact that—just weeks before—TD's senior executives had been directly informed by the Bank's regulators that TD's AML failings were so egregious that they were the focus of a DOJ probe, and would almost certainly preclude approval of the First Horizon merger.

145. Following TD's December 1, 2022 disclosure of what the market concluded was only a "subtle shift in timing expectations," Defendants continued to repeatedly assuage investors' concerns about TD's prospects for obtaining regulatory approval of the deal. For example, during the January 9, 2023 RBC Markets Canadian Bank CEO Conference call, when an analyst asked for an "update" on regulatory approval, Masrani had only positive things to say. Specifically, Masrani stated that "[t]here was a public meeting organized by the regulators that went pretty well"—without mentioning any of the behind-the-scenes meetings with regulators that had decidedly not gone well—that there was "a lot of support among the community groups" for TD's merger application, and that TD was negotiating a community benefit agreement that was also "going pretty well." When Masrani finally addressed the regulatory delay, he presented it as completely benign, pointing to other large bank mergers that had extended their timelines for approval, and telling investors that "[o]ne deal that was approved took … 14 or 15 months," while "[a]nother deal that was announced ... two or three months before ours, [has] not yet been approved." Masrani then reaffirmed that TD's "expectation"

was that the deal would close in the first fiscal half of 2023 pursuant to the updated timeline TD had provided—a statement that had no basis in reality, as regulators had already directly informed TD's executives in November that the merger was in serious peril due to TD's AML problems and the ongoing DOJ investigation.

146.   In fact, TD's private interactions with regulators continued to tell a completely different story from the one TD relayed to investors. Specifically—as detailed in documents obtained from the Federal Reserve through FOIA requests— less than two weeks later, on January 17, 2023, the Federal Reserve Board put TD's outside counsel Simpson Thacher on formal written notice that the agency could not decide on the merger application "until board staff receives additional information from another agency that is necessary for the board to make a decision on the proposal." This correspondence again signaled that the merger was in serious jeopardy—indeed, by this time, the merger had already been pending for almost a year, yet the Federal Reserve considered TD and First Horizon's merger application to be "not complete" because it lacked the information needed to approve it.

147.   A month later, Defendants announced yet another seemingly innocent deal delay. On February 9, 2023, TD Bank and First Horizon issued a joint press release announcing an extension of the merger deadline by three months from February 27 to May 27, 2023. Once again, TD and First Horizon downplayed the significance of this purportedly short delay by assuring investors that it was routine

and "in accordance with the terms of the merger agreement"—which permitted one such mutually agreed upon three-month extension—and by asserting that both parties remained "fully committed to the merger and continue[d] to make significant progress in planning for the closing."

148.    Just two weeks later, on February 22, 2023, Bryan Heath, the OCC examiner in charge of TD Bank, and Tim McDonald, head of Large Bank Supervision at the OCC, scheduled a private Zoom meeting for March 9, 2023 with Defendant Masrani and TD's outside counsel, Simpson Thacher.  According to former bank regulators and industry insiders, this high-level, secret meeting—which was undisclosed to investors until the end of the Class Period—was extraordinarily unusual and meant that the merger was dead in the water.  As *Capitol Forum* would later reveal, according to former regulators and industry sources, this meeting did not "bode well for the merger" because "Bank CEOs attend such meetings with outside counsel only when matters are very serious." Indeed, *Capitol Forum* specifically noted that the involvement of both Masrani and TD's outside counsel strongly indicated that the meeting was a last-ditch attempt by TD to avoid criminal prosecution.

## V.    INVESTORS SUFFER LOSSES AS THE TRUTH IS DISCLOSED

### A.    As the Truth Is Revealed Through a Series of Disclosures, Defendants Falsely Claim That The Deal Will Close Until News Reporting Forces Defendants to Announce the Merger's Termination

149.    The truth about the First Horizon merger—and the fact that regulators had rejected it because of TD Bank's severe and longstanding AML compliance problems—was revealed in a series of corrective disclosures.

150.    <u>First</u>, before the market opened on March 1, 2023, and less than a month after Defendants' prior delay announcement, First Horizon stunned investors by announcing in its Form 10-K that "TD does not expect that the necessary regulatory approvals will be received in time to complete the [p]ending TD Merger by May 27, 2023." First Horizon further disclosed that, rather than extending the deal deadline for another three months, "TD [could] not provide a new projected closing date at this time." Upon this disclosure, First Horizon stock fell over 10%, from a close of $24.77 per share on February 28 to $22.14 per share on March 1, 2023.

151.    Analysts immediately reacted with concern, expressing surprise that First Horizon had announced a delay due to regulatory approval only weeks after the parties had already extended the closing date by three months.  For example, a March 1, 2023 Barclays report stated that "the timing of a disclosure that the deal may not get regulatory approval is surprising," as it was only "weeks after an extension of the agreement between TD and FHN." Similarly, National Bank of Canada opined

that the "regulatory approval uncertainty" was now "legitimate," "especially considering the TD/FHN transaction has already faced some political backlash."

152.    As a result, analysts were intently focused on TD Bank's statements about the status of the transaction in its forthcoming March 2 earnings release and investor call.  In the earnings press release, TD tried to quell investor concern by unequivocally stating that "TD is fully committed to the transaction." Nonetheless, analysts from Evercore, RBC, Janney, Wells Fargo, and Barclays all specifically noted their interest in further comments from TD management about the deal and TD's "desire and willingness to complete the deal" on the upcoming call.

153.    Then, during TD Bank's March 2, 2023, earnings call, Defendant Masrani provided the further assurances the market was looking for, strongly reiterating TD Bank's commitment to the transaction and dismissing any suggestion that regulators would be unwilling to approve it.  For example, Defendant Masrani told investors that TD was "fully committed to the transaction" and that it was "really excited about what this transaction does for [TD Bank's] U.S. franchise." Masrani further confirmed that TD had "opened discussions with First Horizon about a potential additional extension" of the closing date.

154.    Despite these assurances, Masrani faced a barrage of analyst questions concerning the status of regulatory approval for the deal.  For example, later on the call, an analyst directly asked Masrani "about the nature of the delay" given that it

had "come[] so soon after the contract was extended to the end of May"—and specifically whether it was "procedural" or "something more substantive." In response, Masrani claimed that while he purportedly could not provide any more detail about the reason for the delay, there was no cause for concern about obtaining regulatory approval of the merger.  Indeed, to the contrary, Masrani made clear that TD was "<u>really excited about this transaction</u>," was "<u>continu[ing] to work very, very hard</u>" on getting it done, and TD's "<u>planning for integration [had] continue[d]</u>" as the bank had recently "set up an integration management office."

155.  First Horizon offered similar reassurances. Specifically, on March 3, 2023, CFO Defendant Dmuchowski had a discussion with analysts at Evercore ISI. In that discussion, Dmuchowski similarly told investors that "<u>TD & FHN remain in active discussions re: merger integration plans & related matters</u>," and "support[ed][the] view that [a] new deal timeline is on the way"—leading the analysts to "<u>remain confident that the likelihood of the deal closing exceeds that of the deal breaking</u>." Ten days later, on March 13, 2023, First Horizon CEO Defendant Jordan sent FHN shareholders a letter further confirming that TD and First Horizon were continuing to work on the "pending transaction" and integrating the companies. The letter assured investors that First Horizon "and TD <u>continue to work together to progress integration planning for the pending transaction</u>, which is subject to customary closing conditions, including approvals from U.S. and Canadian

regulatory authorities." The letter did not disclose that the merger was dead in the water due to regulators' rejection of the deal, but rather affirmed that the "<u>pending transaction will provide new opportunities</u>" for First Horizon stakeholders.

156.   Analysts were greatly comforted by TD and First Horizon's statements. For example, a March 2, 2023 Barclays report noted that the "clarity [from TD] on the FHN transaction should alleviate some confusion." A March 2, 2023 Evercore ISI report similarly noted that "[d]espite the regulatory delay, TD not only reiterated its commitment to the deal and discussions with FHN to discuss the outside date, but also reiterated the merits of the acquisition (citing scale & U.S. capabilities)." Evercore further took great comfort in the fact that, "[n]otably, [management] also highlighted continued conversion planning & integration plans across all businesses"—causing it to "continue to believe the likelihood of the deal closing is greater than a termination[,] particularly given today's seemingly firm reiteration by TD." RBC likewise commented that "[w]e believe TD is committed to the FHN acquisition and we put a high enough probability on a successful closing that we maintain our Outperform rating."

157.   However, at the same time Defendants were claiming that they were in the midst of merger integration planning and actively negotiating a new closing date, and after learning of the ongoing DOJ investigation, on February 22, 2023, Masrani had already scheduled the "highly unusual" meeting with senior OCC officials and

TD's outside counsel for March 9, 2023. As set forth above, this eleventh-hour meeting and its involvement of Masrani, TD's outside counsel, and the OCC's most senior officials overseeing the merger was completely out of the ordinary and meant that Defendants knew that the merger could not be approved. This was confirmed by documents produced pursuant to FOIA requests to the Federal Reserve, which revealed that only four days later on March 13, 2023, Philadelphia Federal Reserve supervisor Eddy Hsaio emailed TD Bank's outside counsel and instructed TD to "prepare and submit a request for suspension of the processing" of TD's merger application. In other words, the Federal Reserve had explicitly instructed TD to formally withdraw its merger application because it could not be approved.

158. Since at least 2014, the Federal Reserve has informed banks that "when substantive issues are not resolved during the application review process," the Federal Reserve's "general practice has been to inform the filer before final Board action that staff would recommend denial of the proposal to the Board in order to provide the filer the option to withdraw the application or notice." Moreover, as set forth above, the Federal Reserve had explicitly warned banks in 2015, after taking "the highly unusual step of permitting" the delayed M&T merger to pend for three years while M&T remedied its severe AML issues, that it would never again approve a merger of a bank with significant AML issues. Indeed, First Horizon's Form 10-K filed just days earlier on March 1, 2023—and which First Horizon was required

to share with TD per Section 6.2 of the merger agreement—confirmed the parties' understanding that AML compliance issues signified a death knell to the merger. Specifically, the Form 10-K warned that "if issues arise during the processing of an application for expansionary activity, [the Federal Reserve] will expect [TD] to withdraw its application pending resolution of any supervisory concerns"—exactly what the Federal Reserve had asked TD to do.

159.   On March 17, 2023, TD's outside counsel complied with the Federal Reserve's request and provided the agency with its suspension letter—definitively and formally ending any possibility of regulatory approval. Remarkably, despite this stark reality, Defendants still did not disclose to investors that they could not obtain regulatory approval of the deal or that TD had been the target of an ongoing DOJ investigation into its AML failures for months. To the contrary, they continued to represent that integration planning for the merger was ongoing and that they were actively in the process of negotiating an extension of the deal deadline.

160.   Later, during a meeting Masrani attended with Bank of America analysts on April 12, 2023, Masrani made additional public statements about TD's strong commitment to completing the First Horizon deal.  As Bank of America reported that day, Masrani had represented that TD "remains committed to completing the FHN deal where TD/FHN are currently negotiating an extension to the current deal deadline"—and had again "emphasized the synergies expected from

the acquisition, namely fortifying the U.S. commercial banking (mainly middle market) capabilities, while adding over one million new customers." Masrani's positive statements about the deal had a direct and immediate impact on First Horizon's share price, which surged as much as 4.6% just after he made them.

161.    Similarly, during TD's annual general shareholder meeting on April 20, 2023—only two weeks before Defendants would be forced to reveal the truth that regulators had rejected the merger—Masrani continued to provide assurances to investors that the transaction was proceeding, and that closing remained a matter of "when," not "if." For example, during the call, Masrani was besieged by shareholder questions about the transaction and what was "causing the delay." Despite knowing that TD had already formally withdrawn its merger application over a month earlier because regulators refused to approve the deal and because there was an active and ongoing DOJ investigation into the severe AML deficiencies that precluded approval, Masrani continued to strongly give investors the impression that the deal would still close—just on a longer timeline—by repeatedly telling investors in response to their numerous questions that TD had "initiated negotiations to extend our agreement with FHN."

| Question: | Hello. … Just a few questions. Question number one, <u>are you currently in discussions with FHN to extend the merger agreement</u> that you were referred to earlier in your presentation? |
| --- | --- |
| Masrani: | <u>We've initiated the extension arrangements or</u> |

<u>negotiations with FHN. Yes.</u>

Question:   And if you compare where you were back in late February when you announced this to now, <u>do you have the ability to provide</u> <u>FHN with more information now than you did a few months ago</u> <u>as to what is causing the delay?</u>

Masrani:    We said in March and I said it today that our belief is that we will not be able to get approvals by the merger expiry date of May 27.    And therefore, <u>we've initiated</u> <u>negotiations to extend our agreement with FHN</u>. That's all I can provide you today, and I have no further update.

162.    Masrani was highly motived to tout the benefits of the deal during this annual meeting, where TD shareholders held a say-on-pay vote for the TD Executive Defendants' compensation, which included a recommendation to increase Masrani's target compensation from his 2022 target of $13 million to $15 million—a one-year increase of $2 million, and a nearly 150% increase from his $10.5 million total compensation just two years earlier. The purported basis for this increase included, among other things, the First Horizon deal.  At the meeting, without knowing that the First Horizon deal had already failed, TD shareholders voted overwhelmingly to approve the TD Executive Defendants' pay packages.

163.    Analysts were again strongly reassured by Defendants' representations and had no idea that regulators had already fully and formally rejected the merger. For example, Wells Fargo analysts reported on March 24 that the "Pending Deal with TD Still on Track," concluding that "we still expect the deal to ultimately close at the negotiated price of $25 per share." That assessment remained the same in the

weeks that followed, with Wells Fargo concluding as late as April 18, 2023 that "mgt at FHN is still focused on deal closure, and is working toward that goal" and that "TD has commented recently they also remain excited about and focused on closure." And Cormark analysts rejected the idea that an OCC investigation was the cause of the delay, stating that "we don't have any evidence to suggest this is the case," inferring instead that greater regulatory scrutiny to larger U.S. bank mergers overall had caused delays like the one reported by TD to be more "commonplace."

164.   Second, less than two weeks after Masrani told investors that TD was working to close the deal, the truth emerged—but not from TD or First Horizon. Instead, it was *Capitol Forum*, which Defendants had publicly excoriated for publishing purportedly false and defamatory information, that disclosed the truth that regulators had blocked the merger.

165.   On May 3, 2023, *Capitol Forum* published an article revealing for the first time that Defendant Masrani and TD's outside counsel had secretly met with senior OCC officials nearly two months earlier on March 9, 2023—in what could only be understood as an eleventh-hour meeting that former regulators and industry sources confirmed was highly unusual and "d[id] not bode well for the merger." Moreover, *Capitol Forum* noted that the secret OCC meeting had suspiciously come "just seven days after Masrani publicly declined to 'speculate' on when the deal might close," and had confidently presented that TD was "fully committed to the

transaction."    This report—which confirmed investors' worst fears that TD's repeated delays in seeking regulatory approval were due to significant regulatory issues Defendants had concealed for months—immediately triggered a 7% decline in First Horizon shares, with news sources tied to the "*Capitol Forum* report being circulated among traders."

166.    Spurred by the *Capitol Forum* report, Defendants were finally forced to come clean.  The very next day, on May 4, 2023, before the market opened, First Horizon and TD Bank stunned investors by issuing a joint press release disclosing that they had mutually agreed to terminate the merger because TD Bank could not obtain regulatory approval of the deal.    According to the press release, the termination of the deal came after "TD informed First Horizon that TD does not have a timetable for regulatory approvals to be obtained," as there was "uncertainty as to when and if those regulatory approvals can be obtained."

167.    TD and First Horizon also announced that TD would voluntarily pay First Horizon a massive $200 million break-up fee—despite the fact that no out-of-pocket termination fee by TD was contemplated in the merger agreement—on top of the $25 million in merger-related expenses TD was already required to pay under the merger agreement for being unable to close.  TD clearly made this unusual payment to avoid liability for breaching its representations and warranties in the merger agreement, including representations stating that TD had "complied with"

BSA/AML regulations.  In addition, while Defendants had represented for months that they had been negotiating an "extension" of the deal, in reality, First Horizon and TD had instead been negotiating this lawsuit-preventing termination fee.

168.   In response to this shocking announcement, First Horizon's stock price plummeted 33%, from a closing price of $15.05 per share on May 3, 2023 to $10.06 per share on May 4, 2023.

169.   Even after announcing the termination of the deal, TD remained completely silent as to any specifics about the regulatory issues that had prevented approval of the deal.  Instead, confronted with First Horizon's cratering stock price, it was First Horizon CEO Defendant Jordan who made clear during the company's first quarter earnings call held that morning that the termination of the deal was due to TD's regulatory problems, and had nothing to do with First Horizon.  As Jordan told investors, "the fact that regulatory approvals weren't able to be obtained by May 27 did not relate in any way to First Horizon."  Rather, Jordan explained that TD "could not provide an updated timeline for an extension," and in fact "could not provide assurance of regulatory approval in 2023 or 2024"—meaning that TD's regulatory issues were so longstanding and severe that they would take years to resolve.

170.   Moreover, Defendant Jordan clarified that—despite First Horizon and TD having both previously represented that they had been actively engaged in

merger deadline extension negotiations since February and that price renegotiations had also been entertained—TD's regulatory issues were so severe and had doomed the merger to such a definitive degree that, in reality, "[a]t no time did we discuss any changes in price or any other changes to the structure of the deal."

171.    Analysts expressed utter shock at the parties' joint announcement, and immediately questioned the extent of TD Bank's regulatory compliance problems, and questioned management's credibility.  For example, an RBC Capitol analyst noted that "[r]egulatory resistance to this extent clearly was more serious than we thought," and that "TD's future ability to close U.S. deals may be in doubt and TD's credibility as an acquirer has been dealt a blow."  A Barclays analyst similarly commented that "TD ha[d] effectively put itself in the penalty box for some time" with future acquisitions, as the failure of the merger because of serious regulatory issues would prohibit TD from acquiring a U.S. retail bank for 3-5 years at least. National Bank of Canada noted that "on the FHN call it was clear that regulatory approvals were not coming, to the point that FHN stated a renegotiated deal price was not even attempted."  One Morningstar analyst similarly described the termination as "baffling" because before the termination, and based on Defendants' representations, TD had successfully convinced the market—including by keeping pervasive regulatory problems a secret—that it was "one of the highest rated banks" globally and believed its "risk management and the way they operate is very strong."

BMO analysts explicitly criticized management's failure to disclose   TD's compliance issues, incredulously asking: "[w]hat was the issue that was significant enough to delay regulatory approvals indefinitely, yet not material enough to disclose?"  And a May 4, 2023 *Forbes* report opined that "[t]he delay in regulatory approval that TD cited as the reason for canceling the deal suggests that there is something wrong here."

### B. After the Class Period, Additional Details Emerge Corroborating the *Capitol Forum*'s Reporting that the Merger Was Terminated Due to Regulatory Scrutiny in TD's AML Program

172.    Although TD Bank refused to provide any further detail on its compliance issues, the investors' concerns were soon confirmed.  On May 8, 2023, *The Wall Street Journal* reported, based on internal sources, that TD Bank's deficient AML compliance program and improper "handling of suspicious transactions" was behind regulators' refusal to approve the deal.  The article noted that "regulators' concerns stemmed from the way TD handled unusual transactions in recent years, and the speed at which some of them were brought to the attention of U.S. authorities."  *The Wall Street Journal* specifically cited an instance relayed from regulators to the Bank in which TD Bank had reported only 28 SARs for suspicious customer transactions in the 30 days in which banks are required to report them to FinCEN—an extraordinarily low number for a bank the size of TD.  *Bloomberg* likewise reported on May 8, 2023 that the merger "was held up as US regulators

scrutinized [TD Bank's] handling of suspicious customer transactions," and "[t]he reluctance by [the OCC] and the Federal Reserve to sign off on those practices ended up being the biggest obstacle."

173.   Analysts' reactions to these disclosures confirm the materiality of Defendants' statements and that investors had been misled by TD Bank's prior false statements about its regulatory compliance.  For example, Bank of America analysts described how these disclosures were a "significant negative for TD's leadership team," a "potential black eye for management," and contrary to Defendants' assertions of their strong risk management during the Class Period.

174.   Then, on August 23, 2023—after having remained silent on the nature of the regulatory issues that had doomed the merger for over three months—TD Bank confirmed *The Wall Street Journal* and *Bloomberg* reports by disclosing that it had been responding to a wave of regulatory inquiries into its AML practices, including a formal DOJ investigation.  Specifically, TD revealed that regulators were investigating its AML compliance program "both generally and in connection with specific clients, counterparties or incidents in the U.S.," and that at least some of these inquiries were related to an investigation by the DOJ.  Moreover—and significantly—despite disclosing these investigations for the very first time in August, TD confirmed that they were so serious, and so far advanced in their

progress, that it fully "<u>anticipat[ed] monetary and/or non-monetary penalties to be imposed</u>."

175.  TD Bank further disclosed that—contrary to its Class Period representations that TD followed "industry-best practices"—TD was instead aggressively "pursuing efforts to enhance its [BSA/AML] compliance program." Defendant Masrani reiterated that point to analysts during the bank's third-quarter earnings call on August 23, when analysts sought clarity as to the extent of TD Bank's AML problems.  Specifically, Masrani stated that TD Bank was "pursuing efforts to enhance" its risk management controls and "working hard to enhance our programs," and noted that additional expenses would be required to fix them and bring them up to regulators' standards but refused to quantify what those expenses would be.  Instead, Defendant Salom noted generally that expenses were up 9.8% from the prior quarter and up 24% year-over-year in part because of investments in "governance and control," and that TD Bank was "investing in a number of different areas to strengthen the foundation of our U.S. franchise."  Despite the lack of specifics, Morningstar concluded in an August 28, 2023 report that Masrani's statements had made "clear that issues with the bank's anti-money laundering/Bank Secrecy Act compliance likely played a role in regulators withholding approval of the acquisition."

176. Later, as set forth above, on January 8, 2024, *Capitol Forum* published a report citing numerous sources who confirmed that TD executives "knew of a DOJ anti-money laundering investigation more than six months before the company publicly disclosed the probe"; that by November 2022, "the bank's executives were aware that multiple federal law enforcement agencies had found such serious lapses in anti-money laundering (AML) controls that U.S. regulators might reject the merger"; that "leading bank regulators were aware of problems at TD Bank and the DOJ probe"; and that "officials from both the Fed and OCC… discussed the alleged AML failings openly with TD Bank executives in November 2022." According to sources in the report, "regulators have determined that [TD's] failings go back many years" and were indicative of "systemic" problems. This reporting was ultimately fully corroborated in October 2024, when TD pleaded guilty to violating the AML laws for a decade and the DOJ, FinCEN, the OCC and the FRB announced the findings of their in-depth investigations and the resulting $3 billion in penalties and fines.

177. In the wake of these disclosures, TD has terminated or replaced virtually every senior-level executive with responsibility over AML compliance. Among others, after the end of the Class Period, TD Bank removed Defendant Bowman as the Bank's chief global AML officer; terminated Defendant Mia Levine, TD Bank's former U.S. Bank Secrecy Act officer; replaced Kevin Doherty, the head

of TD's Financial Intelligence Unit in Canada; and removed Allen Love, the former Head of Fraud Risk Management and Global Security & Investigations. Additionally, on September 19, 2024—just before TD publicly disclosed the Criminal Pleas—Masrani announced that he would himself "retire" from his post as CEO of the Bank, effective April 10, 2025.

178. Since the merger fell apart and as the DOJ investigation neared conclusion, TD has been forced to overhaul its AML technology systems, deploy new software for customer due diligence and transaction monitoring and sanctions screening, and increase spending on its work force and technology to mitigate weakness in its anti-money-laundering infrastructure.

## VI.    TD ADMITS TO CRIMINAL VIOLATIONS OF THE AML LAWS

### A.    TD Pleads Guilty to Violating the Bank Secrecy Act and Conspiracy to Commit Money Laundering and Pays $3 Billion in Fines and Penalties

179. On October 10, 2024, the DOJ, FinCEN, the Federal Reserve Board, and the OCC announced that they had completed parallel investigations into TD's AML practices—the same practices that led to the termination of the merger.  To resolve them, TD pleaded guilty to criminal violations of the BSA and conspiracy to commit money laundering, admitting to "willful" violations of AML regulations for nearly a decade and throughout the entire Class Period, and incurred $3 billion in fines and penalties.  TD further admitted that "high-level executives" and "senior

executive management" knew of "long-term, pervasive, systemic deficiencies" in TD's AML program, that the Bank failed to monitor approximately $18.3 trillion in transaction activity due to a "well known and significant monitoring gap," and that the Bank's violations enabled criminal organizations to launder hundreds of millions in illicit proceeds through TD accounts.  In announcing TD's historic criminal plea, the DOJ highlighted TD's "staggering and pervasive failures in oversight" through which the Bank "created an environment that allowed financial crime to flourish." As the DOJ explained, by "making its services convenient for criminals, [TD] became one."

180.   TD's willful failures included the Bank's failure to update the Bank's transaction monitoring program from at least 2014 to 2022 despite known risks and vulnerabilities and the Bank's "rapid growth" and corresponding increase in AML risks during this time; to monitor at all trillions of dollars of transactions—over 92% of transactions conducted through the Bank—from at least 2014 to 2024; or to implement an AML compliance training program and adequately address insider risk.  TD's violations enabled at least three money laundering networks to launder over $600 million in criminal proceeds over just four years, between 2019 and 2023, including hundreds of millions of dollars in proceeds from fentanyl drug sales, tens of millions of dollars in drug money deposited at stores in New Jersey and Florida

and withdrawn by drug dealers at ATMs in Colombia, and over $120 million in illicit proceeds funneled through TD accounts by a high-risk jeweler.

181.   As the DOJ pointed out and TD admitted, the failures that led to TD's guilty plea were known to the TD Executive Defendants.  Specifically, TD's plea states that "[o]ver at least the past eleven years, the OCC, FinCEN, TDBNA Internal Audit, and third-party consultants have repeatedly identified TDBNA's transaction monitoring program as an area of concern" but, despite these warnings, TD "failed to effectively or substantively adapt its transaction monitoring system."  As a result, TD's employees openly discussed that the Bank facilitated criminal activity and was an "easy target" for "bad guys."

182.   TD's misconduct was unprecedented, and its guilty plea is historic.  TD Bank became the largest bank in U.S. history to plead guilty to BSA program failures and the first U.S. bank in history to plead guilty to conspiracy to commit money laundering.  The combined $3 billion in penalties—including the DOJ's $1.8 billion criminal penalty and FinCEN's $1.3 billion civil penalty—is the largest ever imposed under the Bank Secrecy Act and reflects the first time the DOJ has assessed a daily fine against a bank (in this instance, $500,000 a day).  As part of its resolution with the federal agencies, TD was also required to "fundamentally restructure its corporate compliance program," facilitate a three-year monitorship with the DOJ, spend five years on probation, submit to an asset cap, and is prohibited from growing

the size of its U.S. operations or opening any U.S. offices without the explicit approval of the OCC.

**B.    TD Admitted that It Deliberately Underfunded Necessary AML Programs for Years Despite Repeated Warnings From Regulators and Internal Auditors**

2.    As TD has now admitted, the Bank's criminally deficient AML program was the direct and willful result of TD senior leadership's deliberate enforcement of a "flat cost paradigm"—a directive that AML costs and spending remain flat year-over-year despite the extraordinary growth and corresponding increase in AML risk over the past decade.  According to FinCEN's post-Class Period findings, TD's flat cost approach "resulted in an underinvestment in its AML program by <u>substantial sums</u>"—such that TD "<u>knowingly spen[t] an order of magnitude less than its peers</u>."  At every turn, FinCEN found that, when faced with "a host of significant AML compliance issues," TD "consistently chose to address them in the least costly way possible, even if it meant ignoring failures and refusing to meaningfully remediate issues and prevent recurrences."  This underinvestment led to "willful" failures across each the five pillars of TD's AML program—failures FinCEN placed squarely on shoulders of Defendant Levine and the TDBNA Board on which Defendant Salom served to assure the Bank's compliance with the BSA.

