[Docket Nos. 47, 48, 90, 91]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

|  |  |
|---|---|
| IN RE TORONTO-DOMINION BANK / FIRST HORIZON CORPORATION SECURITIES LITIGATION | Civil Action No. 23-2763 (RMB/AMD)<br><br>**OPINION** |

**APPEARANCES:**

CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.
James E. Cecchi
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068

 *Liaison Counsel for Lead Plaintiff*

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
Salvatore J. Graziano
Michael Blatchley
Aasiya Mirza Glover
1251 Avenue of the Americas
New York, New York 10020

SAXENA WHITE P.A.
Steven B. Singer
David J. Schwartz
10 Bank Street, Suite 882
White Plains, New York 10606

Maya Saxena
Joseph E. White III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, Florida 33434

 *Counsel for Lead Plaintiffs and Lead Counsel for the Class*

BROWN & CONNERY, LLP
Susan M. Leming
360 Haddon Avenue
Westmont, New Jersey 08108

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Susanna M. Buergel
Andrew G. Gordon
Paul A. Paterson
1285 Avenue of the Americas
New York, New York 10019

*Counsel for Defendants Toronto-Dominion Bank, Bharat Masrani, Leo Salom, and Kelvin Vi Luan Tran*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Barry H. Berke
Michael Martinez
Marjorie E. Sheldon
1177 Avenue of the Americas
New York, New York 10036

Brandon L. Arnold
2000 K Street NW, 4th Floor
Washington, DC 20006

*Counsel for Defendants First Horizon Corporation, D. Bryan Jordan, and Hope Dmuchowski*

LEVINE LEE LLP
Scott B. Klugman
Seth L. Levine
Alison M. Bonelli
400 Madison Ave.
New York, New York 10017

*Counsel for Defendant Michael Bowman*

WEIL, GOTSHAL & MANGES LLP
Diane P. Sullivan
17 Hulfish Street, Suite 201
Princeton, New Jersey 08542

Chantale Fiebig
2001 M Street NW, Suite 600
Washington, DC 20036

Joshua S. Amsel
767 Fifth Avenue
New York, New York 10153

*Counsel for Defendant Mia Levine*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This is a federal securities class action brought on behalf of a class of investors consisting of (i) all persons or entities who purchased or otherwise acquired securities of Defendant First Horizon Corporation ("First Horizon") between February 28, 2022 and May 3, 2023 (the "Class Period") and (ii) all persons or entities who were holders of First Horizon common stock as of the April 20, 2022 record date that were entitled to vote to approve the Merger Agreement described below (the "Class"). The Class is represented at this stage by the Westchester Funds, the Pentwater Funds, the Sand Grove Funds, and the Alpine Funds (collectively, for purposes of this Opinion, the "Plaintiffs"). Plaintiffs assert claims under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 promulgated thereunder against First Horizon and its executives D. Bryan Jordan and Hope Dmuchowski (collectively, the "FH Executive Defendants," and together with First Horizon, the "FH Defendants"); Toronto-Dominion Bank ("TD Bank"), its executives Bharat Masrani, Leo Salom, and Kelvin Vi Luan Tran, and its former executives Michael Bowman and Mia Levine (collectively, the "TD Executive Defendants," and together with TD Bank, the "TD Defendants").

In the main, Plaintiffs allege that Defendants made a series of material misrepresentations and omissions during the Class Period about TD Bank's regulatory compliance, in particular its anti-money laundering ("AML") policies, and the likelihood of obtaining regulatory approval for TD Bank's acquisition of First Horizon, which caused Plaintiffs to purchase First Horizon securities at an artificially inflated price and resulted in damages when First Horizon's stock price ultimately plummeted when the merger was terminated.

Before the Court are Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) by the TD Defendants [Docket No. 47], the FH Defendants [Docket No. 48], Mr. Bowman [Docket No. 90], and Ms. Levine [Docket No. 91].[1] Having considered the parties' submissions, the Court resolves the Motions without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons expressed herein, the Motions will be **GRANTED**.

---

[1] In support of their motion, the TD Defendants filed an opening brief ("TD Br.") [Docket No. 47-1] and a reply brief ("TD Reply") [Docket No. 52], as well as a supplemental brief ("TD Supp. Br.") [Docket No. 86] and a supplemental reply brief ("TD Supp. Reply") [Docket No. 101]. The FH Defendants filed the following in support of their motion: an opening brief ("FH Br.") [Docket No. 48-1], a reply brief ("FH Reply") [Docket No. 53], a supplemental brief ("FH Supp. Br.") [Docket No. 87], and a supplemental reply brief ("FH Supp. Reply") [Docket No. 103]. Defendant Bowman filed an opening brief ("Bowman Br.") [Docket No. 90-1] and a reply brief ("Bowman Reply") [Docket No. 104]. Defendant Levine filed an opening brief ("Levine Br.") [Docket No. 91-1] and a reply brief ("Levine Reply") [Docket No. 102]. Both Bowman and Levine joined in the arguments made by TD Bank. Plaintiffs filed a brief in opposition to the TD and FH Defendants' motions ("Pls.' Opp'n") [Docket No. 51], as well as an omnibus brief in opposition to all four motions to dismiss ("Pls.' Supp. Opp'n") [Docket No. 98].

I.   **FACTUAL BACKGROUND**[2]

This litigation stems from TD Bank's failed acquisition of First Horizon by TD Bank.  The merger would have been the most significant transaction in the history of both banks with a value of $13.4 billion.  The resulting bank would have been the sixth largest in the United States.  Upon the merger's announcement, First Horizon's share value increased significantly.  According to Plaintiffs, however, the share price was artificially inflated due to Defendants' ongoing misrepresentations and material omissions regarding significant problems with TD Bank's AML controls and the likelihood of the merger receiving regulatory approval in light of these issues.  While the history of the proposed transaction and Defendants' statements are described in greater detail below, the Court only recites those factual allegations that it deems necessary to resolve the pending Motions to Dismiss.

A.   **The Plaintiffs**

Plaintiffs are investors in First Horizon who purchased First Horizon securities during the Class Period.  [TAC ¶¶ 33–36.]  Plaintiffs do not allege that they ever purchased or sold TD Bank shares or ever held voting rights in TD Bank.

B.   **The Defendants**

TD Bank is a bank operating in the United States, Canada, and internationally. [*Id.* ¶ 37.]  It is incorporated under the laws of Canada and has its U.S. headquarters

---

[2]   As explained below, see *infra* § III.A., the Court draws all factual allegations from the Third Amended Complaint (the "TAC") [Docket No. 46], exhibits attached thereto, and matters of public record, and accepts all well-pleaded allegations as true.

in Cherry Hill, New Jersey.  [*Id.* ¶ 38.]  Throughout the Class Period, Defendant Masrani served as TD Bank's Group President and Chief Executive Officer ("CEO"). He previously served as the CEO of TD Bank's U.S. Retail Bank and Chief Risk Officer of TD Bank Group.  [*Id.* ¶ 42.]  Since early 2022 and throughout the Class Period, Defendant Salom has served as TD Bank's Group Head, U.S. Retail, TD Bank Group and President and CEO of TD Bank America's Most Convenient Bank®. [*Id.* ¶ 43.]  Defendant Tran has been employed in various positions at TD Bank for over twenty years.  Since September 1, 2021, he has served as TD Bank's Group Head and Chief Financial Officer ("CFO").  [*Id.* ¶ 44.]  Defendant Bowman served as Global Head of AML Compliance for TD Bank Group from 2019 through November 2023. [*Id.* ¶ 45.]  He departed TD Bank in March 2024.  [*Id.*]  Defendant Levine served as the Bank Secrecy Act ("BSA") Officer for TD Bank, N.A. and Deputy Global Head of AML Compliance for TD Bank from May 2019 through her termination on May 16, 2023.  [*Id.* ¶ 46.]

Defendant First Horizon is a bank holding company based in Memphis, Tennessee.  [*Id.* ¶ 49.]  Its shares are publicly traded on the New York Stock Exchange under the ticker symbol "FHN."  [*Id.*]  It is largely a regional bank concentrated in the Southeastern United States and operates in only twelve states.  [*Id.*]  Defendant Jordan was First Horizon's Chairman of the Board, President, and CEO during the Class Period.  [*Id.* ¶ 50.]  Defendant Dmuchowski was First Horizon's Senior Executive Vice President and CFO throughout the Class Period.  [*Id.* ¶ 51.]

C.    The Merger Agreement

On January 6, 2022, TD Bank made an unsolicited all-cash offer to acquire First Horizon at $25 per share.  [Proxy at 43, Paterson Decl. Ex. 2 (Docket No. 47-6).] Within days, TD Bank and First Horizon began discussing TD Bank's "ability to obtain regulatory approvals" from the Federal Reserve and the Office of the Comptroller of the Currency ("OCC"), both of which were required for the transaction to close.  [*Id.* at 44; TAC ¶ 60.]  After agreeing to the terms of the merger, the banks "began exchanging due diligence information and materials" on February 2, 2022. [Proxy at 47.]  On February 27, 2022, TD Bank and First Horizon executed an Agreement and Plan of Merger (the "Merger Agreement" or "Agreement").  [Merger Agreement, Paterson Decl. Ex. 1 (Docket No. 47-5).]

The Merger Agreement required the transaction to close by February 27, 2023, with an option to extend the closing date by three months upon notice of either party. [*Id.* § 8.1(c).]  Closing was conditioned on obtaining regulatory approvals for the proposed merger.  [*Id.* § 8.2(f).]  In the Merger Agreement, TD Bank represented that it had "no knowledge of any reason" why it would not receive "regulatory approvals and consent . . . to permit consummation of the Mergers on a timely basis."  [*Id.* § 4.4.] Additionally, TD Bank warranted that it had complied with all applicable laws and regulations and had established and maintained a system of AML controls.  [*Id.* § 4.7(b); TAC ¶ 93.]  TD Bank had also assured First Horizon that there were no "regulatory investigations of any nature" against it and that no regulator had told TD

Bank that it was considering action against it that would materially impact its ability to close the transaction in a timely fashion. [Merger Agreement §§ 4.6, 4.8, 9.16.]

TD Bank was also required under the Merger Agreement to keep First Horizon "apprised of the status of matters relating to completion of the [merger]," to "consult with [First Horizon] in advance of any meeting or conference with" regulators, and to advise First Horizon of the "substantive matters that are addressed in any meeting or conference with" regulators. [*Id.* § 6.1(b).] Confidential supervisory information ("CSI"), however, would not and could not be shared.[3] [*Id.* § 9.14.]

Under the Agreement's terms, if the Agreement was terminated for failure to obtain the required regulatory approvals, TD Bank was required to pay First Horizon $25 million as reimbursement of fees and expenses. [*Id.* § 8.2(g).] TD Bank also invested $493 million in First Horizon convertible preferred stock that would convert into common stock at $25 per share upon closing. [TAC ¶ 290.]

Upon closing, the Merger Agreement provided that the FH Executive Defendants would receive "golden parachute" payments that collectively totaled over $95 million. [*Id.* ¶ 57.] Defendant Jordan also would be appointed as the Vice Chair

---

[3]    CSI includes any records "prepared by, on behalf of, or for the use of" any financial regulator, and any information "created or obtained in furtherance of" that regulator's "supervisory, investigatory, or enforcement activities," or any information "derived from or related to such information." *See* 5 U.S.C. § 552(b)(8); 12 C.F.R. § 261.2(b)(1). Regulators prohibit banks from sharing CSI with potential merger partners without the regulators' express approval, which is denied in all but the most "unusual circumstances." FedLinks, CSI (Aug. 2016), https://perma.cc/33U5-Q3BK. Unauthorized use or disclosure of CSI may result in criminal prosecution. *See* Interagency Advisory, OCC 2005-4 (Feb. 2005), https://perma.cc/Q3PX-45PS.

of TD Group, become a member of TD Bank's Executive Team, and would be named to the Boards of TD Bank's U.S. banking entities. [*Id.*]

On February 28, 2022, the first day of the Class Period, TD Bank and First Horizon issued a joint press release announcing the Merger Agreement and setting forth the terms of the proposed $13.4 billion all-cash transaction. [TAC ¶ 308.] The transaction was "expected to close in the first quarter of TD's 2023 fiscal year." [*Id.*] During a conference call the same day, Defendant Masrani stated that TD Bank "prided [itself] in having excellent regulatory relationships" that would allow closing to happen in this short timeframe. [*Id.* ¶ 98.]