183.    In fact, TD expressly admitted in its guilty plea that the "budgetary pressure" to underinvest in AML compliance "originated with senior Bank

executives," and was executed at the highest levels within GAML and US-AML by Defendants Bowman and Levine—both of whom expressly "touted their abilities to operate within the 'flat cost paradigm[']'" as an accomplishment in their respective employee self-assessments.  Specifically, TD admitted that "GAML's budget was a primary driver of its decisions" regarding AML, and "GAML executives strove to maintain what TD Bank Group referred to as a 'flat cost paradigm' or 'zero expense growth paradigm'" by keeping the AML budget flat year-over-year despite numerous red flags showing that the Bank's AML risk was dramatically increasing and the Bank's existing systems and staff were failing to adequately address it.

184.   The "flat cost" structure was institutionalized at TD. Defendant Bowman himself openly boasted about the Bank's "historical underspend" in an email to the Group senior executive responsible for the enterprise AML budget in 2019.  Moreover, despite express awareness by the Bank's top executives of the Bank's "historical underspend" on AML compliance, TD's "base and project expenditures" on its US-AML program actually decreased between 2018 and 2021 and were insufficient to address substantial backlogs of alerts across multiple workstreams—despite the fact that TDBNA's profits increased 26% over this time.

185.   In fact, the number of employees assigned to TD's AML functions significantly declined during the Class Period despite the increasing AML risk, and despite TD's active pursuit of a merger that would dramatically increase its size.  As

FinCEN detailed, "in 2022, [TD's] AML headcount decreased to less than 2020 totals, while the number of transaction monitoring alerts of potentially suspicious transactions continued to rise." As FinCEN stated, "the Bank's AML staffing was not proportionate to its size, risk profile, and ongoing compliance concerns." Additionally, TD Bank did not invest in any meaningful training of these AML employees—indeed, FinCEN concluded that TD's pervasive AML failures stemmed in part from TD's "failure to properly train its staff on AML typologies and risks the Bank knew were associated with the products and services the Bank offered." TD similarly admitted in its guilty plea to "failing to adequately train its employees who served as the first line of defense against money laundering."

186. Moreover, TD did not make the required AML investments until after the DOJ began bearing down on TD. As FinCEN found: "When confronted with the reality that TD Bank's pennywise, pound-foolish approach caused the Bank to violate the BSA, the Bank refused to make the requisite investments and prevent future violations until near the end of the Relevant Time Period, after the investigations resulting in this Consent Order and parallel resolutions were underway."

187. TD's enforced prioritization of cost-cutting and profits—to the detriment of AML compliance and money laundering prevention—was obvious at all levels of the Bank. For example, TDBNA admitted that Defendant Bowman's

direct report, an AML technologist in TD's Global AML group, exchanged a series of texts with a colleague describing TD as an "easy target" for money launderers and misconduct due to its deficient AML program:

| AML Technologist: | what do the bad guys have to say about us |
|---|---|
| GAML Manager: | Lol |
| GAML Manager: | Easy target |
| AML Technologist: | damnit |
| GAML Manager: | Old scenarios ; old CRR ; tech agility is poor to react to changers [sic] |
| GAML Manager: | Bottomline we have not had a single new scenario added since we first implemented SAS due to various issues with the install |

188.    Other employees repeatedly credited TD's emphasis on the "customer experience" and "convenience" as the reason so much money laundering and suspicious activity flowed through TDBNA unaddressed.  TD's focus on "customer experience" was one of the Bank's core "competitive advantages" and a means of increasing profitability by attracting and retaining customers, and "customer experience" metrics were incorporated into executive compensation decisions for the TD Executive Defendants—embodied by the Bank's motto, "America's most convenient bank."  Internally, however, TD employees joked that the myopic focus on "convenience" in disregard of the Bank's AML obligations made the Bank an easy target for money launderers.  One US-AML employee texted that one reason

TDBNA had not stopped one money laundering scheme was that "we r the most convenient bank lol." Another set of employees responded similarly to a different money laundering scheme using TD accounts:

| Employee 1: | :P why all the really awful ones bank here lol |
| Employee 2: | because… |
| Employee 2: | we are convenient |
| Employee 2: | hahah |
| Employee 1: | bahahahaha |
| Employee 1: | that was their worst move evvvver |

189.    TD's lack of investment in basic AML needs was the subject of ridicule by AML employees, who ascribed the lack of remediation to TD's budget pressures and refusal to spend on AML. One US-AML employee noted that TD's Global AML group "can not properly code [an automated solution for a] scenario to give us what we want and its [sic] too much money to hire a coder …. Lol[.]"

**C.    TD Admitted It Knowingly Used Old And Outdated Automated Transaction Monitoring System That Facilitated Rampant Money Laundering**

190.    As TD admitted in the Criminal Pleas, TD's utter lack of investment in its AML program directly resulted in "systemic deficiencies" in the Bank's vital automated transaction monitoring system. For a bank the size of TD, an effective automated transaction monitoring system is essential for flagging suspicious

activity. To be effective, however, the system has to be regularly updated to include proper "scenarios," or rules for identifying illicit and suspicious activity, as banking products change and as criminals learn new ways to subvert the system.  However, as TD has now admitted, from at least 2014 through the Class Period—and "despite increases in the volume and risk of [TD's] business and significant changes in the nature and risk of transactional activity"—TD did not update the Bank's automated transaction monitoring system, resulting in severe BSA failures that facilitated rampant money laundering at the Bank.

191.   Specifically, in 2013, in the wake of the Rothstein Ponzi scheme, the OCC demanded that TD develop transaction monitoring policies and procedures to update its testing scenarios to adapt to new risks, i.e., "the Bank needed policies and procedures concerning the development of new transaction monitoring scenarios or manual processes to appropriately mitigate emerging risks."  TD did not follow the OCC's instruction.  As was revealed after the Class Period, the OCC directly told TD in 2018 that the planning, delivery, and execution, of its AML technology systems and solutions were plainly "<u>insufficient</u>."  The OCC told TD in 2018 that "nearly all" of the Bank's outstanding AML program deficiencies were "<u>directly linked</u>" to TD's delays in implementing its AML technology projects and updates.

192.   That same year, in 2018, TD's own Risk and Monitoring Program also internally determined that TD's automated transaction monitoring system was

deficient. Specifically, members of the Bank's AML and Risk Monitoring team authored a "Transaction Monitoring Strategy" document which described the Bank's transaction monitoring system as "<u>lagging behind peer group standards,</u>" and specifically noted that required system upgrades were frequently "delay[ed]" due to budgetary concerns (emphasis in original). TD's outside consultants also repeatedly flagged significant failures in TD's outdated automated transaction monitoring system. For example, a 2019 report from an outside consultant stated that TD's automated monitoring system used "outdated parameters" which led to "suboptimal [transaction monitoring] scenarios"—and another vendor, who TD contacted to help with segregating customers into different risk categories, directly told the Bank that its "decision to use an <u>older version</u> of a transaction monitoring system <u>severely limited the Bank's ability to calibrate AML scenarios</u>."

193. Despite these troubling findings by regulators, the Bank, and the TD's outside consultants, TD <u>continued</u> to delay critical updates to its transaction monitoring system in an effort to keep AML costs flat. For example, from 2016 to 2019, TD purportedly "attempted to upgrade" its transaction monitoring system, which was initially supposed to be done by 2017—but fell behind as a result of "insufficient resources." During that period, "numerous reports about the project to AML senior management" and TDBNA's Board—including Defendant Salom— "identified that [the upgrade] was not on target, yet the Bank failed to take action."

194.   Instead, in August 2019, US-AML and GAML executives—including Defendant Levine—met to discuss the 2020 fiscal year budget and identified several transaction monitoring projects they would intentionally postpone, referring to them as "opportunities to reduce expenses for 2020/Opportunity to push out to future years."   Specifically, the Bank postponed, among other projects, (i) a project designed to "Enhance Functionality and Scenario Development for U.S." because "new scenario development means new data and a lot of work effort"; and (ii) a project related to "Manual Monitoring" because it would require "new data feeds" and "scenarios" and there was "no capacity to do this."  Significantly, these projects were postponed indefinitely—the Bank never completed either of them.

195.   In other words, Defendant Levine and TD's senior AML management took nearly identical measures to operate TD's AML program "on the cheap" by restricting funding that resulted in criminal charges against U.S. Bancorp the year before, in February 2018. Defendant Levine addressed the U.S. Bancorp case with TDBNA's Board and Defendant Salom as something "[w]e always look" at to compare TD's AML program to "the conduct that has occurred."  Strikingly, one of the notable cost-cutting measures singled out in the U.S. Bancorp plea, the failure to conduct "scenario testing" to ensure appropriate identification of suspicious transactions, was one of the required AML programs that TD effectively eliminated in 2018 to keep costs down.   As TD admitted, TD's GAML and US-AML

"effectively stopped conducting threshold testing" on scenarios "due to competing priorities and limited resources"—such that, from 2018 through 2022, TD conducted threshold testing on only one of its approximately 40 U.S. transaction monitoring scenarios.

196.    TD's systemic failures to remedy its deficient AML monitoring system were repeatedly called out by AML employees, outside consultants, and TD's internal auditors.  For example, in 2020, TD Bank's Internal Audit conducted a review of the Bank's AML function that resulted in a "high risk" rating—"in large part because there were outstanding reviews of transaction monitoring scenarios, as well as recommended changes to scenarios that were overdue due to defects stemming from the transaction monitoring system upgrade."  An AML senior manager described these findings as a "glaring risk" for the Bank. Similarly, in 2021 TD's outside consultant told TD that its continued use of the old system created "technology barriers" that created "numerous limitations in the Bank's transaction monitoring program"—including the inability to develop "new scenarios" or add "new parameters."

197.    Although TD decided to update its transaction monitoring system in 2019, it delayed implementation of the new system for another three years until August 2024—after the Class Period and after the DOJ forced TD's hand. Moreover, once TD finally selected a vendor for its new system in 2021, TD paused

all updates and changes to the scenarios the old system was set up to monitor, and halted any introduction of new scenarios.

198.   In fact, as TD admitted in its guilty plea, the limited changes TD made to its monitoring scenarios between 2014 to 2023 "almost exclusively—and intentionally—reduced the universe of alerts being generated" in an effort to "lower[] the associated cost of their review."  Thus, while TD "did not add any new transaction monitoring scenarios during the relevant period, it removed at least nine."  Along similar lines, FinCEN found that TD's scenario "tunings"—which were ostensibly focused on identifying "missed" suspicious activity—instead focused on changing scenario thresholds to minimize SAR "false positives," i.e., to lower the amount of alerts being generated.

199.   As set forth below, TD's abject failure to invest in its automatic transaction monitoring system resulted in numerous significant transaction monitoring gaps that money launderers readily exploited.

200.   TD "Decommissioned" Critical Scenario Monitoring.  In 2011, TD determined to "decommission" several scenarios that targeted "large cash activity by businesses and other non-personal customers" ostensibly to test and recalibrate the scenario thresholds.  But that never happened.  Instead, these scenarios "remained offline" for over a decade—from 2011 until late 2022—allowing suspicious cash activity conducted by non-personal accounts to go unmonitored.

This criminal omission failed to trigger alerts for hundreds of millions of dollars in transactions by a purported jewelry business that funneled $120 million through the Bank and tens of millions of dollars illicit proceeds to drug dealers in Colombia.

201. TD also decommissioned key scenario monitoring for "funnel accounts," a common money laundering strategy wherein an account in one country that receives numerous cash deposits—often in amounts just below the cash reporting threshold—are withdrawn in a different country, usually a high-risk jurisdiction, with very little time between the deposits and withdrawals. FinCEN issued an advisory in 2014 about funnel accounts, such that TD Bank "clearly understood both the risks associated with this typology and the gaps in its coverage of them." But rather than address this risk, in 2013, the Bank "decommissioned two scenarios for funnel accounts," purportedly due to "data quality" challenges—which were not reinstated for another eight years.

202. TD's insufficient funnel account monitoring was especially glaring in light of numerous red flags indicating rampant use of funnel accounts at TD Bank— facts that were identified by senior AML personnel and the focus of intense discussion by Defendant Levine and senior management immediately before the Class Period. While TD maintains no physical presence in Latin America, both prior to and throughout the Class Period, "TD Bank customers conducted millions of ATM withdrawals in that region"—such that a "sample review of ATM withdrawals

115

from five high-risk Latin American and Caribbean jurisdictions <u>totaled more than</u> <u>$750 million</u>." Within this sample, "transactions in Colombia stood out as clear outliers," accounting for "nearly half of the $750 million of ATM withdrawals." AML personnel identified customers engaged in funnel account activity in 2019— and were fully aware that "<u>bad actors target TD</u>" precisely "because the Bank maintained different policies than other peer financial institutions" for funnel accounts. An analysis and findings of these funnel account gaps were shared at the highest levels of GAML and US-AML, including with Defendant Levine in a July 29, 2019 analysis with proposed recommendations, as well as in a presentation to the GAML Senior Executive Team including Defendants Bowman and Levine in September 2019. During this time, TD AML personnel recognized that TD's peers had taken measures to remove customers engaged in this activity from their banks— and that those bad actors were turning to TD because it did not mitigate this risk. But TD, including Defendants Bowman and Levine, did not implement any recommended measures to address this gap due to the "customer experience" and the associated increased staffing requirements. Predictably, as a result, the value of ATM withdrawals in Colombia using TDBNA accounts increased more than fivefold in three years—surging from $28.6 million in 2018 to $151.8 million in 2021. That year, in 2021, a total of 12,227 TDBNA accounts had 675,570 ATM withdrawals in Colombia, a country in which TD Bank Group had no presence.

203. <u>TD's Program Lacked the Ability to Monitor High Risk Customers.</u>
TD's archaic automated system also lacked the ability to alert employees to "changes and anomalies in a particular customer's transaction behavior"—a "standard indicator of suspicious activity"—despite regulators' insistence that it be able to do so. In fact, despite a direct OCC instruction in 2015 that TD enhance its monitoring for high-risk customers—as TD's system lacked the ability to specifically "monitor customers [the Bank] deemed to be higher risk, such as money services businesses and precious metals dealers"—TD never did so.

204. Instead, TD repeatedly <u>misled</u> the OCC about its efforts to address this problem. Specifically, TD's US-AML leadership told the OCC "during its examinations in 2017, 2018, and 2019 that these scenarios were in development"—despite the fact that, in reality, TD "<u>never implemented the required enhanced transaction monitoring of high-risk customers</u>." By September 2019, as remedial risk-rating projects remained delayed and in "red" status, AML personnel reported to a risk management committee of senior executives, including Defendant Levine, that a backlog of 1.6 million customers had been identified that were never scored for risk rating. TD chose not to perform any remedial work specific to this large population of unscored customers, in part because doing so would compete with ongoing risk-related projects and resources. Instead, FinCEN explained, rather than address known deficiencies in TD's systems for identification and monitoring of

high-risk customers—or disclose the problem to regulators—TD's "senior executives" instead instructed Bank personnel on the importance of "align[ing] on messaging to regulators" (emphasis in original).

205. Along similar lines, TD's system did not properly monitor high-risk jurisdictions. In 2018, TD's Internal Audit determined that the Bank's high-risk jurisdiction transaction monitoring scenarios were using "an outdated list" of high-risk jurisdictions—meaning the Bank's system was not generating alerts on jurisdictions that were currently deemed to remain high risk. In fact, TD only effectively monitored a subset of transactions on its outdated list of high-risk jurisdictions: what it dubbed "high high risk countries." Even then, from 2013 until after the Class Period, the Bank failed to add any countries to the "high high risk" list for which the system would provide additional oversight—excluding high risk jurisdictions like the Dominican Republic and Jamaica even though AML employees "repeatedly identified suspicious ATM activity" in such countries.

206. The failure to add known high-risk countries was driven by the "flat cost paradigm" directive—enforced by Defendant Levine—that the list could only be updated if the change "would have no impact or lower the volume of false positives." Accordingly, TD only removed high-risk jurisdictions from monitoring but did not add any countries to the list for more than a decade. Indeed, TD admitted

that its senior executives "prioritized reducing alerts and the associated cost savings over identifying suspicious activity involving high-risk countries."

207.    TD's admissions are also corroborated by a former employee who experienced these issues first-hand.  For example, a TD former employee (referred to herein as "FE"), FE2, a Vice President and Fraud Strategy Performance Manager at TD from 2021 to 2023, reported that TD's scenario transactions monitoring would frequently break down such that an investigation into suspicious activity could not occur at all.  Specifically, FE2 explained that all Bank transactions were run through the rules designed to identify fraud at midnight every day and, if a suspicious transaction was identified, TD would receive an immediate alert and a "job" on that transaction would start running.    The following morning, a member of the AML/Fraud team would review the alerts and conduct an investigation.  FE2 said, however, that these alerts were frequently "closed" during the night because of a "capacity" problem where TD's systems were unable to manage all of the flagged transactions.  When that happened, FE2 explained, those alerts would disappear— resulting in the system releasing holds on accounts that should not have been released.  According to FE2, "There were no alerts in the system the following morning because the system would break down.  It was a struggle every morning to try to fix it.  This was a consistent problem."  As a result, scores of "open" transactions that should have been investigated were dropped and not investigated

for suspicious activity—meaning that "accounts were flagged and should have been on hold but were released because of their system."  This meant "a lot of things got missed" even when red flags were triggered.

208.   FE2 explained that these problems were prevalent throughout FE2's tenure at TD, and never resolved, leading TD's AML team to manage the problem with manual tools—which created severe delays with open cases because data had to be entered manually.  For example, while alert systems at other banks would populate the transaction and customer information with a click of a button, this was not the case at TD—where all fields had to be entered manually, leading to delays and suspicious transactions getting missed.   Indeed, TD admitted in its plea agreement that the Bank's expenditures and staffing in 2021 "were not sufficient to address AML deficiencies including substantial backlogs of alerts across multiple workstreams," exactly as FE2 reported.

### D.     TD Admitted It Completely Failed To Monitor Trillions of Dollars In Transactions, Including ACH, Zelle, and Checks

209.   Due to the numerous and substantial oversight gaps created by TD's use of its outdated automated transaction monitoring system, TD also admitted in its guilty plea that it knowingly failed to monitor the overwhelming majority of all transactions through the Bank for more than a decade.  Specifically, by TD's own admission, "between January 1, 2018, and April 12, 2024, [the Bank's] automated AML monitoring failed to monitor 92% of transaction volume and 74% of

transaction value, which corresponded to <u>over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value</u>."  These unmonitored transactions included:  (i) transfers using "ACH," a pervasive system responsible for processing domestic transfers under $1 million between financial institutions; (ii) transactions using Zelle, a mobile peer-to-peer payment platform utilized by banks that allows users to instantly transfer funds between participating banks; and (iii) checks.

210.  <u>ACH Transactions</u>.  Starting in at least 2012, TD completely failed to monitor any transactions made through ACH.  The use of ACH is ubiquitous, as the system enables direct transfers between banks without the use of paper checks, wire transfers, credit cards, or cash—indeed, ACH is often used for "direct deposit" purposes such as payroll, retirement contributions, and governmental benefits, as well as for certain non-Zelle peer-to-peer platforms such as Venmo and PayPal.  According to the OCC, given the pervasive nature of ACH transactions, "an effective risk-based suspicious activity monitoring and reporting system" for these transactions is "<u>critical</u> in detecting unusual and suspicious activities."  Despite this, TD did not include any domestic ACH transactions within its monitoring system until the summer of 2023—after regulators were already bearing down on TD.

211.  <u>Zelle Transactions</u>.  TD introduced Zelle in 2017, a mobile person-to-person payment platform that allows customers to make small bank transfers to other

users.  Although Zelle has access to the ACH network, it does not process all its payments via ACH.  Zelle quickly became popular, as it allowed bank customers to easily send and receive money between banks instantly.  Indeed, in its first year, Zelle saw $75 billion move through its network, and that number is projected to increase to over $1 trillion per year by 2025.

212.   However, as the *New York Times* reported on April 22, 2018, given the boom of users using Zelle, "the same features that make Zelle so useful for customers, its speed and ubiquity, have made it irresistible to thieves."  In fact, a few years later, on March 6, 2022, the *New York Times* reported on the "widespread fraud" "flourishing" on Zelle.  In the article, a lead fraud analyst was quoted emphasizing that "[o]rganized crime [using Zelle] is rampant…A couple years ago, we were just starting to talk about it [on Zelle,]…Now it's common and everywhere."

213.   Despite this, TD Bank did <u>nothing</u> to update its transaction monitoring scenarios to appropriately monitor Zelle transactions, and thus allowed Zelle payments to go unmonitored for years.  Indeed, TD admitted in its plea agreement that from its 2017 introduction of Zelle until March 2020, *i.e.* for nearly three years, the Bank did not screen <u>any</u> Zelle payments for AML risks at all.  Even after the Zelle monitoring gap was directly raised by AML employees in 2020, TD decided to merely add Zelle transactions to existing scenarios relating to wire activity—but

these scenarios only screened for wire transfers that were above $10,000 in deposits or $9,000 in transfers within a 10-day period. As a result and as TD admitted in its guilty plea, TD's monitoring of Zelle transactions was utterly useless, as "the scenarios captured activity that effectively <u>could not occur through Zelle</u>." TD thus confessed in its plea that due to its failure to monitor Zelle, <u>TD knowingly allowed $75 billion in Zelle transactions to flow through the Bank "almost entirely unmonitored."</u>

214. <u>Checks</u>. TD admitted in the 2024 plea agreement that it failed to monitor "most check activity" at the Bank, even though senior management understood that checks produced "<u>a lot of ML [money laundering]</u>." Indeed, in 2017 TD's top BSA officer was expressly told that TD does not "typically monitor for checks," and in 2020, when discussing potential upgrades to the AML system, a compliance manager wrote "[c]urrently we…do not monitor checks as far as I have seen, but we see a lot of ML [money laundering] in this space." Despite this stern warning, check activity was left inadequately monitored throughout the Class Period. In addition, TD admitted that it did not monitor "numerous other transaction types," including remote deposit capture—when customers make check deposits online—"internal transfers between accounts," and "nearly all monetary instruments," such as travelers checks.

**E.      TD Knowingly Failed to File Thousands Of Necessary Reports In Violation of The Bank Secrecy Act**

215.   For years, TD willfully and criminally failed to accurately and timely file thousands of necessary CTRs and SARs. TD pleaded guilty to the "knowing failure to file accurate" CTRs between January 2014 and October 2023 with "the purpose of evad[ing] the [transaction] reporting requirements." These reporting violations were pervasive.  According to FinCEN, TD completely failed to file thousands of required SARs, filed over 6,000 SARs late, willfully filed over "more than 1,000 inaccurate CTRs" that "misled law enforcement," and filed more than 4,000 CTRs weeks after the 15-day time limit.

216.   TD's SAR filings were likewise defective—including because of lack of resources that created tremendous backlogs resulting in the belated filing of at least 6,000 SARs with an aggregate reporting value of $500 million; blatant failures in customer due diligence (CDD) processes and gaps in TD's criminally deficient AML automated monitoring program; improper guidance and instruction from AML personnel and other disregard of obvious red flags; as well as inexplicable failures to file required SARs even after intervention by law enforcement.  FinCEN noted that in investigating multiple money laundering networks between 2014 and 2024, the regulator itself "identified thousands of suspicious transactions totaling approximately one and a half billion dollars for which TD Bank failed to timely and accurately file a SAR."

217.    Many of the reporting failures stemmed from the fact that TD's "severe underinvestment" in training its employees on how to follow the law.    Indeed, despite the fact that inadequate AML training was expressly identified as a basis for TD's 2013 fines, FinCEN found that through 2023, "TD Bank's AML management" still "failed to properly ensure the requisite employees received appropriate training" on multiple critical aspects of AML compliance, including CTR filings.

218.    This underinvestment in training resulted from the TD Executive Defendants' enforcement of the "flat cost paradigm," which also led to a parallel "underinvestment" in the "personnel" and "technology" necessary to ensure proper report filings.    For example, from 2016 through 2019, TD faced extensive backlogs due to substantial understaffing in the group responsible for reviewing alerts to determine if the Bank needed to file a SAR and/or take other mitigating actions. During this time, Defendant Levine's reporting to TDBNA Board, Defendant Salom, and the AML Oversight Committee consistently showed the team in "red" status, indicating significant backlogs.    By 2018, the program had over 70,000 backlogged detection alerts and roughly 3,000 aged subpoena responses and further investigation cases, with less than 60% of alerts falling within benchmarks for timely detection, with one manager noting that the Bank simply "won't hire [additional staff] for us."

219.    By 2019, the queues had not decreased, and a senior executive suggested the program was not "adequately resourced/managed," a situation

125

described as "really concerning." But rather than take action to ensure proper review of the backlogged alerts, TD did the exact opposite. Defendant Bowman—who reported to this senior executive—responded that TD would "identify opportunities to scale back review or investigative rigor." In other words, TD deliberately chose to limit the detection of suspicious activity to avoid the cost of addressing suspicious activity TD knew was occurring.

220. A TD former employee, FE4, who worked as an Assistant Vice President, Corporate Security Investigations on the Global Security Team at TD Bank from March 2022 through October 2023, corroborated regulators' findings. FE4 explained that, in stark contrast to the sophisticated and automated systems of its peer banks, TD's AML infrastructure and policies were archaic—10 to 20 years behind industry standards—and "ridiculous," relying on manual systems and hardcopy files to track important metrics. According to FE4, the Bank's focus was on "quantity, not quality"—and reviewers were to close cases as quickly as possible, rather than thoroughly investigating them and reporting fraud. FE4 stated that TD also engaged in practices unique to the Bank to minimize the reporting of SARs, including knowingly mis-categorizing individuals involved in suspicious activity as an "unidentified/unknown subject" even if the identity were known, which allowed TD to avoid reporting a fraud until it hit a $25,000 threshold. If TD had identified the subjects as "known"—as required—TD would have been required to report

frauds at a lower $5,000 SARs reporting threshold. FE4 also reported that in the Global Security Investigations ("GSI") department at TD Bank, employees were frequently told to designate fraud cases as "Considered Not Filed" ("CNF"). This meant that—even where employees knew fraud to have occurred—TD Bank employees were told to find a reason not to file a SAR.

221. That the failure to timely file SARs was due to severe resource constraints imposed by the "flat cost paradigm" was also confirmed by FE4. In fact, AML staffing levels in 2022—when FE4 joined TD—had actually decreased since 2020. And because the group was understaffed, FE4 stated that many SARs were filed incorrectly, including by recording incorrect amounts of money involved in the transactions, because employees needed to get them done as quickly as possible and did not receive the necessary training to complete them. As FE4 reported, the workload was "insane" and "obscene," with members on her team getting up to 100 new cases per week. Because the Global Security Team was so severely under-resourced, no one at TD Bank conducted quality control to ensure that required state filings of elder fraud had been completed, and many were missed.

222. Even when TD did file SARs, it did so after the deadline due to the criminal "substantial backlogs" that TD refused to remedy during the Class Period. The inability to properly and timely investigate whatever alerts were received caused SARs to be created and filed after their deadlines. As FinCEN concluded, "TD

Bank's chronic underinvestment in its transaction monitoring system and its failure to dedicate adequate resources to address its investigations backlogs resulted in thousands of SAR violations related to a host of illicit activity." As TD admitted, the "substantial backlogs" in suspicious activity reporting due to the enforcement of TD's "flat cost paradigm" was criminal.