The $25 per share acquisition price represented a 37% premium to First Horizon's stock price of $18.25 per share immediately prior to the transaction's announcement. [*Id.* ¶ 56.] As noted, the transaction would make TD Bank the sixth largest bank in the United States and represented the largest and most significant transaction in the history of both banks. [*Id.* ¶¶ 55, 58.] After the announcement was made, First Horizon's stock price increased by nearly 30%, from a price of $18.25 per share to $23.48 per share. [*Id.* ¶ 56.]

### D.    Class Period Developments

Shortly after signing and announcing the Merger Agreement, TD Bank promptly applied for the necessary regulatory approvals. On March 21, 2022, TD Bank publicly filed its Bank Merger Act Application with the OCC. [*Id.* ¶ 331.] The application touted both banks' "comprehensive anti-money laundering and

sanctions programs" that were "designed to ensure compliance with" applicable laws. [*Id.*] Throughout the Class Period, TD Bank highlighted its strong AML program on its website and SEC filings. [*Id.* ¶¶ 94–95.] A crucial factor in regulators' decision making is the effectiveness of the acquiring bank's AML controls. [*Id.* ¶ 60.] Weak AML controls would likely result in regulators not approving a transaction. [*Id.* ¶¶ 72–75.]

In April 2022, First Horizon issued its Proxy Statement urging First Horizon shareholders to approve the merger. [*Id.* ¶ 340.] The Proxy Statement represented that First Horizon "had identified TD's 'legal and regulatory compliance' as a 'Reason[] For The Merger' based on 'information obtained through due diligence.'" [*Id.*] The Proxy Statement assured shareholders that neither First Horizon nor TD Bank knew of any reason why the merger would not receive the necessary regulatory approvals on a timely basis, but warned that they "cannot be certain when or if the requisite regulatory approvals will be obtained." [Proxy at 20.] It also included several additional risk disclosures and warnings about the uncertainty of the receipt and timing of regulatory approvals. [*See, e.g.*, *id.* at 10, 31, 52.]

On May 4, 2022, *Capitol Forum*, an investigative news outlet, reported that TD Bank had a multi-year history of failing to prevent and rectify misconduct such as the opening of fake bank accounts and that, in 2017, the OCC had issued TD Bank a private reprimand due to its regulatory compliance issues. [TAC ¶¶ 102, 346.] The report questioned whether TD Bank's "misconduct would result in increased regulatory scrutiny of the First Horizon deal." [*Id.* at ¶ 102.] TD Bank denied all

allegations of regulatory misconduct and affirmed that it "follow[ed] industry-best practices that are designed to detect and help prevent fraud." [*Id.* ¶ 103.] On a May 26, 2022 earnings call, Defendant Salom expressed that TD Bank was "very comfortable" that the proposed merger would receive regulatory approval because "we did this transaction on the basis that [] it meets all requirements of the regulators." [*Id.* ¶ 349.] The next day, First Horizon's Chief Banking Officer, Anthony Restel, sold $3.5 million in his First Horizon stock. [*Id.* ¶ 264.] Days later, on May 31, 2022, First Horizon shareholders voted to approve the merger. [*Id.* ¶ 105.]

Days later, on June 3, 2022, the Cullen Commission[4] issued its final report identifying TD Bank as the "largest source of bank drafts flagged as suspicious" by Canadian authorities and criticized TD Bank as "an outlier among Canadian banks in terms of having woefully deficient AML controls." [*Id.* ¶ 91.] Later that month, a group of U.S. lawmakers sent an open letter to the OCC regarding the allegations of "unchecked fraud and abuse at TD Bank" set forth in the *Capitol Forum* report and called on the OCC to "closely examine" any "ongoing wrongdoing" by TD Bank and "block any merger until TD Bank is held responsible for its abusive practices." [*Id.* ¶ 108.] TD Bank strongly denied any regulatory abuses or inadequate AML controls. [*Id.* ¶ 109.]

---

[4]    The Cullen Commission was "a formal money laundering inquiry established by the Canadian province of British Columbia that was convened to investigate hundreds of millions of dollars laundered through British Columbian casinos between 2018 and 2021." [TAC ¶ 90.]

*Capitol Forum* issued another report on July 8, 2022 questioning TD Bank's regulatory compliance and whether regulatory approval of the merger with First Horizon was in jeopardy. [*Id.* ¶¶ 110, 355.] TD Bank vehemently denied all allegations in this report and accused the reporter of defamation. [*Id.* ¶¶ 111, 356.] In an August 2022 investor call, Defendant Masrani stated he had no reason to believe the merger with First Horizon would not close and that it "is proceeding at the pace we expected." [*Id.* ¶ 365.]

On August 18, 2022, the OCC and the Federal Reserve hosted a public hearing on the merger as part of the application process. [*Id.* ¶ 113.] During an analyst call the following month, Defendant Salom stated that TD Bank was "very excited" about the anticipated merger and was "extremely confident" in its ability to obtain regulatory approval "in short order" due to the "strength of the application." [*Id.*]

Beginning in October 2022, however, regulators had a series of "confidential," "private," and "secret" discussions with TD Bank during which they conveyed that they were "virtually certain to reject the merger because of [TD Bank's] AML deficiencies." [*See, e.g.*, *id.* ¶¶ 135–39, 390.] In October 2022, the OCC completed its annual supervisory examination of TD Bank and its AML controls, which revealed "serious lapses in the Bank's AML program." [*Id.* ¶ 135.] Thereafter, TD Bank met with regulators in private and were told that the regulators had identified "such serious problems in TD's AML controls that they were the focus of an ongoing DOJ [Department of Justice] investigation and, as a result, the merger was almost certain to be rejected." [*Id.* ¶ 139.] TD Bank's General Counsel, outside counsel, and certain

senior executives met with the Federal Reserve and the OCC on at least four occasions in the following month.  [*Id.* ¶ 136.][5]

Despite the concerns raised in these meetings, TD Bank did not disclose any issues to the market.  Instead, it repeatedly publicly assured the market of its confidence in obtaining regulatory approval for the merger and explained any delays as "benign."  [*Id.* ¶¶ 142–45.]  During this time, First Horizon's stock price continued to rise.  On November 30, 2022, the First Horizon share price increased to $24.85 per share, nearly equal to the deal price of $25.  [*Id.* ¶ 115.]

In the coming months, TD Bank continued to meet in private with regulators. [*Id.* ¶ 146.]  In January 2023, the Federal Reserve sent a formal written notice to TD Bank's outside counsel informing that it could not make a decision on the proposed merger until it "receive[d] additional information from another agency that is necessary" to its determination, "signal[ing] that the transaction was in serious jeopardy."  [*Id.*]

TD Bank and First Horizon issued a joint press release on February 9, 2023 disclosing that they had agreed to extend the merger's deadline by three months, as permitted by the terms of the Merger Agreement, to May 27, 2023.  [*Id.* ¶ 147.]  The banks did not disclose any regulatory concerns at this time, but rather reiterated their

---

[5]    During November 2022, two high level First Horizon executives, Tammy LoCascio and David Popwell, sold millions of dollars of First Horizon shares.  [TAC ¶ 262.]  Both were intimately involved in overseeing the merger.  [*Id.*]

full commitment to the merger and stated that they "continue[d] to make significant progress in planning for the closing." [*Id.*]

Two weeks later, on February 22, 2023, the OCC scheduled a private meeting with Defendant Masrani and TD Bank's outside counsel for March 9, 2023. [*Id.* ¶ 148.] Two days later, Defendant Jordan sold approximately $2.3 million worth of First Horizon common stock. [*Id.* ¶ 259.] First Horizon Chairman Daryl Byrd sold $12.66 million in shares during the Class Period, which was twice as many shares as compared to the 15 months prior. [*Id.* ¶ 261.]

On March 1, 2023, First Horizon announced in its Form 10-K that "TD does not expect that the necessary regulatory approvals will be received in time to complete the [p]ending TD Merger by May 27, 2023," and that "TD [could] not provide a new projected closing date at this time." [*Id.* ¶ 150.] First Horizon stock fell over 10% after this disclosure. [*Id.*] The following day during an earnings call, Defendant Masrani stated that TD Bank was "fully committed to the transaction" and that TD Bank and First Horizon had "opened discussions . . . about a potential additional extension" of the closing date. [*Id.* ¶ 153.] When asked if the delay was merely "procedural" or "something more substantive," Masrani stated that there was no cause for concern about receiving regulatory approval. [*Id.* ¶ 154.]

The next day, Defendant Dmuchowski, First Horizon's CFO, had a discussion with Evercore ISI analysts in which she stated that First Horizon "has not been informed as to the nature of the new regulatory issue at TD, nor which regulator has

14

brought it up," but assured the analyst that "TD & FHN remain in active discussions re: merger integration plans & related matters."  [*Id.* ¶¶ 155, 398.]

Shortly after the meeting with the OCC on March 9, 2023, TD Bank's outside counsel submitted "a request for suspension of the processing" of the merger application at the "instruct[ion]" of the Federal Reserve, "because it could not be approved."  [*Id.* ¶¶ 157, 159.]  This was not publicly disclosed.  [*Id.* ¶ 159.]  Despite this development, on April 12, 2023, Defendant Masrani told Bank of America analysts that TD Bank "remains committed to completing the FHN deal where TD/FHN are currently negotiating an extension to the current deal deadline." [*Id.* ¶ 160.]  First Horizon's stock price rose around 4.6% after his statements.  [*Id.*] A week later, during TD Bank's annual general shareholder meeting, Masrani told investors that "closing remained a matter of 'when,' not 'if'" and that TD Bank was negotiating an extension with First Horizon since it did not believe it would receive regulatory approval by May 27, 2023.  [*Id.* ¶ 161.]

### E.    The Merger Termination

On May 3, 2023, *Capitol Forum* published an article reporting publicly for the first time that Defendant Masrani and TD Bank's outside counsel had met confidentially with senior OCC officials in March, noting that such a meeting was "highly unusual" and "d[id] not bode well for the merger."  [*Id.* ¶ 165.]  Immediately thereafter, First Horizon's stock price fell by 7%.  [*Id.*]

The next day, on May 4, 2023, TD Bank and First Horizon issued a joint press release announcing that the Merger Agreement had been terminated because there was no "timetable for regulatory approvals to be obtained." [*Id.* ¶ 166.]  TD Bank agreed to pay the $25 million reimbursement to First Horizon, as required under the Merger Agreement, as well as a $200 million cash break-up fee that had not been anticipated in the deal terms.  [*Id.* ¶ 167.]  Plaintiffs allege that TD Bank "made this unusual payment to avoid liability for breaching its representations and warranties in the merger agreement, including representations stating that TD had 'complied with' BSA/AML regulations." [*Id.*]  In response, First Horizon's stock price fell 33% in one day to $10.06 per share.  [*Id.* ¶ 168.]  Defendant Jordan, First Horizon's CEO, stated during an earnings call that day that the Merger Agreement was terminated due to TD Bank's regulatory issues that "did not relate in any way to First Horizon." [*Id.* ¶ 169.]  He also explained that "TD's regulatory issues were so severe and had doomed the merger to such a definitive degree that, in reality, '[a]t no time did we discuss any changes in price or any other changes to the structure of the deal.'" [*Id.* ¶ 170.]

In a subsequent investor call, Defendant Dmuchowski described First Horizon's thirty-day due diligence on TD Bank as "chaotic." [*Id.* ¶ 251.]  An anonymous First Horizon Senior Compliance Officer identified as "FE1" confirmed that the diligence period was inadequate and did not allocate sufficient time and resources to conduct a fulsome due diligence on TD Bank.  [*Id.* ¶ 252.]  FE1 reported that according to their supervisor, TD Bank representatives had acknowledged the deficiencies in

TD Bank's AML compliance program and noted that the merged company would have to rely on First Horizon's compliance program instead. [*Id.* ¶ 253.]

### F.    Post-Termination Developments and TD Bank's Guilty Plea

Several analyst reports were published in the wake of the merger termination that questioned the severity of TD Bank's regulatory compliance problems. [*Id.* ¶ 171.] BMO analysts asked: "What was the issue that was significant enough to delay regulatory approvals indefinitely, yet not material enough to disclose?" [*Id.*] On May 8, 2023, *The Wall Street Journal* reported that "TD Bank's deficient AML compliance program and improper 'handling of suspicious transactions' was behind regulators' refusal to approve the deal." [*Id.* ¶ 172.]