223. Moreover, even when the Bank properly investigated suspicious activity and "decided to terminate customer relationships"—a process known as "demarketing"—the Bank took months to close the accounts, "thereby allowing billions of additional potentially suspicious funds to flow through the Bank." From 2018 through 2021, "on average, the demarketing process took nearly four months, with more complex cases averaging over five months"—as there was only <u>one US-AML employee tasked with reviewing the demarketing request for much of this period</u>, a fact known by Defendant Levine, who received and denied multiple requests to increase staffing. As TD admitted, due to this protracted timeline, customers that TD had in fact determined were too "high risk" to be banked "conducted an <u>additional $5.16 billion in transaction activity</u>" through TD.

**F.    TD's AML Failures Led to Rampant Money Laundering and Active Criminal Prosecutions of TD Employees During the Class Period**

224. TD's willful and criminal failure to maintain an adequate AML program led to rampant money laundering that, as TD admitted, "<u>was obvious even</u>

<u>to the casual observer</u>." As TD has admitted, its oversight failures resulted in instances where the Bank disregarded suspicious activity in which criminals deposited "millions of dollars of cash in a single day," purchased "more than $1 million in official bank checks…in a single day," and conducted cash transactions "despite being neither an accountholder or signatory."

225. TD's admitted criminal violations—and the harm they caused to the financial system—are exemplified by the case of David Sze, whose network laundered $470 million in illegal fentanyl proceeds through TD from January 2019 through March 2021. As TD admitted, TD willfully failed to file accurate CTRs related to David Sze's suspicious activity, whereby he laundered money through the Bank by depositing large amounts of cash—occasionally in excess of one million dollars in a single day—into accounts opened by other individuals and by requesting that Bank employees send wires and issue official checks. TD failed to identify David as the conductor of transactions in over 500 of the CTRs the Bank filed for his transactions, totaling over $400 million in transaction value, despite David entering TD stores with nominee account holders and conducting transactions directly by making large cash deposits into accounts he purportedly did not control.

226. While David Sze bribed five TD employees who facilitated his transactions, video surveillance and contemporaneous communications by TD employees made clear just how brazen his conduct was—with one TD store manager

emailing another store manager in August 2020, remarking, "You guys really need to shut this down LOL"; another TD store manager imploring several TD regional managers in late 2020 to do something about it, as "[i]t is getting out of hand and my tellers are at the point that they don't feel comfortable handling these transactions"; and another TDBNA store employee in February 2021 remarking, after David Sze purchased more than $1 million in official bank checks with cash in a single day, "How is that not money laundering"—to which a back-office employee responded, "oh it 100% is."

227. Despite their obvious suspicious nature, TD repeatedly failed to file accurate CRTs in connection with the suspicious transactions Sze conducted. In fact, even though Bank personnel processing his transactions knew Sze's identity, they repeatedly accepted identification belonging to other individuals (including a photo of a license on his phone), leading TD Bank to intentionally report incorrect driver's license numbers and misidentify the true individuals involved in his network. For example, even though David Sze was clearly conducting the suspicious transaction shown below, the CTR filed in connection with this transaction, which lists 29 locations and involved over $3 million in cash deposits, did not mention him:



228.  David Sze's criminal activity was also brought directly to the attention of Defendant Levine, who was provided reports highlighting the extraordinary volume and value of David's Network's official bank check activity as a substantial outlier.  For example, a February 2020 report to Defendant Levine called out two of the companies in David's Network for purchasing a total of $8.5 million in official bank checks, the highest amount of official bank checks at two different TD stores, in cash.  Additional business and personal accounts linked to David's Network were singled out in subsequent reports to Defendant Levine throughout 2020 for outlier activity.

229.  TD further admitted that, between November 2019 and November 2022, its deficient AML program allowed five TD employees ("TD Insiders") to facilitate the laundering of over $39 million through TD accounts, to be withdrawn

in cash at ATMs in Colombia—using a method of money laundering (the "Colombian ATM Typology") that FinCEN had designated as a risk for the financial industry.  As TD admitted, TD "did not appropriately act on" "numerous red flags" that should have alerted TD to the TD Insiders' misconduct.  Specifically, one TD employee, financial services representative, Oscar Marcelo Nunez-Flores (identified as "Insider-1" in the Criminal Pleas) accepted bribes to open U.S. accounts "in the names of shell companies and nominee owners, often without the account holder present."  Nunez-Flores, along with four other TD employees, also issued dozens of debit cards (in some cases, more than 50 per account), far in excess of TD's policy prohibiting more than 15 debit cards for any business account.  Money laundering organizations used these U.S. TD accounts and debit cards to withdraw millions of dollars in illicit drug proceeds from ATMs in Colombia, where TD did not even have a presence.

230.   The TD Insiders' misconduct was obvious and would have been identified and stopped by any minimally functioning AML program.  For example, Nunez-Flores worked from a New Jersey branch but opened accounts for businesses with Florida addresses; another TD Insider opened dozens of accounts in the names of different non-citizens who all used the same address in Miami, Florida; other TD Insiders opened hundreds of accounts for individuals not present at account opening; and one Insider even opened an account outside bank opening hours. These TD

Insiders used their TD email addresses to communicate with the money launderers, helping with logistics and resolution of any issues that arose with their fraudulent accounts.

231.   TD admitted that it knew it was facilitating ongoing money laundering through this specific Colombian ATM Typology as early as 2019.   At least by September 2019, TD's AML leadership, including Defendants Bowman and Levine, knew that at least 74 TD accounts had already been used to launder money to Colombia but TD chose not to implement any recommended changes to prevent the misconduct going forward.   As TD admitted, Defendant Levine and US-AML personnel decided not to implement necessary AML changes because they would detract from the "customer experience" and require increased staffing.   Over the next four years, even as US-AML personnel continually reported on the ongoing Colombian ATM Typology, money laundering through TD accounts to Colombian ATMs increased fivefold. TD further admitted that the TD Insiders' misconduct was "reasonably foreseeable to GAML and US-AML leadership in light of [TD's] pervasive AML failures."

232.   Despite this, none of the TD Executive Defendants, including Defendants Bowman and Levine, took any steps to enhance TD's AML programs in response to the Colombian ATM Typology until law enforcement alerted TD to Nunez-Flores's misconduct. Even worse, when a third-party financial services

company raised concerns about the Colombian ATM Typology during TD's internal investigation prompted by the DOJ and regulatory investigations, TD withheld those concerns from the DOJ—a fact prosecutors noted in the Plea Agreement as a failure to cooperate.

233.    TD's willful AML misconduct also enabled another money laundering front masquerading as a jewelry business to launder $123 million through TD Bank unreported and, in some cases, undetected from 2021 to 2022.  Again, TD's admitted AML violations facilitated this laundering.    First, TD admitted that the decommissioned transaction monitoring scenario for large cash deposits by business customers described above would have generated over 160 alerts for this customer's activity.  Second, TD's transaction monitoring system had a known gap in scenarios for the high-velocity intrabank transfers this customer used—but while TD identified a proposed solution to remediate this gap in 2020, it was never implemented.  Third, even though TD had identified this business as a high-risk customer (including under the Bank's risk categorization identifying the precious metals industry as high-risk), TD's transaction monitoring system did not actually track suspicious conduct by such high-risk accounts.

234.    TD knew its transaction monitoring system was incapable of detecting and reporting the exact money laundering scheme the purported jeweler conducted because TD built it to fail. TD admitted that it "intentionally" made changes to its

transaction monitoring scenarios to "reduce[] the universe of alerts being generated and thereby lower[] the associated cost of their review."  TD also admitted that the OCC had repeatedly warned of the failures in TD's transaction monitoring program, and that TDBNA and TDBUSH's boards (including Defendant Salom) were informed by Internal Audit about the significant deficiencies in transaction monitoring.  The "known gaps in the Bank's transaction monitoring system" were also escalated directly to TD's Global AML and US-AML management, who decided against taking any remedial action.

235.   Although these three examples underscore the severity of TD's AML failures during the Class Period, they were not the only high-profile instances in which government prosecutors targeted TD employees and the Bank's AML misconduct for facilitating money laundering and fraud during the Class Period.

236.   For example, a TD banker, Daniel Hernandez, pleaded guilty to wire fraud related to the government's Paycheck Protection Program (or "PPP") COVID-19 relief loan program—in what one federal prosecutor described as "one of the largest COVID-19 relief cases in the country"—on December 21, 2022, i.e., in the middle of the Class Period.  In that case, Mr. Hernandez admitted that from April 2020 through July 2021, he and several co-conspirators—including a former TD employee who was terminated from the bank in 2021 for submitting falsified documentation in order to obtain PPP loans—obtained kickback-like "commissions"

from TD Bank customers by directing them to submit falsified paperwork for more than 90 PPP loans worth $30 million.

237.   The PPP loans submitted by Mr. Hernandez and his co-conspirators were obviously fraudulent and should have been identified by the basic BSA compliance program and AML checks required under the federal regulations governing the PPP.   For example, the loans Mr. Hernandez procured included fictitious names that did not match IRS records, and were funneled to another TD employee, Oscar Alvarez, who processed three to four times more PPP loan applications than anyone else at the bank.   When other TD employees raised concerns about the unusually high number of loans Mr. Alvarez processed, they were either ignored, silenced or retaliated against. Even after TD Bank ultimately suspended Mr. Alvarez in May 2021 after learning that he was a target for prosecutors, a whistleblower Sean Tracy reiterated earlier reports he had made to senior management (including the Florida Regional Vice President) that it was very unusual that Mr. Alvarez processed significantly more PPP loan applications than any other bank employee—and that he had in fact personally witnessed Mr. Hernandez pushing numerous PPP applications to Mr. Alvarez—Mr. Tracy was told, "we are not to talk of this again . . . we didn't have this conversation."

238.   Despite the red flags of fraud and Mr. Hernandez's known and reported participation in PPP activity with an employee terminated for fraudulent conduct,

TD did nothing until law enforcement intervened.  And when Mr. Hernadez's guilty plea was covered by the news media, TD denied any culpability, telling investors that it took appropriate and prompt action concerning Mr. Hernandez and that "TD has strong processes in place to identify, investigate, and deter potential fraud." However, rather than have "strong processes in place," FinCEN concluded that Defendant Levine's failure to monitor the Bank's "day-to-day BSA compliance" led directly to the Bank's failure to identify the PPP loan fraud.

239.   In a similar instance, on February 24, 2023, Diape Seck, a TD Bank employee, was convicted in connection with fraudulently opening hundreds of bank accounts between January 2019 and January 2020 in order to facilitate depositing checks stolen from the mail that were intended as donations to religious institutions. As described by witnesses at Mr. Seck's trial, *United States v. Seck*, No. 8:20-cr-00317-TDC (D. Md.), the opening of these accounts reflected a failure of KYC protocols and raised glaring AML red flags, including that (1) the same addresses were used for dozens of the 400 accounts that Mr. Seck opened, with the same address used for multiple different names (e.g., 80 accounts, each opened under different names, used the same address of a single-family residence in Baltimore as the account holder address); (2) the accounts were opened with either no documented identification by the account owner or with identifications that listed names other than the listed account holder's name; and (3) donation checks made out to churches

137

and other religious institutions were deposited into these accounts—not to accounts associated with those institutions.

240.   Despite these blatant red flags, TD Bank failed to properly or timely report any suspicious activity for an entire year—even though the fraud involved hundreds of highly suspicious accounts, and Mr. Seck himself repeatedly raised concerns about the legitimacy of the accounts he was opening to his supervisor, Lawrence Thompson, who escalated these concerns to his regional operations manager and regional market manager during quarterly audits.  Still, TD did not act before law enforcement intervened.

241.   When sentencing Mr. Seck in June 2023, the federal judge overseeing the trial—the Honorable Theodore D. Chuang—determined that Mr. Seck was entitled to a mitigation under the sentencing guidelines specifically because of TD Bank's complicity in failing to uncover and stop the fraud.   Judge Chuang recognized that TD Bank's senior leadership had all of the information necessary to identify and put a stop to the fraud—but consciously chose not to do so in order to inflate the bank's bottom line.   Indeed, Judge Chuang found that "the TD Bank people either were asleep at the switch or they were happy that they were getting these accounts."   As Judge Chuang stated, "it was apparent from the evidence that the leadership of TD Bank had sufficient information to uncover this fraud and the tools to put a stop to it, but it let it continue" but that branch leadership likely

preferred the statistics associated with the account openings and "the dollar amounts associated with that rather than trying to uncover the fraud."

### G. TD Misled Its Regulators for Years, and Sought to Conceal Its AML Violations in Order to Close the First Horizon Merger

242. TD's plea agreement and FinCEN's Consent Order detail TD's longstanding practice and pattern of actively misleading regulators with respect to the Bank's ALM failures. In numerous instances, the DOJ and FinCEN call out TD for failing to provide necessary information to regulators during supervisory exams, in response to requests for additional information, and for giving regulators empty assurances that the Bank's problems were being address when in fact they were not.

243. For example, FinCEN found that rather than address known deficiencies in TD's systems for identification and monitoring of high-risk customers—or at least disclose the problem to regulators—"senior executives" instead instructed Bank personnel on the importance of "<u>align[ing] on messaging to regulators</u>." (emphasis in original). Similarly, in its guilty plea, TD admitted that after the OCC instructed the Bank to enhance its transaction monitoring for high-risk customers, TD employees "informed the OCC during its examinations in 2017, 2018, and 2019 that these scenarios were in development"—when in reality these scenarios were "never implemented."

244. TD executives also misleadingly told the OCC during its July 2021 annual assessment of the Bank's AML controls that "the Bank was conducting

scenario based monitoring of Zelle," even though the Bank knew the scenarios it was using only applied to "activity that effectively could not occur through Zelle" and that "employees continued to identify Zelle as a gap in [the Bank's] transaction monitoring program."  According to FinCEN, TD Bank "repeatedly cited these scenarios" to regulators "without describing the scenarios' parameters" as examples of current Zelle monitoring, even though TD knew the thresholds for these scenarios were "not suitable" for Zelle.  As FinCEN detailed, the Bank did not update its Zelle scenarios until <u>February 2023</u>—"roughly six years after Zelle's launch, two-and-a-half years after the initial request for the scenario was submitted, and <u>well after the Bank was aware its AML practices were facing intense scrutiny by regulators and law enforcement</u>."

245.  Finally, with respect to ACH transactions, FinCEN explained that "[s]ince at least 2012, TD Bank knew it failed to monitor virtually <u>any</u> domestic ACH transaction" (emphasis in original) despite trillion of dollars in these transactions flowing through the Bank.  Despite this, <u>TD never once alerted regulators to this known massive transaction monitoring gaps, even after the Bank was under intense regulatory scrutiny</u>.  Instead, according to FinCEN, "[i]t was only after one of TD Bank's regulators became aware of the gaps" late into regulators' investigation that TD finally "began taking steps to mitigate the significant ongoing risk that they posed to both the Bank and the broader financial system."  Moreover,

FinCEN detailed that, even when "these substantial gaps were identified by one of TD Bank's regulators," the Bank still did not come clean.  Rather, TD misleadingly told the regulator "that its risk assessment historically categorized ACH payments as low risk, which the Bank claimed justified the lack of monitoring for these transactions."  However, when pressed, the Bank admitted that "it could not identify any 'historic documentation related to risk analysis or risk memos related to domestic ACH risk and its exclusion for monitoring from [the transaction monitoring system]."

246.   Former TD employees reported the same deception, and noted that TD Bank personnel took steps to hide TD's AML compliance deficiencies from the OCC and the Federal Reserve during annual supervisory examinations.  For example, FE3, who worked as an AML manager at TD Securities from 2015 to 2022, repeatedly raised to his managers that TD's onboarding software did not reflect instances where compliance managers had granted KYC exceptions, making it impossible to accurately convey to regulators when and why certain customers had been onboarded without the proper documentation and verification.

247.   When regulators at the Federal Reserve or the OCC did request documentation for a customer who had been granted one of these exemptions, FE3 was instructed by individuals in Compliance who interacted with the regulators not to tell the regulators that they were missing the requested documentation and to leave

it to the regulators to find the problems.  When the regulators ultimately did raise these issues, FE3 stated that the Compliance department assured them they were working to address them.  In reality, FE3 said, TD was not doing the work needed to fix TD's AML deficiencies.  FE3 could not understand how such supervisory exams could have gone successfully because TD Bank had such huge "holes" in its AML compliance.  To FE3, TD's AML compliance procedures were so obvious and significant that he was surprised when the Bank's examination supervisors did not issue severe regulatory findings.  To the extent TD avoided adverse findings, FE3's reaction was to question his counterparts in Compliance, asking "What? How? Oh, so you basically just lied."

248.  Perhaps most striking, both the DOJ and FinCEN detailed how the Bank actively hid its most substantial transaction monitoring gap from regulators until late into regulators' investigation of TD—i.e., the Bank's abject failure to monitor ACH transactions for over a decade, allowing trillions of dollars in transactions to go unmonitored through the Bank—a "well-known and significant transaction monitoring gap" that regulators were forced to discover on their own during the course of their investigation of TD.

249.  In fact, both the DOJ and FinCEN found that TD Bank failed to provide key information to them during the course of their investigations during the Class Period—i.e., at the very same time that Defendants were vehemently dismissing

questions about regulatory compliance raised by journalists, lawmakers and investors. These included "concerns expressed to [the Bank], during the course of its internal investigation, by a third-party financial services company concerning the Colombian money laundering activity." Further, as FinCEN found, "TD Bank did not voluntarily disclose" all of its AML failures, FinCEN's investigation was not the result of Bank disclosures, and to the contrary, TD failed "to timely disclose the ongoing nature of certain issues that persisted late into FinCEN's investigation of TD Bank."

### H. After The Class Period, First Horizon Admits That Its Diligence on TD Was Rushed and "Chaotic" And That, Unbeknownst to Investors, Its Top Executives Expected Regulatory Delays

250. After the deal collapsed, the First Horizon Executive Defendants admitted that their due diligence on TD was rushed and "chaotic"—despite being aware of significant regulatory red flags indicating that TD had serious compliance issues.

251. For example, on June 14, 2023, during an investor call following the termination of the merger, Defendant Dmuchowski explained that First Horizon had received TD's unsolicited offer only seven days after it had completed a "merger-of-equals" with IberiaBank. As a result, First Horizon's due diligence on TD Bank was in truth "chaotic" and cursory, and crammed into a 30-day period, even though "[t]ypically" the bank would "have a much longer due diligence." Specifically, in

describing First Horizon's due diligence on the investor call, Defendant Dmuchowski explained:

> So it was a little bit chaotic. We went into a 30-day due diligence. Typically, you have a much longer due diligence. Banks, when they enter into mergers, will enter right after a quarter end, give themselves some time. TD being on a Canadian calendar, they kind of worked right between that. So we had a 10-Q coming out, so we only had – or we had an earnings release coming out. So we only had 30 days to do all the due diligence with TD.

252.   Indeed, FE1, who worked in First Horizon's compliance program from 2018 through August 2022, and most recently as a Senior Compliance Officer, likewise confirmed that First Horizon did not allocate sufficient time and resources to conduct adequate due diligence on TD.  FE1 stated that the merger with TD was announced very soon after First Horizon had finalized the merger with IberiaBank, and that First Horizon employees were given an unheard-of short amount of time in which to do proper due diligence.

253.   First Horizon employees were accordingly dumbfounded that First Horizon thought the deal would quickly obtain regulatory approval.  While First Horizon had a very robust compliance program, TD did not have nearly the breadth of compliance testing First Horizon had, despite being a much larger bank.  For example, from what FE1 heard from fellow First Horizon employees, TD was not even looking at or touching some of the regulations First Horizon monitored.  As FE1 stated, TD Bank had a very "light" compliance schedule—"too light of a

schedule to properly mitigate risk"—and it was clear that TD was not doing enough compliance testing and did not have enough resources devoted to this work. FE1 reported that, according to FE1's supervisor, TD's counterparts acknowledged how deficient TD's compliance program was in merger integration discussions centered on how the merged company would have to rely on First Horizon's compliance program instead. According to FE1, by the early summer of 2022, it was evident to compliance personnel that there was no choice but to go with First Horizon's program, as "we wouldn't be able to have the coverage we needed if we were to go with TD's program."

254. Further, following the collapse of the deal, journalists and insider trading experts questioned the First Horizon Defendants insider stock sales during the Class Period—suggesting that these sales reflected that the stock market did not provide a "level playing field for both corporate insiders and outsiders." Indeed, only one of Defendants' Class Period sales—Defendant Jordan's sales of 93,157 shares on February 24, 2023—was made pursuant to a Rule 10b5-1 insider trading plan.[2]

255. However, the circumstances of even these sales were highly suspicious in nature, as Jordan had entered into the Rule 10b5-1 trading plan during the Class Period as regulators were zeroing in on TD's AML deficiencies in September 2022,

---

[2] In certain cases, implementing a Rule 10b5-1 trading plan can provide an affirmative defense to claims of insider trading where, unlike the case here, the plan is entered into when the insider lacks material nonpublic information.

and the sales were made less than one week before First Horizon would reveal that TD could not close by the merger deadline due to its inability to timely obtain regulatory approval.   Moreover, when asked to respond to suspicions that First Horizon insiders knew inside information about the risks to the deal while selling shares, a First Horizon spokesperson said that Defendant Jordan had entered into the Rule 10b5-1 plan specifically as a "safety measure" so that he could sell the shares in case there was a "delay" to deal closing—all but conceding that Defendant Jordan knew about the significant risks of regulatory delay, and entered into the Rule 10b5-1 plan so that he could profit off of that knowledge.

256.   These post-Class Period admissions are corroborated by the reports of FE1.  As FE1 explained, meetings between TD and First Horizon personnel that took place in the spring and summer of 2022 made clear that TD had gaps in its AML program.  FE1's supervisor, a VP and Compliance Testing Director at First Horizon who reported up to First Horizon's BSA Officer Conchata Brown and Chief Compliance Officer Uylanda Cunningham, told her she was shocked by TD's approach to BSA and AML.  FE1 further described an initially rushed diligence, which was inexplicably followed by sudden radio silence from leadership about necessary appointments.  Further, First Horizon missed the diligence deadlines it had initially set.  As a result, First Horizon Compliance employees believed as early as August 2022 that the merger would either not receive approval or would face major

obstacles.  FE1 explained that these concerns reached First Horizon leadership, who held what FE1 described as unconvincing town halls aimed at quelling these widespread concerns.

## I.    Defendants Were Highly Motivated to Conceal the Truth and Profited Through Their Suspicious Insider Trades

257.    The First Horizon and TD Bank Executive Defendants were highly incentivized to conceal the truth from investors—as they were able to profit through highly suspicious sales of their personally held shares at artificially inflated prices and through pay packages premised on an acquisition they knew had failed.

258.    During the Class Period, numerous First Horizon senior executives engaged in sales of their personally held shares on the open market while the merger was pending—highly suspicious trades that did not make any economic sense unless those individuals knew that the deal would not occur, or at minimum was in serious jeopardy of not being completed.  As a University of Michigan Ross School of Business professor and insider trading expert noted, these insider sales were for prices below the $25 per share price that was guaranteed upon closing of the merger, and occurred at a time when "there was no need for any insider during this 12-month window to sell any shares in the open market, especially below the merger price of $25."

259.    Not only did First Horizon insiders sell shares on the open market while the merger was pending, but they did so under circumstances that strongly support

an inference of scienter.  For example, Defendant Jordan sold approximately $2.3 million worth of First Horizon common stock on February 24, 2023, just two days after the OCC scheduled a call with Defendant Masrani and TD's outside counsel—a highly unusual meeting that industry insiders described as indicating the OCC's concerns were "very serious."  Of course, under the deal's terms, TD Bank was required to report this meeting to Defendant Jordan, invite him to attend (if permitted by the OCC), and relay the "substantive matters" that it was to address.

260.   Further, although this sale was conducted pursuant to a Rule 10b5-1 trading plan, that plan was adopted in September 2022—while the merger was pending and after First Horizon executives had seen first-hand just how deficient TD's compliance and AML systems were.  While First Horizon defended Defendant Jordan's highly suspicious trades after the Class Period—claiming this 10b5-1 plan was set up as a "safety measure" in case the merger with TD Bank was delayed—First Horizon's explanation all but concedes that Defendant Jordan had knowledge of a risk of delay that investors did not.  Indeed, Defendant Jordan's adoption of a Rule 10b5-1 trading plan as a "safety measure" while regulators were scrutinizing the merger and TD Bank's AML compliance belies Defendants' contemporaneous statements that they were "extremely confident" about the merger timeline.

261.   Similarly, former First Horizon Chairman Daryl Byrd sold twice as many shares during the Class Period as compared to the 15 months prior, for total

proceeds of $12.66 million—representing approximately one-fourth of his total holdings—none of which were pursuant to a Rule 10b5-1 trading plan.

262.    Likewise, First Horizon COO Tammy LoCascio and President of Specialty Banking David Popwell—the head of the execution for strategic initiatives and the head of specialty banking and marketing/customer experience, respectively—together reaped proceeds of approximately $4 million from insider sales (approximately 20% and 25% of their holdings, respectively) during the month of November 2022, when regulators told TD Bank the deal was in serious peril because of TD's severe AML deficiencies. Both Ms. LoCascio, who was identified in the Proxy as a key merger contact and named by Defendant Jordan as the "First Horizon integration leader for the TD transaction"—a role that required real-time updates about the progress of the transaction and regulator approval—and who was Mr. Popwell's former direct report, and Mr. Popwell, who himself formerly served as the M&A chair at one of the largest law firms in the country and oversaw M&A at his prior bank, were intimately involved in overseeing the merger.

263.    Similarly, First Horizon's Chief Risk Officer Terry Lawson Akins sold approximately $1 million of her First Horizon stock during the Class Period—or approximately one-third of her entire shareholdings—and had not reported any sales prior to this time. Her sales occurred on two dates—on April 27, 2022 and February 2, 2023, just days before TD Bank and First Horizon disclosed an extension of the

deal closing timeline on February 9, 2023.  Akins oversaw the merger integration efforts, and her direct reports, including First Horizon CCO Cunningham and BSA Officer Brown, were intimately involved in discussing the coordination of the banks' AML and compliance systems beginning in the spring of 2022.   As FE1 explained, Cunningham attended these meetings through discussions with their TD compliance counterparts it became clear that the combined bank would have to take on First Horizon's compliance program because TD's was "too light of a schedule to properly mitigate risk," it was clear that TD was not doing enough compliance testing, and did not have enough resources devoted to this work. Cunningham reported directly to Akins, who would have received these critical updates on the merger.  Thus, when Akins sold one-third of her holdings in the spring of 2022— her first sales of First Horizon stock ever—she did so with nonpublic information that none of First Horizon's investors had about TD's compliance deficiencies.

264.  Likewise, one month later, First Horizon Chief Banking Officer Anthony Restel, a key executive involved in the merger efforts who would have received $10.2 million in golden parachute payments upon its closing, sold First Horizon stock on May 27, 2022, for proceeds of over $3.5 million.  As Restel told investors immediately after the Class Period, "I did have the privilege of seeing a lot of under the hood of a large bank" in comparing First Horizon's "model" favorably to TD's, conceding he knew information about TD that public investors did not.

265.   None of these other executives' sales were made pursuant to a Rule 10b5-1 trading plan.  Moreover, none of these First Horizon executives sold any shares until a full year after the deal fell apart, as First Horizon shares collapsed and began trading at prices unaffected by the TD Bank merger premium. Moreover, altogether, First Horizon officers and directors sold $25.8 million worth of their personally held shares during the Class Period, and did so at an average price of $23.35—a level approximately 10% below the merger price but, following the disclosures revealing the deal had been terminated, almost <u>double</u> what they were worth after the end of the Class Period.

266.   The TD Bank Executive Defendants—and Masrani and Salom in particular—were also motivated to conceal the truth that regulators had rejected TD Bank's application, as publicly disclosing that fact risked jeopardizing their rich compensation packages that were in part premised on their work in overseeing the acquisition.