In August 2023, TD Bank confirmed that regulators were investigating its AML compliance program and that it expected "monetary and/or non-monetary penalties to be imposed." [*Id.* ¶ 174.] TD Bank also stated that it planned to enhance its BSA/AML compliance programs. [*Id.* ¶ 175.]

*Capitol Forum* issued a report on January 8, 2024 stating that TD Bank was aware as early as November 2022 that regulators were likely to reject the proposed merger due to serious lapses in its AML controls and that, although TD Bank had long been aware of the DOJ's AML investigation, it chose not to disclose it publicly for six months. [*Id.* ¶¶ 139–40, 176.]

On October 10, 2024, the DOJ, FinCEN,[6] the Federal Reserve Board, and the OCC announced that they had completed parallel investigations into TD Bank's AML practices.  [*Id.* ¶ 179.]  As a result of these investigations, TD Bank pled guilty to criminal violations of the BSA and conspiracy to commit money laundering. It admitted to "willful" violations of AML regulations spanning nearly a decade and covering the entire Class Period.  [*Id.*]  It incurred $3 billion in fines and penalties.  [*Id.*] TD Bank's inadequate AML program was the result of its "flat cost paradigm," which Plaintiffs describe as "a directive that AML costs and spending remain flat year-over-year despite the extraordinary growth and corresponding increase in AML risk over the past decade" and resulted in extreme budgetary pressure to underinvest in AML compliance.  [*Id.* ¶¶ 182–84.]

## II.  PROCEDURAL HISTORY

Two putative class action complaints were first filed in May and June 2023 by Plaintiffs the Arbitrage Fund and Andrew Amicarelli respectively, which were consolidated on August 29, 2023.  [Civ. No. 23-2763, Docket Nos. 1, 24; Civ. No. 23-3024, Docket No. 1.]  On February 9, 2024, Plaintiffs filed the Second Amended Consolidated Class Action Complaint [Docket No. 46].  On April 8, 2024, the TD Defendants and the FH Defendants filed their respective Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[6]     FinCEN is "a bureau of the Department of Treasury whose 'mission' is 'to safeguard the financial system from illicit use' and 'combat money laundering and its related crimes.'"  [TAC ¶ 61.]  It is the agency charged with enforcing the BSA.  [*Id.*]

Plaintiffs advised the Court on November 4, 2024 that they intended to seek leave to amend the complaint either with consent of the Defendants or via motion practice to add newly developed facts relating to the extent of TD Bank's regulatory issues and Defendants' knowledge of the same during the Class Period [Docket No. 61]. The Court, after receiving the consent of the parties, administratively terminated the motions pending the filing of the forthcoming amended complaint [Docket No. 67].

The operative Third Amended Complaint ("TAC") was filed on January 31, 2025 [Docket No. 71]. The TAC asserts that (i) Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder (Count I); (ii) Defendants violated Section 14(a) of the Exchange Act (Count II); and (iii) the Executive Defendants violated Section 20(a) of the Exchange Act (Count III).[7] TD Bank and First Horizon supplemented their original motions to dismiss, as directed by the Court, and the newly added Defendants Bowman and Levine each filed their respective motions to dismiss. The motions are now fully briefed and ripe for adjudication.

---

[7] Plaintiffs explained that they "only bring scheme claims against Defendants Bowman and Levine, and do not assert Rule 10b-5(b) or Section 14(a) claims against them." [Pls.' Supp. Opp'n at 44 n.14.] It is unclear to the Court whether Plaintiffs intend to pursue their Section 20(a) claim against Defendants Bowman and Levine. Any future amended complaint should make this clear and specify precisely which Defendants are named under each count.

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss—Rule 12(b)(6)

A pleading is generally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  Under Rule 8, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requires the plaintiff to allege "more than mere labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Plaintiffs must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

A complaint may be dismissed, in whole or in part, pursuant to Federal Rule of Civil Procedure 12(b)(6) when it appears beyond doubt that no relief could be granted under any set of facts that could be proved.  *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005) (citations omitted).  When considering a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pled allegations in the complaint, including all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.  *Id.* at 350–51.  A court need not accept "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  A court may "generally consider only the allegations contained in the complaint, exhibits attached to the

complaint[,] and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court's role in reviewing the sufficiency of a complaint is thus limited: the issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). "When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016) (citation omitted).

## B.    Heightened Pleading

When an asserted claim sounds in fraud, as here, plaintiffs must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). This requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The particularity requirement is "rigorously applied in securities fraud cases." *Burlington*, 114 F.3d at 1417 (citations omitted).

"Although Rule 9(b) falls short of requiring every material detail of the fraud, such as the date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (quoting *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 557 (D.N.J. 2001)). Generally,

courts cast this requirement in terms of alleging "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *Id.* at 217 (quoting *Burlington*, 114 F.3d at 1422). This level of particularity is critical to "place the defendant on notice of the 'precise misconduct with which it is charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223–24 (3d Cir. 2004)) (cleaned up). Usually, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b), however, requires private plaintiffs in securities fraud actions, such as this one, to plead scienter with particularity. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) ("Under § 78u–4(b)(2), 'a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b).'") (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (outlining the "two exacting and distinct pleading requirements" that the PSLRA imposed); *Rockefeller Ctr. Props.*, 311 F.3d at 217 (reviewing the purposes of the PSLRA—"to restrict abuses in securities class-action litigation"—and observing that "Congress 'expressly intended' to 'substantially heighten' the existing pleading requirements") (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531, 534 (3d Cir. 1999)).

## IV.    DISCUSSION

The Defendants seek dismissal of the TAC in its entirety.  According to the TD Defendants, Plaintiffs lack standing to pursue their Section 10(b) claims against the TD Defendants because all alleged misrepresentations and omissions were about TD Bank, not First Horizon, and Plaintiffs were not TD Bank shareholders. Additionally, the TD and FH Defendants argue that Plaintiffs' Section 10(b) claims fail because the TAC does not allege a strong inference of scienter as required to establish their claims.  The FH Defendants also contend that Plaintiffs' Section 10(b) claims must be dismissed because Plaintiffs do not allege any actionable misstatements or omissions made by the FH Defendants, as required to plead a misstatement claim, or any misconduct beyond a misrepresentation, as required to plead a scheme liability claim.

As to Plaintiffs' Section 14(a) claim, the TD Defendants contend that Plaintiffs once again lack standing to assert this claim because Plaintiffs did not have any voting rights in TD Bank.  All Defendants argue that Plaintiffs' Section 14(a) claim fails for the additional reason that the Merger was never consummated, meaning that causation cannot be established.  The FH Defendants further argue that Plaintiffs have no adequately alleged any misleading statements in the proxy solicitation, as required.

Finally, all Defendants argue that Plaintiffs' Section 20(a) claims fail as a matter of law because Plaintiffs cannot establish a predicate independent violation of the Exchange Act.

The Court addresses each claim in turn.

### A.    Section 10(b) Claim

In their first claim for relief, Plaintiffs assert that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, by making false statements and omissions and engaging in deceptive and manipulative acts to defraud investors, which resulted in Plaintiffs paying artificially inflated prices for First Horizon shares.

Section 10(b) and Rule 10b-5 prohibit fraud in connection with the purchase or sale of securities. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010); *SEC v. Desai*, 145 F. Supp. 3d 329, 335 (D.N.J. 2015). Specifically, Section 10(b) prohibits "the use or employ, in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, renders the following conduct illegal in connection with the purchase or sale of any security:

> (a) to employ any device, scheme, or artifice to defraud;
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5(a)–(c). Claims brought under Rule 10b-5(b) relate to deceptive statements, whereas claims under Rules 10b-5(a) and (c) are referred to as "scheme liability" claims because they "make deceptive *conduct* actionable, as opposed to . . . deceptive statements," as in Rule 10b-5(b). *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623,

643 n.29 (3d Cir. 2011) (emphasis added).  Here, Plaintiffs invoke all three subsections against Defendants.

Section 10(b) and Rule 10b-5 "imply a private cause of action for securities fraud."  *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (quoting *City of Warren Police & Fire Dep't Retirement Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d. Cir. 2023)).  To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Plaintiffs must plead sufficient facts to demonstrate that Defendants (1) made a misrepresentation or omission of material fact, or employed a fraudulent device, scheme, act, or practice, (2) with scienter, (3) in connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *See In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at \*2 (3d Cir. June 14, 2022) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)); *U.S. Sec. & Exch. Comm'n v. Mintz*, 723 F. Supp. 3d 386, 403 (D.N.J. 2024).

### 1. Plaintiffs Lack Statutory Standing to Sue the TD Defendants for Violations of Section 10(b)

The Court first considers the TD Defendants' argument that Plaintiffs lack statutory standing to assert Section 10(b) claims against them.  Relying on recent Second and Ninth Circuit Court interpretations of the "purchaser-seller" rule, the TD Defendants contend that statutory "[s]tanding to sue under Section 10(b) is limited to purchasers or sellers of securities *about which a misstatement was made*."  [TD Br. at 11 (emphasis in original) (quoting *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022)); *see also* TD Supp. Authority Letter [Docket No. 56] (citing

*In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1185 (9th Cir. 2024)); TD Supp. Br. at 4–7.]  According to the TD Defendants, their alleged misstatements are only "about" TD Bank – not First Horizon.  Therefore, Plaintiffs – First Horizon shareholders – do not have standing to sue TD Bank because they are not purchasers or sellers of the securities about which the alleged misstatements were made.  response, Plaintiffs argue that the Circuit Court decisions in *Menora* and *Lucid Motors* are unpersuasive, distinguishable, and contrary to controlling Third Circuit authority, which allows investors in one merger partner to sue the other merger partner for securities fraud.  [Pls.' Opp'n at 23–27 (relying on *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176–78 (3d Cir. 2000)).]

Having thoroughly considered the relevant case law and the parties' arguments, the Court agrees with the TD Defendants that *Menora* and *Lucid Motors* did not create new law, but rather are well-reasoned interpretations of binding Supreme Court precedent.  Accordingly, the Court is persuaded that the Third Circuit Court of Appeals would follow its sister circuits in determining that the narrow judicially created private right of action under Section 10(b) does not extend to Plaintiffs here.  For the reasons explained herein, the Court finds that Plaintiffs – as First Horizon shareholders – lack statutory standing to pursue Section 10(b) claims against the TD Defendants.

*(a) The Purchaser-Seller Rule Limits Section 10(b) Plaintiffs to Actual Purchasers or Sellers of the Securities About Which a Misstatement Was Made.*

"Neither Section 10(b) of the Exchange Act nor Rule 10b-5 provides an express private right of action, but the Supreme Court has long held that one is implied." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 85 (2d Cir. 2022) (citations omitted); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 729–30 (1975) (documenting the development of the implied private right of action). In *Blue Chip*, the Supreme Court adopted the reasoning of the Second Circuit Court of Appeals in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952) and limited the class of plaintiffs who may bring a Section 10(b) or Rule 10b-5 claim to actual sellers or purchasers of the stock in question, not simply holders or offerees. 421 U.S. at 754–55. This precluded the *Blue Chip* plaintiff – an offeree of a stamp corporation's stock, not an actual purchaser or seller of that stock – from pursuing its claims. *Id.* at 755.

"The virtue of the *Birnbaum* rule," adopted by the Supreme Court in *Blue Chip*, "is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 747; *see also id.* at 742 ("The *Birnbaum* rule . . . permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question."). This, explained the Supreme Court, helped curtail "vexatious litigation" by limiting the class of proper plaintiffs to those who can establish this "objectively demonstrable fact." *Id.* at 747. The *Blue Chip* Court was fully aware of the disadvantages of drawing such a bright line rule, including that it "undoubtedly excludes plaintiffs who have in fact been

damaged," but found the disadvantages to be outweighed by the advantages. *See id.* at 738–39, 743, 755.[8]  Among the advantages of a bright line rule was the prevention of an "endless case-by-case erosion" of the purchaser-seller rule. *Id.* at 755.  The Court explained that it did "not believe that such a shifting and highly fact-oriented disposition of the issue of who may bring a damages claim for violation of Rule 10b-5 is a satisfactory basis for a rule of liability imposed on the conduct of business transactions." *Id.*

The Supreme Court has since reaffirmed that the judicially-created private right of action under Section 10(b) must be narrowly construed.  *See Stoneridge Inv. Partners,*

---

[8]     The Court noted that "[t]hree principal classes of potential plaintiffs" are barred by its adoption of the *Birnbaum* rule:

> First are potential purchasers of shares, either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was.  Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material.  Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5.  It has been held that shareholder members of the second and third of these classes may frequently be able to circumvent the Birnbaum limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities.