267.   Specifically, as detailed in the proxy circular for TD Bank's April 20, 2023 annual meeting, Defendant Masrani and Salom were awarded pay packages that significantly exceeded those these executives received in prior years. Moreover, those pay packages were supposedly based, in part, on those executives' work on the First Horizon transaction.  According to the proxy, the First Horizon transaction was one of a few "strategic" "highlights" entitling Masrani and Salom to their

compensation packages and was a transaction that, "once closed, [] will add scale, new capabilities, talented colleagues, and over one million customers and clients to the bank" and "accelerate the bank's long-term growth strategy in the U.S. by acquiring a premier regional bank with an aligned culture and risk-management framework."

268.   Indeed, these Defendants' work on the First Horizon transaction was cited to justify an 117% upward adjustment for their bonus compensation plan under TD Bank's Executive Compensation Plan. These and the other key terms of the TD Bank Executive Defendants' compensation were subject to a "say-on-pay" vote by TD shareholders as outlined in the proxy circular sent to investors via a press release published on March 14, 2023—after the Federal Reserve told TD to suspend and withdraw its merger application. But rather than disclose the truth that regulators had rejected the deal, at the April 20 annual meeting, Defendant Masrani misleadingly represented that TD was in "extension negotiations with First Horizon" about when the deal would close.

269.   As a result, shareholders overwhelmingly approved the compensation packages detailed in the proxy.  In doing so, Defendant Masrani received the largest pay bump of the most senior executives at Canada's five largest banks—enabling him to take home nearly $15 million in compensation, a 150% increase from two years prior, during a year where most bank CEOs' pay declined.  For his part,

Defendant Salom was paid $8 million—almost double his compensation as compared to the prior year.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

270.   As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning TD's proposed acquisition of First Horizon were materially false and misleading when made.   In addition to the allegations set forth above, these particularized facts include the following.

### A.     Additional Allegations of Scienter as to All Defendants

271.   <u>First</u>, the size and scope of TD's criminal misconduct support scienter. TD's guilty plea and regulator findings establish that the TD Defendants knowingly engaged in widescale criminal misconduct that involved "pervasive" and "systemic" AML violations that resulted in a historic criminal plea and $3 billion in record-setting fines. TD's admitted criminal violations included "the <u>willful</u> failure to maintain an adequate AML program" and the "<u>knowing failure</u> to accurately report currency transactions" for the time period between January 2014 and October 2023, i.e. over the entirety of the Class Period, and were so egregious that they resulted in historic charges and unprecedented fines.   As described by the U.S. Attorney General, as a result of TD's criminal misconduct, "TD Bank became the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures and the first

153

U.S. bank in history to plead guilty to conspiracy to commit money laundering," and resulted in prosecutors levying "the largest-ever penalty under the Bank Secrecy Act and the first time the Justice Department has assessed a daily fine against a bank." The size, scope, and egregious nature of TD's misconduct supports scienter.

272.    Second, the scale of TD's AML violations made it impossible for First Horizon to be unaware of TD's AML deficiencies. The magnitude of TD's AML failures—spanning nearly a decade and including such significant AML monitoring gaps that the Bank completely failed to monitor trillions of dollars in transactions and facilitated hundreds of millions of dollars in rampant money laundering—were, as the Criminal Pleas made clear, open and "obvious to a casual observer."  Even First Horizon's cursory due diligence, which it represented to investors it adequately conducted, would have revealed these pervasive and egregious AML failures, and/or numerous red flags making clear that further due diligence was warranted that First Horizon clearly willfully failed to conduct.  Indeed, First Horizon's awareness of red flags indicating TD's severe AML deficiencies is confirmed by FE1's account.  As reported by FE1, as early as the summer of 2022—during integration planning and soon after the merger was announced—FHN had determined that TD's compliance programs were so deficient that the combined bank would have to use the First Horizon's compliance programs instead. The issues were significant, obvious, known, and could not have escaped management attention.

273.  Third, TD's proposed acquisition of First Horizon was the largest and most critical transaction in the history of both companies, and throughout the Class Period, the most senior officers of TD and First Horizon repeatedly spoke at length about the transaction and responded to repeated analyst questions about the prospects and progress of the deal.  Indeed, Defendant Masrani characterized the deal as a "tremendous opportunity" for TD that was "strategically compelling" precisely because it would provide "leadership positions" in "some of the fastest-growing markets across the U.S.," catapulting TD into becoming the sixth largest bank in the nation that would compete against the likes of JPMorgan and Citibank. The Executive Defendants answered repeated questions from analysts about the status of the merger and interactions with regulators about it, and professed to have a detailed understanding of those issues when they spoke.  Accordingly, it is implausible that the senior executives of TD and FHN were unaware of the details of such an important and transformative transaction, the regulatory requirements surrounding approval, and the discussions with regulators regarding the merger.

274.  Fourth, Defendants understood full well that regulatory approval of the merger would be of paramount importance for the deal's success, and that in particular, the effectiveness of TD's AML controls was the single most critical aspect of the deal for purposes of obtaining regulatory approval.  Indeed, in the years immediately preceding the announcement of the transaction, regulators had

materially delayed much smaller and less important bank mergers for years precisely because of AML deficiencies. For example, M&T's $3.7 billion acquisition of Hudson City, announced in 2012, did not gain regulatory approval until 2015 precisely because regulators found "significant weaknesses" in M&T's AML policies. Significantly, the Federal Reserve emphasized in a September 2015 order that it would not provide any such leeway in the future, and that moving forward, it "expect[ed] that a banking organization will resolve all material weaknesses identified by examiners before applying to engage in expansionary activity." Indeed, First Horizon expressly cited this very language about the Federal Reserve's expectations about "material weaknesses" in its proxy statement issued on March 19, 2020 in connection First Horizon's merger with IberiaBank, as well as in connection with its merger with TD in its Form 10-Ks filed during the Class Period on March 1, 2022 and March 1, 2023. Given that the First Horizon merger was an even larger and more high-profile transaction—one of the largest deals of its kind since the financial crisis, and a transaction that would greatly expand TD's presence in the U.S.—Defendants knew that regulators would closely scrutinize TD's AML compliance in connection with the merger.

275. <u>Fifth</u>, multiple public financial frauds and AML-specific lawsuits and prosecutions put the Defendants on notice that—unless TD had made a substantial shift in its AML programs—TD had pervasive AML failures that posed serious risks

to regulatory approval of the merger.  Indeed, with respect to the $1.2 billion Rothstein Ponzi scheme, the OCC found "a pattern of misconduct" at TD that was "significant and egregious," and TD ultimately entered into a public settlement with the OCC, the SEC and FinCEN in which the bank admitted that it had "willfully violated" BSA reporting requirements.  With respect to the $7 billion Stanford Ponzi scheme, TD paid a $1.2 billion settlement during the Class Period after U.S. Senators highlighted that "TD Bank ignored numerous inescapable signs of fraudulent activity" and "turned a blind eye to obviously fraudulent activity by Stanford." Just months before the start of the Class Period, a federal judge in Texas had determined that "TD Bank transacted with Stanford in full awareness that improper behavior was ongoing within the Stanford entities." Likewise, with respect to the $3 billion Telexfree Ponzi scheme, the United States District Court for the District of Massachusetts found in August 2022 that the facts supported a finding "that TD Bank 'actually knew' that TelexFree was a fraud." Canadian authorities also singled out TD's failures in maintaining adequate AML controls.  In June 2022, the Cullen Commission publicly issued a scathing report after a multi-year money-laundering investigation, which criticized TD for failing to implement basic AML controls after being "aware by at least May 2019 that their bank was the single largest source of suspicious bank drafts being tendered at [British Columbia, Canada] casinos."

157

276.   These repeated and consistent public excoriations from a multitude of regulators, judges and government officials would have been accessible to First Horizon during its due diligence, and put the Executive Defendants on direct notice that TD had serious AML deficiencies that, unless addressed, would pose a serious risk to the merger.

### B.   Additional Allegations of Scienter as to the TD Defendants

277.   First, TD admitted that the Bank's AML violations were "knowing" and "willful." In pleading guilty, TD admitted that "high level executives" and those in "senior executive management…knew there were long-term pervasive, and systemic deficiencies in [TD Bank's] U.S. AML policies, procedures, and controls." According to the DOJ's press release announcing the plea, for nearly a decade, federal "regulators and TD Bank's own internal audit group repeatedly identified concerns about its transaction monitoring program," yet "from 2014 through 2022, TD Bank's transaction monitoring program…did not adapt to address known, glaring deficiencies." Most significantly, as TD admitted in its criminal pleas, TD's monitoring system failed to monitor 92% of all transactions made through the Bank. Specifically, for a decade, TD did not monitor "any domestic ACH activity," internal transfers between accounts at TDBNA, "most check activity," and numerous other transaction types. As a result, a staggering "$18.3 trillion in unmonitored transaction value" flowed through the Bank over the past decade—with coverage gaps leaving

several trillion dollars in transactions unmonitored in 2023 alone.  TD management expressly confirmed and the DOJ and FinCEN concluded that the failure to monitor ACH transactions was a "well known and significant monitoring gap."  Given the scale of TD's known AML deficiencies, the TD Defendants acted with knowledge or at the very least recklessness in touting TD's legal and regulatory compliance, and their confidence about regulatory approval of the merger.  Thus, contrary to what Defendants told investors in connection with the merger, the TD Defendants knew that TD had *not* "complied with...any other law, policy or guideline relating to bank secrecy...[and] money laundering prevent[ion]."

278.   Second, the TD Defendants were aware by no later than October 2022 that the merger was highly unlikely to receive regulatory approval specifically because of TD's criminal AML deficiencies.  Indeed, in October 2022, the OCC conducted a confidential supervisory examination of TD in which it provided highly critical feedback to TD's senior leadership, including TD's audit committee and Defendant Masrani, and in November 2022, senior TD executives privately met with OCC officials no less than four times—meetings during which TD's AML problems were discussed.  In fact, as reported by the *Capitol Forum*, by November 2022, TD's top executives "were aware that multiple federal law enforcement agencies," including the DOJ, "had found such serious lapses in anti-money laundering (AML) controls that U.S. regulators might reject the merger" and that "officials from both

the Fed and OCC… discussed the alleged AML failings openly with TD Bank executives in November 2022." Furthermore, on February 22, 2023, Defendant Masrani scheduled what journalists reported and industry insiders described as a "very serious" meeting with senior OCC officials that was a "last-ditch effort" to stave off a DOJ criminal prosecution with the OCC for March 9, 2023—confirming that the merger lacked any chance for approval.  Four days later, TD was instructed by the Federal Reserve to submit a request to suspend the agency's consideration of the merger application, and TD did just that on March 17, 2023—formally terminating any chance for approval. Moreover, as confirmed by TD's admissions in and FinCEN's findings, TD knew it was facing "intense scrutiny" into its AML practices from both regulators and law enforcement during the pendency of the merger.  That Defendants knew about an ongoing DOJ investigation during the Class Period and were directly informed that regulators were unwilling to approve the merger—but told investors the exact opposite, denied knowledge of any regulatory problems, and repeatedly expressed "confidence" in approval—provides powerful evidence of scienter.

279.  <u>Third</u>, TD's deliberate decision to prioritize "profits over compliance" is indicative of scienter. Contrary to Defendants' Class Period claims that TD ensured "there are adequate resources" to oversee the Bank's AML function and its "ongoing effectiveness," the exact opposite was true: TD admitted that the "goal of

the conspiracy" to violate its AML obligations and to launder money "was to keep costs, including spending on anti-money laundering controls, flat while growing TDBNA's retail banking business in the United States and prioritizing the 'customer experience.'" "Bank senior executives repeatedly prioritized… a 'flat cost paradigm'" that refused to increase the "AML compliance" budget year over year and "resulted in a willfully deficient AML program." As Attorney General Garland stated, "TD Bank chose profits over compliance, in order to keep its costs down." FinCEN similarly concluded that "TD Bank knowingly spend[t] an order of magnitude less than its peers" on its AML program, explaining that its "pennywise, pound-foolish approach caused the Bank to violate the BSA." Indeed, FinCEN found that "[t]he Bank's fervent emphasis on costs fostered an environment that discouraged addressing the material substantive AML compliance issues that the Bank faced"—and "AML senior management knew that the Bank was chronically underspending on AML, resulting in an inadequate AML program in violation of BSA requirements." Accordingly, as U.S. Attorney Sellinger made clear, the Bank knew its "underspending on compliance" created a host of issues, yet made "zero changes" because it "prioritize[ed] profits and convenience over meeting its legal obligations." Thus, the TD Defendants knew that TD had a deficient AML program and that the merger faced an extreme risk of regulatory disapproval—because the

TD Defendants had deliberately ordered the Bank to maintain a deficient AML program to keep costs low.

280.  Fourth, that the TD Defendants actively hid TD's pervasive AML problems from regulators is indicative of scienter.  For example, TD hid that 92% of the Bank's total transactions went completely unmonitored—a fact that regulators ultimately uncovered themselves.   As FinCEN found, TD senior executives discussed misleading regulators about the fact that the Bank had decided not to make necessary improvements to its customer-risk rating system in 2019 in part because of budget concerns, stressing to employees the importance of "align[ing] on messaging to regulators." (emphasis in original).  TD also admitted that after the OCC flagged gaps in TD's high-risk customer monitoring, TD's US-AML leadership misleadingly "informed the OCC during its examinations in 2017, 2018, and 2019 that these scenarios were in development," even though they were "never implemented." TD further admitted that it told the OCC in July 2021 that "the Bank was conducting scenario based monitoring of Zelle," despite knowing that the Zelle scenarios only applied to "activity that effectively could not occur through Zelle." Additionally, according to FinCEN, TD "not only failed to timely file required reports with FinCEN, but also many of the reports that TD Bank did file were so inaccurate that they were misleading"—to the extent that they "severely hindered financial crime investigations." The result of this concealment was that TD did not

162

receive credit for voluntary disclosure or full credit for cooperation from either the DOJ or FinCEN, with FinCEN concluding its investigation was "materially undermined" by the Bank's failures to disclose. That TD conspired to hide the truth from regulators supports the inference that the TD Defendants also acted with knowledge or at least recklessness in deceiving investors about TD's AML compliance and the risk to the merger's regulatory approval.

281. Fifth, TD's own employees engaged in money laundering and other criminal misconduct. TD pleaded guilty to conspiracy to commit money laundering in part because five of its own employees spanning different TD locations were involved in schemes to move more than $39 million to Colombia—misconduct that TD admitted was "reasonably foreseeable" to Bank leadership "in light of [the Bank's] pervasive AML failures." This brazen and blatant insider misconduct shows that Defendants either knew, or recklessly disregarded, that TD's AML program was deficient. Indeed, prosecutors were actively pursuing criminal charges against dozens of TD employees during the Class Period during which the Bank was required to respond to prosecutors' subpoenas, requests for information, and conduct their own internal investigations that would have demonstrated striking and obvious criminal behavior by numerous employees. It would be implausible to suggest that such egregious criminal behavior—the focus of numerous active criminal prosecutions and which bore directly on TD's AML compliance—escaped the

attention of TD Executive Defendants, particularly given that the TD Executive Defendants were then publicly responding to questions about TD Bank's regulatory track record and interacting with regulators while the merger was pending.

282.  <u>Sixth</u>, as FinCEN repeatedly emphasized in the Consent Order, TD did not implement any remedial measures with respect to its significant transaction monitoring gaps until after it was under significant regulatory scrutiny.  As FinCEN stated, despite TD's "systemic and pervasive" AML deficiencies, TD "only significantly increas[ed] resources late in the Relevant Time Period and largely after the Bank was aware it was under investigation."  Moreover, "[d]espite AML senior management's knowledge of longstanding issues, TD Bank has yet to fully implement an effective automated transaction monitoring system that addresses the Bank's identified money laundering risks."  Thus, as FinCEN concluded, "TD Bank began to take steps to meaningfully address [its AML] gaps only after coming under scrutiny from regulators and law enforcement years after it identified pervasive issues."  That TD took necessary steps to address ***known*** AML deficiencies only when forced to, after the start of the Class Period and in response to DOJ and FinCEN enforcement activity, bolsters the inference that the deceptive scheme was conducted with knowledge or recklessness and that the TD Defendants knew their positive statements about TD's AML compliance, TD's supposedly "excellent

relationships" with regulators, and the prospects for the merger closing were misleading when made.

283.   <u>Seventh</u>, immediately prior to and during the Class Period, TD was responding to law enforcement regarding large-scale money laundering activity at the Bank.  For example, TD had been responding to law enforcement requests related to the guilty plea of David Sze, who used the Bank to launder more than $470 million, facilitated in part by bribing TD bank tellers.  In fact, Sze and his shell companies appeared on multiple internal reports provided to Defendant Levine setting forth the largest cash transactions made at the Bank. On February 22, 2022— less than a week before Defendants announced the merger—Sze pleaded guilty to laundering over $653 million.  Given TD's (belated) role in law enforcement's prosecution of Sze, Sze's guilty plea and his admission to bribing bank tellers to accomplish his crimes would have triggered alarms within TD that its AML procedures were deficient and that regulatory and law enforcement agencies were zeroing in on the Bank.

284.   TD's AML deficiencies also led to numerous criminal prosecutions of its own employees during the Class Period.  In one case, during the Class Period from April 2022 through February 2023, a TD employee helped funnel millions of dollars in narcotics proceeds through tens of thousands of highly suspicious ATM withdrawals to criminals in Colombia in a scheme that exhibited egregious signs of

money laundering that should have been immediately identified by any adequate AML program. In yet another, a TD employee opened hundreds of highly suspicious TD bank accounts to help criminals deposit and withdraw funds from stolen religious donation checks. With respect to the latter case, Judge Chuang of the District of Maryland found after the Class Period that "it was apparent from the evidence that the leadership of TD Bank had sufficient information to uncover this fraud and the tools to put a stop to it, but it let it continue." These active criminal prosecutions went to the heart of TD's AML program and highlighted its egregious deficiencies, putting the TD Executive Defendants on direct notice that TD was not in compliance with its AML obligations, providing compelling support for a strong inference of scienter.

285. Eighth, TD's increasingly vehement denials of any regulatory issues jeopardizing the First Horizon deal in direct response to questions being raised by journalists, lawmakers and investors support scienter. Throughout the Class Period, *Capitol Forum* issued a series of reports raising questions about TD's regulatory compliance, including the rampant opening of fake accounts at TD that constituted direct violations of critical KYC procedures and internal controls. These reports ultimately prompted Senator Warren to write a letter to the OCC flagging "unchecked fraud and abuse at TD Bank," including the opening of new accounts without customers' knowledge or permission in violation of KYC requirements, and

requesting that the OCC "closely examine" any regulatory violations and "block any merger until TD Bank is held responsible for its abusive practices." In response, TD issued increasingly strongly worded vehement denials of any regulatory issues with its fraud detection procedures, including issuing a direct letter from TDBNA's then-General Counsel Ellen Glaessner, who served as a senior advisor to Defendant Salom and the U.S. Management Committee. In that response, TD went so far as to accuse the *Capitol Forum* reporter of defamation for printing "misrepresentations" and "inaccuracies." Moreover, despite these concerns being raised, TD continued to unequivocally represent to investors—including in response to direct investor questions about whether there were any regulatory issues causing delays in the deal timeline—that TD remained "extremely confident" in obtaining regulatory approval of the deal. The TD Defendants' repeated and emphatic denials in response to concerns being raised about TD's AML program—the same program that, unbeknownst to investors, was so criminally deficient that it would preclude regulatory approval of the deal—is highly probative of the TD Defendants' scienter.

286. Ninth, the senior executives of TD received the results of regular independent testing of and reports on the Bank's AML compliance program. For example, Defendants Masrani and Salom sat on the boards of TD entities that received regular briefing on AML compliance issues from Defendants Bowman and Levine, and were informed by Defendant Levine in September 2021 that "included

within [TD's Global AML] responsibilities is to have an appropriate framework in place to identify and monitor both emerging and evolving risk."  Defendant Salom received the findings from the Bank's 2018 and 2020 Internal Audits, which identified multiple grave AML compliance deficiencies, some of which "involved the same issues as the OCC finding from seven years earlier," and all of which "remained unresolved" in 2021.  And as Masrani himself publicly confessed after the Class Period, "there were serious failures of our U.S. AML program," and it was his "responsibility as this happened on [his] watch as CEO."  Both Defendants Bowman and Levine led the management of TD AML groups to which AML employees escalated known AML deficiencies, such as inadequate transaction monitoring and the presence of the Colombian ATM Typology within the Bank, and they each made multiple decisions to delay or reject remediation measures to manage costs.  Defendant Bowman, as head of Global AML, received reports from "third-party consultants who identified fundamental weaknesses in the Bank's AML program" in 2018, 2019, and 2021.  Defendant Levine knew about and reported to TD's AML Oversight Committee on the U.S. Bancorp AML violations and the need for TD to avoid the same, "regularly received reports" (including some for which she was the sole recipient) about the Bank's deficient CTR activity and David Sze's suspicious bank check activity, and rejected requests to increase staffing to mitigate the Bank's marked delay in terminating accounts with known AML risk.  Despite

the TD Executive Defendants' receipt of this information, Defendants never disclosed these deficiencies to investors, and instead falsely claimed during the Class Period that the Bank was in compliance with its BSA obligations while continually touting the purportedly positive prospects for regulatory approval of the merger.

287.   Tenth, the TD Executive Defendants had a strong personal financial motivation to conceal the truth.   Indeed, by delaying disclosure of the truth concerning the First Horizon merger, Defendants Masrani, Salom and Tran avoided jeopardizing their generous pay packages, which were premised on the First Horizon acquisition but subject to a shareholder "say-on-pay" vote on April 20—after TD Bank had formally withdrawn the merger application. By delaying this disclosure, these Defendants were able to avoid scrutiny into their pay packages—and the embarrassing situation in which the compensation approved by the Board would have been based on a failed deal that exposed the very AML compliance deficiencies that will likely inhibit TD's growth for years to come. Moreover, the TD Executive Defendants' compensation system was tied to maintaining the "flat cost paradigm"—which in their roles they oversaw, guided, and enforced—and disincentivized incurring costs to comply with AML obligations and the BSA.

288.   Eleventh, TD's payout of $200 million to First Horizon (on top of $25 million in expenses) when the deal was terminated is further indicative of Defendants' scienter. The merger agreement did not contemplate any such payout—

and there was no reason for TD to make any such payout, let alone one of this magnitude—but for the fact that TD knew that it needed to do so in order to avoid or resolve claims against it by First Horizon.  Indeed, TD had made a series of representations and warranties in the parties' merger agreement claiming that it was fully in compliance with BSA/AML requirements when it clearly was not. Not only does the break-up fee bolster the inference that TD's senior management knew its statements about AML compliance were false, but also demonstrates Defendants' statements about seeking to "extend" the deal deadline were knowingly false.  As Defendant Jordan admitted at the end of the Class Period, in truth, Defendants had never negotiated a revised deal structure or price—but as the break-up fee reflects, were instead focused on TD's culpability for its inability to obtain regulatory approval due to its severe AML deficiencies.

289.  Twelfth, in the wake of the disclosures revealing TD's AML violations, virtually every member of TD's senior leadership with direct responsibility for AML compliance was replaced or terminated—including Defendant Bowman, Defendant Levine, the former Head of Fraud and Risk Management and Global Security & Investigations Allen Love (referred to as "Individual-3" in the Criminal Pleas), Kevin Doughtery, the head of TD's Financial Intelligence Unit in Canada, Chief Compliance Officer Monica Kowal, and head of Global Compliance at TD Securities Emily Jelich.  Indeed, Masrani himself was forced to step down and

announced his retirement on September 19, 2024. Moreover, the Bank has been forced to revamp its AML technology infrastructure and spend hundreds of millions of dollars to bring its systems into compliance and the largest fine in BSA history was levied against TD. Given the pervasive and long-standing AML failures and Defendants' lack of credibility, regulators knew they could not trust anyone who worked at the Bank to oversee TD's rehabilitation. To that end, the OCC implemented an asset cap against TD's U.S. operations to prevent the Bank from being able to grow its business—a cap which the OCC stated would be lowered of TD failed to comply with regulatory requirements—with no indication as to when the cap will be lifted. Furthermore, the DOJ required that TD retain an "independent compliance monitor"—to be chosen by the regulators—to "oversee Defendant's compliance remediation and enhancement" for a full three years, with FinCEN requiring that a monitor remain in place for four years. The extraordinary measures that TD has been required to undertake to bring the Bank's systems into compliance not only demonstrates that TD's public description of its purportedly "best-in-industry" fraud detection and AML program bore no resemblance to reality, but also confirm that TD's deficiencies were well known to TD's senior management, including Defendant Masrani.

290.   <u>Thirteenth</u>, TD had a half-billion dollar incentive to prop up the price of First Horizon stock for as high as possible and as long as possible. Specifically,

as part of the combination and "in connection with the execution of the merger agreement," TD purchased $493,569,400 worth of First Horizon preferred stock on February 27, 2022.    Upon closing of the merger, those shares would "be automatically converted into shares of common stock of the surviving corporation" at a value equivalent to the purchase price, i.e., $25 per share.  If the merger did not close, and the price of that stock fell, TD could suffer serious economic losses. Indeed, that is exactly what happened when Defendants were forced to terminate the merger after regulators refused to approve it, which required TD to report a nearly $200 million valuation adjustment loss the following quarter.  Accordingly, TD (and the TD Executive Defendants) therefore had a strong incentive to work to push the merger through over the objections of regulators—including by hiding the truth during law enforcement and regulatory objections—to maintain a higher price for those shares.

### C.    Additional Allegations of Scienter as to the First Horizon Defendants

291.   There is no question that First Horizon and its most senior executives knew either that TD's AML/BSA compliance was gravely deficient, or that they had been fully and contemporaneously informed of the status of regulatory meetings with TD and their import concerning regulators' increasing refusal to approve the merger.

292.  <u>First</u>, as set forth in the merger agreement, TD was obligated not only to "keep [First Horizon] apprised of the status of matters relating to completion" of the transaction, but also to consult with First Horizon "in advance of any meeting or conference with any regulatory agency or governmental entity" concerning the merger; to provide First Horizon with "the opportunity to attend and participate in such meetings and conference"; to provide First Horizon with "all information . . . as may be reasonably necessary or advisable in connection with the requisite regulatory approvals"; and to "promptly advise each other upon receiving any communication" from regulators "that causes such party to believe that there is a reasonable likelihood that [regulatory approval] will not be obtained, or that the receipt of any such approval will be materially delayed."

293.  In light of this—and particularly considering the merger's critical importance to First Horizon—there can be no question that First Horizon and its most senior executives were contemporaneously informed of all of TD's interactions with regulators concerning the merger, including (i) the negative results of the October 2022 OCC supervisory examination revealing significant AML compliance gaps; and (ii) the series of November 2022 meetings senior TD executives held with the Bank's regulators during which those regulators directly informed TD that it was under DOJ investigation for pervasive and severe AML failures and that the deal was therefore highly unlikely to be approved; and (iii) the March 9, 2023 meeting

173

the OCC's Head of Large Bank Supervision and Senior Examiner held with Masrani, scheduled on February 22, 2023, that indicated the merger was dead in the water and that TD would not avoid criminal prosecution for its egregious AML failures.

294.    The fact that First Horizon was informed by TD of these regulatory meetings and their consequences is evidenced by First Horizon's announcements of deal delays on February 9, 2023, just after the November 2022 meetings, and March 1, 2023, just after the March 9, 2023 meeting was scheduled.    Moreover, it is inconceivable that First Horizon and its senior executives would not have immediately demanded information from TD about was discussed during these meetings to cause such delays in the deal timeline and whether they related to any significant regulatory deficiencies on the part of TD.    Indeed, First Horizon has never once alleged that TD either failed to inform it of, hid or lied about these meetings with regulators, which TD was clearly obligated to "promptly" share with First Horizon as soon as they occurred.