*Blue Chip*, 421 U.S. 737–38.  The Court notes that only shareholders of the issuer in question can bring a derivative action on behalf of the issuer.

*LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008) ("Concerns with the judicial creation of a private cause of action caution against its expansion. . . . the § 10(b) private right should not be extended beyond its present boundaries.") (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1085 (1991)).

### (i) <u>The Second and Ninth Circuits Weigh In.</u>

In recent years, both the Second and the Ninth Circuit Courts of Appeal have had occasion to consider the purchaser-seller rule as articulated in *Blue Chip* in the context of a merger. In *Menora*, the plaintiffs -- shareholders of International Flavors & Fragrances Inc. ("IFF") – alleged that, prior to the IFF's merger with Frutarom Industries Ltd. ("Frutarom"), Frutarom made materially misleading statements about its compliance with anti-bribery laws, which were incorporated into IFF's public regulatory filings. *Menora*, 54 F.4th at 84. The plaintiffs, seemingly recognizing the statutory standing limitations imposed by *Blue Chip*, argued that they had "standing because there was a sufficiently 'direct relationship' between Frutarom's misstatements about itself and the price of IFF's shares." *Id.* at 86.

The Second Circuit categorically rejected this argument, calling it "meritless." *Id.* "[A]dopting Plaintiffs' 'direct relationship' test for standing would begin exactly the 'endless case-by-case erosion' of the purchaser-seller rule about which *Blue Chip Stamps* warned." *Id.* at 87. Under such a test, "standing would be a 'shifting and highly fact-oriented' inquiry, requiring courts to determine whether there was a sufficiently direct link between one company's misstatements and another company's

stock price." *Id.* Accordingly, the *Menora* court reaffirmed the purchaser-seller rule as set forth in *Blue Chip*, holding that "[t]he purchaser-seller rule requires plaintiffs to have bought or sold the security about which a misstatement was made in order to have standing to sue under Section 10(b)." *Id.* at 86. "In short, Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold the securities about which the misstatements were made." *Id.* at 88.

*Lucid Motors* involved similar allegations of misstatements made in advance of an anticipated merger. 110 F.4th at 1185. The court emphasized that the Second Circuit in *Menora* was "the *only* circuit court to have considered Section 10(b) standing in [this] context." *Id.* (emphasis added). *Lucid Motors* agreed with *Menora* "that the *Birnbaum* Rule and *Blue Chip* limit Section 10(b) standing to purchasers and sellers of the security about which the alleged misrepresentations were made." *Id.* The *Lucid Motors* plaintiffs "ignore[d] the plan language of *Blue Chip* and assert[ed] that Section 10(b) standing extends to any stockowner who claims that the misstatements of another person or company negatively affected the value of the owner's stock." *Id.* at 1186. The Ninth Circuit rejected this argument, reasoning that the plaintiffs' "interpretation of the securities laws would vastly expand the boundaries of Section 10(b) standing and contradict the express limiting purpose of the *Birnbaum* Rule." *Id.* The plaintiffs' interpretation would also "require courts to determine 'whether the security plaintiff purchased is sufficiently *connected* to the misstatement'

30

on a case-by-case basis," which is precisely "the fact-intensive inquiry that the Supreme Court expressly rejected" in *Blue Chip*. *Id.*

### (ii) The Third Circuit Would Follow the Standing Limitations in *Blue Chip*, *Menora*, and *Lucid Motors*

Despite the sound reasoning set forth in *Menora* and *Lucid Motors*, Plaintiffs contend that this Court may not follow these decisions because of "controlling Third Circuit law holding that Plaintiffs can assert Section 10(b) claims in the precise circumstances here." [Pls.' Supp. Opp'n at 22.] The Court disagrees.

As a preliminary matter, this Court agrees with the Second and Ninth Circuits that neither *Menora* nor *Lucid Motors* created new law. *See Lucid Motors*, 110 F.4th at 1185 ("we endorse and apply the bright-line rule that we think is commanded by Supreme Court precedent in *Blue Chip*."); *Menora*, 54 F.4th at 88 n.7 (rejecting concurrence's position that the opinion "create[s] new law"). At most, these decisions applied the bright line rule set forth in *Blue Chip* to the context of a merger. Indeed, the Supreme Court itself recognized that the purchaser-seller rule "limits the class of plaintiffs to those who have at least dealt in the security *to which* the prospectus, representation, or omission *relates*." *Blue Chip*, 421 U.S. at 747 (emphasis added); *see also id.* at 742 (the purchaser-seller rule "permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the *stock in question*." (emphasis added)). Under *Blue Chip* alone, the Court finds that Plaintiffs – as purchasers and sellers of First Horizon securities only – do not have standing to sue TD Bank for its misstatements unless those statements were *about First Horizon*.

Regardless, there is no binding Third Circuit precedent that precludes this Court from routinely applying the holdings of *Menora* and *Lucid Motors* to the case before it. First, Plaintiffs cherry-pick this language from the Third Circuit's decision in *Deutschman v. Beneficial Corp.*: "The only standing limitation recognized by the Supreme Court with respect to section 10(b) damage actions is the requirement that the plaintiff be a purchaser or seller of a security." 841 F.2d 502, 506 (3d Cir. 1988). But the paragraph continues and explains that while "plaintiffs need not be in any relationship of privity with the defendant charged with misrepresentation," the purchaser-seller rule "limited 'the class of plaintiffs to those who have at least dealt in the security *to which the prospectus, representation, or omission relates*." *Id.* (quoting *Blue Chip*, 421 U.S. at 745, 747). The dispute in *Deutschman* centered on whether the plaintiff – a purchaser of call options on stock issued by the defendant corporation – was properly considered a purchaser or seller for purposes of Section 10(b). The Third Circuit found that he was. *Id.* at 506–07. Accordingly, the plaintiff had standing as a member of the limited class of plaintiffs "who have at least dealt in the security to which the [alleged misrepresentation] relates." *See id.* at 506. The facts and issues in *Deutschman* in no way resemble those in the case at bar or before the *Menora* and *Lucid Motors* courts. Accordingly, the Court sees nothing in the Third Circuit's decision in *Deutschman* that is inconsistent with *Menora*, *Lucid Motors*, or this Court's own interpretation of the purchaser-seller rule as articulated by *Blue Chip*.

32

Next, Plaintiffs rely upon the Third Circuit's decision in *Cendant*, 223 F.3d 165, claiming that this decision is directly on point and forecloses the application of *Menora* and *Lucid Motors* here. But their reliance on *Cendant* falls. The *Cendant* plaintiffs were a class of individuals who purchased shares of American Bankers Insurance Group, Inc. ("ABI") common stock during a tender offer by defendant Cendant Corporation ("Cendant"). They did not purchase Cendant stock or tender shares of ABI stock to Cendant. *Id.* at 169. These plaintiffs alleged that Cendant made misrepresentations about itself that artificially inflated the price at which the plaintiffs purchased their ABI shares and that the plaintiffs suffered a loss when the misrepresentations were disclosed and the merger was terminated. *Id.*

True, the fact pattern in *Cendant* is similar to the case before it. Critically, however, *Cendant* did not address statutory standing or the purchaser-seller rule at all, relevant here. Instead, it focused on a separate requirement of a Section 10(b) claim, namely that the alleged misrepresentation be "in connection with" the purchase or sale of a security. *Id.* at 174–77. The defendants argued that "the alleged misrepresentations must speak directly to the investment value of the security that is bought or sold, and that they must have been made in with the specific purpose or objective of influencing an investor's decision." *Id.* at 174. The plaintiffs, in turn, argued that "the 'in connection with' requirement is satisfied whenever a misrepresentation was made in a manner that is reasonably calculated to influence the investment decisions of market participants." *Id.*

The Third Circuit resolved the dispute as to the contours of the "in connection with" requirement by looking to then-recent decisions of the Second and Ninth Circuits. *Id.* at 175–76 (citing *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 955–56 (2d Cir. 1993); *McGann v. Ernst & Young*, 102 F.3d 390, 391–92 (9th Cir. 1996)). These cases, as summarized by the Third Circuit, "held that, where the fraud alleged involves the public dissemination of information in a medium upon which an investor would presumably rely, the 'in connection with' element may be established by proof of the materiality of the misrepresentation and the means of its dissemination." *Cendant*, 223 F.3d at 176. "[I]t is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants." *Id.* The Third Circuit adopted "the materiality and public dissemination approach" and held that the plaintiffs "may establish the 'in connection with' element simply by showing that the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated." *Id.*

Indeed, the Second Circuit expressly considered *Cendant* and found plaintiffs' reliance on it to be "unavailing." *Menora*, 54 F.4th at 88 n.6 (citing *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 33 (2d Cir. 2004)). This Court agrees with the Second Circuit in *Menora* and *Nortel* that "the [*Cendant*] opinion never explicitly addressed the standing requirement of Rule 10b-5, and this limits its persuasiveness," and rejects Plaintiffs' argument that *Cendant* is contrary

34

controlling law on this question. *Nortel*, 369 F.3d at 33; *see also Menora*, 54 F.4th at 88

n.6. Nor does the Court find that *Cendant* "presents a compelling argument in favor

of standing." *Nortel*, 369 F.3d at 33.[9]

    The Court will not read an implicit ruling on statutory standing into *Cendant*.

*Cendant* plainly did not address the purchaser-seller rule or statutory standing.

Nor was it required to do so. Whereas constitutional standing is a "threshold

jurisdictional requirement" that courts must examine, *see George v. Rushmore Serv. Ctr.,*

*LLC*, 114 F.4th 226, 234 (3d Cir. 2024), this is not the case with statutory standing.

*See In re CarLotz, Inc. SEC. Litig.*, 2024 WL 3924708, at *2 (S.D.N.Y. Aug. 23, 2024)

(citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir.

---

[9]    Plaintiffs also note that "at least one court in this Circuit has already rejected their argument as contrary to controlling Third Circuit law." [Pls.' Supp. Opp'n at 23 (citing *Levy v. Luo*, 2025 WL 437022, at *5 (D. Del. Feb. 7, 2025).] *Levy* is a report and recommendation that has not yet been adopted by the District Court. In *Levy*, the magistrate judge in *Levy* examined *Menora* and *Lucid Motors* and determined that they were "in contravention of current controlling precedent," namely *Blue Chip*, *Cendant*, and *Deutschman*. Respectfully, this Court disagrees. *Levy* described the holding of *Blue Chip* as one related to the requirement that the alleged fraud be "in connection with the purchase [or] sale' of securities," *id.*, which it plainly was not. *Levy* also erroneously relied on *Cendant*'s rulings regarding the "in connection with" requirement to determine that Third Circuit precent precluded application of the separate statutory standing requirement as articulated by the Second and Ninth Circuits. *See id.* at *5 n.3. The decision also claimed that the Act must be "construed flexibly, not technically and restrictively." *Id.* at *5 (citing *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002)). But this was, again, in the context of explaining that "the SEC has consistently adopted a broad reading" of the "in connection with" requirement. *Zandford*, 535 U.S. at 819. It is true that the Supreme Court has endorsed a "broad interpretation" of the "in connection with" requirement. *See Merrill Lynch*, 547 U.S. at 85. It has, however, chosen to narrowly construe "the purchaser-seller rule as a distinct, judicially implied limitation on Section 10(b)'s private right of action." [TD Supp. Reply at 2 (citing *Blue Chip*, 421 U.S. at 740).]

2016)).  The Court emphasizes that the purchaser-seller rule and the "in connection with" requirements are distinct elements, each with their own governing body of case law.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84 (2006) ("The *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b–5—not to define the words 'in connection with the purchase or sale.'"); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 284 (1992) ("The purchaser/seller standing limitation in Rule 10b–5 damages actions thus does not stem from a construction of the phrase 'in connection with the purchase or sale of any security.'").[10]  Plaintiffs essentially urge this Court to rule on statutory standing relying on the *absence* of such a ruling in *Cendant*.  The Court will not do so.[11]

---

[10]    Notably, the law review article upon which Plaintiffs rely to criticize *Menora* and *Lucid Motors* recognized that "the 'in connection with' requirement is a separate element from the standing inquiry."  Marc I. Steinberg & Antonio R. Partida, *Undue Limitations in the Section 10(b) Purchaser-Seller Requirement*, 99 Tul. L. Rev. 1, n.151 (2024).  And, despite examining *Cendant*, the scholars specifically noted that no circuit split exists after *Menora* and *Lucid Motors*.  *Id.* at 30.