295.    Further, consistent with TD's conduct with other merger partners in prior transactions, TD's senior management was in close contact with First Horizon's throughout the pendency of the First Horizon merger.    This was confirmed by FE5, who served as the head of TD Securities U.S. Governance and Controls from October 2022 through March 2023 and who served on the integration management team for the First Horizon merger and previously served on the

integration team for TD's acquisition of Cowen that closed during the Class Period. FE5 explained that First Horizon would have expected TD to promptly and fully update First Horizon management about the status of TD's discussions with regulators, any changes to the timeline, and any material updates to the parties' plan.

296.    Second, the First Horizon executives' sales of their personally held First Horizon shares during the Class Period were highly suspicious in both timing and amount, and are highly indicative of their scienter.  For example, Defendant Jordan sold $2.3 million worth of his personally held shares during the Class Period— including in sales that occurred just days after the OCC scheduled a "very serious" meeting with Defendant Masrani on February 22. Similarly, former First Horizon Chairman Byrd sold approximately a quarter of his holdings—over twice as many shares as he had the 15 months prior—for proceeds of $12.66 million, while First Horizon's chief risk officer, COO, and head of specialty banking together reaped proceeds of approximately $5 million from insider sales (representing between approximately 20% and 25% of their respective personal holdings).  Further, Ms. LoCascio—who was identified in the Proxy as a key contact for the merger and served as the "First Horizon integration leader for the TD transaction"—and her former boss, Mr. Popwell, conducted their sales during the month of November 2022, after regulators had told TD the merger was in serious peril because of TD's significant AML failures. Ms. Akins, who was involved in overseeing the integration

of the banks' compliance systems, and Mr. Restel, who admitted he had the chance to "see[] a lot under the hood" at TD, sold over $1 million and $3.5 million, respectively, amounting to approximately one-third and one quarter of each individual's entire holdings, during the Class Period.  None of these executives' sales were conducted pursuant to a Rule 10b5-1 trading plan, and all of which were suspicious in light of the fact that they were made at prices below those they would have received had the merger closed.  As one leading insider trading expert put it, no insider would logically "sell any shares in the open market, especially below the merger price of $25" unless they knew the truth—that the merger was at grave risk of being denied regulatory approval.

297.  Third, First Horizon deliberately issued very few public statements concerning the merger during the Class Period, intentionally entering a "quiet period" and opting to not hold any earnings or conference calls to discuss the regulatory progress of the merger with investors for the entire duration of the Class Period despite its critical importance to First Horizon's business.  In so doing, First Horizon effectively held TD out as the sole spokesperson to investors for the merger and its regulatory progress, despite knowing that TD was repeatedly making glaring material misrepresentations to investors claiming that regulatory approval of the merger would be obtained in "short order" when in reality TD's severe and pervasive AML violations, and the highly negative feedback it had received from regulators,

made regulatory approval exceedingly unlikely. Indeed, First Horizon never once sought to correct or qualify any of the representations TD made to FHN investors, even though it easily could have and even though TD's representations were clearly driving FHN's stock price during the Class Period. First Horizon instead allowed TD's statements to artificially inflate its stock price while its senior executives profited handsomely off their insider sales, and otherwise issued highly limited and exclusively positive public statements about the deal indicating the merger was likely to close without allowing any questioning from analysts or investors.

298. <u>Fourth</u>, First Horizon CEO Defendant Jordan was a longtime personal friend of Defendant Masrani, and communicated with him frequently about the transaction as it was occurring. As Defendant Jordan told the Memphis Business Journal, "Bharat and I have known each other for over 10 years and have been friends" for years before the deal was announced. Consistent with their personal friendship, and as reflected in the proxy, Defendant Masrani and Defendant Jordan spoke frequently and in detail about the transaction before the deal was announced, including during in-person meetings on January 12 and January 20 in Nashville; on February 4 in Charlotte, in which the two discussed Defendant Jordan's role in the combined company; on February 7, in Dallas, where Masrani, Salom, Jordan and the First Horizon Board discussed the transaction; and on February 19, when Masrani and Jordan discussed the transaction by phone. Defendants Masrani and Jordan also

kept in close contact while the merger was pending, as required by the merger terms and as Masrani and Jordan admitted.

299.  <u>Fifth</u>, even though Defendant Dmuchowski admitted First Horizon's due diligence for the transaction was "chaotic" and abbreviated, First Horizon tellingly bargained for and obtained deal terms that protected its interests in the event regulators rejected the merger. Specifically, under the merger agreement, the base merger consideration of $25 per share would increase by $0.65 per share on an annualized basis if the merger did not close within the nine-month closing date of November 27, 2022—a term that compensated First Horizon for delays in obtaining regulatory approvals within an already tight timeline.  Further, as part of the merger, First Horizon negotiated and obtained TD's agreement to invest $493.5 million in convertible First Horizon stock—a cash payment to First Horizon that First Horizon would be able to (and in fact did) retain if (and when) TD was unable to close.  While Defendant Masrani claimed these were "customary terms" and "nothing unusual" when questioned about them during the Class Period, they decidedly were not. Rather, these terms were highly unique, not found in any comparable transaction, and support a strong inference that the First Horizon Executive Defendants possessed highly material nonpublic information about TD's regulatory risks that were not shared with the investing public.

## VIII. ADDITIONAL ALLEGATIONS THAT DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE ABOUT FIRST HORIZON SECURITIES

300.   All of the Defendants' materially false and misleading statements were about First Horizon securities.

301.   <u>First</u>, First Horizon itself told investors that statements about the merger, including the likelihood of its regulatory approval, were about First Horizon common stock.  In the joint press release published on the day of the announcement, First Horizon and TD told investors that "announcements relating to the proposed combination could have adverse effects on the market price of the common stock of either or both parties to the combination."  Moreover, as First Horizon stated in public SEC filings, "[t]he market price of our [First Horizon] common stock was and continues to be substantially impacted by the Pending TD Merger." First Horizon included this statement in a section of its March 1, 2023 Form 10-K titled "Executive Summary of Principal Investment Risks"—clarifying that the merger was a "principal" risk to First Horizon investors.  First Horizon also warned investors of "the risk that any announcements relating to the Proposed TD Merger could have adverse effects on the market price of the common stock of FHN."  Specifically, "a termination of the Proposed TD Merger would likely have a negative effect on our market price," including "as a result of failure to obtain all needed regulatory approvals."  First Horizon also listed as a "contingenc[y]" related to its business "the

outcome of any legal proceedings that may be instituted against . . . TD, or TD-US." Analysts covering First Horizon understood this reality, which is why analysts from Wells Fargo, Jeffries, RBC, Evercore, Janney, Bloomberg Intelligence, Cabot and others referenced statements by <u>TD</u> in their reports assessing <u>First Horizon</u> securities.  For example, a March 1, 2022 Wells Fargo report on First Horizon listed as an "Upcoming Catalyst" for the stock that "TD expects the deal to close by February 2023 pending all customary regulatory approvals."  Similarly, a March 2023 Cabot report on First Horizon reported <u>TD</u>'s statement about the deal delay, stating "TD has said that even this date won't provide enough time for it receive the necessary approvals" as the basis for the analyst's "belie[f] that year-end is a more realistic target."

302.  <u>Second</u>, the statements about TD's legal, regulatory, AML and BSA compliance were made in the context of TD speaking to investors about the merger. These statements were about the likelihood of the merger's approval and thus about First Horizon securities.  For example, the Definitive Proxy told investors in a section titled "Regulatory Approvals," that "[t]o complete the mergers, First Horizon and the TD are required to obtain approvals or consents from" regulatory authorities. Therefore, First Horizon and TD agreed to seek to take all appropriate steps to consummate the merger, including all needed regulatory approvals.  And the Definitive Proxy expressly warned investors that the "merger is subject to the

approval of the Federal Reserve Board" and "the OCC," which both "take into consideration" the banks' "records of compliance with applicable laws and regulations" and "the effectiveness of the <u>applicant</u>"—in this case, TD—"in combatting money laundering." Thus, both First Horizon and TD expressly stated in the Definitive Proxy that TD's regulatory approvals, histories of legal and regulatory compliance, and effectiveness in combatting money laundering affected the likelihood of the merger's approval, which in turn affected the price of First Horizon common stock. Statements by Defendants—including by TD—about TD's legal and regulatory compliance, likelihood of regulatory approvals, and money laundering programs were therefore necessarily about First Horizon common stock.

303.  <u>Third</u>, many of the false statements alleged herein made by the TD Defendants were filed with the SEC <u>by First Horizon</u> as Soliciting Material under 17 C.F.R. § 240.14a-12, and First Horizon itself referenced and repeated TD's statements about the merger in its SEC filings.  Those include First Horizon's January 18, 2023 earnings presentation for the fourth quarter of 2022 in which First Horizon told investors that "TD expects the deal to close in the first half of its 2023 fiscal year, subject to the receipt of the required regulatory approvals."  And First Horizon told investors in its March 1, 2023 Form 10-K and its April 18, 2023 Form 8-K "that TD informed First Horizon that TD does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger

by May 27, 2023." Moreover, many of the alleged misstatements were jointly made by both First Horizon and TD, including statements in the February 28, 2022 joint press release announcing the merger and filed with the SEC by First Horizon in a Form 8-K, and the February 9, 2023 "joint press release" announcing the extension of the closing date to May 27, 2023.

304.    <u>Fourth</u>, while the merger was pending, First Horizon stopped holding its regular investor conference calls, holding its <u>only</u> earnings call during the Class Period on May 4, 2023, when it announced the termination of the deal, and curtailed its direct communications with investors. Thus, First Horizon indicated to investors that TD spoke for them on the merger in its frequent statements to investors. As a result, First Horizon stock traded in response to TD statements about the merger and its prospects.

305.    For at least these reasons, all of the materially false and misleading statements alleged herein were "about" First Horizon securities.

## IX.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

306.    During the Class Period, Defendants made materially false and misleading statements, and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning First

Horizon acquisition, including, among other misrepresentations, Defendants' statements concerning TD Bank's compliance with BSA/AML regulations and their ability to obtain regulatory approval of the merger.

307. As discussed above and further below, Defendants' representations were false and misleading when made, and omitted material facts necessary to make Defendants' statements not misleading. These material misstatements and omissions created in the market a misleading and inaccurate impression of the prospects that the First Horizon merger would obtain regulatory approval and close on the timeline Defendants represented or at all. Among other things, Defendants' statements were false and misleading because they failed to disclose the highly material facts that (i) as TD has now admitted, its criminally deficient AML program had "long-term, pervasive, systemic deficiencies" that it "willfully failed to remediate" and that these criminal violations were ongoing and persisted throughout the Class Period; (ii) at the time the statements were made, numerous federal regulators were investigating TD's criminal AML misconduct, and TD was actively obstructing their investigations by "failing to timely disclose the ongoing nature of certain issues that persisted late into" the investigations; and (iii) as a result, and in light of TD's criminally deficient AML system and efforts to impede federal regulators' investigations, Defendants' statements concerning the timing and prospects for

regulatory approval of the First Horizon merger were materially misleading and without basis when made.

### A. Defendants Tout TD's Regulatory Compliance and Confidence About Regulatory Approval in Announcing the Merger

308.   On February 28, 2022, the first day of the Class Period, First Horizon and TD Bank issued a joint-press release, which the companies also filed with the SEC on Forms 8-K and 6-K, respectively, announcing TD Bank's proposed acquisition of First Horizon.  In the press release, Defendants lauded the transaction as "financially compelling," a "tremendous opportunity" and a "terrific strategic fit for TD."  Indeed, Defendants emphasized that the deal was compelling specifically because it would significantly expand TD's U.S. presence, highlighting that the deal would "accelerate[] [TD's] long-term growth strategy in the United States by acquiring a premier regional bank with an aligned culture and risk-management framework." The press release further represented that the deal was "expected to close in the first quarter of TD's 2023 fiscal year"—or by January 21, 2023.

309.   Also on February 28, 2022, TD held a conference call to discuss the First Horizon acquisition, which was attended by First Horizon CEO Jordan.  A transcript of the conference call was provided directly to First Horizon shareholders as part of the proxy statement for the merger, which TD and FHN both filed with the SEC on Schedule 14A as "Soliciting Material" under § 240.14a-12. Significantly, during the call, analysts bombarded Defendants with questions about the likelihood

of receiving regulatory approval for the deal, and in response, Defendant Masrani made clear that there were no impediments whatsoever in obtaining regulatory approval of the merger.  For example, after an analyst noted that "there's a lot of sensitivity around regulatory approval process for M&A in the U.S." and asked for TD Bank's "comfort level on getting deal closing done," Masrani responded by asserting that, due to TD Bank's "excellent regulatory relationships" and "familiar[ity] with what the regulatory requirements are," the companies "expect[ed]" that the deal "will get approved and get closed around the 9-month mark"—with a risk of only a "slight delay" at most:

> We at TD pride ourselves in having excellent regulatory relationships. We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking. So we will follow the customary regulatory requirements that you would expect us to do.  The structure here – there have been instances where some deals have been slightly delayed.  So [the $0.65 per share increase] does compensate the First Horizon shareholders should there be a delay of that nature.  But our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023.  So our expectation is that this will get approved and get closed around the 9-month mark.

310.    Similarly, on the same call, another analyst asked about TD's ability to timely close the transaction "given the size of the transaction and the sort of the situation of the Fed in the U.S.," noting that "the probability of the delay is relatively high." Masrani responded by again asserting his confidence in a timely closing, and

dismissing any suggestion that there was any basis to infer that the acquisition was "unique" in terms of the risk of a potential regulatory delay:

> [O]ur expectation is that we close by the first quarter, fiscal quarter of '23, which is before January 31. And then all these deals have extension rates of – in case the approvals are delayed or for whatever reason, we're not able to close during that time. It gets extended. And then finally, there's a final extension as well, and that's just customary. I don't think there's anything unique in this deal that you should be reading. Every deal we've done has had these provisions.

311. The statements in ¶¶308-310 were materially false and misleading, and omitted highly material facts when made. It was materially false and misleading for Defendants to state that TD was a "bank with an aligned culture and risk-management framework" with First Horizon's and that this positive assessment of TD Bank's culture and risk management supported the transaction and timeline Defendants represented. Rather than have a positive and "aligned culture and risk-management framework," in truth, TD's risk-management framework and AML program was characterized by "staggering and pervasive failures in oversight" such that TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank."

312. In fact, rather than operate an effective risk-management framework and have a culture aligned with First Horizon's, TD's risk management framework included an AML compliance infrastructure that failed to monitor 92% of all

transactions conducted through the Bank, had "long-term, pervasive, and systemic deficiencies in its U.S. AML policies, procedures, and controls," and permitted enforcement of a "flat cost paradigm" that prioritized profits over compliance with the law—all of which facilitated money laundering on a massive scale. It was also misleading for Defendants to state that TD had "an aligned culture" because, in truth, TD Bank's culture was not as the Bank represented to investors, but instead "prioritized growth and convenience over following its legal obligations" and TD Bank's culture of non-compliance and risk management failures were so severe that they resulted in an unprecedented criminal plea and over $3 billion in fines and penalties. Moreover, the two banks' culture and risk-management frameworks were not "aligned" because, in truth, TD's risk and compliance framework was so poor and understaffed that management determined the combined bank would have to use First Horizon's compliance program—not TD's—because TD's compliance program did not "properly mitigate risk."

313. It was also materially false and misleading for Defendants to state that TD Bank had "excellent regulatory relationships" and "familiarity with the regulatory requirements," and to convey this as a basis for achieving regulatory approval of the First Horizon merger within nine months. In fact, rather than have "excellent regulatory relationships," in truth, TD "materially undermined" its regulators' relationships when it "did not voluntarily disclose all of the issues"

187

uncovered in the FinCEN investigation or the "conduct described in the [DOJ] Statement of Facts"; "fail[ed] to timely disclose the ongoing nature of certain issues that persisted late into FinCEN's investigation of TD Bank"; and persistently violated the BSA "for nearly a decade."  In fact, rather than have "excellent regulatory relationships," at the time this statement was made, TD was the subject of multiple parallel investigations into its criminal violations of the BSA and AML laws by its regulators—and had misled them for years about the extent of its AML problems.

314.  It was also materially false and misleading for Defendants to state that TD Bank had "<u>familiarity with the regulatory requirements</u>" and that "<u>we will follow the customary regulatory requirements that you would expect us to do</u>," and to convey this as a reason why the nine-month timeline was achievable.  Specifically, rather than have "familiarity with the regulatory requirements" and that TD would follow the "customary regulatory requirements that you would expect us to do"— which a reasonable investor would interpret as conveying good faith compliance with regulatory requirements—in truth, for over a decade and at the time this statement was made, TD had "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program," was engaging in ongoing criminal violations of the AML laws, and failed to disclose its violations to regulators as required.  Among other things, TD failed to monitor over 92% of all transactions,

amounting to $18.3 trillion in transaction activity, conducted through the Bank; deliberately failed to remediate this and other known AML deficiencies that enabled criminal organizations to launder over $670 million through TD accounts; enforced a "flat cost paradigm" that prevented spending needed sums to remedy known TD AML deficiencies and prioritized profits and growth over compliance with the law; and knowingly failed to timely or accurately file thousands of necessary CTRs and SARs and, in doing so, "misled law enforcement." It was thus materially misleading for Defendants to state that TD had an "expectation" of obtaining approval "around the 9-month mark" based on its "familiarity with the regulatory requirements" when, in truth, TD's criminal violations of the AML laws precluded regulatory approval of the merger.

315. It was also materially false and misleading for Defendants to state that there was nothing "unique" about the deal with respect to regulatory approvals. In reality, TD was at the time the target of regulatory investigations into its "staggering and pervasive failures in oversight" that resulted in the largest-ever penalty ever imposed under the BSA, including the DOJ's first-ever daily fine assessed against a bank. It was thus materially misleading for TD to state there was nothing "unique" from a regulatory approval standpoint when, in reality, TD's AML deficiencies were so severe that they had resulted in numerous law enforcement actions and regulatory investigations such that regulatory approval would by highly unlikely and unusual.

316.    It was also materially false and misleading to state there was nothing "unique" about the deal when in truth, First Horizon had negotiated highly unique contractual provisions under which the base merger consideration would increase by $0.65 per share on an annualized basis if the merger did not close within the nine-month closing date.  Further, as part of the merger, First Horizon negotiated and obtained TD's agreement to invest $493.5 million in convertible First Horizon stock—a cash payment to First Horizon that First Horizon would be able to (and in fact did) retain if (and when) TD was unable to close.  First Horizon negotiated these terms precisely because of the increased risk that TD's undisclosed AML violations jeopardized regulatory approval for the merger and presented an extraordinary undisclosed risk that regulators would reject the deal. These terms were not found in any comparable transaction and further contradict the claim that there was nothing "unique" about this deal with respect to obtaining regulatory approval.

317.    TD Bank also maintained a Code of Conduct and Ethics ("Code of Conduct") on its website throughout the Class Period, which was accessible to investors on February 28, 2022, the first day of the Class Period, via a Form 6-K TD Bank filed with the SEC on February 7, 2022. The Code of Conduct was also reproduced and re-filed throughout the Class Period, including through Form 6-K filings on March 7, 2022, February 14, 2023, and March 14, 2023.

318.   The Code of Conduct unequivocally stated that "TD is committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so . . .  We must not knowingly initiate or be party to money laundering and must promptly report suspected money laundering situations in accordance with the TD Bank Group Enterprise Anti-Money Laundering and Anti-Terrorist Financing Policy and the escalation procedures established for our business or region."

319.   The statements in ¶¶317-318 were materially false and misleading, and omitted material facts when made.  It was materially false and misleading for Defendants to state that TD was "committed to taking all reasonable and appropriate steps to deter persons engaged in money laundering from utilizing TD products or services to do so." In truth, rather than being "committed to taking all reasonable and appropriate steps," TD willfully refused to take reasonable steps to deter money laundering. Specifically, for a decade, TD engaged in ongoing criminal violations of the AML law by failing to monitor over 92% of all transactions, amounting to $18.3 trillion in transaction activity, conducted through the Bank; deliberately failing to remediate this and other known AML deficiencies, which enabled criminal organizations to launder at least $670 million through TD accounts; enforcing a "flat cost paradigm" that prevented spending needed sums to remedy known TD AML deficiencies and prioritized profits and growth over compliance with the law; and

knowingly failing to comply with its fundamental BSA duty to timely file thousands of necessary CTRs and SARs and submitting thousands of materially inaccurate CTRs and SARs that "misled law enforcement."  In other words, it was materially false and misleading for TD to state it was "taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so," when, in reality, TD had "created an environment that allowed financial crime to flourish."

320.   It was also materially false and misleading for TD to state it "must not knowingly initiate or be party to money laundering," when in truth, TD was knowingly a party to money laundering over the course of a decade due to its willful and knowing AML violations—which resulted in TD pleading guilty to conspiracy to commit money laundering.  It was also materially false and misleading for TD to state it must "promptly report suspected money laundering situations." In reality, TD failed to monitor 92% of total transaction volumes and failed to timely file thousands of necessary CTRs and SARs.  Indeed, as TD admitted, it completely failed to file thousands of required SARs, filed over 6,000 SARs late, and filed more than 4,000 CTRs weeks after the 15-day limit.  Moreover, of the CTRs it did file, TD willfully filed "more than 1,000 inaccurate CTRs" that "misled law enforcement." It was thus materially misleading for Defendants to state that TD "must not be a party to money laundering" and must "promptly report suspected money laundering," when, in truth,

TD was in fact "knowingly" engaged in a conspiracy to commit money laundering and "willfully" failed to promptly report suspicious activity, including by failing to file thousands of SARs and CRTs covering at least $500 million in transactions.

**B.    While Defendants Conduct Due Diligence, TD Claims It Is in Full Compliance With Its BSA Obligations and Details Its Compliance Framework in the Proxy**

321.    Throughout the Class Period, TD posted an "AML Statement" on its website touting its AML program, which the bank claimed allowed it to detect and deter money laundering, and the actions it supposedly took to address those concerns. Specifically, the AML Statement claimed that TD's commitment to combatting money laundering was "<u>formalized</u>" through the Bank's "<u>enterprise-wide Anti-Money Laundering/Anti-Terrorist Financing (AML/ATF)</u>" program that was "<u>designed to detect and report suspected money laundering and terrorist financing and activity</u>."

322.    The AML Statement further stated that the bank ensured "<u>[o]ngoing monitoring to detect and report suspicious transactions or activities</u>," "<u>[r]egulatory reporting of prescribed transactions, including cash transactions, international electronic funds transfer, as well as terrorist and other frozen property and rejected transactions</u>," and "<u>[i]ndependent testing of AML, ATF and sanctions control effectiveness.</u>"    The AML Statement further represented that the "<u>Global AML</u>

Program is routinely evaluated, updated and enhanced in order to reflect changes to TD's business activities, as well as supervisory standards and legal requirements."

323.   The statements in ¶¶321–322 were materially false and misleading, and omitted material facts when made.  Rather than have a formalized AML program "designed to detect and report suspected money laundering and terrorist financing and activity," TD's AML program was not "designed" to perform that function.  Nor was TD's AML program "routinely evaluated, updated and enhanced in order to reflect changes to TD's business activities, as well as supervisory standards and legal requirements."  To the contrary, as TD admitted, TD "did not substantively update the Bank's automated transaction monitoring system from 2014 through 2022— including to address known gaps and vulnerabilities in the TDBNA's transaction monitoring program—despite increases in the volume and risk of its business and the significant change in the nature and risk of the transaction activity."  In fact, rather than maintain a system that ensured "[o]ngoing monitoring to detect and report suspicious transactions or activities," in truth, TD failed to monitor over 92% of all transactions, amounting to $18.3 trillion in transaction activity, conducted through the Bank; deliberately failed to remediate this and other known AML deficiencies that enabled criminal organizations to launder over $670 million through TD accounts; enforced a "flat cost paradigm" that prevented spending needed sums to remedy known TD AML deficiencies and prioritized profits and

growth over compliance with the law; and knowingly failed to timely file thousands of necessary CTRs and SARs and submitted thousands of materially inaccurate CTRs and SARs that "misled law enforcement."

324.   It was also materially false and misleading for TD to claim the Bank conducted "[i]ndependent testing of AML, ATF and sanctions control effectiveness" when, in truth and as TD admitted, third party consultants, employees, and regulators had all identified fundamental weaknesses in TD's AML program.  Moreover, as TD admitted, rather than conduct "independent testing" over is AML "control effectiveness," by the beginning of 2018, TD had "effectively stopped conducting threshold testing on its scenarios due to competing priorities and limited resources," the result of which was that "from 2018 through 2022, TDBNA conducted threshold testing . . . on only one of its approximately 40 U.S. transaction monitoring scenarios."

325.   On March 3, 2022, TD Bank issued a Report to Shareholders regarding its first fiscal quarter of 2022 results, which it publicly filed with the SEC on Form 6-K, signed by Defendants Masrani and Tran. The Report to Shareholders incorporated TD Bank's "Risk Framework" set forth in TD Bank's 2021 Annual Report (filed with the SEC on Form 40-F on December 2, 2021), which purportedly provided a basis for the First Horizon transaction. The same "Risk Framework" was

incorporated into TD Bank's Class Period filings on Form 6-K made on May 26, 2022 and August 25, 2022.

326.  According to the "Risk Framework," TD Bank's Audit Committee actively oversaw "the activities of the Bank's Global Anti-Money Laundering (GAML) group," which was "responsible for the oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance" and ensured "that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."

327.  The statements in ¶326 were materially false and misleading, and omitted material facts when made.  Far from ensuring "that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated," in truth, and as TD admitted, TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank."  Indeed, rather than ensure money laundering risks were "appropriately identified and mitigated, TD was knowingly a party to money laundering, and its "pervasive" and "systemic" AML deficiencies enabled criminal organizations to launder at least $670 million through TD accounts.  Specifically, TD failed to monitor 92% of total transaction volumes and failed to timely and accurately file

thousands of necessary CTRs and SARs. Thus, it was materially false and misleading for TD to state it "appropriately identified and mitigated" money laundering risks when, in truth, TD had "created an environment that allowed financial crime to flourish."

328. On March 7, 2022, TD Bank filed its 2022 investor proxy, which it filed with the SEC on Form 6-K and which was signed by Defendant Masrani. In the proxy statement, TD promoted the actions taken by TD Bank's Audit Committee to ensure compliance with anti-money-laundering regulations. Specifically, the proxy statement proclaimed that, as part of its responsibilities, the Audit Committee "[r]eceived updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions," and oversaw "the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program)."

329. The statements in ¶328 were materially false and misleading, and omitted material facts when made. It was materially false and misleading for TD to state that its Audit Committee "satisf[ied] itself that there are adequate resources with experience and knowledge in each of the key oversight functions," when in reality, TD enforced a "flat cost paradigm" that prioritized profits over compliance

with the law and, as TD admitted, its Audit Committee "consistently endorsed the flat-cost spending paradigm for the AML program despite the Bank's consistent growth and expansion of its business in the United States." This resulted in an AML program that was characterized by "staggering and pervasive failures in oversight," such that TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank." In fact, rather than ensure "<u>adequate resources with experience and knowledge in each of the key oversight functions,</u>" the reality was the opposite. As FinCEN found, "TD Bank willfully failed to establish or maintain an adequate AML program, in part, by failing to provide sufficient resources and staffing to the Bank's AML program"; that "TD Bank's severe understaffing persisted throughout the Relevant Time Period," i.e., for well over a decade; that the "effects of the Bank's persistent under-resourcing and understaffing reverberated throughout every aspect of its AML program" and resulted in extensive, persistent, and prolonged backlogs within the AML function." Further, rather than ensure "resources with experience and knowledge in each of the key oversight functions," TD installed "<u>multiple AML managers without any prior experience in AML,</u>" including the heads of the Bank's AML Investigation Unit and AML Operations who "oversaw critical AML processes without *any* previous AML experience" (emphasis in original).