[11]    The Court is similarly unpersuaded by the other cases cited by Plaintiffs.  None of the opinions addressed the purchaser-seller rule or the question of statutory standing.  *See, e.g.*, *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939 (3d Cir. 1985); *Chabot v. Walgreens Boots All., Inc.*, 2023 WL 2908827 (M.D. Pa. Mar. 31, 2023) *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 311 (D. Del. 2001); *In re ValueVision Int'l Inc. Sec. Litig.*, 896 F. Supp. 434, 443 (E.D. Pa. 1995).  Plaintiffs' reliance on *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022), fares no better.  The *Turquoise Hill* court expressly found that the non-issuer defendant's "misstatements [were] not 'self-referential,'" but actually "statements directly about the operation of [the issuer's] project."  *Id.* at 202.  The *Turquoise Hill* defendants subsequently moved for an order certifying interlocutory review, which the court denied, finding that its decision was "perfectly aligned with the Second Circuit's subsequent decision in" *Menora*.  Civ. No. 20-08585, Docket No. 181 (Oct. 24, 2022).

**(b)** *Plaintiffs Lack Standing to Pursue Their Misstatement Claim Against the TD Defendants Because TD Bank's Alleged Misstatements Are About TD Bank, Not First Horizon*

The Court believes that when presented with the issue this Court confronts here, the Third Circuit, elaborating upon *Cendant* or *Deutschman*, would follow its sister circuits in determining that the narrow judicially-created private of action under Section 10(b) does not extend to Plaintiffs. Prior to the merger and to this day – given that the merger never occurred – TD Bank and First Horizon are "two entirely separate companies." *Id.* at 1187. The Court will not impute TD Bank's alleged misrepresentations *about itself* to First Horizon. Thus, Plaintiffs – as purchasers and sellers of First Horizon securities only – do not have standing to sue TD Bank for its misstatements unless those statements were *about First Horizon*. So, the question before this Court is whether Plaintiffs have pled that TD Bank's alleged misstatements were self-referential or *about First Horizon*.

The Court finds that the TAC alleges only self-referential misstatements by TD Bank. As the TD Defendants rightly point out, the TAC is premised upon TD Bank's alleged misstatements about "TD's interactions with regulators, TD's compliance with regulatory requirements, and TD's expectations regarding the likelihood and timing of regulatory approval for the First Horizon transaction." [TD Supp. Br. at 7.] Indeed, when Plaintiffs sought leave to amend, they characterized their case as one concerning "a series of false and misleading misrepresentations concerning *TD's* anti-money laundering ('AML') practices, the status of *TD's* proposed acquisition of First Horizon, and the related regulatory issues and scrutiny concerning

*TD's* AML practices." [Pls.' Ltr. at 1 (Docket No. 61).] The bulk of the new allegations in the TAC relates to *TD Bank's* AML and BSA compliance programs and *TD Bank's* guilty plea. [*See, e.g.*, TAC ¶¶ 124–28, 179–89, 203–05.]

Plaintiffs essentially contend that TD Bank's alleged misstatements – about its own regulatory compliance and its own commitment to the merger – were actually about First Horizon because they were made in the context of the pending merger. [*See* Pls.' Supp. Opp'n at 27–29.] But this is nothing more than a veiled attempt to relitigate the "direct relationship" and "sufficiently connected" tests that were expressly rejected by *Menora* and *Lucid Motors* respectively. The test advocated for by Plaintiffs "would begin exactly the 'endless case-by-case erosion' of the purchaser-seller rule about which *Blue Chip Stamps* warned." *Menora*, 54 F.4th at 87 (quoting *Blue Chip*, 421 U.S. at 755). "The Supreme Court adopted a bright-line rule for standing—even at the risk of it being 'arbitrary' in some cases—to avoid" such an outcome. *Lucid Motors*, 110 F.4th at 1186 (citing *Blue Chip*, 421 U.S. at 738–39). Adhering to this rule, the Court will not engage in an endless inquiry "to determine whether there was a sufficiently direct link between [TD Bank's] misstatements and [First Horizon's] stock price." *Menora*, 54 F.4th at 87. Plaintiffs appeal to joint press releases and First Horizon's SEC filings. [Pls. Supp. Opp'n at 28.] But this does not change the Court's analysis. *Menora*, 54 F.4th at 87. In adopting the purchaser-seller rule, the Supreme Court expressly sought to avoid this "shifting and highly fact-oriented" inquiry. *Blue Chip*, 421 U.S. at 755.

"[T]he relevant inquiry is not whether Plaintiff purchased a security that was *affected* by an alleged misrepresentation, but rather whether the purchased security was the *subject* of the misrepresentation." *Butala v. Owlet, Inc.*, 2024 WL 4560173, at *3 (C.D. Cal. Sept. 26, 2024) (emphasis in original) (citing *Lucid Motors*, 110 F.4th at 1186). The mere fact that the alleged misstatements were made in the context of the merger does not transform TD Bank's self-referential comments about its own "legal, regulatory, AML and BSA compliance" into statements about First Horizon. [*See* TAC ¶ 302.] *See Lucid Motors*, 110 F.4th at 1186. Even TD Bank's comments regarding its commitment to the merger and the timeline for obtaining regulatory approval for the merger are not *about* First Horizon. These types of statements are simply "a variant of the 'sufficiently connected' statutory standing test," firmly rejected by *Lucid Motors*. *Butala*, 2024 WL 4560173, at *3; *see also Water Island Event-Driven Fund v. MaxLinear, Inc.*, 2024 WL 3974758, at *5 (S.D. Cal. Aug. 28, 2024) (statements about one company's "evaluation of the benefits of the merger" and that company's "continued commitment to the merger's success" were not statements about merger partner); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *6 (S.D.N.Y. Mar. 29, 2024) (statements by one company about itself made in the context of a pending merger and directed to merger partner's shareholders were not about merger partner).

Plaintiffs allege that TD Bank essentially "spoke for" First Horizon on the merger. [TAC ¶ 304.] But, that allegation must be read in context and so, as the TD Defendants note, "[t]hat theory is belied by the immediately preceding paragraph of the TAC" [TD Br. at 12], which details various statements expressly made by First

Horizon to its shareholders about the merger.  [TAC ¶ 303.]  In essence, this is simply another attempt to impute TD Bank's statements to First Horizon merely by virtue of their relationship as merger partners.  The Court, once again, rejects this under *Menora* and *Lucid Motors*.

> ### (c) Plaintiffs Lack Standing to Pursue Their Scheme Liability Claim Against the TD Defendants Because It Is No More Than a Repackaged Misstatement Claim

The Court finds that Plaintiffs' attempt to recast their Section 10(b) claim as one for scheme liability does not save the day.  A scheme liability claim turns not on deceptive statements, but deceptive conduct.  *See DVI*, 639 F.3d at 643 n.29.  While *Menora* and *Lucid Motors* do not expressly address statutory standing to bring a scheme liability claim, at least one court has held that "where the challenged conduct relies principally on an alleged misstatement to meet the elements of a scheme claim, Plaintiffs may proceed with their suit only if they 'purchased or sold the securities about which the alleged misrepresentations were made.'"  *HBK Master Fund L.P. v. MaxLinear, Inc.*, 2025 WL 20438, at *5 (S.D. Cal. Jan. 2, 2025) (quoting *Lucid Motors*, 110 F.4th at 1186); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 404 (S.D.N.Y. 2005) (dismissing scheme liability claim for lack of standing, reasoning that "[i]t is axiomatic that in order to have standing, 'a 10b–5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the . . . deceptive conduct.") (quoting 2 Thomas Lee Hazen, *The Law of Securities Regulation* § 12:7[1] (5th ed. 2005); citing, among others, *Blue Chip*, 421 U.S. at 754–55; *Birnbaum*, 193 F.2d at 463–64).  "To conclude otherwise would

undermine the purchaser-seller rule, allowing a plaintiff to proceed with 10(b) scheme liability where they otherwise could not under a misrepresentation theory for the exact same liability imposing misrepresentation." *HBK*, 2025 WL 20438, at *5. This Court agrees.

The TAC does not distinguish between Plaintiffs' misstatement claim under Rule 10b-5(b) and their scheme liability claim under Rule 10b-5(a) and (c). Instead, these claims are bundled together under Count I, captioned "Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants." [TAC at 258.] It does include, however, a subsection entitled "Defendants' Acts in Furtherance of Defendants' Scheme to Defraud Investors in violation of Section 10(b) Specifically Under Rules 10b-5(a) and (c)." [*Id.* at 259.] Plaintiffs claim that "Defendants created the false impression and expectation that TD was in compliance with its AML and BSA obligations, and that the merger would obtain regulatory approval and close." [*Id.* ¶ 441.] This "false impression and expectation" was allegedly created by filing the merger application and working with regulators to accomplish the merger without disclosing TD Bank's AML deficiencies [*id.* ¶ 442] and concealing its willfully inadequate AML and BSA programs and money laundering activities [*id.* ¶¶ 443–45]. Plaintiffs claim that the TD Defendants engaged in "an aggressive and misleading public relations campaign to garner" approval for the merger and failed to disclose the regulatory obstacles facing the merger. [*Id.* ¶¶ 446, 448–49.] These allegations are just various ways of saying that TD Bank allegedly misstated its regulatory compliance and the likelihood of obtaining regulatory approval for the merger. This is nothing

more than a repackaged misstatement claim. The Court will not permit Plaintiffs to circumvent the standing requirement set forth in *Blue Chip* and clarified in *Menora* and *Lucid Motors* by packaging and labeling its misstatement claim as a scheme liability claim. Accordingly, because Plaintiffs rely "principally on [TD Bank's] alleged misstatements to meet the elements of [their] scheme claim," Plaintiffs do not have standing to pursue this claim against the TD Defendants unless the alleged misstatements were about First Horizon. *HBK*, 2025 WL 20438, at *5. Plaintiffs have not alleged that TD Bank's misstatements were about First Horizon. Thus, Plaintiffs lack standing to pursue their scheme liability claims against the TD Defendants.

Accordingly, Count I of the TAC is dismissed in its entirety against the TD Defendants for lack of standing.

### 2. Plaintiffs Fail to Allege a Strong Inference of Scienter, Requiring Dismissal of their Section 10(b) Claims Against the FH Defendants

The Court's analysis of Plaintiffs' Section 10(b) claims against the FH Defendants begins – and ends – with scienter. All claims under Section 10(b) and Rule 10b-5, namely both misstatement and scheme liability claims, require a showing of scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) ("To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (internal citation omitted); *see also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. June 5, 2020) (setting forth elements of Section 10(b) scheme liability claim, including scienter). In other words, failure to

adequately alleged a strong inference of scienter on the part of the FH Defendants dooms Plaintiffs' Section 10(b) claims.

This requires a plaintiff to show that the defendant acted either: (1) intentionally—that is, "a mental state embracing intent to deceive, manipulate, or defraud," *see Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 319), or (2) recklessly—that is, under circumstances showing "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," *see In re Ikon Office Sols., Inc.*, 277 F.3d 658, 667 (3d Cir. 2002) (quoting *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000)).

A plaintiff may establish a strong inference of scienter where he alleges facts showing either directly or circumstantially that (1) defendants had both a motive and opportunity to commit the fraud; or (2) conscious misbehavior or recklessness. *Roofer's*, 687 F. Supp. 3d at 617 (citing *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *14 (D.N.J. Aug. 17, 2005)). To establish reckless or conscious misbehavior, a plaintiff must show that defendants either: (1) "egregious[ly] refused to see the obvious, or [failed] to investigate the doubtful," or (2) had "knowledge of facts or access to information contradicting their public statements such that defendants knew or should have known that they were misrepresenting material facts related to the corporation." *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *12 (D.N.J. Aug. 17, 2005) (quoting *Novak v. Kasaks*, 216 F. 3d 300, 308 (2d. Cir. 2000)). Critically, "[i]n analyzing scienter, [courts must] consider 'not only inferences urged by the plaintiff

. . . but also competing inferences rationally drawn from the facts alleged." *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017) (quoting *Tellabs*, 551 U.S. at 314).