330. It was also materially false and misleading to state that TD's Audit Committee oversaw "the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program)" when, in reality, TD admitted that "high-level executives including those in Global AML Operations, in senior executive management, and on the TDBUSH Audit Committee . . . knew there were long-term, pervasive, and systemic deficiencies in [TD's] AML policies, procedures, and controls." Despite this knowledge, TD and the Audit Committee "did not substantively update the Bank's automated transaction monitoring system . . . despite increases in the volume and risk of its business and significant changes in the nature and risk of transactional activity." This failure to update resulted in TD's failing to monitor over 92% of all transactions, amounting to $18.3 trillion in transaction activity conducted through the Bank and enabling criminal organizations to launder over $670 million through TD accounts. It was thus materially misleading for TD to claim its Audit Committee oversaw "the execution and ongoing effectiveness" of the AML program when, in reality, its AML deficiencies were so widespread and pervasive they resulted in criminal guilty pleas and an unprecedented $3 billion fine.

331. On March 21, 2022, TD filed the Bank Merger Act Application ("BMA Application") with the OCC in which the bank provided further assurances regarding its anti-money laundering practices. The BMA Application was submitted in

connection with the First Horizon merger and was publicly available to shareholders on the OCC website. TD represented in the BMA Application that "[t]he [TD] AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated." Additionally, the BMA application represented:

> Both TD and FHN have comprehensive anti-money laundering and sanctions programs that are reasonably designed to ensure compliance with the Bank Secrecy Act of 1970 [] and all applicable regulations and regulatory guidance, as well as compliance with requirements administered by [OFAC].  In addition, each bank has qualified, dedicated personnel who are responsible for administering such programs.  During the due diligence process, the AML team members from TD used a risk based approach to review and assess key risks related to AML.  Both programs are currently designed to meet the five pillars requirements and will be further enhanced in the Proposed Transaction.

332.  The statements in ¶331 were materially false and misleading, and omitted material facts when made.  It was materially false and misleading to state "[t]he [TD] AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."  In reality, and as TD admitted, TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank."  Indeed, rather than ensure money laundering risks were "appropriately identified and mitigated," TD admittedly did not appropriately identify and mitigate

money laundering risks.  Among other things, TD failed to monitor 92% of total transaction volumes, failed to timely file thousands of necessary CTRs and SARs, and refused to remedy pervasiveness deficiencies in its AML program due to the enforcement of "flat cost paradigm."  As U.S. Attorney General Garland noted, by "making its services convenient for criminals, [TD] became one." Thus, it was materially false and misleading for TD to state it "appropriately identified and mitigated" money laundering risks when, in truth, TD had "created an environment that allowed financial crime to flourish."

333.   It was also materially false and misleading for the BMA Application to state that TD has "comprehensive anti-money laundering and sanctions programs that are reasonably designed to ensure compliance with the Bank Secrecy Act of 1970 [] and all applicable regulations and regulatory guidance, as well as compliance with requirements administered by [OFAC]."  In truth, the "staggering" and "long-term, pervasive, systemic deficiencies," as described above, resulted in TD Bank becoming the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures and the DOJ assessing the largest-ever penalty under the Bank Secrecy Act.  It was thus materially false and misleading for TD to state that its AML program was designed to "meet the five pillars requirements" and "ensure compliance with the Bank Secrecy Act" when its senior management knew it was in fact willfully violating the BSA.  Rather, as FinCEN found, TD's willful failures

201

"spanned all pillars of TD Bank's AML program" and exhibited "systemic failures" that caused "actual and material harm to the U.S. financial system."

334.   It was also materially false and misleading for the BMA Application to state that "each bank has qualified, dedicated personnel who are responsible for administering such [AML] programs" and that "[d]uring the due diligence process, the AML team members from TD used a risk based approach to review and assess key risks related to AML."  In truth, as TD admitted, its senior executives "repeatedly prioritized… a 'flat cost paradigm'" that refused to increase the "AML compliance" budget year over year and "resulted in a willfully deficient AML program."  As Attorney General Garland stated, "TD Bank chose profits over compliance, in order to keep its costs down."  Indeed, FinCEN found that "[t]he Bank's fervent emphasis on costs fostered an environment that discouraged addressing the material substantive AML compliance issues that the Bank faced"—and "AML senior management knew that the Bank was chronically underspending on AML, resulting in an inadequate AML program in violation of BSA requirements."  Thus, it was materially false and misleading for TD to state its employees used a "risk based approach to review and assess key risks related to AML" when, in truth, TD did not use a risk based approach but, as FinCEN found, the Bank "consistently chose to address" AML compliance issues "in the least costly way possible, even if it meant

ignoring failures and refusing to meaningfully remediate issues and prevent recurrences."

335.  On April 12, 2022, First Horizon filed its Preliminary Proxy Statement on Schedule 14A with the SEC (the "Preliminary Proxy Statement"), which was signed by Defendant Jordan.  TD was also responsible for the content of the Preliminary Proxy Statement, as Section 6.1 of the merger agreement provided that TD Bank was to be "provided with a reasonable period of time to review the Proxy Statement . . . prior to filing and shall reasonably consider any comments from Parent." The Preliminary Proxy Statement represented that "<u>each of First Horizon and TD does not know of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be received to permit the consummation of the merger on a timely basis</u>[.]"  The Preliminary Proxy Statement further represented that "<u>First Horizon currently anticipates that the merger will be completed in the first quarter of TD's 2023 fiscal year (beginning on November 1, 2022)</u>."

336.  TD Bank and First Horizon included a copy of the merger agreement as Annex A to the Preliminary Proxy Statement.  The merger agreement contained multiple representations by TD Bank that it was in material compliance with its obligations under the Bank Secrecy Act, including by maintaining a compliant AML program.  Specifically, TD represented that, "Except as would not, either

individually or in the aggregate, have a Material Adverse Effect on Parent, Parent, Holdco and each of their Subsidiaries have complied with and are not in default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to Parent, Holdco or any of their Subsidiaries, including" the Bank Secrecy Act and "any other law, policy or guideline relating to bank secrecy, discriminatory lending, financing or leasing practices, consumer protection, money laundering preventing, foreign assets control," and "U.S. sanctions laws and regulations."    Moreover, TD Bank represented that it and its affiliates "have established and maintain a system of internal controls designed to ensure compliance by Parent, Holdco and their Subsidiaries with applicable financial recordkeeping and reporting requirements of applicable money laundering prevention laws in jurisdictions where Parent, Holdco and their Subsidiaries conduct business."

337.    The statements in ¶¶335-336 were materially false and misleading, and omitted material facts when made.    It was materially false and misleading for TD to state that "each of First Horizon and TD does not know of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be received to permit the consummation of the merger on a timely basis[.]"    In truth, for over a decade and at the time the Proxy Statement was filed, TD had "willfully failed to remediate persistent, pervasive and known deficiencies in its

AML program" and was actively concealing those violations from its regulators. Among other things, TD failed to monitor over 92% of all transactions, amounting to $18.3 trillion in transaction activity, conducted through the Bank; deliberately failed to remediate this and other known AML deficiencies that enabled criminal organizations to launder over $670 million through TD accounts; enforced a "flat cost paradigm" that prevented spending needed sums to remedy known TD AML deficiencies and prioritized profits and growth over compliance with the law; and knowingly failed to timely file thousands of necessary CTRs and SARs and submitted thousands of materially inaccurate CTRs and SARs that "misled law enforcement."  It was thus materially misleading for Defendants to state that neither TD nor First Horizon "kn[e]w <u>of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be received to permit the consummation of the merger on a timely basis</u>," when, in truth, TD's criminal violations of the AML laws precluded regulatory approval of the merger.

338.   It was also materially false and misleading to state that the banks "have complied with and are not in default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to Parent, Holdco or any of their Subsidiaries, including" the Bank Secrecy Act and "any other law, policy or guideline relating to bank secrecy, discriminatory lending, financing or leasing practices, consumer protection, money laundering preventing,

foreign assets control," and "U.S. sanctions laws and regulations."  In truth, the "staggering" and "long-term, pervasive, systemic deficiencies," as described above, resulted in TD Bank becoming the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures and in the DOJ assessing the largest-ever penalty under the Bank Secrecy Act.

339.   It was also materially false and misleading to represent that TD and its affiliates "have established and maintain a system of internal controls designed to ensure compliance by Parent, Holdco and their Subsidiaries with applicable financial recordkeeping and reporting requirements of applicable money laundering prevention laws in jurisdictions where Parent, Holdco and their Subsidiaries conduct business."  In truth, and as TD admitted, TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank."  Indeed, rather than "establish[] and maintain a system of internal controls designed to ensure compliance . . . with applicable money laundering prevention laws," TD was knowingly a party to money laundering, and its "pervasive" and "systemic" AML deficiencies enabled criminal organizations to launder at least $670 million through TD accounts.  Thus, it was materially false and misleading for TD to state it "established and maintain[ed] a system of internal controls designed to ensure compliance . . . with applicable financial record keeping and reporting requirements

of applicable money laundering prevention laws" when in truth, and as FinCEN found, TD knowingly violated AML reporting requirements on the order of "thousands of suspicious transactions totaling approximately one and a half billion dollars for which TD Bank failed to timely and accurately file a SAR."

340.   On April 22, 2022, First Horizon filed its Definitive Proxy Statement on Schedule 14A with the SEC (the "Definitive Proxy Statement"), which was signed by Defendant Jordan.  As set forth above, TD Bank was also responsible for the content of the Definitive Proxy Statement pursuant to Section 6.1 of the merger agreement.  The Definitive Proxy Statement—in which First Horizon's board urged shareholders to approve the merger—provided investors further comfort regarding TD Bank's ability to easily secure regulatory approval.  Specifically, the Definitive Proxy Statement represented that:  (1) leading up to the merger, First Horizon's CEO Defendant Jordan personally met with Defendant Masrani no less than four times to discuss "the ability of TD to obtain, and the anticipated timing with respect to, the regulatory approvals required for TD to acquire First Horizon"; (2) First Horizon's board had identified TD's "legal and regulatory compliance" as a "Reason[] For The Merger" based on "information obtained through due diligence"; (3) that "each of First Horizon and TD does not know of any reason related to it or its respective subsidiaries, as applicable, why the requisite regulatory approvals will not be

<u>received to permit the consummation of the merger on a timely basis</u>"; and (4) that <u>TD in fact "complied" with the BSA</u>.

341.   Additionally, First Horizon made the same statements in the Definitive Proxy Statement as it made in the Preliminary Proxy Statement as set forth in ¶¶335-336.

342.   The statements referenced in ¶¶340-341 were materially false and misleading, and omitted material facts when made.  <u>First</u>, it was materially false and misleading to state that TD Bank's "legal and regulatory compliance" was a reason for First Horizon to recommend the deal, when in truth, First Horizon had negotiated highly unique contractual provisions—not found in any comparable transaction—under which the base merger consideration would increase by $0.65 per share on an annualized basis if the merger did not close within the nine-month closing date. Further, as part of the merger, First Horizon negotiated and obtained TD's agreement to invest $493.5 million in convertible First Horizon stock—a cash payment to First Horizon that First Horizon would be able to (and in fact did) retain if (and when) TD was unable to close.  First Horizon negotiated these terms precisely because of the increased risk that TD's undisclosed AML violations jeopardized regulatory approval for the merger and presented an extraordinary undisclosed risk that regulators would reject the deal.

343.    It was also materially false and misleading for First Horizon and TD to claim they were unaware of any regulatory risk that would delay or prevent Defendants' ability to obtain regulatory approval.  In truth, for over a decade, TD had "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program" and was actively concealing AML violations from its regulators. Among other things, TD failed to monitor over 92% of all transactions, amounting to $18.3 trillion in transaction activity, conducted through the Bank; deliberately failed to remediate this and other known AML deficiencies that enabled criminal organizations to launder over $670 million through TD accounts; enforced a "flat cost paradigm" that prevented spending needed sums to remedy known TD AML deficiencies and prioritized profits and growth over compliance with the law; and knowingly failed to timely file thousands of necessary CTRs and SARs and submitted thousands of materially inaccurate CTRs and SARs that "misled law enforcement."

344.    Second, First Horizon was aware of numerous red flags indicating that TD Bank had a recent history of serious regulatory violations that should have prompted it to conduct thorough due diligence on the matter, including, among other things, TD Bank's facilitation of several Ponzi schemes, its systematic creation of unauthorized or fraudulent customer accounts, and its routine facilitation of money laundering.  TD's recent admissions confirmed that these serious BSA/AML

209

deficiencies were so severe and persistent that they would take years to cure, and were ongoing and had been for years at the time First Horizon performed due diligence on TD and when it made these statements.  As TD admitted, the Bank "willfully fail[ed] to maintain an appropriate AML program" and "knowingly fail[ed] to file accurate Currency Transaction Reports."  And, as FinCEN similarly concluded, TD Bank: (1) "willfully violated the BSA and its implementing regulations;" (2) "willfully failed to implement and maintain an AML program that met the minimum requirements of the BSA;" and (3) "willfully failed to accurately and timely report suspicious transactions and Currency Transaction Reports to FinCEN."  First Horizon's failure to disclose that it performed woefully inadequate due diligence, and/or that its due diligence identified serious issues with TD's AML compliance, was materially misleading.

345. <u>Third</u>, despite these numerous and serious red flags, Defendant Dmuchowski admitted after the Class Period that First Horizon's due diligence on TD Bank was in truth cursory and "chaotic" and crammed into a 30-day period, even though "[t]ypically" the bank would "have a much longer due diligence." Thus, First Horizon had not actually properly considered TD Bank's "legal and regulatory compliance," and misleadingly failed to disclose during the Class Period that its "due diligence" was in truth haphazard and inadequate, despite its awareness of numerous glaring red flags indicating that TD's AML controls were woefully deficient.

210

### C.    TD Issues "Vehement" Denials In Response to Reports Over Its Compliance Deficiencies

346.    On May 4, 2022, *Capitol Forum* published the first of a series of scathing articles that directly questioned the adequacy and legitimacy of TD's compliance controls. Specifically, the article reported that TD had engaged in massive improprieties by opening fraudulent and fictitious bank accounts and enrolling customers in TD services without their customers' knowledge or consent, and that the OCC had privately reprimanded TD in 2017 regarding these violations. Significantly, the article directly questioned whether TD's misconduct would jeopardize regulatory approval of the First Horizon acquisition, particularly since the article alleged, relying on accounts from anonymous TD employees, that TD was still "strong-arm[ing]" customers into services they did not need—and that the bank was "so lax about opening new accounts that abuse [was] inevitable."

347.    In response, TD Bank categorically denied that it was engaged in any fraudulent practices that would jeopardize the regulatory review of the First Horizon deal whatsoever, and claimed that it followed "industry-best practices" that were "designed to detect and help prevent fraud":

> Our business is built on a foundation of ethics, integrity and trust . . . . We strongly disagree with any implications . . that our fraud controls are somehow related to sales practices or otherwise inadequate. . . . [W]e strongly disagree with the characterization of information presented as facts regarding TD Bank's fraud procedures.  At TD Bank, protecting the security of our customer's accounts and personal information is a top priority.  We follow industry-best practices that are

211

designed to detect and help prevent fraud.

348.    The statements in ¶347 were materially false and misleading, and omitted material facts when made.  It was materially false and misleading to state that TD "follow[ed] industry-best practices that are designed to detect and help prevent fraud." In truth, for over a decade, TD's AML program was characterized by "staggering and pervasive failures in oversight," such that TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank. Specifically, TD failed to monitor 92% of all transactions conducted through the Bank, had "long-term, pervasive, and systemic deficiencies in its U.S. AML policies, procedures, and controls," and permitted enforcement of a "flat cost paradigm" that prioritized profits over compliance with the law—all of which facilitated money laundering on a massive scale.  Indeed, as TD admitted, it completely failed to file thousands of required SARs, filed over 6,000 SARs late, and filed more than 4,000 CTRs weeks after the 15-day limit.  Moreover, of the CTRs it did file, TD willfully filed "more than 1,000 inaccurate CTRs" that "misled law enforcement."  Thus, it was materially false and misleading for TD to state it "appropriately identified and mitigated" money laundering risks when, in truth, TD had "created an environment that allowed financial crime to flourish."

349.   On May 26, 2022, TD Bank issued a Report to Shareholders regarding its second fiscal quarter of 2022 results, which it publicly filed with the SEC on Form 6-K signed by Defendants Masrani and Tran. TD also held an earnings conference call that same day to discuss those results. During the call, Defendant Masrani again lauded the deal as "very compelling" from a strategic perspective, touting the acquisition as being "very additive as we continue to build our commercial bank and as we continue to try to grow the middle-market space," and that the progress of the transaction was "quite encouraging."  And once again, the merger's prospects for obtaining regulatory approval was front and center during the call and the focus of analysts' questions.  Indeed, analysts specifically inquired about the timing of the First Horizon acquisition in light of "the U.S. regulatory process [that] has become a little more prolonged over the last year." In response to an analyst question seeking TD Bank's "conviction level in terms of getting the deal through the regulatory sort of finish line," Masrani emphatically stated that TD Bank was "very comfortable":

> [W]e feel very comfortable.  Our process continues.  <u>And we did this transaction on the basis that [] it meets all the requirements of all the regulators</u>.  So we continue to be comfortable and are working hard to get it to closing.

350.   The statements in ¶349 were materially false and misleading, and omitted material facts when made. Rather than the transaction "meet[ing] all the requirements of all the regulators," the exact opposite was true.  In truth, for over a

decade, TD's AML program was characterized by "staggering and pervasive failures in oversight," such that TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank. Specifically, TD failed to monitor 92% of all transactions conducted through the Bank, had "long-term, pervasive, and systemic deficiencies in its U.S. AML policies, procedures, and controls," and permitted enforcement of a "flat cost paradigm" that prioritized profits over compliance with the law—all of which facilitated money laundering on a massive scale. Thus, it was materially false and misleading for TD to state it was "meet[ing] all the requirements of all the regulators," when, in truth, TD had "created an environment that allowed financial crime to flourish."

351.    Notwithstanding TD Bank's angry denials of *Capitol Forum*'s reports as set forth above in ¶347, in the following months, numerous regulators, senior government officials, and investigative journalists continued to raise issues regarding TD's regulatory compliance and AML deficiencies. In response, TD continued to tout the merger and assure investors that there were no obstacles or impediments to obtaining regulatory approval of the deal.

352.    On June 3, 2022, the Cullen Commission issued its Final Report, singling out TD as the only one of Canada's largest banks to fail to implement simple AML measures to prevent rampant money laundering in BC casinos. Specifically,

214

the Cullen Commission concluded that it was "troubled" by TD's delay in "address[ing] money laundering vulnerability flagged by law enforcement"—a fact the Cullen Commission found especially "surprising" given that "senior management in TD's anti-money laundering unit" were aware that "their bank was the single largest source of suspicious bank drafts being tendered at BC casinos."

353.    Then, less than two weeks later on June 15, 2022, several media outlets—including CNBC, *The Commercial Appeal* and the *Financial Post*— reported on Senator Warren's June 14, 2022 letter to the OCC, referencing the "disturbing May 4, 2022 *Capitol Forum* report about unchecked fraud and abuse at TD Bank." In the letter, Senator Warren sharply criticized the OCC for issuing only "a private reprimand" to TD in 2017 in response to discovering the bank's "systemic" and "troubling" improper sales practices, which had "allowed TD Bank's rampant fraud and abuse to go unpunished." The letter then called upon the OCC to block the First Horizon merger until TD had been held accountable for its regulatory abuses: "As TD seeks approval from your agency to increase their market share and become the sixth-largest bank in the U.S., the OCC should closely examine any ongoing wrongdoing and block any merger until TD bank is held responsible for its abusive practices."

354.    In response to Senator Warren's letter and media reports regarding that letter, TD Bank issued another strong statement unequivocally denying any regulatory abuses:

> The allegations in the *Capitol Forum* article are unfounded. Our business is built on a foundation of ethics, integrity and trust . . . We vehemently object to any allegations of systemic sales practice issues, or any other claims alleged in the article . . . Finally, we strongly disagree with the article's characterization of information presented as facts regarding TD Bank's fraud procedures. At TD Bank, protecting the security of our customers' accounts and personal information is a top priority. We follow industry-best practices that are designed to detect and help prevent fraud.

355.    On July 8, 2022, *Capitol Forum* issued another report questioning TD Bank's regulatory compliance, stating that the CFPB had conducted a "years-long investigation into TD Auto Finance," and that "matters on the CFPB enforcement unit's docket typically involve violations of law that have been found by the CFPB." The report also again referenced how the OCC, "the top regulator for national banks, found serious consumer abuses at TD Bank"—and how this had resulted in Senator Elizabeth Warren writing a letter to the OCC asking it to block the First Horizon merger. The report commented that these investigations "could spur additional concerns" among regulators "about the First Horizon acquisition."

356.    TD Bank swiftly issued another categorical denial of this "unfounded" report—which this time came directly from the General Counsel of TD Bank US,

Ellen Glaessner—that went so far as to accuse the *Capitol Forum* of defamation due to the "inaccuracies and misrepresentations of your reporting":

> Your story is an accumulation of false claims, half-truths, rumor, innuendo, and completely unrelated information that misinforms your readers. <u>You're leaping to unfounded conclusions that present an inaccurate view of TD and the hard work of thousands of dedicated employees.</u>
>
> . . .
>
> <u>On repeated occasions, we have outlined for you the extensive inaccuracies and misrepresentations in your reporting</u> and inquiries, which are once again evident in this story . . . You state '. . . the top regulator for national banks [the OCC], found serious consumer abuses at TD Bank . . .' You make this claim yet have not disclosed any information to support this broad and unmitigated attack on our integrity. <u>If you persist in publishing, you will be doing so with the specific knowledge that your insinuations about TD are false, and in reckless disregard of the truth and the information that we have provided.</u>

357.    The statements in ¶354 and ¶356 were materially false and misleading, and omitted material facts when made. Far from having no issues with the OCC or "follow[ing] industry-best practices that are designed to detect and help prevent fraud," the exact opposite was true. In truth, for over a decade, TD's AML program was characterized by "staggering and pervasive failures in oversight," such that TD Bank "willfully failed to monitor trillions of dollars of transactions" and "allowed hundreds of millions of dollars from money laundering networks to flow through the bank. Thus, it was materially false and misleading for TD to state it "follow[ed]

217

industry-best practices that are designed to detect and help prevent fraud," when, in truth, TD had "created an environment that allowed financial crime to flourish."

> **D.    Despite Increasing Scrutiny on TD's Compliance with Its BSA Obligations, First Horizon Continues to Reassure Investors About TD's Comfort with the Timeline and Regulatory Approval**

358.    As TD's regulators and government officials began scrutinizing the Bank's BSA/AML obligations in the midst of TD's persistent, longstanding and severe AML failures, leading up to the shareholder vote on May 31, 2022, First Horizon continued to repeatedly represent to investors that that the merger was on track to obtain regulatory approval and be completed in TD's first quarter of fiscal 2023.

359.    On May 6, 2022, First Horizon filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2022, ended March 31, 2022.  In the report, First Horizon represented that the "merger is expected to be completed in the first quarter of TD's 2023 fiscal year."

360.    On May 13, 2022, First Horizon issued "Integration Newsletter" which was filed on Schedule 14A with the SEC as "Definitive Additional Materials" to the Definitive Proxy Statement. The Integration Newsletter contained a "Special Message from our President and CEO," where Defendant Jordan emphasized that the "transaction is expected to close in the first quarter of TD's 2023 fiscal year,

pending the satisfaction of customary closing conditions, including regulatory and shareholder approvals."

361.   Then, on May 31, 2022, First Horizon issued a press release, which it filed with the SEC on Form 8-K, announcing that it had received shareholder approval for TD to acquire First Horizon. The press release again emphasized that the "transaction is expected to close in the first quarter of TD's 2023 fiscal year subject to U.S. and Canadian regulatory approvals."

362.   Following the shareholder vote, First Horizon continued to represent to investors there was no change to the expected closing date of the merger.   For example, on July 19, 2022, First Horizon issued a press release and accompanying slide presentation announcing its results for the second quarter of 2022, which continued to emphasize that First Horizon still "Expect[s] deal to close in 1Q of TD's 2023 fiscal year."   First Horizon's quarterly report on Form 10-Q for the second quarter of 2022 similarly represented that the "Proposed TD Merger is expected to be completed in the first quarter of TD's 2023 fiscal year."

363.   The statements referenced in ¶¶359-362 were materially false and misleading, and omitted material facts when made.   It was materially false and misleading for First Horizon to state that it expected the merger to "be completed" by the first quarter of TD's 2023 fiscal year.   In truth, First Horizon knew firsthand that TD's severe and pervasive AML failures presented an extraordinary undisclosed

risk to closing the merger. As early as the summer of 2022, TD and First Horizon's integration planning made clear that TD's compliance programs were so deficient that managers were discussing how the combined bank would have to use the First Horizon's compliance programs instead. Moreover, First Horizon had negotiated highly unique contractual provisions under which the base merger consideration would increase by $0.65 per share on an annualized basis if the merger did not close within the nine-month closing date. Further, as part of the merger, First Horizon negotiated and obtained TD's agreement to invest $493.5 million in convertible First Horizon stock—a cash payment to First Horizon that First Horizon would be able to (and in fact did) retain if (and when) TD was unable to close. First Horizon negotiated these terms precisely because of the increased risk that TD's undisclosed AML violations jeopardized regulatory approval for the merger and presented an extraordinary undisclosed risk that regulators would reject the deal.

364. First Horizon also knew or was reckless in not knowing about TD's significant AML deficiencies, which were "persistent, pervasive and known," in many cases open and "obvious to a casual observer," and that numerous TD employees were the targets of active criminal prosecutions for money laundering. Indeed, First Horizon was either aware of these violations as part of the due diligence process, or aware of numerous red flags clearly indicating additional due diligence was warranted that First Horizon failed to conduct. Thus, it was materially false and

misleading for First Horizon to claim to investors that regulatory approval of the merger would be completed in the first quarter of TD's 2023 fiscal year.

### E.    Defendants Continue to Reassure Investors Concerning TD's Comfort with the Timeline and Regulatory Approval

365.    On August 2, 2022, TD Bank held a call to discuss its current acquisitions, including TD's proposed acquisition of Cowen Inc. that was disclosed that day.  In response to an analyst question during the call, Defendant Masrani explicitly rejected the notion that there was any risk of regulatory delay regarding the First Horizon acquisition:

> Question:   And just one follow up, Bharat, on First Horizon.  It's been about six months since the deal.   Any reason you have to believe why the deal may not close as per the original timeline, the regulatory or other issues that may delay the deal at this point?
>
> Masrani:   No.  I have no reason to believe that, Ebrahim. Just following its normal process within the U.S. regulatory requirements.   And we obviously cannot talk about our conversations with our regulators. We feel comfortable that [it] is proceeding at the pace we expected, and we are hoping that we can close it within the timeline we have stipulated.

366.    On August 25, 2022, TD Bank held a conference call to discuss its third quarter earnings.  During the call, analysts were again focused on TD's ability to obtain regulatory approval of the deal, with an analyst asking if TD "still fe[lt] comfortable in terms of the timing of the close," and if "there [is] any risk like in terms of a deal delay."  Defendant Masrani responded by again denying the existence of any regulatory risk, insisting that the deal "continued to progress in the normal course" with "nothing out there to suggest that is different this time around":

Just on your point, there is a lot of speculation on what might be the requirements to get approvals. Our deal continues to progress in the normal course. There is nothing out there to suggest that, that is different this time around.

367. The statements in ¶¶365-366 were materially false and misleading, and omitted material facts when made. It was materially false and misleading to assert that regulatory approval of the First Horizon deal would "progress in the normal course," with "nothing out there" or "no reason" to suggest any risk of regulatory delay or non-approval. In truth, for over a decade, TD had "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program" and was actively concealing those violations from its regulators. It was thus materially misleading for Defendants to state that regulatory approval of the First Horizon deal would "progress in the normal course," with "nothing out there" or "no reason" to suggest any risk of regulatory delay or non-approval when, in truth, TD's criminal violations of the AML laws precluded regulatory approval of the merger and TD's violations and numerous TD employees were the subject several ongoing high profile criminal money laundering prosecutions implicating the Bank's decade long "knowing" and "willful" AML violations.