The Court first notes that the TAC is full of group pleading, which is impermissible under the PLSRA's heightened pleading requirements. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) (holding that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."). The Court recites but a few examples of this widespread problem. Plaintiffs claim that "Defendants" – without specifying which – "secretly worked to scuttle a confidential DOJ investigation and regulatory scrutiny into TD's AML violations." [TAC ¶ 1.] Paragraphs later, Plaintiffs allege that "Defendants were told regulators would reject it precisely because of TD's AML failures." [*Id.* ¶ 4.] Later, Plaintiffs plead that "TD's admissions and its regulators' findings establish that Defendants' statements during the Class Period were materially false and misleading." [*Id.* ¶ 24.] And Plaintiffs claim that "Defendants knew that the merger could not be approved" after TD Bank met with the OCC. [*Id.* ¶ 157.] And the TAC devotes an entire section to scienter allegations as to all Defendants, which improperly lumps the TD and FH Defendants throughout. [*Id.* ¶¶ 271–76.]

Yet none of these allegations allege specific facts regarding the FH Defendants in particular. Rather, they attempt to impute – via impermissible group pleading – the actions of the TD Defendants onto the FH Defendants. The Court rejects this attempt. Plaintiff cannot rely on these vague group allegations to establish scienter on the part of the FH Defendants. *See, e.g.*, *City of Southfield Fire & Police Ret. Sys. v. Hayward*

*Holdings, Inc.*, 2024 WL 4370833, at *7 (D.N.J. Oct. 2, 2024) ("Plaintiff improperly alleges scienter by group pleading."); *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *19 (D.N.J. Aug. 8, 2011) ("broad statements about 'Defendants'—whether it be their knowledge, access to information, involvement in the manipulation of clinical trials, or other circumstances that might give rise to a strong inference of scienter" do not "meet the pleading requirements of the PSLRA.").

The Court now turns to the TAC's allegations specifically regarding the FH Defendants.[12] While the Court discusses each of the alleged facts bearing on the FH Defendants' scienter for purposes of clarity and completeness, it has "heeded *Tellabs'* command to evaluate [Plaintiffs'] allegations collectively rather than individually." *Avaya*, 564 F.3d at 280; *see also Tellabs*, 551 U.S at 322–23 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). In considering each allegation in turn, the Court has "added it to the picture painted by the previously considered allegations and asked: How does this addition affect the relative strength of the culpable and non-culpable inferences?" *Avaya*, 564 F.3d at 280.

---

[12]     They are few and far between. While the TAC spans 483 paragraphs of allegations, the section dedicated to allegations of scienter as to the FH Defendants is confined to just nine paragraphs. [TAC ¶¶ 291-99.] A handful of other allegations expressly related to the FH Defendants are sprinkled throughout the TAC. [*See, e.g.*, TAC ¶¶ 272, 364.]

### *Information Sharing Provisions*

Plaintiffs first point to the information sharing provisions in the Merger Agreement, which required TD Bank to "'promptly advise [First Horizon] with respect to substantive matters that [we]re addressed in any meeting or conference' with any regulatory authority concerning the merger." [TAC ¶ 12.]   The Merger Agreement also required TD Bank to keep First Horizon "apprised of the status of matter relating to completion" of the merger.  [*Id.* ¶ 292.]  Based on these provisions, the TAC alleges that "[t]here is no question that First Horizon and its most senior executives knew either that TD's AML/BSA compliance was gravely deficient, or that they had been fully and contemporaneously informed of the status of regulatory meetings with TD and their import concerning regulators' increasing refusal to approve the merger." [*Id.* ¶ 291; *see also id.* ¶ 293.]

But this is no more than an unsupported conclusion.  Plaintiffs have nowhere alleged that TD Bank in fact did keep the FH Defendants apprised of its meetings with regulators or its concerns about obtaining regulatory approval.  The "who, what, when, where and how," required by the applicable heightened pleading standard, is entirely missing.  *See Rockefeller*, 311 F.3d at 217.  And any inference TD Bank in fact shared this information pursuant to these provisions is strongly undermined by Plaintiffs' simultaneous allegations that TD Bank breached its obligations under the Merger Agreement and paid First Horizon a $200 million fee to avoid liability for its breaches.  [TAC ¶¶ 167, 288.]  Further undercutting any culpable inference that can be drawn from the information sharing provisions is the fact that CSI – which would

46

cover information regarding TD Bank's interactions with its regulators – could not be shared with the FH Horizon Defendants, both by statute, *see* 5 U.S.C. § 552(b)(8), and contract.  [Merger Agreement § 9.14.]

### Contact with TD Bank Executives

Next, Plaintiffs allege that "TD's senior management was in close contact with First Horizon's throughout the pendency of the First Horizon merger" and that First Horizon's CEO, Defendant Jordan, "was a longtime personal friend of Defendant Masrani [TD Bank's CEO], and communicated with him frequently about the transaction as it was occurring."  [TAC ¶¶ 295, 298.]  But nowhere does the TAC allege specifically when or what they spoke about, let alone that they spoke about TD Bank's AML deficiencies and regulatory concerns.  These allegations are vague and conclusory at best.

### Magnitude of TD Bank's AML Deficiencies

Next, Plaintiffs allege that "the size and scope of TD's criminal misconduct support scienter," not just on the part of the TD Defendants, but also the FH Defendants.  [*Id.* ¶¶ 271–72.]  According to Plaintiffs, "the scale of TD's AML violations made it impossible for First Horizon to be unaware of TD's AML deficiencies."  [*Id.* ¶ 272.]  Plaintiffs allege that TD Bank's "AML violations were so egregious, pervasive, and systemic that 'suspicious activity' at the Bank 'was obvious even to the casual observer,'" and, therefore, First Horizon must have been aware or willfully blind to these issues.  [*Id.* ¶ 26.]  But this language is selectively quoted from TD Bank's plea agreement, which described a specific individual's "suspicious

activity" as "obvious even to the casual observer" and included a surveillance photograph showing this open and obvious activity.  [Plea Agreement, Attachment A ¶ 50 (Docket No. 61-4).]  There is no allegation that First Horizon would have been privy to what was happening in individual TD Bank locations.

What's more, any inference of scienter that could be drawn from the magnitude of TD Bank's regulatory issues is severely weakened by the competing allegations that TD Bank "actively concealed" these problems from regulators for years.  [TAC ¶¶ 133; *see also id.* ¶¶ 246, 248, 280.]  Plaintiffs cannot have it both ways.  It simply strains credulity to claim that TD Bank was able to dupe several government regulators – in both the United States and Canada – over the course of a decade even though its regulatory compliance deficiencies were so "open and obvious to a casual observer." Without more, the Court cannot infer scienter – either conscious misbehavior or recklessness – on the part of the FH Defendants from this.[13]

---

[13]    Plaintiffs also fault the First Horizon Defendants for not speaking up during the Class Period and correcting TD Bank's alleged misrepresentations.  The TAC alleges that "First Horizon effectively held TD out as the sole spokesperson to investors for the merger and its regulatory progress" in choosing to enter "quiet period" during which it "deliberately issued very few public statements concerning the merger." [TAC ¶ 297.]  But rather than support an inference of scienter, this simply *assumes* that the FH Defendants knew of the falsity of TD Bank's statements – even by Plaintiffs' own admission.  [*Id.* (alleging that First Horizon let TD Bank speak on its behalf "despite *knowing* that TD was repeatedly making glaring material misrepresentations to investors.").

*Due Diligence*

Plaintiffs claim that First Horizon conducted insufficient due diligence prior to entering into the Merger Agreement, which shows that they were recklessly and willfully blind to TD Bank's AML deficiencies. Defendant Dmuchowski, First Horizon's CFO, described its due diligence as "a little bit chaotic," which Plaintiffs equate with "cursory." [TAC ¶ 251.] As disclosed to its shareholders, the due diligence period lasted thirty days, which Plaintiffs describe as "an unheard-of short amount of time in which to do proper due diligence." [*Id.* ¶¶ 251–52.]

But "rote allegations" that defendants "must have had knowledge of the 'true facts' based on their supervision of the due diligence investigation" does not meet the heightened pleading requirement of the PSLRA. *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 2002 WL 33934282, at *23 (D.N.J. June 26, 2002). And "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at *20. The TAC does not allege what specifically was done or not done during the due diligence period that would make it inadequate. Nor does it allege what information was made available to First Horizon or what it supposedly overlooked. "[V]ague, conclusory allegation[s] that [the FH Defendants] must have been aware of" TD Bank's regulatory deficiencies "through partaking in due diligence does not suffice." *California Pub. Employees' Ret.*

*Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004).[14]  And, as the Court has already found, given the extensive allegations regarding TD Bank's active concealment of its AML deficiencies, these bare allegations do not support an inference that First Horizon could have discovered these issues during its diligence.

The TAC also sets forth certain alleged statements from an unnamed First Horizon compliance employee, identified as FE1, which Plaintiffs claim support an inference of scienter.  According to FE1, "First Horizon did not allocate sufficient time and resources to conduct adequate due diligence on TD."  [TAC ¶ 252.]  And "from what FE1 heard from fellow First Horizon employees," TD Bank's regulatory compliance program was far inferior to First Horizon's and that the post-merger entity would have to rely on First Horizon's program instead.  [*Id.* ¶ 253.]  FE1's unnamed

---

[14]     Plaintiffs allege that First Horizon "bargained for and obtained deal terms that protected its interests in the event regulators rejected the merger," and insinuate that this is somehow suggestive of scienter.  [TAC ¶ 299.]  These protective deal terms provide that "the base merger consideration of $25 per share would increase by $0.65 per share . . . if the merger did not close" within the original timeframe and that TD Bank would make a $493 million investment in convertible First Horizon stock, which First Horizon would keep even if the merger did not close.  [*Id.*]  Plaintiffs conclude that these were "highly unique" terms that "support a strong inference that [the FH Defendants] possessed highly material nonpublic information about TD's regulatory risks that were not shared with the investing public."  [*Id.*]  But in the same breath, Plaintiffs recognize that TD Bank's CEO considered these "customary terms." [*Id.*]  The Court does not find these terms to support an inference of scienter in the least.  Business transactions require give and take on the part of both counterparties and responsible hedging of risks.  As all parties recognize here, "the most critical issue facing" the merger was "obtaining regulatory approval for the transaction."  [*Id.* ¶ 6; *see also id.* ¶ 274.]  Without more, these allegations support only the inference that First Horizon was attempting to minimize risk for its shareholders.

supervisor was allegedly "shocked by TD's approach to BSA and AML."  [*Id.* ¶ 256.] FE1 also felt that First Horizon's due diligence was "initially rushed."  [*Id.*]

These allegations do not change this Court's conclusion.  "[T]he Third Circuit [has] held that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail." *In re PDI Sec.*, 2006 WL 3350461, at *5 (D.N.J. Nov. 16, 2006) (citing *Chubb*, 394 F.3d at 146).  The TAC does no such thing.  Rather, it describes a broken game of telephone that attempts to masquerade "she-said-that-he-said-that-she-said" claims as facts supporting scienter.  *Id.* at *27. "[T]he narrow rule on admissibility of confidential sources' statements is not meant to open the Court's floodgate to exponential layers of hearsay."  *Id.*  Instead, the "rigid specificity test set forth by the Third Circuit in *Chubb*" is to ensure there is a basis for the source's personal knowledge.  *Id.*  There is no allegation that FE1 was personally involved in the merger or any of the meetings mentioned.  Rather, FE1's account is based on other unnamed individuals' secondhand impressions.  These allegations do not support a strong inference of scienter, even when considered together with the TAC's other allegations.  *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (affirming dismissal where confidential source did not have firsthand knowledge of meetings described); *In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *10 (D.N.J. July 2, 2019) (finding that confidential source's "testimony amounts to nothing more than second-hand retelling and generalized rumor, neither of which

provides value in trying to infer scienter" where plaintiff did not allege that source "was personally involved in the transaction" or "had first-hand knowledge.").