368. On September 14, 2022, Defendant Salom attended the Barclays Global Financial Services Conference on behalf of TD Bank. During the conference, Salom again claimed that TD was still "very excited about the First Horizon transaction," and in fact "more excited now than back in February when we announced the deal."

The Barclays analyst asked Defendant Salom about "the elephant in the room," which was "obviously [] the acquisition of First Horizon"—and specifically, for an "update in terms of the timeline" for regulatory approval. Salom responded by unequivocally stating that TD Bank was "extremely confident" in obtaining regulatory approval of the deal "in short order":

> [O]n August 18th we had the public hearing, the OCC, the Fed hosted. That is part of the normal part of the application process. But to your point, I'm sure there's going to be a lot of questions about how confident are we? We're extremely confident. We believe this transaction does not represent any financial stability or competitive consolidation risk. We've already announced that we will protect all the front-line staff, we will be retaining all the retail and commercial bankers. Likewise, we won't be closing any stores. So, if you look at the strength of the application, we're quite excited about getting this done in short order.

369.    The statements in ¶368 were materially false and misleading, and omitted material facts when made. It was materially false and misleading for Defendants to state they were "extremely confident" in obtaining regulatory approval from the OCC or the Federal Reserve, or that they "expect[ed]" the transaction to close "in short order," or by the end of TD Bank's first fiscal quarter. In truth, for over a decade, TD had "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program" and was actively concealing those violations from its regulators, who had initiated formal investigations into TD's misconduct following several high-profile criminal prosecutions massive money laundering crimes carried out through TD Bank and involving numerous TD

employees.  It was thus materially misleading for Defendants to state they were "extremely confident" in obtaining regulatory approval from the OCC or the Federal Reserve, or that they "expect[ed]" the transaction to close "in short order," or by the end of TD Bank's first fiscal quarter when, in truth, TD's criminal violations of the AML laws precluded regulatory approval of the merger.

## F.    Defendants Disclose a Delay to Deal Timeline But Continue to Reassure Investors About Regulatory Approval

370.    In October 2022, the OCC completed its supervisory examination of TD Bank, and communicated to the bank's senior leadership, including Defendants Masrani, Salom and Tran, that it had identified serious and longstanding AML deficiencies.   FE5, who served as the head of TD Securities U.S. Governance and Controls from October 2022 through March 2023 and was a member of the "Integration Management Team" on the First Horizon acquisition, confirmed that the OCC conducted an examination of TD during the Class Period and reported its findings to senior management in October 2022.  According to FE5, the OCC had flagged problems with TD Bank's AML programs like "basic monitoring" systems that were not in place, and which were documented in the formal written communications with TD concerning the OCC's supervisory findings.

371.  This prompted four separate meetings in November 2022 between senior OCC and Federal Reserve officials, those agencies' senior counsel, and TD's outside counsel, in addition to the bank's most senior executives—including its

General Counsel Ellen Glaessner and Defendant Salom.  During these meetings, regulators made clear to TD's top executives that the AML deficiencies regulators had identified were so severe and pervasive that they were the subject of numerous federal law enforcement investigations—including by the DOJ—such that regulatory approval of the First Horizon deal was highly unlikely.

372.    Nevertheless, Defendants continued to assert that TD maintained robust AML controls and that the deal was going forward as expected and would soon obtain regulatory approval.

373.    For example, on October 18, 2022, First Horizon issued a press release and accompanying slide presentation announcing its results for the third quarter of 2022, which it filed with the SEC on Form 8-K.  In discussing the TD merger, the presentation noted the parties saw "[c]ontinued progress on planning and Legal Day One readiness," and again emphasized that First Horizon still "Expect[s] deal to close in 1Q of TD's 2023 fiscal year." Furthermore, First Horizon specifically highlighted that "Regulatory approval process remains on track" for the merger. On November 7, 2022, First Horizon filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2022 which again affirmed that the "Proposed TD Merger is expected to be completed in the first quarter of TD's 2023 fiscal year, and is subject to customary closing conditions, including approvals from U.S. and Canadian regulatory authorities."

374.    The statements in ¶373 were materially false and misleading, and omitted material facts when made.  It was materially false and misleading for First Horizon to state that it "expect[ed]" the merger to close by the first quarter of TD's fiscal year and that the "regulatory approval process remain[ed] on track." According to FE1, First Horizon had learned through the merger integration process that TD Bank had AML controls that were so inadequate that First Horizon's AML program would have to be used instead—and First Horizon also was acutely aware that inadequate AML controls were a chief concern of regulators and could preclude approval of the merger.  Moreover, by this time in October and November 2022, regulators were bearing down on TD Bank, with the OCC having completed its supervisory examination finding severe AML deficiencies—which the OCC and Federal Reserve openly discussed with TD Bank during a series of meetings in early November 2022.  Moreover, there is no question that First Horizon and its most senior executives were informed of these regulatory developments—indeed, the merger agreement explicitly provides that TD must "promptly" and fully inform First Horizon of all regulatory developments, particularly those that may result in regulatory delay.  Because regulators had made clear to TD that its AML deficiencies were so severe that it was now under formal DOJ investigation and the deal was highly unlikely to be approved, the First Horizon Defendants had no basis to assert

that the deal would close by the first quarter of TD's fiscal year or that regulatory approval "remain[ed] on track."

375.   On December 1, 2022, TD Bank filed its Annual Report for the fiscal year ending October 31, 2022 ("2022 Annual Report") with the SEC on Form 40-F, signed by Defendants Masrani and Tran.   The 2022 Annual Report included information about TD Bank's AML controls, stating:  "GAML is responsible for the oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated."

376.   Despite the fact that regulators had already told TD executives in November 2022 that the Bank's severe AML deficiencies were virtually certain to preclude regulatory approval, the 2022 Annual Report also made several representations in which TD purported to warn about the mere "possib[ility]" of future regulatory action, including that regulators "could challenge" the Bank's compliance.  Specifically, the 2022 Annual Report provided the following purported risk warning regarding regulators' potential focus on "internal control frameworks;

and money laundering, terrorist finance and economic sanctions risks and threats,"

stating:

> [W]hile the Bank devotes substantial compliance, legal, and operational business resources to facilitate compliance with these developments by their respective effective dates, and also to the consideration of other governmental and regulator expectations, it is possible that: (i) the Bank may not be able to accurately predict the impact of regulatory developments, or the interpretation or focus of enforcement actions taken by governments, regulators and courts, (ii) the Bank may not be able to develop or enhance the platforms, technology, or operational procedures and frameworks necessary to comply with, or adapt to, such rules or expectations in advance of their effective dates; or (iii) <u>regulators and other parties could challenge the Bank's compliance</u>.

> ***

> Also, <u>it may be determined that the Bank has not adequately, completely or timely addressed regulatory developments or enforcement actions to which it is subject, in a manner which meets governmental or regulator expectations</u>. The Bank has been subject to regulatory enforcement proceedings and has entered into settlement arrangements with regulators and self-regulatory organizations, and the Bank may continue to face a greater number or wider scope of investigations, enforcement actions, and litigation. In addition, public notifications of enforcement actions are becoming more prevalent which could negatively impact the Bank's reputation.

377. The 2022 Annual Report provided the purported warning that

regulators and law enforcement agencies "may pursue regulatory settlements,

criminal proceedings or other enforcement actions <u>against the Bank in the future</u>."

378. The 2022 Annual Report (including in the notes to the financial

statements) also included several representations regarding the First Horizon

acquisition, including that TD "continues to work towards obtaining regulatory

approvals to close the transaction." Specifically, in describing how TD Bank "has prepared for a successful integration" with First Horizon, the 2022 Annual Report represented that the two banks had "[c]onfirmed an approach to primarily migrate to TD systems" and "[r]eaffirmed confidence in TD's ability to execute on cost synergies." Finally, the 2022 Annual Report stated that the "<u>Bank is currently planning to close the [First Horizon] transaction in the first half of fiscal 2023</u>" or April 2023—which signaled a delay to the prior planned closing date of the first fiscal quarter in January 2023.

379. The statements in ¶¶375-378 were materially false and misleading, and omitted material facts when made. It was materially false and misleading to state that the Bank devote[d] substantial compliance, legal and operational business resources to facilitate compliance…and government and regulator expectations" and to suggest that it was merely "possible" the Bank's regulators and others could "challenge" its compliance. In reality, given TD Bank's criminally deficient BSA/AML controls, which TD admitted stemmed from a "pervasive and systemic failure to maintain an adequate AML compliance program," and included "the involvement of employees at all levels" of the Bank—at the time the 2022 Annual Report was filed—Defendants knew that TD Bank's deficient BSA/AML program, and overall AML compliance, was the subject of numerous regulatory and law enforcement inquiries (including by the DOJ) that would ultimately prevent TD from

229

obtaining the necessary regulatory approvals from either the OCC or the Federal Reserve.  As TD's guilty plea confirmed, both leading up to and during the Class Period, TD Bank "willfully fail[ed] to maintain an appropriate AML program" and "knowingly fail[ed] to file accurate Currency Transaction Reports" for over a decade—facts that TD knew did not meet regulators' expectations.

380.   In addition, TD's representations that "regulators and other parties could challenge the Bank's compliance" and that "it may be determined that the Bank has not adequately, completely or timely addressed regulatory developments" and that the Bank could be subject to enforcement actions "in the future" were misleading because, at the time these statements were made and as TD would later admit in its guilty plea, the Bank "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program" for nearly a decade.  Indeed, as the *Capitol Forum* would reveal, before these statements were made, "the bank's executives were aware that multiple law enforcement agencies had found such serious lapses in anti-money laundering (AML) controls that U.S. regulators might reject the merger."  In other words, contrary to TD's representation that there was only a "possibility" that its compliance could be challenged or that enforcement action might be taken "in the future," in truth, regulators had in fact already challenged the Bank's compliance, a DOJ investigation was pending, and regulators

were poised to reject the merger precisely because multiple federal agencies had found such serious violations of the Bank's AML obligations.

381.  Defendants' representations concerning the progress of the First Horizon merger, including that during the quarter TD had continued "to work towards obtaining regulatory approvals to close the transaction," "[c]onfirmed an approach to primarily migrate to TD systems" and "[r]eaffirmed confidence in TD's ability to execute on cost synergies," were also materially misleading because they likewise omitted the highly material facts that, by this time, regulators had already informed TD's senior executives that merger approval was in serious peril due to TD's egregious AML failures.  Further, TD's representation that it had confirmed an approach to migrate to TD systems was false and misleading because it omitted the highly material fact that, as FE1 reported, rather than migrate to TD systems, merger integration discussions between TD and First Horizon focused on how the combined company would have to rely on First Horizon's compliance program instead of TD's.  In addition, as TD Bank disclosed after the end of the Class Period, rather than "execute on cost synergies" as a result of the merger, TD would in fact be forced to spend billions of dollars, revamp its AML technologies, and replace nearly every single senior-ranking AML compliance official in order to bring its AML systems into compliance with the law, among other remediation efforts required by regulators.

382.   Also on December 1, 2022, following the filing of the 2022 Annual Report, TD Bank held an earnings conference call during which Defendants assured investors that the delay in the closing timeline for the First Horizon deal was of no moment.  Specifically, when an analyst questioned what was "prompting the delayed expectation of closing," rather than disclose any regulatory problems with TD Bank's AML controls, Defendant Masrani dismissed any reason for concern, stating: "[W]e're already in December.  And so we don't control the timing of all the regulatory approvals, but we are confident that we'll get the closing within the timeline that we have put out."

383.   When the analyst followed up by asking for additional detail about what had caused the regulatory delay—and specifically whether the regulators were "taking a closer look at anything"—Masrani responded with an unequivocal "No," stating that he was "not aware" of any regulatory issues that could be causing the delay:

| | |
|---|---|
| Question: | I mean are [the regulators] taking a closer look at anything? Are you anticipating having to make any adjustments to your product lineup or your fee schedule in advance of the close? |
| Masrani: | No, I'm not aware of anything of the sort you're mentioning. |

384.   The statements in ¶¶382-383 were materially false and misleading, and omitted material facts when made.  The delay in the regulatory review process was

not routine and inconsequential as Defendants represented, but rather demonstrated regulators had significant concerns about the deal and were unlikely to approve it. Rather, as the *Capitol Forum* revealed after the end of the Class Period, before this statement was made, in November 2022, the Bank's senior executives were directly informed by TD's regulators in a series of private meetings that the merger was in serious jeopardy precisely because of TD's AML failings, and "the bank's executives were aware that multiple law enforcement agencies"—including the DOJ—"had found such serious lapses in anti-money laundering (AML) controls that U.S. regulators might reject the merger."  Indeed, as TD would later admit in its guilty plea, TD was itself conspiring to commit money laundering, as it "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program"—such that, as Defendants were forced to admit at the end of the Class Period, TD was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal.

385.   On January 6, 2023, the *Miami Herald* published a news report that a high-ranking TD Bank employee, Daniel Hernandez, who had conducted a massive PPP loan fraud through TD Bank's customers and accounts, had pleaded guilty to a wire conspiracy charge in what prosecutors labeled one of the "largest COVID-relief cases in the country."  In response to the story, which specifically cited to the then-pending First Horizon transaction, TD Bank issued a strong defense to its conduct

233

with respect to Mr. Hernandez and represented that it complied with the law and that its fraud and AML controls had worked. Specifically, as reported in the *Miami Herald*, TD represented that "[t]o protect our customers and the bank, TD has strong processes in place to identify, investigate, and deter potential fraud." TD Bank further stated that "[i]n this matter, we initiated an internal investigation, cooperated with law enforcement, and terminated Mr. Hernandez prior to his arrest."

386.   The statements in ¶385 were materially false and misleading, and omitted material facts when made. Rather than have "strong processes in place" to "identify, investigate, and deter potential fraud," in reality, TD was itself conspiring to commit money laundering, as it "willfully failed to remediate persistent, pervasive and known deficiencies in its AML program"—such that, as Defendants were forced to admit at the end of the Class Period, TD was unable to obtain the necessary regulatory approvals from either the OCC or the Federal Reserve for the First Horizon deal.

387.   Further, rather than act properly to initiate an "internal investigation" and "cooperate with law enforcement," TD Bank deliberately ignored, silenced, or retaliated against TD Bank employees who sought to report Mr. Hernandez's suspicious conduct—including by telling the whistleblower Sean Tracy "not to talk" about his suspicions concerning Mr. Hernandez to anyone. And while TD Bank claimed to have terminated Hernandez "prior to his arrest," in reality, TD

misleadingly omitted that TD's senior management told employees who reported suspicions about the Hernandez fraud to remain silent, and only a year later terminated Hernandez just days before he was formally indicted. Finally, it was false and misleading for TD to represent that it had "strong processes in place to identify, investigate, and deter potential fraud" without disclosing the fact that, at the time this statement had been made, regulators had specifically informed TD of its serious AML failings and that the DOJ was then conducting a probe of TD's failure to properly identify, investigate and deter potential fraud. Indeed, TD's transgressions were so severe that it would ultimately be forced to plead guilty to conspiracy to commit money laundering because it "willfully fail[ed] to maintain an appropriate AML program" for over a decade. FinCEN similarly concluded that TD Bank: (1) "willfully violated the BSA and its implementing regulations;" (2) "willfully failed to implement and maintain an AML program that met the minimum requirements of the BSA;" and (3) "willfully failed to accurately and timely report suspicious transactions and Currency Transaction Reports to FinCEN."

388.  On January 9, 2023, Defendant Masrani attended the RBC Markets Canadian Bank CEO Conference on behalf of TD Bank. In response to an analyst question seeking an update on the First Horizon timeline, Masrani asserted that the delay was common in U.S. mergers and that the deal would close in a timely manner:

> [In] the U.S., the latest deals seem to take longer than what they used to. The one deal that was approved took, I don't know, 14 or 15 months

or something like that.  Another deal was announced approximately 2.5 to 3 months ago before our deal got announced, we are into about 9 or 10 months into ours – I think, end of February is when we announced First Horizon.  But the deal that was announced a couple of months, two or three months before ours, is not yet been approved.  So, given all that, we – last quarter, I said that instead of originally expectation of closing within the first fiscal quarter of this year, it will be the first fiscal half, which seems to be appropriate given all the other stuff that's been going on.  So, that's our expectation on when that gets done.

389.   On January 18, 2023, First Horizon issued a press release and accompanying slide presentation announcing its results for the fourth quarter and full fiscal year of 2022, which it filed with the SEC on Form 8-K.  While First Horizon's previous SEC filings stated its own belief that the merger "is expected to be completed in the first quarter of TD's 2023 fiscal year," First Horizon now stated, that "TD expects the deal to close in the first half of its 2023 fiscal year, subject to the receipt of required regulatory approvals and satisfaction of other closing conditions." (emphasis added).  However, First Horizon did not explain this change in terminology, or if its own expectations as to the closing of the deal might have changed.  These statements are also explicitly attributed to and thus made by TD.

390.   The statements in ¶¶388-389 were materially false and misleading, and omitted material facts when made.  The delay in the regulatory review process was not routine and inconsequential as Defendants represented.  Rather, by this time, as discussed above, regulators at the OCC and the Federal Reserve had already informed TD's senior executives they were virtually certain to reject the merger

because of the Bank's AML deficiencies, which were so serious and problematic that they were then the focus of investigations by multiple federal law enforcement agencies, including the DOJ. Indeed, TD would ultimately be forced to plead guilty to conspiracy to commit money laundering, due to the Bank's "willful[] fail[ure] to remediate persistent, pervasive and known deficiencies in its AML program" for over a decade. Moreover, First Horizon was fully aware of TD Bank's negative interactions with regulators and of their significance, as the merger agreement explicitly required TD Bank to keep First Horizon promptly and fully advised of regulatory discussions pertaining to any delay in approval.

### G.    Defendants Disclose Deal Delays But Insist They Are Benign—And Continue To Claim the Deal Is Going Forward Despite Regulators Having Already Rejected the Merger

391.    On February 9, 2023, TD Bank and First Horizon issued a joint press release announcing that the companies had agreed to extend the acquisition's closing deadline by three months, from February 27, 2023 to May 27, 2023, which they claimed was routine and "in accordance with the terms of the merger." TD and First Horizon further represented that they remained "fully committed to the merger and continue to make significant progress in planning for the closing"—without disclosing anything about the significant regulatory issues TD was facing that likely precluded regulatory approval of the deal.

392.   Then, on February 22, 2023 and unbeknownst to investors, senior OCC officials scheduled a private Zoom meeting with Defendant Masrani and TD's outside counsel, Simpson Thacher, for March 9, 2023.  As *Capitol Forum* would later report, this meeting was "highly unusual," and effectively meant that the merger was dead in the water because "Bank CEOs attend such meetings with outside counsel only when matters are very serious."

393.   Less than one week later, the truth began to emerge.  First, on March 1, 2023, before market hours, First Horizon filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022.  In the report, First Horizon revealed that TD Bank had informed First Horizon that it "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023."  On this news, the price of First Horizon shares fell 10.6%, to close at $22.14 per share on March 1, 2023.

394.   The next day on March 2, 2023, TD Bank held its earnings conference call for the first quarter of 2023.  During the call, Defendant Masrani continued to give investors the impression that no significant regulatory issues had surfaced, and that TD Bank was "fully committed to the transaction" and still fully expected to close the deal and receive regulatory approval:

> [W]e are doing what is prudent and appropriate.  <u>We've opened discussions with First Horizon about a potential additional extension</u>.  I cannot speculate on when we will receive approval.  I can tell you that we are fully committed to the transaction.  We have a robust

Community Benefits Plan in place with broad community support across our combined footprint and our teams have made progress on integration plans. This is a great transaction that offers scale and new capabilities to our U.S franchise.

395.    Later on the call, an analyst asked Masrani whether investors "should[] be concerned that maybe there is a supervisory issue in the U.S.," to which Masrani responded: "I can't comment on our confidential discussions with our regulators. That is an area no bank ventures into. But with respect to First Horizon, we continue to work with our regulators as part of our application process, and we continue to do that." When the analyst pressed Masrani and brought up the example of the M&T/Hudson City merger that was delayed by regulators for three years due to AML concerns, Masrani responded: "We are very happy with the transaction and continue to work hard to get it over the closing over the finish line."

396.    That same day, on March 2, 2023, TD Bank filed its Form 6-K announcing its first quarter financial results and providing an update on the First Horizon transaction (the "1Q23 Form 6-K"). Specifically, the 1Q23 Form 6-K reiterated that the parties had mutually agreed to extend the outside date for closing the deal to May 27, 2023 because regulatory approvals "now are not expected to be obtained prior to May 27, 2023," and that TD and First Horizon were discussing "a potential further extension" if the merger did not close by May 27, 2023. The 1Q23 Form 6-K also contained boilerplate risk warnings related to approval of the merger, and instructed investors to review the "Risk Factors and Management" section of the

2022 Annual Report, which provided the warning that regulators and law enforcement agencies "may pursue regulatory settlements, criminal proceedings or other enforcement actions against the Bank in the future."

397. The statements in ¶391 and ¶¶394-96 were materially false and misleading, and omitted material facts when made, as Defendants falsely gave the misleading impression that TD Bank was actively negotiating a further extension of the deal and that no tangible regulatory issue seriously jeopardizing regulatory approval of the deal had occurred. However, in truth, the delay in the regulatory review process was not benign, but instead was because regulators had raised significant concerns about TD Bank's BSA/AML compliance. Indeed, by this time, Defendants knew (1) there was an ongoing investigation into TD's AML compliance failures by the DOJ, FinCEN, and other law enforcement agencies; (2) Defendants had privately met with senior OCC and Federal Reserve officials on several occasions in which TD's AML problems were "openly discussed"; and (3) senior OCC officials had requested a meeting with Defendant Masrani and TD's outside counsel—leaving little doubt that the ongoing DOJ and other law enforcement investigations and regulators' "openly discussed" concerns about TD Bank's AML failures had doomed the deal. Further, rather than face a risk of a possible "enforcement action in the future," as Defendants represented in the 1Q23 From 6-K and the 2022 Annual Report, Defendants knew that TD was then already the

240

subject of an ongoing DOJ investigation into its serious AML lapses that resulted not only in termination of the merger, but also in TD's guilty plea to conspiracy to commit money laundering and historic criminal penalties being issued against the Bank. Moreover, First Horizon was fully aware of TD Bank's negative interactions with regulators and of their significance, as the merger agreement explicitly required TD Bank to keep First Horizon promptly and fully advised of regulatory discussions pertaining to any delay in approval.

398. On March 3, 2023, Evercore ISI published an analyst report which summarized a recent discussion it had held with First Horizon CFO Defendant Dmuchowski. The Evercore ISI report stated that the analysts' "[d]iscussion with FHN's CFO Hope Dmuchowski supports view that new deal timeline is on the way," as Dmuchowski had represented that "TD & FHN remain in active discussions re: merger integration plans & related matters." Dmuchowski also claimed that "FHN has not been informed as to the nature of the new regulatory issue at TD, nor which regulator has brought it up." The Evercore ISI analysts reported that, based on their discussion with Dmuchowski, they "remain[ed] confident that the likelihood of the deal closing exceeds that of the deal breaking."

399. Similarly, on March 13, 2023, First Horizon issued a "Letter from the President" which was filed on Schedule 14A with the SEC as "Definitive Additional Materials" to the First Horizon's 2023 proxy statement. The letter, addressed to

"Shareholders," and signed by Defendant Jordan, stated that First Horizon "and TD continue to work together to progress integration planning for the pending transaction." Jordan also emphasized the benefits for First Horizon, noting that "[j]oining forces with TD following the completion of the pending transaction will provide new opportunities for our associates, clients, and communities." Tellingly, this letter was sent out just days after senior OCC officials met with Defendant Masrani and TD's outside counsel as described above in ¶392.

400.    The statements in ¶¶398-99 were materially false and misleading, and omitted material facts when made, as Defendants falsely gave investors the impression that First Horizon was actively working with TD to negotiate a further extension of the deal, was still progressing with integration efforts, and that no tangible regulatory issue seriously jeopardizing the deal had occurred.  However, in truth, the delay in the regulatory review process was not benign, but instead indicated that regulators had significant concerns about the deal and were unlikely to approve it.  Indeed, during the November 2022 meetings regulators held with senior TD Bank executives, regulators had made clear to TD that TD's AML deficiencies were so severe and pervasive they had resulted in a formal DOJ investigation that meant the merger was highly unlikely to be approved.  Additionally, on February 22, 2023, senior OCC officials had requested an additional meeting with Defendant Masrani and TD Bank's outside counsel, strongly indicating that regulators had refused to

approve the merger. Contrary to Defendant Dmuchowski's statements, First Horizon was fully aware of TD Bank's interactions with regulators and of their significance, as the merger agreement required TD Bank to keep First Horizon promptly and fully advised of regulatory discussions pertaining to any delay in approval. Moreover, as Defendant Jordan admitted at the end of the Class Period, in truth TD's regulatory issues were so severe and had doomed the merger to such a definitive degree that, in reality, "[a]t no time did we discuss any changes in price or any other changes to the structure of the deal."

401. On March 7, 2023, Defendant Tran attended an investor conference with RBC Capital Markets. In response to a question about what had "changed" about the First Horizon deal, and whether the closing date would "go much further into the future," Tran responded by asserting that TD Bank was still "very excited about the deal." When the analyst pressed Tran by asking if there was a "plan B" if "First Horizon doesn't actually close," Tran rejected the notion there was any "plan B" and responded by claiming TD Bank was still fully committed to the deal: "Well, we're very committed to the transaction, very focused on that. And we're doing— we're working really hard to get the deal closing as soon as we can."

402. Just two days later, on March 9, 2023, Masrani and TD's outside counsel met with senior OCC officials, in the "highly unusual" meeting that,

according to former regulators and industry insiders, meant that the merger was doomed.

403.   On March 29, 2023, *Capitol Forum* reported that "U.S. financial regulators' decisions on TD Bank's (TD) proposed $13.4 billion acquisition of First Horizon Bank (FHN) are being held up by issues raised in a DOJ investigation, a source familiar with the matter said." While the *Capitol Forum* did not know what the focus of this investigation was or how long it had been going on, the source claimed it was not "related to faulty account concerns," which had been the subject of an earlier May 4, 2022 article by the *Capitol Forum*. Significantly, the March 29, 2023 *Capitol Forum* article contained a response from TD Bank (which it also provided publicly as an attachment) denying that any DOJ investigation existed:

> When asked if TD Bank is being probed by DOJ for possible fair lending abuses, TD Bank in a statement defended its lending practices, adding, "We are not aware of any such investigation." <u>When asked whether TD Bank was aware of any Justice investigation, the bank said: "Our statement stands as our response."</u>

404.   The statements in ¶401 and ¶403 were materially false and misleading, and omitted material facts when made. By this time, senior OCC officials had already told TD's senior most executives that the merger was dead in the water— and moreover, the DOJ investigation of TD's AML deficiencies had already been ongoing for months.  As the January 8, 2024 *Capitol Forum* report confirmed, in November 2022, the OCC and the Federal Reserve had directly informed TD's top

executives that the Bank's AML deficiencies were so severe that they were the subject of an ongoing DOJ investigation—and that these problems had essentially doomed the merger. Further, at the time this statement was made, not only was TD well aware of the DOJ's, FinCEN's, and other regulators' ongoing investigations, but TD had in fact already formally withdrawn its merger application precisely because its regulators had refused to approve it because of the Bank's egregious AML problems and the DOJ's ongoing investigation into them. Indeed, as a result of the DOJ's investigation, the Bank was ultimately forced to plead guilty to conspiracy to commit money laundering due to its willful failure to "remediate persistent, pervasive and known deficiencies in its AML program" for over a decade, with over $3 billion in penalties imposed—in addition to numerous other nonmonetary penalties, including an asset cap and the assignment of a monitor—across several federal agencies.