### Insider Stock Sales

Finally, the TAC alleges that certain First Horizon executives made suspicious stock sales that evidence their scienter. Specifically, the TAC alleges that Defendant Jordan sold $2.3 million of First Horizon shares on February 24, 2023, pursuant to a Rule 10b5-1 insider trading plan adopted in September 2022. [TAC ¶¶ 254, 260.] Plaintiffs claim that Defendant Jordan's stock sale is suspiciously timed given that it occurred just two days after the OCC scheduled a call with TD Bank executives and outside counsel. [*Id.* ¶ 259.] The TAC also claims that First Horizon's former chairman "sold twice as many shares during the Class Period as compared to the 15 months prior, for total proceeds of $12.66 million," approximately a quarter of his total holdings, and that First Horizon's COO and President of Specialty Banking sold approximately 20% and 25% of their holdings respectively in November 2022. [*Id.* ¶¶ 261–62.] First Horizon's Chief Risk Officer sold roughly a third of her holdings, totally around $1 million on two dates, once in April 2022 and again in February 2023, just days before the parties disclosed an extension of the deal closing timeline. [*Id.* ¶ 263.] First Horizon's Chief Banking Officer sold roughly $3.5 million in shares in May 2022. [*Id.* ¶ 264.] Aside from Defendant Jordan, none of these executives is named as a defendant in this suit. Defendant Dmuchowski is not alleged to have made any insider sales.

Fraudulent intent is not properly inferred "from the mere fact that some officers sold stock." *Avaya*, 564 F.3d at 279 (quoting *Advanta*, 180 F.3d at 540). "But if the stock sales were unusual in scope or timing, they may support an inference of scienter." *Id.* Plaintiffs contend that these sales are highly suspicious because "no insider would logically 'sell any shares in the open market, especially below the merger price of $25' unless they knew the truth—that the merger was at grave risk of being denied regulatory approval." [TAC ¶ 296.] But this is speculation. This speculation is highlighted by First Horizon's reply with an explanation that contrasts Plaintiffs' nefarious one – namely, that these insiders sought to hedge against the disclosed risk associated with the Merger. [FH Br. at 29.] *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 613 (E.D. Pa. 2009) (finding inference of scienter to be "neither cogent nor at least as compelling as the plausible nonculpable inferences offered by the defendants."). Indeed, as Plaintiffs recognize, the "regulatory regime" at the time the Merger was announced "was less friendly toward M&A activity," particularly "larger bank mergers." [TAC ¶ 59.]

Notably, aside from Defendant Jordan, the other First Horizon executives are not named as defendants. The Court does not view their sales to be "relevant to evaluate the scienter of [the FH] Defendants." *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *11 (E.D. Pa. Sept. 27, 2010) (collecting cases). The fact that Defendant Dmuchowski did not make any sales further undermines any inference of scienter. *See id.* The only insider sale by a Defendant in this case is Defendant Jordan's single sale on February 24, 2023 resulting from the exercise of

existing stock options that were about to expire the following week.  [*See* FH Br. Ex. 8 (Docket No. 48-10).]  Sales pursuant to stock options generally do not give rise to an inference of scienter.  *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("The [Third] Circuit, however, has recognized that stock options are commonly an important part of compensation packages, and refused to impute scienter based on sales of such shares.") (citing *Advanta*, 180 F.3d at 541).  The Court sees no reason to deviate from this rule.

Even considering the sales of each of the listed executives, the Court notes that each is alleged to have retained the vast majority of their holdings.  This, too, undermines any inference of scienter.  *See Avaya*, 564 F.3d at 279 (insider stock sales did not support inference of scienter where each defendant "retained a large percentage of his common stock holdings"); *Party City*, 147 F. Supp. 2d at 313 ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages.").  "Far from supporting a 'strong inference' that [the FH insiders] had a motive to capitalize on artificially inflated stock prices, these facts suggest they had every incentive to keep [First Horizon] profitable." *Advanta*, 180 F.3d at 540–41 (considering insider defendant's decision "hold a sizable percentage" of shares).  That certain insiders sold more shares than in prior time periods – both alone and in combination with the other inferences that can be drawn from the pleadings – is insufficient to establish unusual trading practices support this claim.

Likewise, the timing of the sales is not unusual. For example, the Chief Banking Officer's sales in May 2022 were made six months prior to when Plaintiffs claim the "merger began to unravel" in November 2022. [TAC ¶ 4.] And the sales by the other non-defendant executives almost exclusively took place at least six months before the Merger was terminated in May 2023.[15] This is simply too attenuated to support any inference of scienter. *Kenexa*, 2010 WL 3749459, at *10 (timing of trade "counsel[ed] against an inference of scienter" where was made six months in advance of corrective disclosure); *Party City*, 147 F. Supp. 2d at 313 (finding sales twelve, four, and three months before disclosure too attenuated and noting that "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter.").

The Court does not find the isolated sales of a handful of First Horizon executives – most of whom who are not even parties to this litigation – to support an inference of scienter on the part of the FH Defendants.

———————————

The Court has considered each of these allegations as part of the overall "picture painted" and evaluated the additive effect of each on "the relative strength of the culpable and non-culpable inferences." *See Avaya*, 564 F.3d at 280. Taken collectively, these allegations simply do not give rise to a strong inference of scienter

———————————

[15] The Chief Risk Officer sold shares on two dates: April 27, 2022 and February 2, 2023. The FH Defendants show that 89% of her sales took place in April 2022 – thirteen months prior to the Merger's termination – and just 11% in February 2023. [FH Br. Ex. 9 (Docket No. 48-11).]

on the part of the FH Defendants.  "[S]cienter must 'not rest on a bare inference that a defendant 'must have had' knowledge of the facts.'"  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 285 (D.N.J. 2007) (quoting *Advanta*, 180 F.3d at 539).  And that is fundamentally Plaintiffs' argument here.  The allegations against the FH Defendants amount merely to an accusation that "they-must-have-known" because TD Bank and First Horizon executive spoke regularly about the merger, First Horizon conducted due diligence ahead of the merger, and TD Bank's AML deficiencies were widespread and pervasive.  *See Fain*, 707 F. App'x at 96 (rejecting a "'they-must-have known' type inference" where "Plaintiff's scienter arguments boil down to the assertion that Defendants must have known about [misrepresentations]," given their positions and "the obvious nature of the error").  But the facts alleged do not support this inference. And the isolated, limited insider sales add no facts supporting scienter to this picture.

Accordingly, the Court finds that Plaintiffs have not adequately pled a strong inference of the FH Defendants' scienter as required to sustain its misstatement and scheme liability claims under Section 10(b) and Rule 10b-5.  Count I is dismissed in its entirety against the FH Defendants.

### B.    Section 14(a) Claim

The Court now turns to Count II of the TAC, in which Plaintiffs assert a claim under Section 14(a) of the Exchange Act against all Defendants on behalf of all First Horizon shareholders who held common stock as of April 20, 2022 and were entitled

to vote on the merger. Plaintiffs claim that the Proxy and documents incorporated into the Proxy unlawfully contained misstatements and/or omissions of material fact.

Under Section 14(a), it is "unlawful for any person . . . to solicit . . . any proxy" in violation any rule promulgated under the Exchange Act. 15 U.S.C. § 78n(a)(1). Rule 14a-9 prohibits proxy solicitations from "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). "The purpose of Section 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in a proxy solicitation." *Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964)).

To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must adequately allege that (1) a proxy statement contained a material misrepresentation or omission that (2) caused the plaintiff injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials was "an essential link in the accomplishment of the transaction." *Id.* (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970); *Ash v. GAF Corp.*, 723 F.2d 1090, 1092–93 (3d Cir. 1983)).

### 1. Plaintiffs Have Statutory Standing to Sue the TD Defendants Under Section 14(a)

The TD Defendants first attack Plaintiffs' Section 14(a) on statutory standing grounds.[16]  Section 14(a) is designed to protect "only interest-holders with voting rights."  *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 229 (5th Cir. 1994) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1106–08 (1991)).  As a result, according to the TD Defendants, Plaintiffs cannot bring Section 14(a) claims against them because Plaintiffs were not "interest-holders with voting rights" in TD Bank.  [TD Br. at 15.]  Plaintiffs argue that this position is based on the "false premise that Plaintiffs must be 'interest-holders with voting rights' in TD, as the 'defendant company.'"  [Pls.' Opp'n at 73.]  The Court agrees.

The statute prohibits "*any* person" from making misleading statements or omissions in a proxy solicitation.  15 U.S.C. § 78n(a) (emphasis added).  And the purpose of this prohibition is to protect the corporate voting process from deception by "management *or others*."  *Cathcart*, 980 F.2d at 932 (emphasis added); *see also Shaev v. Saper*, 320 F.3d 373, 378 (3d Cir. 2003) (Section 14(a) claim protects interference with "fair corporate suffrage.").  Indeed, *7547 Corp.*, the case upon which the TD Defendants primarily rely, does not address who the proper defendants are or the

---

[16]    The TD Defendants do not raise this argument in their supplemental briefing. The Court does not consider this argument – or any other not expressly abandoned – to be waived simply because it was not renewed in the supplemental submissions. The Court directed Defendants "only to supplement their previously filed motion papers, as necessary, rather than file new potentially duplicative motions."  [Docket No. 70.]

relationship between the plaintiffs and defendants.  *See* 38 F.3d at 229–30 (plaintiffs lacked standing where they were not the limited partners whose votes were required to approve transaction).[17]  Rather, *7547 Corp.* merely reinforces the rule that only interest-holders with voting rights on the transaction at issue in the proxy materials. *Id.* (citing *Virginia Bankshares*, 501 U.S. at 1106–08 (holding that Section 14(a) claims cannot be asserted by shareholders whose votes are not required on the transaction)).

As Plaintiffs rightly note, all the other cases relied upon by the TD Defendants also stand for this uncontroversial requirement.  [Pls.' Opp'n at 74.]  *See, e.g.*, *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *12 (E.D. Va. Sept. 4, 2020) ("only stockholders who were entitled to vote on a transaction have standing under § 14(a)."); *Murray v. Hosp. Corp. of Am.*, 682 F. Supp. 343, 348 (M.D. Tenn. 1988) (parties who sold stock before proxy statement issued could not vote on transaction in question and lacked standing to bring Section 14(a) claims; *Wulc v. Gulf & W. Indus., Inc.*, 400 F. Supp. 99, 104 (E.D. Pa. 1975) (holder of "options rights without suffrage rights" lacked standing).  Put plainly, there is no support for the TD Defendants'

---

[17]    In refusing to expand standing to allow plaintiffs who are not entitled to vote on the transaction at issue in the proxy to sue under Section 14(a), the *7547 Corp.* court reasoned that finding otherwise would "open a Pandora's box" by extending standing to "disappointed potential merger partners, disgruntled employees, etc."   38 F.3d at 230.  The TD Defendants claim that "Plaintiffs here are precisely 'disappointed potential merger partners' of TD and therefore lack standing.  [TD Br. at 16.]  This misunderstands the concern.  The "disappointed potential merger partners" here would be TD Bank itself or *its* shareholders – parties who were *not* entitled to vote on the Merger.

position that the ability to assert a Section 14(a) is contingent on the plaintiffs having voting rights in the defendant.[18]

For these reasons, the Court finds that Plaintiffs have statutory standing to assert claims under Section 14(a) and Rule 14a-9 against the TD Defendants. The Court now turns to the Defendants' remaining challenges to the Section 14(a) claim.[19]

### 2. Plaintiffs Have Failed to Allege Causation as Required to Plead a Claim under Section 14(a)

Defendants challenge Plaintiffs' Section 14(a) claim for failure to allege causation. As noted above, Plaintiffs must establish that "the proxy solicitation itself, rather than the particular defect in the solicitation materials was an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970); *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007).

---

[18]    As Plaintiffs point out, the Third Circuit has permitted voting shareholders of a target company to assert a Section 14(a) claim against the acquiring company. *See Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713–15 (3d Cir. 2020). The court did not evaluate statutory standing or the question the TD Defendants now pose and, therefore, while persuasive, *Jaroslawicz* alone is not a controlling on the issue. That being said, unlike in the context of Plaintiffs' Section 10(b) claim discussed above, this decision is consistent with Supreme Court precedent and the statute's goal of protecting the integrity of the corporate voting process. *See J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (Section 14(a) aims to protect "fair corporate suffrage"); *In re Penn Cent. Sec. Litig.*, 367 F. Supp. 1158, 1174 (E.D. Pa. 1973) ("The purpose of § 14(a) is to protect the integrity of the corporate voting process.").