405. On April 12, 2023, Bank of America held an investor meeting with Defendant Masrani. According to Bank of America analysts, in that discussion, Defendant Masrani "reiterated interest in pursuing the First Horizon-FHN acquisition, with mgmt. highlighting the strategic merits of the deal, including expansion into the demographically attractive US Southeast markets, and gaining middle market commercial lending capabilities (synergistic with the recently

completed Cowen acquisition)."    According to Bank of America, Defendants represented:

> Committed to First Horizon-FHN: <u>Mgmt. remains committed to completing the FHN deal where TD/FHN are currently negotiating an extension to the current deal deadline.</u> Mgmt. emphasized the synergies expected from the acquisition, namely fortifying the U.S. commercial banking (mainly middle market) capabilities, while adding over one million new customers. Location also remains attractive to TD, as the US Southeast is desirable for business and continues to grow at a faster pace than the rest of the US. The recent completion of the Cowen acquisition brings middle market investment banking capabilities to TD, pairing well with markets served by FHN. Cowen's Equity Capital markets (ECM) operations also brings US offering to TD's Canadian clients who want access to the US Capital markets.

406.    On April 20, 2023, at TD Bank's Annual Meeting—which was held less than two weeks before the truth would be fully revealed—Defendant Masrani was besieged by shareholder questions about when the merger would close, and what the cause of the regulatory delay was.    In response, Masrani provided repeated assurances to investors that TD Bank had "<u>opened discussions with First Horizon about a possible extension,</u>" while refusing to provide any information about what was causing the regulatory delay:

> Question:    Just a few questions. Question number one, <u>are you currently in</u> discussions with FHN to extend the merger agreement that you were referred to earlier in your presentation?

> Masrani:    <u>We've initiated the extension arrangements or negotiations with FHN. Yes.</u>

> Question:    And if you compare where you were back in late February when you announced this to now, <u>do you have the ability to provide FHN with more information now than you did a few months ago as to</u>

<u>what is causing the delay?</u>

Masrani:    We said in March and I said it today that our belief is that we will not be able to get approvals by the merger expiry date of May 27. And therefore, <u>we've initiated negotiations to extend our</u> <u>agreement with FHN</u>. That's all I can provide you today, and I have no further update.

407.    The statements in ¶¶405-406 were materially false and misleading, and omitted material facts when made, as Defendants falsely gave investors the impression that TD Bank was continuing to negotiate the deal with First Horizon when, in truth, regulators had already rejected it.  Indeed, by this time, senior OCC officials had directly informed Defendant Masrani and TD's outside counsel that the deal would not be approved because of TD Bank's serious BSA/AML compliance problems, which were so longstanding, severe and pervasive that they ultimately forced TD to plead guilty to conspiracy to commit money laundering, with over $3 billion in penalties imposed.  In fact, the Federal Reserve had requested that TD Bank suspend its application from consideration by March 13, 2023—and TD Bank did just that on March 17, 2023, meaning that there was zero prospect of regulatory approval. Moreover, these facts—which were produced to Plaintiffs pursuant to a routine FOIA request—were decidedly not subject to any supervisory privilege, and thus could easily have been conveyed to investors despite Masrani's assertions to the contrary.

408.   Indeed, it was not until May 4, 2023 that First Horizon—and not TD—disclosed that the deal was off due to regulatory issues concerning TD that "did not relate in any way to First Horizon," and that were so longstanding and severe that they could not be resolved for years, precluding regulatory approval of the deal.

## X.    LOSS CAUSATION

409.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that caused a price decline in First Horizon shares, artificially inflated the price of First Horizon shares, and operated as a fraud or deceit on Class Period purchasers and holders of First Horizon shares. Specifically: to ensure the success of the merger, Defendants (a) took specific steps to hide from investors, law enforcement, and regulators TD's decade-long practice of cutting costs by willfully maintaining a criminally non-compliant AML program and knowingly permitting extensive, pervasive money laundering at TD's U.S. branches and (b) failed to disclose and misrepresented the adverse facts detailed herein, including that (i) TD Bank willfully failed to maintain an appropriate AML program, knowingly failed to file accurate CTRs, and TD Bank, N.A. was participating in a conspiracy to launder monetary instruments; (ii) TD's regulatory compliance failures and criminal conduct jeopardized regulatory approval of the TD-First Horizon merger; and (iii) regulators had disapproved of the TD-First Horizon merger during the Class Period. This conduct artificially inflated the price of First

Horizon common stock by leading investors to believe that the merger would close, and that First Horizon shareholders would receive the consideration promised under the merger agreement.

410.  As a result of Defendants' misrepresentations and omissions and deceptive conduct, the price of First Horizon securities declined significantly on March 1, May 3, and May 4, 2023. Defendants' misstatements and omissions and deceptive conduct were the proximate cause of those price declines and the losses suffered by Class members.

411.  The disclosures that caused the price declines, corrected the market price of First Horizon securities, and reduced the artificial inflation caused by Defendants' materially false and misleading statements and omissions, are summarized in the chart below, which identifies each corrective disclosure event, the price declines in First Horizon common stock resulting from the event as compared to the prior day's close, and the percentage decline, each of which was statistically significant at the 99% confidence level:

| Date | Event | Price Change |
|------|-------|--------------|
| March 1, 2023 | First Horizon's annual report reveals that TD had informed First Horizon that TD "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023." | ($2.63) |
| May 3, 2023 | *Capitol Forum* reveals that Defendant Masrani had a "very serious" meeting with senior OCC officials that did not "bode well" for merger approval. | ($1.14) |
| May 4, 2023 | TD Bank and First Horizon disclose that the deal had been terminated because TD was unable to receive regulatory approval. | ($4.99) |

412.    As a result of their purchases of First Horizon shares during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' materially false and misleading statements caused First Horizon shares to trade at artificially inflated levels throughout the Class Period, reaching as high as $24.88 on February 15, 2023, and caused the price of First Horizon shares to decline on the disclosure dates.

413.    With respect to the Section 10(b) claims, by engaging in the fraudulent scheme and concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of TD Bank's ability to acquire First Horizon and the value of First Horizon securities.  As true facts about the Company were revealed to the market, the price of First Horizon securities declined significantly. These declines removed the inflation from the price of First Horizon securities, causing

real economic loss to investors who had purchased or acquired First Horizon securities during the Class Period.

414. The declines in the price of First Horizon securities after the corrective disclosures came to light were a direct result of Defendants' fraudulent scheme and misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price declines in First Horizon shares negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

415. The economic loss, i.e., damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme, which artificially inflated the price of First Horizon shares and caused the subsequent significant decline in the value of First Horizon shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

416. With respect to the Section 14(a) claim, Defendants made material misrepresentations and omissions in Defendants' proxy solicitations. When the truth about those material misrepresentations and omissions was revealed, the price of First Horizon shares declined as a result. Class Members who held First Horizon shares on the April 20, 2022 record date and were entitled to vote on the merger

agreement thus suffered economic loss, i.e., damages, when the price of those shares declined on the dates of the disclosures.

## XI.    PRESUMPTION OF RELIANCE

417.    At all relevant times, the market for First Horizon securities was an efficient market for the following reasons, among others:

(a)    First Horizon met the requirements for listing and its shares were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    First Horizon filed periodic public reports with the SEC and the New York Stock Exchange;

(c)    First Horizon regularly publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    First Horizon was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

418.    As a result of the foregoing, the market for First Horizon securities promptly digested current information regarding First Horizon from all publicly available sources and reflected that information in the price of First Horizon securities.  Under these circumstances, all purchasers of First Horizon shares during the Class Period suffered similar injury through their purchase of First Horizon shares at artificially inflated prices, and the presumption of reliance applies.

419.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding First Horizon and the TD Bank merger— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the TD Bank's compliance with regulations governing its business, as alleged above, that requirement is satisfied here.

## XII.   THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

420.   The statements alleged herein to be materially false and misleading are not subject to the protections of the PSLRA's statutory Safe Harbor for forward-looking statements because (a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, Defendants cannot meet the requirements for invoking the protection, i.e., identifying the statements as forward looking and demonstrating that the statements were accompanied by meaningful cautionary language.

253

421.    Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

422.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is identified as such and "accompanied by meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A)(i).    An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (i) identify the written document, or portion thereof, that contains such factors; and (ii) the referenced written documents must contain meaningful cautionary language. 15 U.S.C. § 78u-5(c)(2)(B).

423.    The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K. 15 U.S.C. § 78u-5(b)(2)(A).

424.    Statements of historical fact, current condition or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

425.    To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.  A warning that identifies a potential risk, but implies that such a risk had not materialized, i.e., states that something might occur but does not state that something actually has already occurred, is not meaningful and does not fall within the protections of the Safe Harbor.

426.   Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis. Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of First Horizon and TD Bank, who knew that those statements were false or misleading when made.

## XIII.  CLASS ACTION ALLEGATIONS

427.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired FHN securities from February 28, 2022 through May 3, 2023, inclusive ("Class Period") and were damaged thereby; and (ii) all persons or entities who were holders of FHN common stock as of the April 20, 2022 record date that were entitled to vote to approve the merger agreement as set forth

in the April 22, 2022 Proxy Statement (the "Class"). Excluded from the Class are Defendants; members of the immediate families of the Executive Defendants; First Horizon's and TD Bank's subsidiaries and affiliates; any person who is or was an officer or director of First Horizon's and TD Bank's during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

428.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The First Horizon shares are actively traded on the NYSE and there are more than 566 million shares of First Horizon shares outstanding.  While the exact number of Class members is unknown at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by First Horizon, its transfer agent, or its depository bank and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

429.   Common questions of law and fact predominate and include:

     (a)    whether Defendants violated the Exchange Act and SEC Rule 10b-5 and SEC Rule 14a-9;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants knew or recklessly disregarded that their statements were false or misleading or were negligent in making such false or misleading statements;

(d)     whether Defendants' statements and/or omissions artificially inflated the price of First Horizon shares;

(e)     whether the Defendants' statements and/or omissions caused the price decline of First Horizon shares on the disclosures; and

(f)     the extent and appropriate measure of damages.

430.   Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

431.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

432.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV.  COUNTS

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

433.   Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

434.   This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

435.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (2) cause Lead Plaintiffs and other members of the Class to purchase First Horizon securities at artificially inflated prices.

436.   Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of First Horizon's securities in connection with their purchases of First Horizon shares during the Class Period.

437.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the merger's likelihood of regulatory approval and the true value of First Horizon securities.

### A.   Defendants' Affirmative Misrepresentations in Violation of Section 10b-5(b)

438.   During the Class Period, Defendants made the false statements specified above ¶¶306-408, which they knew, or were deliberately reckless in not knowing, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

439.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or were deliberately reckless in not knowing the true facts that were available to them. Defendants engaged in this conduct to conceal the true risk that the First Horizon merger would not be approved and to support the artificially inflated prices of First Horizon's securities.

### B.   Defendants' Acts in Furtherance of Defendants' Scheme to Defraud Investors in Violation of Section 10(b) Specifically Under Rules 10b-5(a) and (c)

440.   During the Class Period, Defendants "devised a plan and induced [Lead Plaintiffs and class members] to [purchase] their shares without disclosing to them

material facts that reasonably could have been expected to influence their decisions to [purchase]." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). As alleged herein, Defendants' deceptive conduct involved "'employ[ing]' a 'device,' 'scheme,' and 'artifice to defraud'" and constituted an act, practice and course of business that operated as a fraud on First Horizon investors. *Lorenzo v. Securities and Exchange Commission*, 587 U.S. 71, 78 (2019). Defendants' fraudulent scheme also artificially inflated the value of First Horizon securities and caused investors to unwittingly purchase First Horizon securities at artificially inflated prices.

441. As part of their scheme to defraud investors in violation of SEC Rule 10b-5(a) and (c), Defendants created the false impression and expectation that TD was in compliance with its AML and BSA obligations, and that the merger would obtain regulatory approval and close, while knowing or recklessly disregarding material facts contradicting that impression or expectation. Defendants thus caused purchasers of First Horizon common stock to misvalue the likelihood First Horizon common stock purchasers would receive the consideration promised in the merger agreement, which false expectation was priced into First Horizon common stock, causing investors to purchase and otherwise trade in that stock. Defendants' scheme was built on the conduct alleged above including the below non-exclusive list:

442.  <u>First</u>, Defendants engaged in an unlawful scheme to acquire First Horizon while deceiving regulators concerning the dangers such an acquisition posed to the U.S. financial system in light of TD's longstanding, pervasive and systemic AML violations.  In doing so, the TD Defendants committed numerous deceptive acts to convince regulators that the transaction would "create a unique opportunity to provide enhanced services to the customers and communities of both banks" and without increasing "systemic risk to the U.S. financial system," including among other things, filing an application under the BMA with the Federal Reserve and the OCC that omitted highly material facts concerning TD's "pervasive" and "systemic" AML violations and the substantial risks posed by TD's ongoing criminal behavior.   TD Bank officials—including Defendants Bowman and Levine—prepared and reviewed numerous materials certifying TD's compliance with AML laws contained in filings to the Federal Reserve and the OCC that omitted these material facts and otherwise deceived regulators reviewing TD's application concerning the risks and dangers posed by TD's deficient and criminal AML program.  Defendants also responded to numerous questions about TD's application from officials at the Federal Reserve and the OCC that omitted these material facts and deceived regulators concerning the risks posed by the acquisition.  As set forth above, TD Bank representatives also engaged in a series of meetings with OCC and Federal Reserve officials beginning in November 2022 an in effort to convince

regulators to approve the merger while omitting highly material facts concerning TD's ongoing criminal misconduct.

443.  Second, during the Class Period, the TD Defendants engaged in a scheme to conceal known, criminal, systemic AML and BSA violations from investors in connection with TD's proposed merger with First Horizon.  As admitted in the Criminal Pleas, TD willfully and knowingly criminally violated AML and BSA regulations for nearly a decade as part of an effort to maintain a "flat cost paradigm" that prioritized growth, profits and executive compensation over the Bank's legal obligations.   In carrying out this scheme, Defendants committed numerous deceptive acts, including by omitting to disclose substantial and pervasive AML deficiencies during OCC and Federal Reserve supervisory reviews, assuring regulators that TD was undertaking to remedy identified deficiencies when it was not, and otherwise failing to undertake required steps to remedy deficiencies in TD's AML practices identified by regulators, internal auditors, outside consultants, and AML personnel.  As regulators found, this conduct and failure to remedy known deficiencies in TD's AML program as required by the BSA continued "well after the Bank was aware its AML practices were facing intense scrutiny by regulators and law enforcement."

444.  Third, during the Class Period, Defendants engaged in conduct to conceal from law enforcement and regulators TD's deficient AML program, its

AML and BSA violations, and substantial ongoing money laundering activity. For example, the Criminal Pleas document that, during the course of the DOJ investigation, TD did not inform DOJ of a "well-known and significant transaction monitoring gap that, since at least 2008, allowed the Bank to process trillions of dollars" of transactions per year without monitoring or reporting. As further set forth herein, TD Bank also admitted that it repeatedly, falsely informed the OCC that it had certain required monitoring programs in place or development, when in truth it did not. FinCEN similarly found that TD Bank's "cooperation was materially undermined by the Bank failing to disclose the ongoing nature of certain issues that persisted late into FinCEN's investigation of TD Bank."

445. <u>Fourth</u>, the TD Defendants deliberately decimated their AML program and engaged in willful violations of the BSA in order to pursue growth in the United States—a growth strategy exemplified by the acquisition of First Horizon. As TD admitted, TD willfully and knowingly engaged in a conspiracy to grow the Bank's retail banking business in the United States and prioritize the "customer experience" by keeping costs and spending on AML flat.

446. <u>Fifth</u>, Defendants engaged in an aggressive and misleading public relations campaign to garner public support for the merger and to respond to and quell opposition to the merger from third parties such as lawmakers and journalists, including by facilitating the publication of positive news concerning the merger,

TD's practices, and reputation, and countering efforts by opponents of the merger who raised questions about TD's regulatory track record. Defendants' deceptive acts included issuing statements in response to news reports in *Capitol Forum* and letters published by Senator Warren that omitted the highly material facts concerning TD's criminal wrongdoing, as well as engaging outside counsel at Clare Lock to pursue baseless legal action and claims of defamation against *Capitol Forum* journalists whose reporting focused on TD's regulatory violations and the investigation by DOJ during the Class Period.

447. <u>Sixth</u>, the TD Defendants were incentivized to engage in their scheme to inflate the price—and ensure the conversion—of the $493 million in First Horizon preferred stock that TD had purchased on February 27, 2023 in connection with the merger agreement. TD's investment in nearly half a billion dollars' worth of First Horizon securities provided a powerful motive for the TD Defendants to maintain the price of those shares at or near the price at which they were purchased, and which could only be accomplished if the merger closed.

448. <u>Seventh</u>, after Defendants knew that regulators were unlikely to approve the merger, Defendants disseminated numerous public reports and engaged in a deceptive lobbying effort to convince regulators to approve the merger—including in numerous meetings with regulators detailed above in ¶¶1.a.i.1.a.i.1.135-

1.a.i.1.a.i.1.139—while omitting disclosure of the highly material facts concerning TD's ongoing and pervasive criminal AML misconduct.

449.   Eighth, after regulators had rejected the merger, Defendants kept the regulators' rejection of the merger secret for months while negotiating a termination agreement and entering into a settlement that prohibited either TD or First Horizon from making "any public or private statements or other communications concerning or related to" merger with certain limited exceptions to ensure that the Bank's ongoing criminal misconduct would remain confidential and not be disclosed—an additional effort intended to avoid scrutiny into TD's practices.

450.   Ninth, the First Horizon Executive Defendants who were privy to TD's AML deficiencies through the course of their due diligence, integration planning, and other confidential discussions with TD executives and members of TD's AML and compliance departments, capitalized on their knowledge of the scheme by selling First Horizon shares at artificially inflated prices.  As set forth above at ¶¶257-265, First Horizon executives and directors sold $25.8 million worth of their personally held shares during the Class Period.  Moreover, they did so at an average price of $23.35—even though First Horizon's shares would be worth $25 in cash had the merger closed—but at prices that were nearly twice as high as First Horizon's stock price immediately before and after the Class Period, enabling them to reap substantial insider profits.

451.   Tenth, Defendants knew that their deceptive conduct would impact the price of First Horizon securities and in fact did so.  For example, when Defendants announced the proposed merger, First Horizon shares immediately increased nearly 30%, from a price of $18.25 per share to $23.48 per share.  In the joint press release published on the day of the announcement, First Horizon and TD told investors that "announcements relating to the proposed combination could have adverse effects on the market price of the common stock of either or both parties to the combination." Further, after journalists and Senator Warren raised concerns about TD's regulatory track record, Defendants' deceptive public relations efforts successfully countered those negative reports, prompting First Horizon shares to surge by 17%, from a price of $21.14 per share on June 15, 2022, the day after Senator Warren sent her letter to the OCC, to a price of $24.85 per share on November 30, 2022.  Then, after First Horizon shares declined when Defendants disclosed a delay to the deal timing on March 1, 2023, and First Horizon stock declined nearly 10%, Defendants engaged in further deceptive acts that stunted that decline and maintained artificial inflation in First Horizon's share price.  For example, after Defendant Masrani disseminated additional false statements concerning the merger at a Bank of America investor conference on April 12, 2023, First Horizon shares increased as much as 4.6% just after he made them.

452.   Due to Defendants' scheme, Lead Plaintiffs and other class members were deprived of "material facts that reasonably could have been expected to influence their decisions to [purchase]" First Horizon securities and, as a result, purchased their First Horizon securities at artificially inflated prices, among other things. *Affiliated Ute Citizens of Utah*, 406 U.S. at 153.

*    *    *

453.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for First Horizon shares. Lead Plaintiffs and the Class would not have purchased First Horizon shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

454.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of First Horizon shares during the Class Period.

455.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violation of Section 14(a) Against All Defendants

456.   Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

457.   The claims in this Count are brought under Section 14(a) of the Exchange Act (the "Proxy Claims"). The Proxy Claims are brought on behalf of investors who held First Horizon common stock on the Record Date of April 20, 2022 and were entitled to vote on the merger agreement between TD and First Horizon. The Proxy Claims are based solely on negligence. They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

458.   The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the merger agreement, including the Proxy and the documents incorporated into the Proxy, contained misstatements and/or omissions of material facts.  Approval of the merger agreement was the corporate transaction for which Defendants sought First Horizon shareholder approval through Defendants' proxy solicitations. The merger agreement provided for one of two options: an acquisition of First Horizon by TD or a termination of the agreement.

459.   Defendants' proxy solicitations included all statements which in any way informed and affected the market's view of the deal and encouraged First Horizon shareholders to vote in favor of the merger agreement. These statements included the statements (collectively referred to as the "Proxy Solicitations") set forth in ¶¶335-336 and ¶¶340-341 above.  All of the Proxy Solicitations were

materially false and misleading because they failed to disclose the highly material facts concerning TD Bank's AML compliance deficiencies that imperiled regulatory approval of the merger.

460.    Moreover, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made concerning TD Bank's AML compliance deficiencies and their impact on regulatory approval.  In violation of these duties, Defendants never disclosed any of the omitted facts before the shareholder vote.

461.    The false statements and omissions set forth above proximately caused foreseeable losses to Lead Plaintiffs and members of the Class, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures causing First Horizon stock to fall precipitously, as alleged herein.

462.    Defendants named in this Count did not update the solicitations, or the Proxy, when material information arose after dissemination of these documents, but before the shareholder vote on May 31, 2022. The Defendants named in this count, jointly and severally, solicited and/or permitted the use of their names in solicitations contained in the Proxy.

463.   TD and First Horizon permitted the use of their names in the Proxy by allowing the Proxy to represent, among other things, that TD was in compliance with BSA and AML laws and regulations and that TD would be able to obtain regulatory approval for the merger.

464.   Defendant Masrani permitted the use of his name in the Proxy by allowing the Proxy to represent, among other things, Defendant Masrani's discussions with Defendant Jordan about "TD's confidence in its ability to obtain regulatory approvals for any potential transaction, including the timing of such approvals"; "the ability of TD to obtain, and the anticipated timing with respect to, the regulatory approvals required for TD to acquire First Horizon"; and "the payment by First Horizon of a termination fee if the definitive transaction agreement was terminated in certain circumstances," among other things.

465.   Defendant Salom signed the merger agreement attached as Annex A to the Proxy, which included numerous false statements of material fact concerning TD's compliance with BSA and AML laws and regulations, and permitted the use of his name elsewhere in the Proxy by allowing the Proxy to represent, among other things, Defendant Salom's discussions with Defendant Jordan and others about "the businesses and operations of First Horizon in connection with TD's due diligence."

466.   Defendant Jordan signed the cover letter for the Proxy and the merger agreement attached as Annex A to the Proxy and otherwise permitted the use of his name in the Proxy.

467.   By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants named in this Count sought to secure Lead Plaintiffs' and other Class members' approval of the merger agreement and solicited proxies from Lead Plaintiffs and other members of the Class.

468.   Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, and/or omitting material facts required to be stated in order to make the statements contained therein not misleading. These Defendants were required to disclose the material facts discussed above because Defendants were required to ensure that the Proxy fully and fairly disclosed all objective material facts to allow a reasonably prudent investor to make an informed investment decision. These Defendants also acted negligently in failing to update the Proxy and its Supplements prior to the May 31, 2022 shareholder vote.

469.   The solicitations alleged herein were essential links in the accomplishment of the corporate transaction—approval of the merger agreement—and, through these solicitations, First Horizon shareholders approved the merger agreement.

470.    Lead Plaintiffs and Class members eligible to vote on the merger agreement were denied the opportunity to make an informed decision in voting on the merger agreement and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

471.    This claim is brought within the applicable statute of limitations.

472.    By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

### COUNT III

#### For Violation of Section 20(a) of the Exchange Act
#### Against the Executive Defendants

473.    Lead Plaintiffs repeat and reallege every allegation above as if fully stated in this Count.

474.    This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

475.    During the Class Period, the Executive Defendants acted as controlling persons of First Horizon and TD Bank within the meaning of Section 20(a) of the Exchange Act.

476.    **The TD Executive Defendants**. During their tenures as officers and/or directors of TD, each of Defendants Masrani, Salom, Tran, Bowman, and Levine

272

was a controlling person of TD within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of TD, these Defendants had the power and authority to cause TD to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of statements alleged as false and misleading, as well as the Proxy and the other solicitations described herein made by TD during the Class Period.  In addition to permitting their names to be used in the Proxy concerning false and misleading statements and omissions of material facts as to TD's ability to timely obtain regulatory approvals, Defendants Masrani, Salom, Tran, Bowman, and Levine were able to and did control, directly and indirectly, the content of the merger agreement and, in particular, TD's false and misleading representations as to its legal compliance, which were attached as Annex A to the Proxy.

477.   In their capacities as senior corporate officers and/or directors of TD, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above.  Indeed, these Defendants had access to information regarding the circumstances surrounding the merger, including TD's regulatory approval process, TD's regulatory and legal compliance, and the terms of the merger.  As a result of the foregoing, Masrani, Salom, Tran, Bowman, and

273

Levine were control persons within the meaning of Section 20(a) of the Exchange Act.

478. **The First Horizon Executive Defendants**. During his tenure as President and CEO, and her tenure as CFO, of First Horizon, respectively, Defendants Jordan and Dmuchowski were controlling persons of First Horizon within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as CEO and CFO, respectively, of First Horizon, Jordan and Dmuchowski had the power and authority to cause First Horizon to engage in the wrongful conduct complained of herein. Jordan and Dmuchowski were able to and did control, directly and indirectly, the contents of the Proxy and the other solicitations described herein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

479. In their capacities as senior corporate officers of First Horizon, and as more fully described above, Jordan and Dmuchowski had access to information regarding the circumstances surrounding the merger and, consistent with the terms of the merger, were provided with updates concerning TD's interactions with its regulators in real time. By reason of their positions of control and authority as officers and/or directors of First Horizon, these Defendants had the power and authority to cause First Horizon to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the

content of statements alleged as false and misleading, as well as the Proxy and the other solicitations described herein, made by First Horizon during the Class Period.

480.   As set forth above, TD violated Section 10(b) of the Exchange Act by their acts and omissions as alleged in this Complaint. During the respective times Defendants Masrani, Salom, Tran, Bowman, and Levine served as officers of TD, they are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as TD is liable under Section 10(b). Similarly, as detailed above, First Horizon violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. During the respective times Defendants Jordan and Dmuchowski served as officers of First Horizon, they are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as First Horizon is liable under Section 10(b).

481.   Further, as set forth above, TD violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of TD, and as a result of their own aforementioned conduct, Defendants Masrani, Salom, Tran, Bowman, and Levine are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as TD is liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class. Similarly, as set forth above, First Horizon violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this

Complaint. By virtue of their positions as controlling persons of First Horizon and as a result of their own aforementioned conduct, Defendants Jordan and Dmuchowski are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as First Horizon is liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class.

482. By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XV.    PRAYER FOR RELIEF

483.    WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)    Awarding Lead Plaintiffs' reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(d)    Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

484.    Lead Plaintiffs demand a trial by jury.

Dated:  January 31, 2025                Respectfully submitted,

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

By: /s/ *James E. Cecchi*
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Salvatore J. Graziano (*pro hac vice*)
Michael Blatchley
Aasiya Glover (*pro hac vice*)
Chloe Jasper (*pro hac vice*)
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
michaelb@blbglaw.com
aasiya.glover@blbglaw.com
chloe.jasper@blbglaw.com

**SAXENA WHITE P.A.**

Steven B. Singer (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Kyla Grant (*pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606

Tel: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com
kgrant@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice*
forthcoming)
Lester R. Hooker (*pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (866) 290-1291
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the Class*