[19]    The Court also notes that to succeed on their Section 14(a) claim, Plaintiffs need to show that the TD Defendants made material misstatements or omissions in the proxy statement. *See Jaroslawicz*, 962 F.3d at 710–15 (target's shareholders adequately pled that acquirer made material omissions in joint proxy statement."). The Court does not opine on whether Plaintiffs have adequately alleged this and, as explained in detail below, Plaintiffs' Section 14(a) claims fail on other grounds.

The transaction for which shareholder approval was required must be "the direct cause of the pecuniary injury for which recovery is sought." *Cathcart*, 980 F.3d at 933.

Defendants argue that because the Merger was never consummated, it cannot be the direct cause of Plaintiffs' injuries. [TD Br. at 37–39; TD Supp. Br. at 21–22; FH Br. at 38; FH Supp. Br. at 21–22.] The Court agrees. The seminal case on Section 14(a) – indeed, the case that first found an implied cause of action under Section 14(a) – stated in no uncertain terms that the only question before it was whether the statute "authorizes a federal cause of action for rescission or damages to a corporate stockholder with respect to a *consummated merger* which was authorized pursuant to the use of a proxy statement alleged to contain false and misleading statements violative of s 14(a) of the Act." *Borak*, 377 U.S. at 428 (emphasis added); *see also Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 298 (3d Cir. 2007).

"[A] damage claim under Section 14(a) must arise out of corporate action taken pursuant to a proxy statement." *Rediker v. Geon Indus., Inc.*, 464 F. Supp. 73, 81 (S.D.N.Y. 1978). If the transaction is never consummated, no such corporate action has been taken and the claim fails. *Id.* at 82; *see also Heil v. Lebow*, 1993 WL 15032, at *3 (S.D.N.Y. Jan. 13, 1993) ("Because the Proposed 1990 Restructuring was not consummated, Plaintiff cannot show the fundamental requirement that the proxy solicitation caused him injury."); *Hoover v. Allen*, 241 F. Supp. 213, 230 (S.D.N.Y. 1965) (Section 14(a) claim dismissed where no "corporate action was taken pursuant to the proxies thus solicited."). Since the Merger here was never consummated, "any alleged misstatement or omissions in the proxy statement could not have injured

61

[Plaintiffs] in [their] rights of corporate suffrage." *Rediker*, 464 F. Supp. at 82; *see also Hoover*, 241 F. Supp. at 230 ("The fact that the piece of paper upon which the allegedly misleading statements appeared was a proxy statement is irrelevant to the damage claimed" and insufficient alone to state Section 14(a) claim).

Plaintiffs feebly argue that the operative transaction for purposes of this claim is not the Merger itself, but the shareholder vote on the Merger Agreement. [Pls.' Opp'n at 75; Pls.' Supp. Opp'n at 67–68.]   The Court disagrees.   The very language of the Supreme Court's decision in *Mills* makes plain that the shareholder vote to approve a transaction cannot itself be the operative transaction.   *See Mills*, 396 U.S. at 384 ("This requirement that the defect have a significant propensity to affect the voting process is found in the express terms of Rule 14a-9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, *or so unrelated to the transaction for which approval is sought*, that correction of the defect or imposition of liability would not further the interests protected by [Section] 14(a).") (emphasis added).   "[I]t is clear the *Mills* Court considered the 'transaction' as separate from the 'approval' the shareholder vote provides for such a transaction." *Jaroslawicz*, 2024 WL 474846, at *24.

In the alternative, Plaintiffs argue that the operative transaction is the entire Merger Agreement, which was consummated through its termination, and that closing was not required.   [Pls.' Opp'n at 75; Pls.' Supp. Opp'n at 67.]   Plaintiffs cite no case law that supports their theory that termination of the Merger Agreement constitutes "consummation" of the transaction.   Instead, Plaintiffs rely primarily on *Jaroslawicz*,

which made "a fact-specific determination regarding the scope of the transaction" and found that closing was not required to state a Section 14(a) claim in that context. 2024 WL 474846, *24–26. The *Jaroslawicz* plaintiffs alleged damages from reductions in share prices due to public disclosures of regulatory concerns throughout the pendency of the merger. *Id.* at *26. The court found that plaintiffs who had sold their shares before the merger closed still stated a claim even though closing had not yet occurred. *Id.* But the merger at issue in *Jaroslawicz* did in fact close.

Moreover, *Jaroslawicz* is distinguishable and not controlling. In this Court's view, *Jaroslawicz* at most stands for the proposition that no bright-line rule prohibits recovery of damages incurred during the pendency of mergers. *Id.* at *26. Indeed, the *Jaroslawicz* plaintiffs sought damages for interim reductions in share price, whereas Plaintiffs do not. Plaintiffs instead seek to recover stock drop damages caused by the Merger's termination. And, as the Court has already noted, *Jaroslawicz* did not involve a terminated merger agreement; the merger did eventually close. The decision is also inconsistent with the bulk of cases finding that a transaction that has not yet closed cannot be the *cause* of a plaintiff's injury. *See, e.g.*, *In re Pattern Energy Grp. Inc., Sec. Litig.*, 2023 WL 2655537, at *4 (D. Del. Mar. 27, 2023); *In re Willis Towers Watson PLC*

*Proxy Litig.*, 2020 WL 5361582, at *12 (E.D. Va. Sept. 4, 2020); *Heil*, 1993 WL 15032, at *3; *Rediker*, 464 F. Supp. at 82; *Hoover*, 241 F. Supp. at 230.[20]

In *dicta*, the *Jaroslawicz* court expressed concern that a bright-line rule requiring a merger's closing could "significantly undermine the enforceability of Section 14(a) in situations where a misleading proxy eviscerates stockholder value, but the merger never closes due to the merger partner's wrongdoing." 2024 WL 474846, at *26. Based upon this, Plaintiffs urge the Court to expand the implied private right of action under Section 14(a). The Court will not do so. As the Third Circuit has explained, the private cause of action implied under Section 14(a) was created during an "*ancient regime*" and that courts now follow "a far more cautious course" in recognizing rights of action not expressly found in statute. *Jaroslawicz*, 962 F.3d at 709. "Having sworn off the habit of venturing beyond Congress's intent, [this Court] will not accept [Plaintiffs'] invitation to have one last drink." *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). Binding Third Circuit precedent requires that the transaction authorized by the shareholder vote be "the direct cause of the pecuniary injury for which recovery is sought." *Cathcart*, 980 F.2d at 933. If the transaction was never consummated, it cannot be the cause of Plaintiffs' injury. Accordingly, the

---

[20]    Plaintiffs' cases relating to injunctive relief are likewise unpersuasive. [*See* Pls.' Opp'n at 76 (citing cases).] Plaintiffs do not seek this type of relief. Plaintiffs' case, *Wininger v. SI Mgmt., L.P.*, involved a failed merger and permitted plaintiff to recover only damages incurred in connection with corrective disclosures. 33 F. Supp. 2d 838, 845–46 (N.D. Cal. 1998). Plaintiffs have not alleged any such damages here.

Court finds that Plaintiffs' Section 14(a) claim fails because the Merger was never consummated.

Even if closing is not required, Plaintiffs still cannot establish the requisite causation to state a Section 14(a) claim. The Merger must be "the direct cause of the pecuniary injury for which recovery is sought." *Cathcart*, 980 F.2d at 933; *In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *22 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002) (same); *see also Virginia Bankshares*, 501 U.S. at 1099 (misstatements in proxy solicitation must be "responsible for damages claimed *from the merger*") (emphasis added); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017) ("The essential link requirement can only be established when the proxy statement at issue directly authorizes the loss-generating corporate action.") (citations omitted). Yet, as the FH Defendants point out, "there is a fundamental disconnect between shareholders' approval of the merger and the stock-drop damages claimed by Plaintiffs." [FH Br. at 37.] Far from being a "loss-generating" transaction, the Merger – by Plaintiffs' own admission – would have been "highly lucrative" for Plaintiffs. [TAC ¶ 56.] The deal offered Plaintiffs, as First Horizon shareholders, $25 per share, representing a 37% premium over the share price before the Merger was announced. [*Id.*] And, if closing took longer than the original nine months, Plaintiffs stood to receive an additional $0.65 per share. [*Id.*] The market viewed the Merger as "a highly positive development for both companies." [*Id.* ¶ 58.]

Plaintiffs fail to allege "any facts as how [they] sustained damage directly from the approval of the" Merger. *In re NAHC*, 2001 WL 1241007, at *22. This is because

Plaintiffs' alleged damages do not stem from shareholders' approval of the Merger Agreement or the Merger itself, but rather from the Merger's *termination*. [*See, e.g.*, TAC ¶¶ 17 ("First Horizon's stock price plummeted by 33%" when Merger termination was announced), 265 (describing that "First Horizon shares collapsed" after "the deal fell apart"); 411–12 (First Horizon share price was artificially inflated for the duration of the Class Period until it was announced that Merger would not close).[21]

"Even if the proxy contained a misstatement, [P]laintiffs cannot state a claim under Section 14(a) unless the complete transaction was detrimental to the company." *In re Diamond Foods, Inc. Derivative Litig.*, 2012 WL 1945814, at *5 (N.D. Cal. May 29, 2012), *aff'd,* 575 F. App'x 716 (9th Cir. 2014).  Plaintiffs allege that the Merger would have been beneficial to First Horizon and its shareholders and that "it was the loss of the transaction that damaged the company, not approval of it by shareholder[s]."  *Id.* This is insufficient to state a claim under Section 14(a).  *See, e.g., id.*; *Britton v. Parker*, 2009 WL 3158133, at *11 (D. Colo. Sept. 23, 2009) ("One might criticize a company that fraudulently obtains shareholders' proxy votes, but if the corporate actions approved by those fraudulently-obtained votes do not result in harm to the shareholders, there is no liability under § 14(a)."); *Gannon v. Cont'l Ins. Co.*,

---

[21]    Notably, Plaintiffs do not allege that their damages arose due to the *delay* in closing.  [*See* FH Br. at 39 n. 16.]  Their alleged stock-drop damages occurred once Defendants announced that the Merger would not move forward.  The stock price presumably would have suffered even if First Horizon shareholders had voted not to approve the Merger Agreement.

920 F. Supp. 566, 584 (D.N.J. 1996) (causation not adequately pled where plaintiff did not allege that "merger itself was wrongful").

Plaintiffs cannot establish that the shareholder-approved transaction—namely the Merger—caused their alleged injury. The Merger would have been beneficial to Plaintiffs, and it was never consummated. As a result, the Section 14(a) claim set forth in Count II of the TAC is dismissed in entirety against all Defendants.[22]

### C.    Section 20(a) Claim

Section 20(a) allows for controlling person liability for federal securities law violations. Specifically, Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. As a result, Section 20(a) only creates a derivative cause of action that must be predicated on an independent violation of the Exchange Act. *Rockefeller*, 311 F.3d at 211. As the Court finds that Plaintiffs cannot establish an underlying violation of Sections 10(b) or 14(a) against either the TD or the FH Defendants,

---

[22]    Since the Court dismisses the Section 14(a) claims for failure to adequately allege causation, the Court need not address the FH Defendants' argument that Plaintiffs fail to sufficiently allege any misleading statements in the proxy statement. [FH Br. at 39–40.]

Plaintiffs' Section 20(a) claim, set forth in Count III, fails too as a matter of law against all Defendants. *Id.*

## V.    LEAVE TO AMEND

Defendants request that this Court dismiss all claims with prejudice and without leave to amend. The TAC is Plaintiffs' *fourth* opportunity to adequately plead its claims and include all facts pertinent to their case. That being said, this is the first time that the Court has ruled on the adequacy of the pleadings. The Court questions whether Plaintiffs can – in good faith – remedy many of the deficiencies identified by this Court. Surely, if Plaintiffs had a good faith basis to allege, for example, statements by TD Bank that are expressly about First Horizon, they would have done so by now. Nevertheless, the Court will grant Plaintiffs one final opportunity to amend their pleadings and remedy the deficiencies identified in this Opinion if they so choose.

## VI.    CONCLUSION

For the reasons expressed above, the Motions to Dismiss filed by the TD Defendants, Defendants Bowman and Levine, and the FH Defendants will be **GRANTED**. The Third Amended Complaint will be dismissed in its entirety. Plaintiffs shall have thirty (30) days to file an amended complaint. An appropriate Order shall issue separately on this date.

s/Renée Marie Bumb

RENÉE MARIE BUMB
Chief United States District Judge

DATED:  **November 26, 2025**